# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

Civil Action No. _____

RONNIE MAURICE STEWART                    )
1700 Jennifer Road, Apartment 25          )
Lexington, KY 40505                       )
                                          )
GLASSIE MAE KASEY                         )
5414 Robinwood Road                       )
Louisville, KY 40218                      )
                                          )
LAKIN BRANHAM                             )
29 Tie Yard Drive                         )
Dwale, KY 41621                           )
                                          )
SHANNA BALLINGER                          )
1451 West Lincoln Trail Boulevard         )
Apartment 127                             )
Radcliff, KY 40160                        )
                                          )
DAVE KOBERSMITH                           )
105 Leslie Drive                          )
Berea, KY 40403                           )
                                          )
WILLIAM BENNETT                           )
425 Race Street                           )
Lexington, KY 40508                       )
                                          )
SHAWNA NICOLE McCOMAS                     )
1053 Winburn Drive, Apartment 23          )
Lexington, KY 40511                       )
                                          )
ALEXA HATCHER                             )
1875 Bill Dedmon Road                     )
Bowling Green, KY 42101                   )
                                          )
MICHAEL WOODS                             )
SARA WOODS                                )
11692 Main Street, Apartment 2            )
Martin, KY 41649                          )
                                          )
KIMBERLY WITHERS                          )
2220 Devonport Drive, Apartment I38       )

Lexington, KY 40504                            )
                                               )
KATELYN ALLEN                                  )
12 West Adams Lane, Lot 26                     )
Salyersville, KY 41465                         )
                                               )
AMANDA SPEARS                                  )
1070 Jackson Road                              )
Park Hill, KY 41011                            )
                                               )
DAVID ROODE                                    )
331 Montclair Avenue                           )
Ludlow, KY 41016                               )
                                               )
SHEILA MARLENE PENNEY                          )
5410 West Catherine Street                     )
Apartment A                                    )
Louisville, KY 40203                           )
                                               )
QUENTON RADFORD                                )
2501 Montgomery Avenue                         )
Ashland, KY 41101                              )
                                               )
on behalf of themselves and all others simi-   )
larly situated,                                )
                                               )
                  Plaintiffs,                  )
                                               )
        v.                                     )
                                               )
ERIC HARGAN                                    )
ACTING SECRETARY                               )
UNITED STATES DEPARTMENT OF                    )
HEALTH AND HUMAN SERVICES                      )
in his official capacity                       )
200 Independence Avenue, S.W.,                 )
Washington, DC 20201                           )
                                               )
SEEMA VERMA                                    )
ADMINISTRATOR                                  )
CENTERS FOR MEDICARE AND MEDI-                 )
CAID SERVICES                                  )
in her official capacity                       )
7500 Security Boulevard                        )
Baltimore, MD 21244                            )
                                               )

DEMETRIOS L. KOUZOUKAS          )
PRINCIPAL DEPUTY ADMINISTRATOR  )
THE CENTERS FOR MEDICARE AND    )
MEDICAID SERVICES               )
in his official capacity        )
7500 Security Boulevard         )
Baltimore, MD 21244             )
                                )
BRIAN NEALE                     )
DIRECTOR                        )
CENTER FOR MEDICAID AND CHIP    )
SERVICES                        )
in his official capacity,       )
7500 Security Boulevard         )
Baltimore, MD 21244             )
                                )
UNITED STATES DEPARTMENT OF     )
HEALTH AND HUMAN SERVICES       )
200 Independence Avenue, S.W.,  )
Washington, DC 20201            )
                                )
THE CENTERS FOR MEDICARE AND    )
MEDICAID SERVICES               )
7500 Security Boulevard         )
Baltimore, MD 21244             )

     Defendants.

_____

## CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

_____

## PRELIMINARY STATEMENT

1.     This case challenges the efforts of the Executive Branch to bypass the legislative process and act unilaterally to "comprehensively transform" Medicaid, the cornerstone of the social safety net.  Purporting to invoke a narrow statutory waiver authority that allows experimental projects "likely to assist in promoting the objectives" of Medicaid, the Executive Branch has instead effectively rewritten the statute, bypassing congressional restrictions,

overturning a half century of administrative practice, and threatening irreparable harm to the health and welfare of the poorest and most vulnerable in our country.

2. The Medicaid program provides health insurance to more than 75 million low-income people in the United States. Medicaid enables states to provide a range of federally-specified preventive, acute, and long-term health care services to individuals "whose income and resources are insufficient to meet the costs of necessary medical services." As described in more detail below, the core populations covered by Medicaid include (among others) children; pregnant women; the aged, blind, or disabled; and adults with household income of less than 133% of the federal poverty level (currently $33,948 for a family of 4).

3. The program offers a deal for states. If a state chooses to participate in the program, the federal government will contribute the lion's share of the cost of providing care. In return, the state agrees to pay the remaining portion of the costs of care and to follow all federal requirements, including those regarding the scope of coverage and eligibility for the program. States may not impose additional eligibility requirements other than those set forth in the Medicaid Act, and states cannot pick and choose among individuals within a covered population group.

4. The Social Security Act, of which Medicaid is a part, does permit experimental or pilot programs, but only in narrow circumstances, pursuant to a waiver by the Secretary of Health and Human Services, and only if such program is likely to promote the objectives of the Medicaid Act.

5. On August 24, 2016, Kentucky Governor Matt Bevin submitted an application to the Secretary requesting a waiver of various Medicaid Act requirements to implement the "Kentucky HEALTH" project. Kentucky was candid about its goal: it aimed "to comprehensively transform Medicaid." True to its word, the Kentucky HEALTH program sought to radically alter

Medicaid in Kentucky, including by requiring Medicaid enrollees to work in order to receive health insurance and by imposing new and substantial premiums and restrictions.  By the State's own estimate, Kentucky HEALTH would reduce Medicaid enrollment over a five-year period by over 95,000 adults and reduce payments for health care for low income Kentuckians by approximately $2.4 billion.  The Kentucky HEALTH application was subject to state and federal public comment in 2016 and 2017, and the Center for Medicaid Services ("CMS") received over 3,000 comments.

6.     On January 11, 2018, after the comment period closed on the Kentucky HEALTH application, the Director of CMS announced a new approach to Medicaid waivers.  Reversing decades of agency guidance, and consistent with the Director's own expressed view of the need to "fundamentally transform Medicaid," Defendants issued a letter to State Medicaid Directors announcing CMS's intention to, for the first time, approve waiver applications containing work requirements and outlining "guidelines" for states to consider in submitting such applications.

7.     The very next day—January 12, 2018—without seeking or permitting comments on the radical expansion of the Medicaid waiver authority, the Defendants granted the Kentucky HEALTH application, asserting that this grant and Kentucky's imposition of work requirements are consistent with CMS's newly-minted approach set out in its letter to State Medicaid Directors.

8.     The Secretary's issuance of the letter to State Medicaid Directors and approval of Kentucky's request sharply deviate from the congressionally-established requirements of the Medicaid program and vastly exceed any lawful exercise of the Secretary's limited waiver authority.  This change will harm Kentuckians across the state—housekeepers and custodians, ministers and morticians, car repairmen, retired workers, students, church administrators, bank tellers, caregivers, and musicians—who need a range of health services, including check-ups, diabetes treatment, mental health services, blood pressure monitoring and treatment, and vision

and dental care.  The letter and approval of Kentucky's application are unauthorized attempts to re-write the Medicaid Act, and the use of the statute's waiver authority to "transform" Medicaid is an abuse of that authority.  The Defendants' actions here thus violate both the Administrative Procedure Act and the Constitution, and they cannot survive.

## JURISDICTION AND VENUE

9.      This is a class action for declaratory and injunctive relief for violation of the Administrative Procedure Act, the Social Security Act, and the United States Constitution.

10.     The Court has jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. §§ 1331 and 1361 and 5 U.S.C. §§ 702-705.  This action and the remedies it seeks are further authorized by 28 U.S.C. §§ 1651, 2201, and 2202, and Federal Rule of Civil Procedure 65.

11.     Venue is proper under 28 U.S.C. § 1391(b)(2) and (e).

## PARTIES

12.     Plaintiff Ronnie Maurice Stewart is a 62-year-old man who lives in Lexington, Fayette County, Kentucky.  Mr. Stewart is enrolled in the Kentucky Medicaid program.

13.     Plaintiff Glassie Mae Kasey is a 56-year-old woman who lives in Louisville, Jefferson County, Kentucky.  Ms. Kasey is enrolled in the Kentucky Medicaid program.

14.     Plaintiff Lakin Branham is a 20-year-old woman who lives in Dwale, Floyd County, Kentucky with her grandparents.  Ms. Branham is enrolled in the Kentucky Medicaid program.

15.     Plaintiff Shanna Ballinger is a 27-year-old woman who lives in Radcliff, Hardin County, Kentucky with her husband and two sons.  Mrs. Ballinger is enrolled in the Kentucky Medicaid program.

16.     Plaintiff Dave Kobersmith is a 57-year-old man who lives in Berea, Madison County, Kentucky, with his wife Kimberly and their two young sons.  Mr. Kobersmith is enrolled in the Kentucky Medicaid program.

17.     Plaintiff William Bennett is a 47-year-old man who lives in Lexington, Fayette County, Kentucky.  Mr. Bennett is enrolled in the Kentucky Medicaid program.

18.     Plaintiff Shawna Nicole McComas is a 34-year-old woman who lives in Lexington, Fayette County, Kentucky with her husband and four children.  Mrs. McComas is enrolled in the Kentucky Medicaid program.

19.     Plaintiff Alexa Hatcher is a 29-year-old woman who lives in Bowling Green, Warren County, Kentucky.  Ms. Hatcher is enrolled in the Kentucky Medicaid Program.

20.     Plaintiffs Michael "Popjaw" and Sara Woods, aged 52- and 40-years old, respectively, live in Martin, Floyd County, Kentucky.  Mr. and Mrs. Woods are enrolled in the Kentucky Medicaid program.

21.     Plaintiff Kimberly Withers is a 47-year-old woman who lives in Lexington, Fayette County, Kentucky with her husband and two adult children.  Mrs. Withers is enrolled in the Kentucky Medicaid program.

22.     Plaintiff Katelyn Allen is a 27-year-old woman who lives in Salyersville, Magoffin County, Kentucky with her husband and two children.  Mrs. Allen and her family are currently enrolled in the Kentucky Medicaid program.

23.     Plaintiff Amanda Spears is a 33-year-old woman who lives in Park Hill, Kenton County, Kentucky.  Ms. Spears is enrolled in the Kentucky Medicaid program.

24.     Plaintiff David Roode is a 39-year-old man who lives in Ludlow, Kenton County, Kentucky.  Mr. Roode is enrolled in the Kentucky Medicaid program.

25.     Plaintiff Sheila Marlene Penney is a 54-year-old woman who lives in Louisville, Jefferson County, Kentucky.  Ms. Penney is enrolled in the Kentucky Medicaid program.

26.     Plaintiff Quenton Radford is a 20-year-old man who lives in Ashland, Boyd County, Kentucky.  Mr. Radford is enrolled in the Kentucky Medicaid Program.

27.     Defendant Eric Hargan is Acting Secretary of the United States Department of Health and Human Services ("HHS") and is sued in his official capacity.  Defendant Hargan ("the Secretary") has overall responsibility for implementation of the Medicaid program, including responsibility for federal review and approval of state requests for waivers pursuant Section 1115 of the Social Security Act.

28.     Defendant Seema Verma is Administrator of CMS and is sued in her official capacity.  Defendant Verma is responsible for implementing the Medicaid program as required by federal law, including as amended by the Patient Protection and Affordable Care Act.  Secretary Verma recused herself from consideration of the Kentucky HEALTH application because she was a paid consultant with the state of Kentucky and helped design the program.  Nonetheless, the Governor of Kentucky reported that she personally informed him that the application was granted.

29.     Defendant Demetrios L. Kouzoukas is Principal Deputy Administrator of CMS and is sued in his official capacity.  Defendant Kouzoukas is responsible for disposition of all matters, including the Kentucky HEALTH waiver, from which Administrator Verma is recused.

30.     Defendant Brian Neale is the CMS Deputy Administrator and Director for the Center for Medicaid and CHIP Services.  Defendant Neale signed the January 11, 2018 letter to State Medicaid Directors that invited states to submit applications for waiver requests to impose work requirements on Medicaid populations.

31.     Defendant HHS is a federal agency with responsibility for, among other things, overseeing implementation of the Medicaid Act.

32.     Defendant CMS is the agency within HHS with primary responsibility for overseeing federal and state implementation of the Medicaid Act.

## CLASS ACTION ALLEGATIONS

33.     Plaintiffs bring this suit both individually and on behalf of a statewide proposed class of persons similarly situated pursuant to Federal Rule of Civil Procedure 23(a) and (b)(2). The class consists of all residents of Kentucky who are enrolled in the Kentucky Medicaid program on or after January 12, 2018.

34.     The prerequisites of Federal Rule of Civil Procedure 23(a) are met in that:

a.     The class is so numerous that joining all members is impracticable.  The State estimates that hundreds of thousands of adults will be enrolled in Kentucky HEALTH in each year of its demonstration.  Commonwealth of Ky., Kentucky HEALTH: Helping to Engage and Achieve Long Term Health at Attachment A (2017) ("Application Modification"), attached as Exhibit A to this Complaint, at Attachment A.  The class members are geographically dispersed throughout Kentucky, by definition have limited financial resources by virtue of their Medicaid eligibility and enrollment status, and are unlikely to institute individual actions;

b.     There are questions of fact and law, particularly as to the legality of the Defendants' policies and decisions with respect to issuance of the letter to State Medicaid Directors and approval of the Kentucky HEALTH waiver, that are common to all members of the class;

    c.   The claims of the named plaintiffs are typical of the claims of the class; and

    d.   The named plaintiffs and their counsel will fairly and adequately protect the interests of the class. Each plaintiff is an adult resident of Kentucky who is enrolled in the Kentucky Medicaid program and will be subject to the requirements of the Kentucky HEALTH waiver.

35.    The requirements of Federal Rule of Civil Procedure 23(b)(2) are met in that the Defendants have acted or refused to act on grounds that apply generally to the class, making final declaratory and injunctive relief appropriate with respect to the class as a whole.

<b>STATUTORY AND REGULATORY BACKGROUND</b>

**A.**    **The Medicaid Program**

36.    Title XIX of the Social Security Act establishes the cooperative federal-state medical assistance program known as Medicaid. *See* 42 U.S.C. §§ 1396 to 1396w-5. Medicaid's stated purpose is to enable each state, as far as practicable, "to furnish [] medical assistance" to individuals "whose income and resources are insufficient to meet the costs of necessary medical services" and to provide "rehabilitation and other services to help such families and individuals attain or retain capability for independence or self-care." *Id*. § 1396-1.

37.    Although states do not have to participate in Medicaid, all states have chosen to do so.

38.    Each participating state must maintain a comprehensive Medicaid plan for medical assistance that the Secretary has approved. *Id*. § 1396a. The statute defines "medical assistance" to include a range of health care services that participating states must cover or are permitted to cover at state option. *Id.* § 1396d(a).

8

39.     A state's Medicaid plan must describe its program and affirm its commitment to comply with the requirements imposed by the Medicaid Act (listed at 42 U.S.C. § 1396a *et seq.*) and its associated regulations.

40.     State and federal governments share responsibility for funding Medicaid.  Section 1396b of the Medicaid Act requires the Secretary to pay each participating state the federal share (which is based on the state's relative per capita income) of "the total amount expended . . . as medical assistance under the State plan." *Id*. §§ 1396b(a)(1), 1396d(b).

## B.     Medicaid Eligibility and Coverage Requirements

41.     Using household income and other specific criteria, the Medicaid Act delineates who is eligible to receive Medicaid coverage.  *Id*. § 1396a(a)(10)(A), (C).  The Act contains required coverage groups as well as options for states to extend Medicaid to additional population groups.  *Id.*

42.     States participating in Medicaid must provide medical assistance to individuals who meet the eligibility standards applicable to required coverage groups (so-called "mandatory populations").  *Id.* § 1396a(a)(10)(A)(i).

43.     To be eligible for federal Medicaid funding, states must cover, and may not exclude from Medicaid, individuals who: (1) are part of a mandatory population group; (2) meet the minimum financial eligibility criteria applicable to that population group; (3) are residents of the state in which they apply; and (4) are U.S. citizens or certain qualified immigrants.  *Id*. §§ 1396a(a)(10)(A), 1396a(b)(2), (3); 8 U.S.C. §§ 1611, 1641.

44.     The mandatory Medicaid population groups include children; parents and certain other relatives (who are not elderly, blind, or disabled); pregnant women; the elderly, blind, or

disabled; and individuals under age 26 who were in foster care until age 18 ("former foster care youth").  42 U.S.C. § 1396a(a)(10)(A)(i).

45.     In 2010, Congress passed, and the President signed, comprehensive health insurance reform legislation, the Patient Protection and Affordable Care Act ("ACA").  Pub. L. No. 111-148, 124 Stat. 119 (2010), as amended by the Health Care and Education Reconciliation Act of 2010, Pub. L. No. 111-152, 124 Stat. 1029.  "The Act aims to increase the number of Americans covered by health insurance and decrease the cost of health care."  *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 538 (2012).

46.     As part of its effort to ensure comprehensive health insurance coverage, Congress amended the Medicaid Act to add an additional mandatory population group.  Effective January 1, 2014, the Medicaid Act requires states to cover adults who are under age 65, not eligible for Medicare, do not fall within another Medicaid eligibility category, and have household income below 133% of the federal poverty level ("FPL").  42 U.S.C. § 1396a(a)(10)(A)(i)(VIII), 1396a(e)(14).  This group is often called the "expansion population," and it includes adults in a variety of family circumstances: parents living with children (whose income exceeds the state-established limit for the mandatory parents/caretaker relatives population group); parents of older children who have left the home; and adults without children.

47.     States receive enhanced federal reimbursement for medical assistance provided to the Medicaid expansion population: 94% federal dollars in 2019, and 90% for 2020 and each year thereafter.  *Id.* § 1396d(y).

48.     The Supreme Court's decision in *National Federation of Independent Business v. Sebelius* barred HHS from terminating Medicaid funding to states that choose not to extend Medicaid coverage to the expansion population.  567 U.S. 519.

49.     States that choose to cover the expansion population submit state plan amendments electing to provide this coverage.   To date, 31 states, including Kentucky, and the District of Columbia have approved state plans covering the expansion population.

50.     Once a state elects to expand coverage to the expansion population, it becomes a mandatory coverage group.

51.     As noted above, the Medicaid Act also allows states to extend Medicaid eligibility to certain optional population groups, including children and pregnant women with incomes between 133% and 185% of FPL, *see* 42 U.S.C. § 1396a(a)(10)(A)(ii)(IX), limited-income aged, blind, and/or disabled individuals receiving home and community-based services, *id.* § 1396a(a)(10)(A)(ii)(VI), and "medically needy" individuals who would fall within a mandatory population but for excess income, *id.* § 1396a(a)(10)(C).

52.     The Medicaid Act requires a participating state to cover *all* members of a covered population group.   In other words, the state may not cover subsets of a population group described in the Medicaid Act.   *See id.* § 1396a(a)(10)(B).   This requirement applies to optional and mandatory population groups: if a state elects to cover an optional group, it must cover all eligible individuals within that group.   *Id.*

53.     States cannot impose additional eligibility requirements that are not explicitly allowed by the Medicaid Act.   *See id.* § 1315(a)(10)(A).

54.     The Medicaid Act requires states to "provide such safeguards as may be necessary to assure that eligibility … and such care and services will be provided, in a manner consistent with simplicity of administration and the best interests of the recipients."   *Id.*  § 1396a(a)(19).

55.     In addition to addressing *who* is eligible for medical assistance, the Medicaid Act delineates how states must make and implement eligibility determinations to ensure that all eligible

people who apply are served and get coverage. States must determine eligibility and provide medical assistance to all eligible individuals with "reasonable promptness." Social Security Amendments of 1965, Pub. L. No. 89-97, § 1902(a)(8), 79 Stat. 286, 344 (codified at 42 U.S.C. § 1396a(a)(8)); 42 C.F.R. § 435.912(c)(3) (requiring states to determine eligibility within 90 days for individuals who apply on the basis of disability and 45 days for all other individuals).

56.     In addition, the Medicaid Act requires states to provide retroactive coverage to individuals who have been determined eligible to ensure that low-income individuals can obtain timely care and avoid incurring medical debts. Social Security Amendments of 1965, Pub. L. No. 89-97, § 1905(a), 79 Stat. 286, 351 (codified at 42 U.S.C. §§ 1396a(a)(34), 1396d(a)). Specifically, states must provide medical assistance for care provided in or after the third month before the month of application, as long as the enrollee would have been eligible for Medicaid at the time the services were received. 42 U.S.C. §§ 1396a(a)(34), 1396d(a).

57.     When re-determining the eligibility of current Medicaid enrollees, states must follow certain procedures to ensure continuity of coverage for eligible individuals. Among other requirements, states must complete the renewal process on the basis of information available to the agency (for example through state or federal data sources), without seeking additional information from the individual, if possible. Otherwise, the state must provide the enrollee with a pre-populated eligibility renewal form and at least 30 days to return the form. It then must timely reconsider (without a new application) the eligibility of an individual who was terminated for failure to submit the renewal form or necessary information, but who then submitted the form within 90 days after termination. *See* 42 C.F.R. § 435.916(a)(3).

58.     The Medicaid Act sets forth mandatory services that participating states must include in their Medicaid programs and optional services that participating states may include in their Medicaid programs.  42 U.S.C. §§ 1396a(a)(10)(A), 1396d(a).

59.     States must ensure that Medicaid enrollees have necessary transportation, often referred to as non-emergency medical transportation ("NEMT"), to and from Medicaid services. *See* 42 U.S.C. § 1396a(a)(4); 42 C.F.R. § 431.53.

60.     The Medicaid Act also establishes the states' options for imposing premiums and cost sharing on enrollees.  To ensure affordability, the Act permits states to impose premiums and cost sharing only in limited circumstances.

61.     Congress amended the Medicaid Act in 1982 to remove the substantive premium and cost sharing provisions from 42 U.S.C. § 1396a, amend them, and place them in a new provision, Section 1396*o*.  Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. No. 97-248, 96 Stat. 324, 367.

62.     As a result of that amendment, Section 1396a, which generally lists the requirements that a state plan must satisfy, provides that "enrollment fees, premiums, or similar charges, and deductions, cost sharing, or similar charges" may be imposed "only as provided in section 1396*o*." 42 U.S.C. § 1396a(a)(14).

63.     With respect to premiums, Section 1396*o* of the Medicaid Act provides that "no enrollment fee, premium, or similar charge will be imposed under the plan (except for a premium imposed under subsection (c))."  *Id*. § 1396*o*(a)(1).  Subsection (c), in turn, authorizes certain premiums, but generally prohibits a state from imposing any premiums on individuals whose income falls below 150% of the federal poverty line.  *Id.* § 1396*o*(c)(1).

64.     Section 1396o-1, which Congress passed in 2006 to give states additional flexibility to impose premiums and cost sharing on enrollees, likewise prohibits a state from imposing any premiums on individuals with household income below 150% of FPL.  Deficit Reduction Act of 2005, Pub. L. No. 109-171, 120 Stat. 4, 82 (codified at 42 U.S.C. § 1396o-1(b)(1)(A)).

65.     Nothing in Section 1396o or 1396o-1 gives the Secretary authority to waive these limits on premiums.

66.     The Medicaid Act permits states to impose cost sharing, defined as a "deduction, copayment, or similar charge," on program beneficiaries only in limited circumstances.  42 U.S.C. § 1396o-1; *see also id.* § 1396o.

67.     No deduction, copayment, or similar charge may be imposed except as provided under Sections 1396o and 1396o-1.

68.     For non-emergency use of the emergency room, the Medicaid Act generally allows states to charge individuals with household income below 150% of FPL a deduction, copayment, or similar charge up to twice the "nominal" amount, as determined by the Secretary in regulations. *Id*. § 1396o-1(e).  The regulations set this amount at $8, subject to increases for inflation.  42 C.F.R. § 447.54; *see* 42 U.S.C. § 1396o-1(e)(4)(A) (defining non-emergency services).  To implement such cost sharing, a state must meet several conditions.  First, any individual subject to the charge must have an alternate non-emergency services provider "actually available and accessible."  42 U.S.C. §§ 1396o-1(e)(1)(A), 1396o(a)(3).  Second, the hospital must conduct a screening (required under the Emergency Medical Treatment and Active Labor Act) to determine that the individual does not need emergency services.  Third, before providing the non-emergency services and imposing the cost sharing, the hospital must inform the individual of the cost sharing obligation; provide the name and location of an "actually available and accessible" alternate non-

emergency services provider who can provide the services without cost sharing; and provide a referral to coordinate scheduling with that alternate provider. *Id*. § 1396*o*-1(e)(1)(B).

69.     The Secretary's authority to waive the limits on deductions, cost sharing, or similar charges is tightly circumscribed and applies only to a project that:

(1) will test a unique and previously untested use of copayments,

(2) is limited to a period of not more than two years,

(3) will provide benefits to recipients of medical assistance which can reasonably be expected to be equivalent to the risks to the recipients,

(4) is based on a reasonable hypothesis which the demonstration is designed to test in a methodologically sound manner, including the use of control groups of similar recipients of medical assistance in the area, and

(5) is voluntary, or makes provision for assumption of liability for preventable damage to the health of recipients of medical assistance resulting from involuntary participation.

*Id.* § 1396*o*(f)(1)-(5).

## C.     The Secretary's Section 1115 Waiver Authority

70.     Section 1115 of the Social Security Act grants the Secretary authority to waive a state's compliance with certain requirements of the Medicaid Act under certain conditions. *Id*. § 1315.

71.     The Secretary may grant a Section 1115 Medicaid waiver only in the case of an "experimental, pilot, or demonstration project which . . . is likely to assist in promoting the objectives" of the Medicaid Act. *Id*. § 1315(a).

72.     The Secretary may only waive the requirements of Section 1396a for Section 1115 waivers relating to Medicaid. *Id*. § 1315(a)(1).

73.     The Secretary may not waive compliance with requirements that Congress has placed outside of Section 1396a.

74.     The Secretary may grant a Section 1115 waiver only to the extent and for the period necessary to enable the state to carry out the experimental, pilot, or demonstration project. *Id*.

75.     The Secretary must follow certain procedural requirements before he may approve a Section 1115 project. *Id*. § 1315(d); 42 C.F.R. §§ 431.400-431.416.  In particular, after receiving a complete application from a state (following a state-level public comment period), the Secretary must provide a 30-day public notice and comment period.  42 U.S.C. § 1315(d); 42 C.F.R. § 431.416.

76.     The Secretary does not have the authority to waive compliance with other federal laws, such as the United States Constitution, the Americans with Disabilities Act, or other federal statutes.

77.     For example, the Fair Labor Standards Act ("FLSA") requires that all individuals, including individuals receiving public benefits, be compensated at least the minimum wage in exchange for hours worked.  *See* 29 U.S.C. § 206(a)(1)(C); Dep't of Labor, *How Workplace Laws Apply to Welfare Recipients* at 2  (1997),  http://nclej.org/wp-content/uploads/2015/11/ LaborProtectionsAndWelfareReform.pdf.  Notably,  the  Supplemental  Nutrition  Assistance Program ("SNAP") and Temporary Assistance for Needy Families ("TANF") statutes specifically refer to work requirements and further describe how the benefits interact with the FLSA minimum wage protections.  *See* 7 U.S.C. § 2029(a)(1) (SNAP); 42 U.S.C. § 607 (TANF).  In contrast, there is no such reference or description in the Medicaid Act.  And, according to the Department of Labor, medical assistance, unlike SNAP and TANF cash benefits, may not be substituted for a wage.  *See How Workplace Laws Apply to Welfare Recipients* at 4.

### D.     Medicaid in Kentucky

78.     Kentucky, like all other states, has elected to participate in Medicaid.   The Kentucky Cabinet for Health and Family Services, Department for Medicaid Services ("DMS"),

16

administers the program at the state level.  *See* Ky. Rev. Stat. Ann. §§ 205.510-205.50; 907 Ky. Admin. Regs. 1:005-23:020e.

79.     Effective January 1, 2014, Kentucky amended its state Medicaid plan to include the Medicaid expansion group—*i.e.*, adults who are not elderly, disabled, or pregnant; do not fit into another Medicaid (or Medicare) eligibility category; and have household income below 133% of FPL.

80.     By the end of 2014, over 375,000 Kentuckians had enrolled in Medicaid through the expansion.  *See* Deloitte Development LLC, Commonwealth of Ky., *Medicaid Expansion Report 2014*, at 10 (2015) ("*Medicaid Expansion Report*"), http://jointhehealthjourney.com/ images/uploads/channel-files/Kentucky_Medicaid_Expansion_One-Year_Study_FINAL.pdf. The proportion of low-income adults in Kentucky without insurance coverage plummeted over the course of the year, from 35% to under 11%. Joseph A. Benitez et al., *Kentucky's Medicaid Expansion Showing Early Promise on Coverage and Access to Care*, 35 Health Affairs 528 (2016). Enrollment has continued to grow, albeit at a slower pace, with data as of April 2016 indicating that over 428,000 individuals had access to medical assistance as a result of Medicaid expansion. Commonwealth of Ky., Kentucky HEALTH: Helping to Engage and Achieve Long Term Health 4 (2016) ("Application"), https://www.medicaid.gov/Medicaid-CHIP-Program-Information/By-Topics/Waivers/1115/downloads/ky/ky-health-pa.pdf, attached as Exhibit B to this Complaint.

81.     Large numbers of these individuals have made use of their Medicaid coverage, receiving critical preventive care and treatment.  In 2014 alone, over 232,000 enrollees in the expansion population had a non-annual office visit, almost 160,000 received medication monitoring, over 89,000 had their cholesterol tested, over 80,000 received preventive dental services, and 13,000 sought treatment for a substance use disorder.  Medicaid Expansion Report

at 50, 68.  Also, 26,000 women in the expansion population received breast cancer screenings, and 34,000 were screened for cervical cancer.  *Id.* at 68.  As a result of Medicaid expansion, hospitals' uncompensated care costs were $1.15 billion lower in the first three quarters of 2014 than during the same time period in 2013.  *Id*. at 35.

82.     Medicaid expansion in Kentucky has been associated with a variety of positive health outcomes, including increased use of preventive services, decreased reliance on the emergency room, fewer skipped medications due to cost, lower out-of-pocket spending on medical services, and improved self-reported health.  Benjamin D. Sommers et al., *Changes in Utilization and Health Among Low-Income Adults After Medicaid Expansion or Expanded Private Insurance*, 176 JAMA Internal Med. 1501, 1505-06 (2016).

83.     Although initial estimates predicted that the Medicaid expansion would create about 7,300 jobs in health care and related fields, the expansion created more than 12,000 in the first year of implementation alone.  Medicaid Expansion Report at 27-28.

**E.     The Kentucky HEALTH Program**

84.     After more than two years of implementation of the Medicaid expansion under the state Medicaid plan and without a waiver, on August 24, 2016, Kentucky Governor Matt Bevin submitted an application to the Secretary requesting a waiver of various Medicaid Act requirements, pursuant to Section 1115, to implement the Kentucky HEALTH project.  The application presented Kentucky HEALTH as "the terms under which the Commonwealth will continue Medicaid expansion."  Ex. B, Application at 4.

85.     The application declared that, in implementing Kentucky HEALTH, the State "seeks to comprehensively transform Medicaid."  *Id*. at 14.

18

86.     The State described Kentucky HEALTH as an initiative not just "to empower individuals to improve their health and gain employer sponsored coverage or other commercial health insurance coverage," but also to ensure the financial stability of Kentucky's Medicaid program.  *Id*. at 4, 7.

87.     The State estimated that Kentucky HEALTH would save it approximately $2.4 billion over a five-year period, with the savings resulting largely from a reduction in Medicaid enrollment. Ex. A, Application Modification.

88.     The State anticipated that over the course of the Kentucky HEALTH project, more than 95,000 adults would lose Medicaid coverage altogether.  *Id.*

89.     CMS provided a public comment period on the Kentucky HEALTH application from September 8, 2016 through October 8, 2016.  Over 1,800 comments were submitted through the CMS website.  *See* Medicaid.gov, Kentucky HEALTH, https://public.medicaid.gov/connect.ti/ public.comments/view?objectId=1888067.

90.     On July 3, 2017, Governor Bevin proposed modifications to the Kentucky HEALTH application.  Ex. A, Application Modification.  CMS held a public comment period on the proposed modifications from July 3, 2017 to August 2, 2017.  Over 1,200 comments were submitted through the CMS website.  *See* Medicaid.gov, Kentucky HEALTH – Proposed Modifications to Application, https://public.medicaid.gov/connect.ti/public.comments/view? objectId=1891139.

91.     On January 12, 2018, the Secretary approved Kentucky HEALTH through September 30, 2023.  Approval Letter and Special Terms and Conditions ("Approval STCs"), from Demetrios L. Kouzoukas, Principal Dep. Administrator, Ctrs. for Medicare & Medicaid Servs., Ctr. for Medicaid & CHIP Servs. to Adam Meier, Dep. Chief of Staff, Office of Governor Matthew

Bevin (Jan. 12, 2018) (the "Approval"), attached as Exhibit C to this Complaint. The following population groups will be included in Kentucky HEALTH: the Medicaid expansion population; parents and caretaker relatives (who were covered prior to expansion); individuals receiving transitional medical assistance; pregnant women; and former foster care youth. *Id.* at 15.

92.     The Secretary's approval does not indicate what, if any, hypotheses the State will test.

93.     The Secretary's approval does not require Kentucky to obtain CMS approval of detailed operational protocols that will be needed to implement the waivers.

94.     Kentucky plans to begin implementing the majority of the project on July 1, 2018. *Id*. at 7. The key features of Kentucky HEALTH are described below.

<u>Rewards and Deductible Accounts</u>

95.     The State designed Kentucky HEALTH to resemble a high-deductible commercial health plan. Ex. B, Application at 9-10.

96.     As such, all enrollees except for pregnant women will have a deductible account. At the beginning of every 12-month eligibility period, the account will have a $1,000 balance. When an enrollee uses non-preventive services, the cost of the services will be deducted from the initial balance. Individuals who have money remaining in their deductible account at the end of the 12-month eligibility period may transfer up to 50% of the balance to a *My Rewards* account. Enrollees will receive monthly account statements detailing the cost of services received and the account balance. Ex. C, Approval STCs at 23.

97.     According to the State, the purpose of the deductible account is to "expose[] members to the cost of healthcare and encourage[] them to act as consumers of healthcare by evaluating cost and quality as they seek care." Ex. B, Application at 28.

98.     The State's fee-for-service payment schedules are already available to enrollees and the public, as are the per-member, per-month payment rates Kentucky Medicaid pays participating managed care organizations ("MCOs").   Thus, on information and belief, the monthly account statement will detail the payments that the MCOs make to each network provider for the non-preventive services utilized by the enrollee the previous month.

99.     In addition, all Kentucky HEALTH enrollees will have a *My Rewards* account to pay for care and services that Medicaid will no longer cover for these enrollees.   Individuals accrue money in the rewards account by engaging in certain "healthy behaviors," completing certain work-related activities (above those required to maintain Medicaid coverage), and not seeking care in the emergency room.   Ex. C, Approval STCs at 24.

100.    In its application, Kentucky listed how much money enrollees can earn for completing various activities.   For example, enrollees can earn: $25 for completing a health risk assessment (one per year); $10 for receiving certain preventive services ($40 maximum per year); $50 for attending certain disease management courses; $25 for completing a job skills training course ($50 maximum per year); $10 per month for completing job search activities; $10 for participating in community service (maximum $50 per year); and $20 for avoiding inappropriate use of the emergency room (one per year).   Ex. B, Application at 29.

101.    Kentucky HEALTH will not cover certain services for individuals in the expansion population (who are not "medically frail") that were previously covered, including vision services, dental services, and over-the-counter medications.   *Id.* at 22-23.   Individuals enrolled in Medicaid through the expansion will use the rewards account to pay for these services.   In addition, Kentucky HEALTH enrollees may use the rewards account to pay for limited fitness-related services, such as a gym membership.   *Id.* at 23.

Work and Community Engagement Requirements

102.    As noted above, the Medicaid Act requires a participating state to cover *all* members of covered population groups.  In other words, the state may not cover only subsets of a population group described in the Medicaid Act.  *See* 42 U.S.C. § 1396a(a)(10)(A)-(B).

103.    This requirement applies to optional and mandatory population groups: if a state elects to cover an optional group, it must cover all eligible individuals within that group.  *Id.*

104.    States cannot impose additional eligibility requirements that are not explicitly allowed by the Medicaid Act.

105.    Kentucky HEALTH adds a new, unprecedented condition of eligibility that is not permitted under the Act.

106.    Kentucky HEALTH enrollees must engage in 80 hours per month of specified employment or community engagement activities and must document and report their participation each month, as a condition of eligibility.  Ex. C, Approval STCs at 32.  The requirement does not apply to pregnant women, former foster care youth, or "medically frail" individuals.  *Id.*  In addition, individuals who meet certain other criteria will be exempt from the requirements or deemed to have met them.  *Id.* at 32-33.

107.    The State described the work requirement as the "cornerstone" of Kentucky HEALTH.  Ex. B, Application at 12.

108.    Enrollees who are subject to the requirement for a particular month, do not meet it, and are unable to show that one of the narrow "good cause" exceptions applies, will have their eligibility and their health care coverage under Medicaid suspended.  *Id.* at 33-34.  However, individuals can avoid the suspension if, in the following month, they meet the requirement and:

(1) make up the hours missed in the prior month; or (2) take a health or financial literacy course approved by the state. *Id*. at 34.

109.    If the State suspends medical assistance, the penalty continues until: (1) the first day of the month after the enrollee completes 80 hours of work activities within a 30-day period; (2) the enrollee completes a health or financial literacy course approved by the State; or (3) the redetermination date, at which point the State will terminate eligibility. *Id*. at 33-34.  Enrollees may take a health or financial literacy course to prevent or end a suspension only once in a 12-month period. *Id*. at 34.

110.    According to the State, the purpose of the work requirement is to increase workforce participation and reduce poverty among Kentucky HEALTH enrollees, ultimately leading to a reduction in Medicaid enrollment and lower state spending.  Ex. B, Application at 13, 18.

<u>Monthly Premium Payments and Penalties for Failure to Pay</u>

111.    As noted above, the Medicaid Act prohibits states from charging premiums to individuals with household income below 150% of FPL.  42 U.S.C. §§ 1396*o*(a)(1), (c)(1), 1396*o*-1(b)(1).

112.    The Medicaid Act requires states to provide medical assistance to all individuals who fall within a covered population group, *id*. § 1396a(a)(10)(A), and States must provide this assistance with reasonable promptness, *id*. § 1396a(a)(8).

113.    The Kentucky HEALTH program requires enrollees at all income levels to pay a monthly premium.

114.    MCOs that accept Kentucky HEALTH enrollees will bill for and collect the premiums.  Ex. C, Approval STCs at 25.

115.    According to the State, the purpose of the premium requirement is to discourage "Medicaid dependency by preparing individuals for the costs associated with commercial or Marketplace coverage." *Id.* at 32.

116.    All enrollees must pay a premium unless they are pregnant, a former foster care youth, or "medically frail." *Id.* at 25.

117.    The Secretary has approved Kentucky to set the premium amounts up to 4% of household income.  For example, a one-person household with income at 133% of FPL ($16,146) could have a $53 per month premium.  Individuals with no or very low income will be required to pay a minimum premium of $1 per month.  *Id.* at 28.

118.    The Secretary has authorized the State to vary the amount of the premium (up or down) based on household income, length of time enrolled in Kentucky HEALTH, and/or other grounds "consistent with how premium requirements vary in the commercial insurance market in Kentucky."  *Id*. at 28.

119.    In its application, Kentucky set the premium amount to vary as follows: $1 per month when the enrollee's household income is 0-25% of FPL; $4 per month, when 25-50% of FPL; $8 per month, when 51-100% of FPL; and $15 per month, when 101-133% FPL during the first and second year of enrollment.  Ex. B, Application at 31.  For individuals with household income over 100% of FPL, Kentucky set the premium to increase to: $22.50 per month in year three, $30 per month in year four, and $37.50 per month in year five.  *Id*. at 32.  As noted, CMS's approval letter authorizes Kentucky to further adjust premium amounts without obtaining additional CMS approval.

120.    If all household members who are subject to the premium requirement are enrolled in the same MCO, the premiums will be charged on a per-household basis.  Ex. C, Approval STCs at 28.

121.    If household members are enrolled in different MCOs, the premiums will be assessed on a per-person basis, meaning the total premium amount could be greater than 4% of household income.  *Id.*  However, the State will cap aggregate household premiums and cost sharing at 5% of household income for each quarter.  If a household reaches that cap, the premium amount will drop to $1 per month and no cost sharing will be charged for the remainder of the quarter.  Ex. B, Application at 33.

122.    On information and belief, the Kentucky HEALTH premiums are the highest premiums ever permitted in the Medicaid program.

123.    In general, Kentucky HEALTH enrollees subject to the premium requirement will not receive Medicaid coverage of needed health care until the first day of the month in which they pay the premium.  *Id*. at 15-16.

124.    Individuals with household incomes above 100% of FPL who do not pay the initial premium within 60 days after their eligibility determination will not be enrolled in Kentucky HEALTH. Ex. C, Approval STCs at 16.  Once enrolled, individuals above 100% of FPL who do not pay their monthly premium within 60 days of the due date will be terminated from Medicaid and prohibited from re-enrolling for six months (the "lockout period").  *Id*. at 29.  The State will also deduct money from their rewards accounts.  *Id*.

125.    Individuals below 100% of FPL who do not pay the initial premium within 60 days of their eligibility determination will be enrolled as of the first day of the month in which the 60-day period ends.  *Id*. at 16.  However, as a penalty for not paying the premium, the State will deduct

money from their rewards accounts.  In addition, during the next six months, they will be subject to cost sharing (as detailed in the state plan) in lieu of premiums and will not have access to their rewards accounts.  *Id*. at 16, 29-30.  Individuals face the same consequences when they do not pay a subsequent premium.  *Id*. at 29-30.

126.    To end the lockout or penalty period early, enrollees must: (1) demonstrate that one of the narrow "good cause" exceptions applies; or (2) pay all past-due premiums owed, pay the premium for the month of re-enrollment, and complete a financial or health literacy course.  *Id*. at 29, 31.

127.    Although former foster care youth and "medically frail" individuals are exempt from the premium requirement, if they do not pay the premium, they will nonetheless be penalized by having their rewards accounts suspended for six months.  *Id*. at 30.  Unlike the population groups subject to the premium requirement, they do not need to pay all past-due premiums to end the penalty period early.

### Cost Sharing for Non-Emergency Use of the Emergency Department

128.    As explained above, the Medicaid Act allows but limits the ability of a state to impose cost sharing on Medicaid beneficiaries.  For non-emergency use of the emergency room, the Medicaid Act generally allows states to charge individuals with household income below 150% of FPL up to twice the "nominal" amount, as determined by the Secretary in regulations.  42 U.S.C. § 1396*o*-1(e)(2)(A); *see* 42 C.F.R. § 447.54(b) (setting this amount at $8, subject to increases for inflation); 42 U.S.C. § 1396*o*-1(e)(4)(A) (defining non-emergency services).  If a State wishes to impose a deduction, copay, or similar charge outside of the Medicaid Act limits, then it must persuade the Secretary that the charge will meet the five requirements of Section 1396*o*(f), such

as testing a previously untested use of copayments, lasting no more than two years, and using a methodologically sound hypothesis, with control groups.

129.     Under Kentucky HEALTH, the State will deduct $20 from an enrollee's *My Rewards* account for an inappropriate emergency room visit, thus reducing funds in that account that are available to pay for the enrollee's medically necessary vision and dental care and non-prescription drugs.  The charge will increase to $50 for the second such visit and $75 for additional visits.  Ex. B, Application at 30.

130.     The Kentucky HEALTH assessment for inappropriate use of the emergency room is a deduction, copay, or similar charge under 42 U.S.C. §§ 1396*o* and 1396*o*-1.

131.     According to the State, the goal of the policy is to discourage inappropriate emergency room use.  *Id.*

132.     The Kentucky HEALTH program does not meet any of the pre-conditions set out in 42 U.S.C. § 1396*o*(f).

133.     The Defendants approved the Kentucky HEALTH policy without requiring the State to meet any of the requirements of 42 U.S.C. § 1396*o*(f).

Lockout Penalty for Not Meeting Administrative Requirements

134.     Consistent with federal Medicaid law, the State will re-determine the Medicaid eligibility of Kentucky HEALTH enrollees every 12 months and will terminate those who do not complete the re-determination process by the end of their eligibility period.  Also consistent with federal law, individuals who have been terminated will then have three months to re-enroll by submitting their re-determination forms; no new application is required.  Ex. C, Approval STCs at 17.

135.    However, in a dramatic departure from federal law, Kentucky will impose a lockout penalty on individuals (other than those who are pregnant, former foster care youth, or "medically frail") who have not re-enrolled by the end of the three months.  *Id*. at 17-18.  The State will prohibit them from re-enrolling in Medicaid for an additional six months.

136.    The State will impose the same lockout penalty on individuals (other than pregnant women, former foster care youth, and "medically frail" individuals) who do not timely report changes in circumstances that affect their eligibility for Medicaid.  *Id.* at 20.

137.    State regulations already require Medicaid enrollees to report these changes within 10 days.  907 Ky. Admin. Regs. 20:010.  With Kentucky HEALTH, however, the State is imposing an additional six-month lockout penalty on enrollees who do not meet the existing administrative requirement.

138.    Individuals can re-enroll before the end of the lockout period only if they: (1) demonstrate that one of the narrow "good cause" exceptions applies; or (2) pay the premium for the first month of re-enrollment and complete a financial or health literacy course.  Ex. C, Approval STCs at 17, 20.

139.    The only stated purpose of the lockout penalty for failure to complete the re-determination process is to "help familiarize Kentucky HEALTH members with this commercial market policy."  Ex. B, Application at 20.  Similarly, the State describes the lockout penalty for failure to timely report changes in circumstances as a "learning tool" that will help prepare enrollees for commercial insurance coverage.  Ex. A, Application Modification at 6.

No Retroactive Eligibility

140.    As noted above, the Medicaid Act requires that medical assistance be provided to enrollees retroactively.  Specifically, states must provide that

in the case of any individual who has been determined to be eligible for medical assistance . . . such assistance will be made available to him for care and services included under the plan and furnished in or after the third month before the month in which he made application . . . for such assistance if such individual was . . . eligible for such assistance at the time such care and services were furnished.

42 U.S.C. § 1396a(a)(34).  To similar effect, Section 1396d(a) defines "medical assistance" to include coverage for services received by eligible individuals during the three-month period prior to the month of application.  *Id.* § 1396d(a).

141.    There is no authority for the Secretary to grant a waiver of Section 1396d(a).

142.    However, under the Kentucky HEALTH project, enrollees (other than pregnant women and former foster care youth) will not receive the retroactive eligibility required by statute. Ex. C, Approval STCs at 17.  Instead, as outlined above, the State will generally only pay for services received on or after the first day of the month in which enrollees pay their initial monthly premium.  By eliminating retroactive eligibility, the State aims to "encourage[] individuals to obtain and maintain health insurance coverage, even when the individual is healthy."  Ex. B, Application at 19-20.

Elimination of Non-Emergency Medical Transportation

143.    States must ensure that Medicaid beneficiaries have necessary transportation, often referred to as non-emergency medical transportation ("NEMT"), to and from Medicaid services. *See* 42 U.S.C. § 1396a(a)(4); 42 C.F.R. § 431.53.

144.    Between June 2014 and June 2015, individuals enrolled in Medicaid through the Kentucky expansion used 140,000 NEMT trips to get to and from medically necessary health services.  Ex. B, Application at 45.

145.    The Secretary approved Kentucky's request, under the Kentucky HEALTH program, to no longer provide NEMT for the expansion population, with the exception of enrollees

who are pregnant, former foster care youth, aged 19 or 20, or "medically frail" individuals.  Ex. C, Approval STCs at 22.

146.    According to the State, the purpose of eliminating NEMT is to offer Kentucky HEALTH enrollees "a commercial health insurance market experience."  Ex. B, Application at 5.

**F.    Action Taken by the Defendants to Allow Work Requirements and Approve the Kentucky HEALTH Program**

147.    Prior to 2017, CMS's website stated that the purpose of Section 1115 waivers is to "demonstrate and evaluate policy approaches such as:

- Expanding eligibility to individuals who are not otherwise Medicaid or CHIP eligible;

- Providing services not typically covered by Medicaid; or

- Using innovative service delivery systems that improve care, increase efficiency, and reduce costs."

Medicaid.gov, *About Section 1115 Demonstrations*, https://www.medicaid.gov/medicaid/section-1115-demo/about-1115/index.html (last visited September 5, 2017).  The "general criteria" for CMS to use when assessing waiver applications looked at whether the demonstration would:

1.  increase and strengthen overall coverage of low-income individuals in the state;

2.  increase access to, stabilize, and strengthen providers and provider networks available to serve Medicaid and low-income populations in the state;

3.  improve health outcomes for Medicaid and other low-income populations in the state; or

4.  increase the efficiency and quality of care for Medicaid and other low-income populations through initiatives to transform service delivery networks.

*Id.*

148.    Prior to 2017, CMS recognized that work requirements do "not support the objectives of the [Medicaid] program" and "could undermine access to care."  Letter from Andrew M. Slavitt, Acting Administrator, Ctrs. For Medicare & Medicaid Servs., HHS to Thomas Betlach,

Dir. Az. Health Care Cost Containment System (Sept. 30, 2016); *see* Sec'y of Health & Human Services Sylvia Burwell, *Hearing on The President's Fiscal Year 2017 Budget*, Responses to Additional Questions for the Record, U.S. House of Rep. Energy & Commerce Health Subcommittee at 13 (Feb. 24, 2016), http://docs.house.gov/meetings/IF/IF14/20160224/104521/HHRG-114-IF14-Wstate-BurwellS-20160224-SD002.pdf.

149.    The current HHS abruptly reversed course to revise its use of the Section 1115 waiver authority and to authorize work requirements in Medicaid as part of President Trump's vow to "explode" the ACA and its Medicaid expansion.  *See* Amy Goldstein & Juliet Eilperin, *Affordable Care Act Remains "Law of the Land," but Trump Vows to Explode It*, Wash. Post, Mar. 24,   2017,   https://www.washingtonpost.com/national/health-science/affordable-care-act-remains-law-of-the-land-but-trump-vows-to-explode-it/2017/03/24/4b7a2530-10c3-11e7-ab07-07d9f521f6b5_story.html.

150.    As soon as he took office, President Trump signed an Executive Order calling on federal agencies to undo the ACA "to the maximum extent permitted by law."  Executive Order 13765, *Minimizing the Economic Burden of the Patient Protection and Affordable Care Act Pending Repeal,* 82 Fed. Reg. 8351 (Jan. 20, 2017).

151.    On March 14, 2017, Defendant Seema Verma was sworn in as the Administrator of CMS.  Defendant Verma immediately issued a letter to state Governors announcing CMS's disagreement with the purpose and objectives of the law, as established by the Affordable Care Act, stating that "[t]he expansion of Medicaid through the Affordable Care Act ("ACA") to non-disabled, working-age adults without dependent children was a clear departure from the core, historical mission of the program."  *See* Sec'y of Health and Human Servs., Dear Governor Letter, https://www.hhs.gov/sites/default/files/sec-price-admin-verma-ltr.pdf.

31

152.    Since then, Defendant Verma has made repeated public statements criticizing the expansion of Medicaid to "able-bodied individual[s]," advocating for lower enrollment in Medicaid, and outlining plans to "reform" Medicaid through agency action.  *See* https://www.statnews.com/2017/10/26/seema-verma-medicaid-plan/.

153.    For instance, on June 27, 2017, Defendant Verma wrote an Opinion piece in the Washington Post observing that "U.S. policymakers have a rare opportunity, through a combination of congressional and administrative actions, to fundamentally transform Medicaid." Seema Verma, *Lawmakers have a rare chance to transform Medicaid.  They should take it*, Wash. Post, June 27, 2017, https://www.washingtonpost.com/opinions/lawmakers-have-a-rare-chance-to-transform-medicaid-they-should-take-it/2017/06/27/f8e5408a-5b49-11e7-9b7d-14576dc0f39d_story.html?utm_term=.11a4dfe727df.

154.    On November 7, 2017, at a speech before the National Association of Medicaid Directors, Defendant Verma declared that the ACA's decision to "move[] millions of working-age, non-disabled adults into" Medicaid "does not make sense," and announced that CMS would resist that change by approving state waivers that contain work requirements.  Speech: Remarks by Administrator Seema Verma at the National Association of Medicaid Directors (NAMD) 2017 Fall Conference, CMS.Gov (Nov. 7, 2017), https://www.cms.gov/Newsroom/MediaRelease Database/Fact-sheets/2017-Fact-Sheet-items/2017-11-07.html.

155.    On November 10, 2017, Defendant Verma gave an interview in which she declared that one of the "major, fundamental flaws in the Affordable Care Act was putting in able bodied adults," declaring that Medicaid was "not designed for an able bodied person," and announcing that CMS is "trying" to "restructure the Medicaid program."   http://www.wsj.com/video/the-future-of-health-care/D5B767E4-B2F2-4394-90BB-37935CCD410C.html.

156.    In or around early November 2017, CMS revised its website to invite states to submit Section 1115 waivers that would:

1.  Improve access to high-quality, person-centered services that produce positive health outcomes for individuals;

2.  Promote efficiencies that ensure Medicaid's sustainability for beneficiaries over the long term;

3.  Support coordinated strategies to address certain health determinants that promote upward mobility, greater independence, and improved quality of life among individuals;

4.  Strengthen beneficiary engagement in their personal healthcare plan, including incentive structures that promote responsible decision-making;

5.  Enhance alignment between Medicaid policies and commercial health insurance products to facilitate smoother beneficiary transition; and

6.  Advance innovative delivery system and payment models to strengthen provider network capacity and drive greater value for Medicaid.

Medicaid.gov, *About Section 1115 Demonstrations*, https://www.medicaid.gov/medicaid/section-1115-demo/about-1115/index.html.

157.    On January 11, 2018, well after the federal comment periods for the Kentucky HEALTH application had closed, Defendant CMS issued a letter to State Medicaid Directors ("Dear State Medicaid Director Letter"), attached as Exhibit D to this Complaint, titled "Opportunities to Promote Work and Community Engagement Among Medicaid Beneficiaries," which, for the first time, announces its intention to approve state waiver applications with punitive work requirements on Medicaid beneficiaries.  *See* Ex. C, Approval at 3 ("CMS has not previously approved a community engagement requirement as a condition of eligibility.").  The Dear State Medicaid Director Letter also outlines the "guidelines" for states to consider in submitting applications containing work requirements.

158.    The nine-page document "announc[es] a new policy" to allow states to apply "work and community engagement" requirements to certain Medicaid recipients—specifically, "non-elderly, non-pregnant adult Medicaid beneficiaries who are eligible for Medicaid on a basis other than disability."  Ex. D, Dear State Medicaid Director Letter at 1.

159.    The Dear State Medicaid Director Letter acknowledges that allowing states to implement work requirements "is a shift from prior agency policy."  *Id.* at 3.

160.    The Dear State Medicaid Director Letter was not submitted for notice and comment, and was not published in the Federal Register.

161.    The same day CMS issued the Dear State Medicaid Director Letter, it received several letters critical of this novel policy position, including from members of Congress and nonprofit organizations.  The National Health Law Program ("NHeLP") noted that by announcing the policy change after the Kentucky HEALTH comment period had closed, CMS had not given the public the ability to comment meaningfully on the pending Kentucky waiver requests in light of the policy change.  NHeLP noted that the Dear State Medicaid Director letter "entirely ignore[d] the wealth of literature regarding the negative health consequences of work requirements, which was repeatedly cited by NHeLP and others in those state-specific comments."  Letter from Jane Perkins, Legal Director, Nat'l Health Law Program, to Brian Neale, Dir., Ctrs. For Medicare & Medicaid Servs. (Jan. 11, 2018), http://www.healthlaw.org/component/jsfsubmit/showAttachment?tmpl=raw&id=00P0W00000ozROSUA2.

162.    NHeLP requested that CMS re-open public comment on the Kentucky HEALTH project to allow the public a meaningful opportunity to comment.

163.    Defendants ignored this request.  On January 12, 2018, Defendant HHS approved the Kentucky HEALTH application.

164.    In granting the waiver, CMS imposed a variety of terms and conditions on Kentucky's program.  Ex. C, Approval STCs.  Several of those terms and conditions require that Kentucky abide by the requirements set out in CMS's Dear State Medicaid Director letter.  *See*, *e.g.*, *id.* ¶ 44 (exempting from work requirement beneficiaries diagnosed with an acute medical condition); *id.* ¶ 45 (requiring that participation in substance use disorder treatment is a qualifying activity, and that beneficiaries who meet or are exempt from SNAP/TANF employment initiatives "will be deemed to satisfy community engagement requirements"); *id.* ¶ 46(a)(i) (requiring reasonable modifications for beneficiaries with ADA-protected disabilities, including exemption from participation); *id.* ¶ 48(e) (promising that Kentucky will ensure access to sufficient work and community engagement activities for curing a failure to meet the eighty-hour requirement, at no cost to the beneficiary); *id.* ¶ 48(j) (promising that Kentucky will assess areas with fewer qualifying activities or higher barriers to participation to determine whether further exemptions or modifications are needed to the work requirement).

165.    On or about January 18, 2018, CMS further emphasized that it disagrees with the legislative expansion of Medicaid under the Affordable Care Act and that it had announced a "new policy guidance" to support state implementation of work requirements intended to target that expansion population.  CMS, Community Engagement Initiative Frequently Asked Questions, https://www.medicaid.gov/medicaid/section-1115-demo/community-engagement/index.html.

### G.    The Kentucky HEALTH Approval's Effect on the Plaintiffs

166.    By approving Kentucky HEALTH, the Secretary has enabled the State to impose unprecedented work and premium requirements and to punish Plaintiffs who are understandably unable to meet those and other administrative requirements by prohibiting them from obtaining Medicaid coverage.

167.     By approving Kentucky HEALTH, the Secretary has permitted Kentucky to eliminate critical Medicaid services for Plaintiffs enrolled in the program.

168.     By approving Kentucky HEALTH, the Secretary has permitted Kentucky to exclude retroactive coverage for necessary health services received in the three months prior to the date of application.  If a Plaintiff loses coverage and then reapplies, the Plaintiff will not have retroactive coverage for health services received during the gap in coverage.

169.     By approving Kentucky HEALTH, the Secretary has permitted Kentucky to impose cost sharing on Plaintiffs if they need to seek care in an emergency department and their condition is determined not to require urgent medical attention.  The cost sharing amount will increase with each subsequent visit.

170.     Continuous and adequate health insurance coverage is fundamental for each Plaintiff's ability to work.

171.     The Secretary's action approving Kentucky HEALTH will cause harm to Plaintiffs. Specifically:

172.     Plaintiff Ronnie Maurice Stewart is a 62-year-old man who lives alone in Lexington, Fayette County, Kentucky.  He has adult children who do not live with him.

173.     Mr. Stewart is a college graduate who worked in mental health clinics in North Carolina for many years.  He was laid off in his fifties and could not find work.  Mr. Stewart moved to Kentucky in 2014 when he was offered a job in Bowling Green.  After losing that job, Mr. Stewart was homeless for about six months, until he got a job as a medical assistant at the University of Kentucky Hospital.

174.     Mr. Stewart retired at age 62 because he could not be on his feet all day anymore. His sole income is his Social Security retirement benefits of $841 per month. His annual income is $10,092—83% of FPL for a single person ($12,410 for 2018).

175.     Mr. Stewart estimates his expenses total approximately $1,035 each month, including rent, food, clothing, cable, and miscellaneous household expenses.

176.     Mr. Stewart has been covered through Kentucky's Medicaid program since March 2014. He enrolled with the in-person assistance of a kynector/assister. He has not attempted to enroll online or by phone.

177.     Mr. Stewart could not afford to purchase insurance on his own, including through previous employment, before he became eligible for Medicaid.

178.     Mr. Stewart suffers from diabetes, arthritis, and high blood pressure. Medicaid has allowed him to get treatment for these conditions. Medicaid paid for his cataract surgery, which kept him from going blind.

179.     Mr. Stewart will be subject to work requirements under the Kentucky HEALTH waiver. Because of his age and health, he is no longer able to do heavy work that would require standing on his feet all day. He is concerned that he will lose his health coverage if he is unable to work because of his health or if he takes a job with varying work hours. In addition, Mr. Stewart will be at risk of being locked out of Medicaid coverage if he is unable to file or fails to file required reports, including reports within ten days about changes in his income that would affect eligibility. Mr. Stewart is worried he will end up with unpaid medical bills.

180.     Under the Kentucky HEALTH waiver, Mr. Stewart is required to pay a monthly premium of up to 4% of his income for Medicaid coverage under the Kentucky HEALTH waiver. Premium payments are a significant concern for Mr. Stewart. He expects to be able to pay the

premium, but it will mean that he cannot pay for other necessary expenses such as food and rent. If he is unable to pay premiums after 60 days, Mr. Stewart will be required to pay copayments for certain services, money will be taken from his *My Rewards* account, and his account will be suspended (meaning he will not be able to accrue funds to the account or use funds in the account, which are necessary to pay for dental care, vision care, and over-the-counter medications).

181.   Plaintiff Glassie Mae Kasey is a 56-year-old woman who lives in Louisville, Jefferson County, Kentucky.   Ms. Kasey is a high school graduate, who attended community college but was not able to finish her schooling because she needed to work to support herself.

182.   Ms. Kasey has worked her whole adult life in various jobs, including as a disc jockey, a radio broadcaster, and as a caregiver or housekeeper in private homes and nursing homes.

183.   Until mid-September 2017, Ms. Kasey worked at Sullivan University as a custodian cleaning offices, hallways, and bathrooms.   She had to lift and carry heavy containers and ultimately hurt her shoulder.   After she requested an accommodation, she lost her job.

184.   Ms. Kasey is not currently employed.   She has been trying to find a job, without luck.   She cannot afford a car, so her options for searching for work are limited.

185.   Ms. Kasey's only income is unemployment insurance in the amount of $300 every two weeks, or $7,800 annually—64% of FPL for a single person ($12,140).   To get unemployment insurance, Ms. Kasey must be looking for work.

186.   Ms. Kasey estimates that she currently spends approximately $545 on various living expenses each month, including mortgage payments, utilities, food, bus fare, a prescription co-pay, and household supplies.

187.   Ms. Kasey was first covered through Kentucky's Medicaid program in June or July of 2014 and has remained enrolled in Medicaid since then.   She originally enrolled in Medicaid at

the family health center location in Louisville.  She has subsequently renewed her coverage over the phone.

188.    Ms. Kasey has a number of medical conditions for which she receives treatment covered through Medicaid.  These include diabetes; calluses on and numbness in her feet, hands, and right arm; arthritis in her hands; chronic pain in her calf muscles and upper legs; high blood pressure; high cholesterol; urinary problems; chronic chest congestion; and leg, foot, and back pain.  She had kidney stones twice in the last year.

189.    With Medicaid coverage, Ms. Kasey is able to go to a primary care doctor for check-ups, as well as specialists, including a cardiologist, an oncologist, a hand doctor, and a podiatrist.  She saw a surgeon for removal of kidney stones.  She has received medications and medication management through these physicians.  Without Medicaid, it will be difficult for Ms. Kasey to work.

190.    Under the Kentucky HEALTH waiver, Ms. Kasey will be required to complete qualifying work or training equal to 80 hours per month.  If she in unable to comply with the work requirements, she will be terminated from Medicaid.

191.    Under the Kentucky HEALTH waiver, Ms. Kasey will be required to pay a monthly premium of up to 4% of her income.  Premium payments are a significant concern for her.  Any premium amount could be difficult or impossible to pay when it comes due during a given month.  If she is unable to pay the premiums after 60 days, Ms. Kasey will be required to pay copayments for certain services, money will be taken from her *My Rewards* account, and the account will be suspended (meaning she will not be able to use funds in the account or accrue funds to the account).  For the same reasons she may not be able to pay the premium amounts, she may also be unable to pay the cost sharing amounts.

192.    Ms. Kasey has been to the emergency room once in the past year for a severe headache.

193.    Ms. Kasey has needed vision care, including eyeglasses, since childhood.  Her visits with eye care professionals have previously been covered through Kentucky's Medicaid program. These services will now be paid for out of her *My Rewards* account, but only if Ms. Kasey has earned rewards, and only if the account is not suspended.

194.    Ms. Kasey has experienced dental problems, including the loss of seven teeth as a result of diabetes.  These problems will require dental treatment, including dentures.  These services will now be paid out of her *My Rewards* account, but only if Ms. Kasey has earned rewards, and only if the account is not suspended.

195.    Because Ms. Kasey does not own or have access to a motor vehicle, she travels to her health care appointments by bus.  This regularly takes about 35 minutes.

196.    Plaintiff Lakin Branham is a 20-year-old woman who lives in Dwale, Floyd County, Kentucky with her grandparents.

197.    Ms. Branham's grandfather has terminal cancer, and she helps care for him.  Ms. Branham also helps with housework (*e.g.*, cleaning, cooking) and yardwork.  Most days of the week, Ms. Branham's grandfather, grandmother, great grandmother, or great aunt have a doctor's appointment or need to go to the store to get household items.  Ms. Branham's grandmother drives them, and Ms. Branham goes along to help her relatives move from place to place.  She babysits her five-year-old sister three days a week.

198.    Ms. Branham is looking for a job outside the home, though without a license to drive and no public transportation available in Floyd County, the prospects are difficult.

199.    Ms. Branham is in a separate tax household with a current income of $0 per month. Her grandfather is fully disabled and receives Social Security Disability Insurance, as well as Social Security, and her grandmother receives Social Security income.

200.    Ms. Branham has been covered through the Kentucky Medicaid expansion since 2015.  She enrolled in Medicaid with the assistance of the state marketplace, kynect.

201.    Ms. Branham has a number of medical conditions that require ongoing treatment, including mental health medications.  She is primarily focused on her sobriety and is in recovery from addiction, primarily to methamphetamines.   Ms. Branham attends substance abuse counseling and church as often as she can.  Her entire substance abuse treatment has been covered through Kentucky's Medicaid program.

202.    Ms. Branham's goal for the next year is to return to college, get her peer support certification, and start a degree in psychology.  She hopes to become a substance abuse counselor and work for one of the ARC facilities.  She also has goals to remain sober for five years, have her own family, and live in her own home.

203.    Under the Kentucky HEALTH waiver, Ms. Branham will be subject to work requirements.  She is required to complete qualifying work or training equal to 80 hours per month. She is currently caring for her ill grandfather and attending outpatient substance abuse disorder services, but it is likely that she will not meet these and other reporting requirements at least some of the time and will be locked out of Medicaid.

204.    Ms. Branham will be required to pay a premium of $1 per month.  Since she has no income, any premium will be difficult or impossible for Ms. Branham to pay when it comes due each month.  If she is unable to pay the premium, Ms. Branham will be required to pay copayments

for certain health services, her *My Rewards* account will be suspended, and money will be deducted from the *My Rewards* account.

205.     Ms. Branham has experienced dental problems, and has ongoing dental problems that need to be addressed.   These services would have to be paid for with money from her *My Rewards* account.

206.     Plaintiff Shanna Ballinger is a 27-year-old woman who lives in Radcliff, Hardin County, Kentucky with her husband, Matt, and their two sons, aged three and two.

207.     The Ballinger family is currently enrolled in the Kentucky Medicaid program.  Mrs. Ballinger first enrolled in Medicaid in 2015 when she was pregnant.  She was covered by Medicaid from January 2015 to October 2015.  In June 2016, the whole family enrolled in Medicaid and has been covered since then.  They enrolled in Medicaid online.

208.     Mrs. Ballinger graduated from Western Kentucky University with a degree in English.  She previously worked in the human resources command for the army at Fort Knox.  In August 2017, she enrolled as a full-time law student at the Louis D. Brandeis School of Law at the University of Louisville.  She just started her second semester of law school.

209.     Mrs. Ballinger does not currently have any income.  She took out a student loan to pay for childcare, books, and other school-related expenses.

210.     As a full-time student and caregiver to her children, Mrs. Ballinger should be exempt from the Kentucky HEALTH work requirements.  Her husband Matt works full time roughly 35 to 37 hours per week at a Hobby Lobby store in Elizabethtown, Kentucky.  He is also a part-time student at Elizabethtown Community College.  He makes roughly $2,517 per month, with an annual income of roughly $30,206.  He always works at least 35 hours a week.  During the holidays, his hours increase slightly, but never exceed 40 hours per week.  The Ballingers will

be required to report any fluctuation of income within ten days, which might be difficult since Mr. Ballinger's hours vary every week.  They would lose their Medicaid and be locked out of the program if they do not timely report an increase in income that would affect their eligibility.

211.    Because Mrs. Ballinger does not currently have income, the Ballingers have a household income of roughly $2,517 per month and $30,206 per year—roughly 120% of FPL for a family of four ($25,100).

212.    Mrs. Ballinger estimates that she and her family spend approximately $3,341 on various family living expenses each month, including rent, utilities, car payments, credit card payments, child care, food, school expenses, diapers, and other miscellaneous household items. This amount fluctuates from month to month.

213.    Under the Kentucky HEALTH waiver, Mrs. Ballinger will be required to pay a monthly premium of up to 4% of household income for Medicaid coverage.  The premiums are a significant concern.  Her family's household income, with the exception of Mrs. Ballinger's student loan, derives solely from her husband's employment.  The costs detailed above, including child care and other necessities, sometimes exceed the family's income.  This is particularly true at the end of semesters (December and May), when the loan funds are depleted.  The premium will be difficult to pay, particularly at those times.  Mrs. Ballinger and her husband will be locked out of Medicaid coverage if they are unable to pay a premium or file income reports, and there will be no retroactive coverage under the waiver.  Retroactive coverage was extremely helpful to them in the past when they got off Medicaid and then had medical crises and had to reapply.

214.    Mrs. Ballinger has a number of medical conditions for which she receives treatment.  She has postural orthostatic tachycardia syndrome ("POTS"), a condition that causes her heart rate to increase rapidly, sometimes leading her to pass out.  She manages this condition

with the help of physicians, including her cardiologist and her primary care physician. Medicaid covers her treatment.

215.    Mrs. Ballinger also experiences depression and anxiety. She was hospitalized twice for post-partum depression. She manages these conditions through the use of medications and with the help of physicians, including a psychiatrist. She currently takes Prozac, Effexor, and Abilify. Medicaid covers her treatment.

216.    Matt Ballinger had his spleen removed in June 2017 after it grew to about twice its normal size and was growing into his stomach. He gets sick more often now, since the spleen is part of the immune system. He was taking prerequisites to get into nursing school. Because of the risk of infection, he had to abandon that career plan and is now taking general classes at the community college.

217.    The Ballingers' younger son had difficulties after birth. He was in the intermediate nursery for four days and then had to be hospitalized a couple of months later. It was determined that he is allergic to milk and soy products, so his diet must be carefully regulated.

218.    Mrs. Ballinger has been to the emergency room twice in the past year during bouts of POTS. Her husband went to the emergency room with pain from his spleen.

219.    The only way that Kentucky HEALTH will pay for vision and dental services for the Ballingers is through their *My Rewards* account. Mrs. Ballinger and her husband both wear glasses. She is nearsighted and has irregular astigmatism. The *My Rewards* account is unlikely to be sufficient to meet their vision needs, especially if the account is reduced due to a non-emergency emergency room visit.

220.    Without Medicaid coverage, the cost of Mrs. Ballinger's medications alone would exceed $1,200 per month.  With all of the medical crises their family has had, Mrs. Ballinger believes that the family would be homeless if not for Medicaid.

221.    Plaintiff Dave Kobersmith is a 57-year-old man who lives in Berea, Madison County, Kentucky with his wife, Kimberly, and their two sons, ages 13 and 11.  Mr. and Mrs. Kobersmith both work part-time, so that they can jointly home school and care for their sons.

222.    Mr. Kobersmith works as an administrator at the Union Church in Berea.  He regularly works 20 hours each week managing church finances, property, and personnel and supports the pastors.  In 2017, his income was $1,011 every two weeks, or $26,300 annually.  In 2018, his pay has decreased to $866 every two weeks, or $22,539 for the year.

223.    Mrs. Kobersmith is a freelance writer who has written articles for local newspapers and magazines.  Currently, she works about 10 to 12 hours each week and makes roughly $375 to $450 per month, or $4,500 per year.  Mrs. Kobersmith's hours and income fluctuate substantially throughout the year.

224.    In 2018, the Kobersmiths expect to have a household income of roughly $2,253 per month.  However, their household income varies considerably from month to month based on Mrs. Kobersmith's work.  If the Kobersmiths consistently made $2,253 per month, they would have an annual household income of $27,039—108% of FPL for a family of four ($25,100).

225.    The Kobersmiths spend approximately $2,200 on family expenses each month, including utilities, clothing, gas, food, taxes, insurance, savings, charity, and miscellaneous household needs.  Because Mrs. Kobersmith is self-employed, she has to pay all employment taxes out of her monthly income.

226.     Mr. Kobersmith and his wife signed up for Medicaid in 2014.  Before enrolling in Kentucky's Medicaid program, Mr. Kobersmith paid for a high-deductible, catastrophic coverage health insurance plan.  Since he essentially had to pay all health-related costs out-of-pocket under that plan, he regularly avoided seeking health care.

227.     Their children were enrolled in KCHIP in 2011, but are now on Medicaid.

228.     Medicaid has enabled the Kobersmith family to get preventive care services.  Mr. and Mrs. Kobersmith both get an annual check-up and go to the dentist twice a year.  Mr. Kobersmith sees a urologist several times a year and a chiropractor once a month for back issues. Mr. Kobersmith has two crowns and will need another tooth crowned.  Mr. and Mrs. Kobersmith and their younger son all wear glasses.  Their children get well-child check-ups and dental and vision check-ups.  Having affordable health care through Medicaid has allowed Mr. and Mrs. Kobersmith to focus on home schooling and spending more quality time with their children.

229.     Mr. Kobersmith will be subject to work requirements under the Kentucky HEALTH waiver.  Currently, he works 20 hours a week steadily.  If his income and working hours change, he could risk being locked out of Medicaid.  The Kobersmiths are concerned that they could lose Medicaid coverage if they are unable to file required reports, including reports about changes in their total household income.

230.     Under the Kentucky HEALTH waiver, the Kobersmiths will be required to pay a monthly premium of up to 4% of household income for Medicaid coverage.  Because Mr. Kobersmith's income has decreased to $22,539, paying the premium will be harder.  If he is unable to pay a premium within 60 days, the Kobersmiths will be locked out of coverage.

231.     The only way that Kentucky HEALTH will pay for vision and dental services for the Kobersmiths is through their *My Rewards* account.  If the Kobersmiths lose money from their

*My Rewards* account due to a non-emergency emergency room visit, they may be unable to obtain necessary vision and dental care.

232.    Plaintiff William Bennett is a 47-year-old divorced man who lives in Lexington, Fayette County, Kentucky.  He has a 21-year-old son, who splits his time between Mr. Bennett and his ex-wife.  His son has ADHD and is unable to work.  He also has two younger children, aged 13 and 14, who are in foster care.  Mr. Bennett pays $250 each month in child support for all three children.

233.    Mr. Bennett completed a one-year embalming school program at Mid-America College in Indiana.  He also has a two-year degree in ministry from Liberty University in Lynchburg, Virginia.

234.    Mr. Bennett has two part-time jobs.  He is the director and mortician at Hawkins-Taylor Funeral Home in Lexington, Kentucky.  He is also a minister at West Bend Missionary Baptist Church in Clay City, Kentucky.  His income varies widely from $100 to $1,000 per month, depending on the number of funerals.  He volunteers five to eight hours per week at the New Life Day Center in Lexington.

235.    Even if Mr. Bennett made an average of $500 per month, he would have an annual income of $6,000—49% of FPL for a family of one ($12,140).

236.    Mr. Bennett estimates that his regular expenses are approximately $540 per month, including rent, food, student loans, and child support. In addition, he pays a $2 copayment for some of his medications.

237.    Mr. Bennett has been covered through Kentucky's Medicaid program for about two years.  He was able to enroll in Kentucky's Medicaid program with the help of an in-person assister.  He is uncomfortable using a computer and prefers to work with someone face-to-face.

238.     Mr. Bennett has a number of medical problems, including diabetes, high blood pressure, high cholesterol, chronic obstructive pulmonary disease, and hemorrhoids.  At times, the diabetes makes him feel bad in the morning.  He can also have a hard time breathing and a lot of pain and bleeding from the hemorrhoids.  In addition, he has serious eye problems—no vision in one eye due to injury earlier in life, cataracts in both eyes, and glaucoma.  He is unable to drive due to his limited vision and is worried that he might go blind.  His doctors have referred him to be evaluated for surgery.  He hopes to be able to keep working for five more years.

239.     Prior to Mr. Bennett's enrollment in Medicaid, he had to go to the emergency room for treatment and to the health department to try to get prescriptions filled.  Often, he would go without his medicine for long periods of time.  Now, he goes to the Bluegrass Community Health Center for treatment and medications instead of to the emergency room.  He finds that he is not looked down on as much by the medical staff since he got Medicaid.  He feels reassured that he will be able to get his medications and can get the surgeries he needs.

240.     Medicaid coverage is essential to Mr. Bennett's ability to manage his health problems and to keep working.

241.     Mr. Bennett will be subject to work requirements under the Kentucky HEALTH waiver.  He is concerned that he will lose his health coverage if he is unable to work or volunteer at least 80 hours a month, which is likely due to his varying work schedule.

242.     Mr. Bennett is at risk of being locked out of Medicaid coverage if he is unable to file required reports, including reports about changes in his income that could affect his eligibility.  He is concerned that he will incur medical bills that he will not be able to pay.

243.     Under the Kentucky HEALTH waiver, Mr. Bennett will be required to pay a monthly premium of up to 4% of his income for Medicaid coverage.  Premium payments are a

significant concern for him.  He does not believe he can manage a premium set at 4% of his income ($20).  If Mr. Bennett is unable to pay the premiums for 60 days, he will be required to pay copayments for certain services, his *My Rewards* account will be suspended, and money will be taken from the account.

244.    Mr. Bennett has a wisdom tooth that needs to be extracted.  His *My Rewards* account is unlikely to be able to fund the dental and vision care he needs.

245.    Plaintiff Shawna Nicole McComas is a 34-year-old woman who lives in Lexington, Fayette County, Kentucky with her husband and four children, ages 16, 13, 9, and 4.  Mrs. McComas is currently enrolled in the Kentucky Medicaid program.

246.    Mrs. McComas generally works 40 or more hours per week in a housekeeping position at the University of Kentucky Hospital.  She makes roughly $1,200 every two weeks, or $2,400 per month, though this amount varies depending on how many hours she works and whether she has worked overtime hours.  Her work hours vary from week to week and month to month.

247.    Mrs. McComas's husband, Jeremiah, is unemployed.  In September 2017, he secured a job at a restaurant, but he was only able to work one week.  He suffers from post-traumatic stress disorder, which makes it difficult for him to keep a job.

248.    Mrs. McComas estimates that her household income is roughly $2,400 per month, or an annual household income of $28,800, which is 85% of FPL for a family of six ($33,740).

249.    Mrs. McComas estimates that her family currently spends roughly $1,200 on various living expenses each month, including rent.  This amount fluctuates from month to month.

250.    Mrs. McComas has been covered through Kentucky's Medicaid program since August 2017.  She was previously on Medicaid, but her coverage was terminated when she moved and did not receive the notice about the need to re-determine her eligibility.

251.    Mrs. McComas has a number of medical conditions for which she receives treatment.  These include chronic hip pain, congenital hip dysplasia, osteoarthritis in her hips, chronic back pain, arthritis and a bunion on her right foot due to her hip problems, and sciatic nerve damage.

252.    Mrs. McComas receives treatment and checkups for these conditions from a primary care physician as well as specialists, including an orthopedist, an orthopedic surgeon, and a podiatrist.  Though an orthopedic surgeon recommended surgery over a year ago, Mrs. McComas did not have the procedure because she felt she could not afford to miss six weeks of work during the post-surgical recovery period.  She has also received medications and medication management through these physicians.  These treatments and medications are covered through Kentucky's Medicaid program.

253.    Mrs. McComas does not have a car.  She takes buses to get to appointments with doctors.  This takes roughly an hour and a half each way.

254.    Under the Kentucky HEALTH waiver, Mrs. McComas and her husband will both be subject to work requirements.  They will be required to complete 80 hours of qualifying work activities each month, although he might be exempt from the work requirement as caretaker for the children.  Mrs. McComas is currently working more than 20 hours a week.  However, she could be locked out of coverage if her hours decrease or if she does not report changes that would affect her eligibility within ten days.  This reporting might be difficult for her because of her varying work schedule and changing overtime hours.

255.    Under the Kentucky HEALTH waiver, Mrs. McComas is required to pay a monthly premium of up to 4% of household income.  Premium payments are a significant concern for her. Her household income can vary from week to week.  Because of this, any premium amount could be difficult or impossible to pay when it comes due during a given month.  She had difficulty paying a premium in the past when she had a subsidized plan, and as a result, she lost her coverage. Mrs. McComas anticipates that she might have to try to obtain additional overtime work to pay the premium.

256.    If Mrs. McComas is unable to pay the required premium amount for a period of 60 days, she will face penalties.  She will have to pay cost sharing amounts equal to those permitted under Kentucky's Medicaid state plan.  She will have money taken from her *My Rewards* account, and her account will be suspended (meaning she will not be able to accrue funds in the account or use any funds in the account to pay for services not otherwise covered, such as vision and dental).

257.    Mrs. McComas has experienced dental issues, including gum disease, gingivitis, and pain and sensitivity near her teeth. She has had four or five teeth removed.  She also wears prescription glasses.  Any funds she may accrue in her *My Rewards* account are unlikely to cover her dental and vision needs.

258.    Plaintiff Alexa Hatcher is a 29-year-old resident of Bowling Green, Warren County, Kentucky, where she is a full-time student in her final semester at Western Kentucky University.

259.    Ms. Hatcher works a part-time job in a campus food pantry.  This is her only source of income. Ms. Hatcher began working there for 15 to 20 hours per week in September 2017. This spring semester she is working 10 hours per week.  Earning $7.50 per hour, she will earn $300 per month or about $3,600 per year—slightly above 25% of FPL for a single individual ($12,140).

260.    Ms. Hatcher does not earn enough to cover her basic living expenses of food, rent, insurance, utility bills, and gas.  To meet her living expenses, Ms. Hatcher has taken out loans.  She currently owes $50,000 in student loan debt.  She cannot afford private health insurance.

261.    Ms. Hatcher lives with endometriosis and takes medication for the condition, as well as for depression, anxiety, and severe allergies.  Without the medications she needs to treat these conditions, Ms. Hatcher's health and daily life would be severely impaired.

262.    Ms. Hatcher is enrolled in Kentucky's Medicaid program.

263.    When Ms. Hatcher was not enrolled in Medicaid, she did not have any health coverage and did not go to the doctor or seek any type of medical treatment.

264.    Ms. Hatcher had surgery for her endometriosis and uterine polyps in December 2017.  Post-surgery, Ms. Hatcher must maintain a medication regimen to prevent a recurrence of these conditions.  Without Medicaid she could not afford the surgery or medications, and treatment for her chronic conditions would end because she has no other means to pay for it.

265.    Without these health services, Ms. Hatcher's quality of life would be diminished.  She would miss work, miss classes, and lose wages.  It would be difficult for Ms. Hatcher to work and, thus, to afford her bills.

266.    Because she is currently a full-time student, Ms. Hatcher should be exempt from work requirements.  However, she is expected to graduate this semester and will then have to work 80 hours a month.  Right now, Ms. Hatcher's working hours and income fluctuate throughout the year.  She is concerned that she will be locked out of Medicaid coverage if she does not file the required reports informing the State about these changes.  Ms. Hatcher also is concerned she will be unable to timely re-enroll each year, will be kicked off of the program, and as a result, will not get needed care or will incur medical debts when she does seek care.

267.    Under the Kentucky HEALTH waiver, Ms. Hatcher will be charged a monthly premium of up to 4% of her income.  Given her income and debts, it will be next to impossible for her to pay this amount.  The premiums will be financially devastating to Ms. Hatcher, given that she must pay for food, rent, and other necessities.  After she graduates, she will also have to make student loan payments.  If she is unable to pay the premiums for 60 days, Ms. Hatcher will be required to pay copayments for certain health services, and she does not believe she will be able to afford these amounts.  Money will be deducted from her *My Rewards* account, and the account will be suspended.

268.    Plaintiff Michael "Popjaw" Woods and Plaintiff Sara Woods are 52 years old and 40 years old, respectively, and they live in Martin, Floyd County, Kentucky.  Mr. and Mrs. Woods have three children, ages 15, 16 and 21, who do not live in the home.  Their 21-year-old daughter, Beka, had a baby in December 2017.  Mrs. Woods is providing childcare for her granddaughter as well as for a neighbor's child.

269.    Mr. Woods owns and operates Martin Service Center, a service station for car repairs.  The business opened last year.  Martin Service Center offers oil changes and basic car repairs, including brakes and tires.  Mr. Woods' income varies dramatically from week-to-week based on business, but averages around $1,400 per month, gross, and around $1,000 net.

270.    Mrs. Woods is a cleaning specialist with clients including local home owners, a local pawn shop, and her husband's service center.   Currently, Mrs. Woods makes $10 per hour from cleaning and earns, on average, $400 gross per month from her recurring cleaning accounts. Mrs. Woods's hours and income fluctuate substantially throughout the year.

271.    Mr. and Mrs. Woods have a gross household income of roughly $1,800 per month but, as noted above, their income varies considerably.  Their best estimate of the household income would be around $20,000 annually, approximately 122% of FPL for a family of two ($16,410).

272.    Both Mr. and Mrs. Woods signed up for Medicaid in 2014 with the help of an in-person assister.  Neither of them was insured prior to the Medicaid expansion in Kentucky.

273.    With Medicaid coverage, Mrs. Woods was able to get treatment for a substance use disorder.  She has been able to stay sober for nearly three years with the help of suboxone, a prescription medication that is covered by Medicaid.  Mrs. Woods believes she would have died from an overdose by now if she had not gotten on Medicaid.  She also previously suffered from debilitating migraines and low blood sugar.  Medicaid has helped her to get these conditions under control.  She also takes Prozac, Maxalt, and medication as needed for the low blood sugar.

274.    Medicaid has also enabled the Woodses to access preventive services.  With Medicaid coverage, Mr. Woods takes blood pressure medication, treating a long untreated condition.

275.    Mr. and Mrs. Woods will be subject to work requirements under the Kentucky HEALTH waiver.  Because their working hours and income fluctuate substantially throughout the year, the Woodses are at risk of losing coverage.  They will have to report any change of income within ten days, which will be difficult since their income changes every day.  The Woodses have only a limited number of minutes on their cell phones and do not have access to a computer or internet other than through their cell phones.  If a non-reported increase in income would make them ineligible, or if they fail to complete the redetermination process on time, they will be locked out of Medicaid.

276.     Under the Kentucky HEALTH waiver, Mr. and Mrs. Woods will be required to pay a monthly premium of up to 4% of their income for Medicaid coverage.  If they do not pay their premiums within 60 days, they will lose their Medicaid for up to six months.

277.     The Woodses will depend on their *My Rewards* account for vision and dental care. Both need glasses and dental care.  Mrs. Woods has a number of dental problems.

278.     Mr. Woods went to the emergency room in 2017 when a transmission fell on him at work.

279.     Plaintiff Kimberly Withers is a 47-year-old woman who resides with her husband and two children, ages 18 and 20, in Lexington, Fayette County, Kentucky.

280.     Mrs. Withers has worked various jobs all her life, including at gas stations, hotels, fast food restaurants, Wal-Mart, and as a custodian.  Mrs. Withers has worked as a housekeeper for Crothall Healthcare for six years, the last year and a half at Cardinal Hill Rehabilitation Center in Lexington.  She earns $2,626 per month or $31,520 per year.  Her husband, Kevin, is currently unemployed.  They do not have a car, and Mr. Withers has had difficulty finding a job that does not require him to drive to another county.  Most recently, he worked for FedEx but could not afford the gas to commute to work.  Mrs. Withers' daughter, age 20, has a learning disability and has been unable to find a job.  She is supposed to have a medical review for disability.  Mrs. Withers' son, who is 18 years old and still in high school, works part-time.  Because he is still in high school, his income is excluded for purposes of Medicaid eligibility.

281.     The Withers' household income is $2,626 per month, or $31,520 per year, which is 127% of FPL for a family of four ($25,100).

282.     The family's expenses for rent, utilities, food, internet, cell phones, transportation, and other expenses are approximately $1,530 a month.

283.    Mrs. Withers has rheumatoid arthritis in her hands, shoulders, hips, and lower spine. She has been told that her disks are slowly shrinking.  She is in constant pain when she is standing and has a lot of pain by the end of her work day.  Mrs. Withers sees her doctor every two months and has had occupational therapy.  She is supposed to be referred to pain management, but that has not happened yet.  Mrs. Withers needs eyeglasses but cannot afford them.  She and her husband both wear "cheaters."  Mrs. Withers has a broken tooth, and some of her teeth have fallen out.  One tooth had to be pulled because of an abscess.  Mr. Withers has consistent back pain and curvature of the spine and has to work through the pain.

284.    Mrs. Withers and her family signed up for Medicaid in March 2014.  She was helped by an in-person assister at the library.  She can walk to the library.  The welfare office is on the other side of Lexington, and it is difficult for her to get there without a car.  When she has had to go there and could not make it, she has had her benefits cut off.

285.    Mrs. Withers and her husband will be subject to the Kentucky HEALTH work requirements.  Her husband will lose coverage unless he can get a job working 80 hours a month. They will also be subject to various reporting requirements under the Kentucky HEALTH waiver. Mrs. Withers could be locked out of coverage if she is unable to file the required reports, including reports about changes in income that could affect her eligibility for Medicaid.

286.    Under the Kentucky HEALTH waiver, Mrs. Withers will be required to pay a monthly premium of up to 4% of household income for Medicaid coverage.  It will be difficult for her to pay this every month.  If she is not able to pay the premium, she will lose her Medicaid coverage for up to 6 months.

287.     Mrs. Withers and her husband both need eyeglasses.  Mrs. Withers is losing teeth. The *My Rewards* account will likely be inadequate to pay for Mr. and Mrs. Withers's vision and dental needs.

288.     Plaintiff Katelyn Allen is a 27-year-old woman who lives in Salyersville, Magoffin County, Kentucky.  She resides with her husband Gary and their eight- and six-year-old children. Her 18-year-old brother lives with them part-time.

289.     Mrs. Allen recently started working at a teller at First Commonwealth Bank in Salyersville.  She has previously worked for the State collecting samples for drug testing, in a rubber factory, at another drug lab, at a Dairy Queen, and at a hospital doing patient registration. She also breeds dogs once a year, which earns her about $150.  Her gross income is approximately $1,668 per month.  Mr. Allen works delivering pizza 20 hours a week and earns minimum wage plus tips.  He also has worked in a drug testing lab.  His gross income is $728 per month.  At their current jobs, the Allens' annual income is $28,752, which is 115% of FPL for a family of four ($25,100).

290.     Mrs. Allen estimates that the family's regular expenses are approximately $1,466 per month, including lot rent, utilities, internet, phones, car payment, car insurance, food, and miscellaneous household expenses.  They receive SNAP benefits of $400 per month, but still have to pay an additional $200 to $250 per month on food.

291.     Mrs. Allen has been covered through Kentucky's Medicaid program since her first pregnancy in 2008.  Both of her children have been covered by Medicaid since birth.  Mr. Allen enrolled in the Medicaid expansion in 2014.  Mrs. Allen renews her coverage through an in-office visit every 12 months.

292.    Prior to having Medicaid, Mrs. Allen went without medical care due to cost and accumulated debt from obtaining care when absolutely necessary.   Because of her current coverage, Mrs. Allen was able to seek emergency care after a car accident in January 2017.   She is able to get annual check-ups.   Mrs. Allen is healthy and does not have any ongoing medical problems.   Mr. Allen has a slipped disk and nerve damage resulting from the car accident.   He takes Gabapentin for the pain.

293.    Mrs. Allen credits Medicaid with making it possible to keep her children healthy and to take them to the doctor when they are sick.   She would not be able to afford any doctor or dentist visits for them without the coverage.   Mrs. Allen fears that without this coverage she would have to choose between caring for a sick child or paying essential bills.

294.    The Allens will both be subject to the 80 hours per month work requirement under the waiver.   While one parent could be exempted from this requirement as the children's caretaker, the Allens could be locked out of Medicaid if at least one of them fails to work 80 hours a month. They could also be locked out of the program if they fail to report any changes in income that would affect their eligibility within 10 days or if they do not timely submit redetermination paperwork.   The reporting requirement is a particular concern because Mr. Allen's income varies every week.

295.    Under the Kentucky HEALTH waiver, Mrs. Allen will be required to pay a Medicaid premium of up to 4% of household income.   Premium payments are a significant concern for her, especially because the family lives paycheck to paycheck.   If the Allens fail to pay the premium within 60 days, they will be locked out of Medicaid.

296.     Mrs. Allen will have a *My Rewards* account under the Kentucky HEALTH waiver. Earning money in the account will be the only way she will be able to pay for vision and dental care.  Mr. and Mrs. Allen and two of their children need prescription eyeglasses.

297.     Plaintiff Amanda Spears is a 33-year-old married woman with no children who lives in Park Hill, Kenton County, Kentucky.  She is separated from her wife and is currently living with her parents.

298.     Ms. Spears was previously approved for Social Security disability, but those benefits terminated when she tried to go back to work.  She recently reapplied for these benefits. Ms. Spears has worked for the Internal Revenue Service, at an environmental research institute, as a sanitation department communications specialist, and for a financial investment company.  She was forced to quit most of these jobs due to her health.  Most recently, she and her wife had a company called KYSOC making t-shirts, cups, and other merchandise.  Ms. Spears was unable to continue working there due to her health.

299.     Ms. Spears is currently not working due to health problems.  She has no income, and her parents are paying all of her expenses, including her medications, which cost $300-$400 per month.  As a result, Ms. Spears has $0 income—0% of FPL for a single person ($12,140).

300.     Ms. Spears obtained Medicaid coverage in 2015 when medical insurance was unavailable through her job because she was a temporary employee.  She was able to enroll in Medicaid online.  Previous lack of coverage and large medical debt forced Ms. Spears to file for bankruptcy two years ago.

301.     Ms. Spears was born with hypokalemic periodic paralysis, a rare genetic disorder that manifests as attacks of muscle weakness and short term cognitive problems.  She also suffers from postural orthostatic tachycardia syndrome and was born with spina bifida.  She has had Lyme

disease for 12 years.  She has developed multiple chemical sensitivities. An allergy to many of the fillers in her prescriptions has led her to stop taking all prescription medications and to rely on naturopathic medications.  The medications and supplements she is taking, including oregano oil, olive leaf, biotagen, vitamin C and vitamin D complex, are not covered by Medicaid.

302.    Nevertheless, Medicaid is absolutely essential to Ms. Spears' health, as she has a primary care doctor and sometimes ends up in the emergency room due to anaphylactic shocks, seizures, or tachycardia episodes.

303.    Ms. Spears will be subject to work requirements under the Kentucky HEALTH waiver.  She will lose her health coverage if she fails to work 80 hours per month.  If she is able to work, she could be at risk of being locked out of Medicaid coverage if she is unable to file required reports, including reports about changes in her income that would affect her eligibility.

304.    Under the Kentucky HEALTH waiver, Ms. Spears is required to pay a $1 monthly premium for Medicaid coverage.  Since she has no income, paying any premium will be difficult. If she is unable to pay a premium, Ms. Spears will be required to pay copayments for certain services, her *My Rewards* account will be suspended, and money will be taken from the account.

305.    Ms. Spears lives 45 minutes away from her doctor.  She is not able to drive because she has seizures.  Her mother drives her to the doctor.  This interferes with her mother's care for her nieces, as she often has to pick them up and take them places.  Under the Kentucky HEALTH waiver, Ms. Spears is concerned that she will not be able to go to medical appointments because non-emergency medical transportation is not a covered benefit.

306.    Plaintiff David Roode is a 39-year-old man who lives with his wife in Ludlow, Kenton County, Kentucky. They do not have any children.

307.    Mr. Roode is self-employed as a classical musician and plays with various symphony orchestras, usually on a contract basis.

308.    Because he is a self-employed contractor, Mr. Roode's income varies each month, and he often has to pay his own Medicare and Social Security taxes, in addition to income taxes. His average net income, after business expenses, is $1,000 to $1,200 per month.  He generally works 20 to 30 hours per week, although this fluctuates.  His wife is also self-employed.  Her monthly adjusted gross income after business expenses is $500 or less per month.  Mr. Roode's adjusted gross income is about $1,600 per month, which annually amounts to approximately $19,200—117% of FPL for a family of two ($16,460).

309.    Mr. Roode estimates that his regular household expenses (including rent, utilities, food, clothing, car payments, student loan payments, and piano payments) are approximately $1,850 per month.

310.    Mr. Roode has been covered through Kentucky's Medicaid program since the end of 2015 or early 2016.  He was able to enroll online, but once had to go to the local Medicaid office when there was confusion over whether he should be on Medicaid or on subsidized insurance.

311.    Mr. Roode is healthy and has no ongoing health conditions.

312.    With Medicaid, Mr. Roode has been able to get preventive care—including an annual check-up and flu shot.  Preventing illness is very important to him because of his busy schedule and contract status—it is very important not to miss performances.  Medicaid coverage is essential to Mr. Roode's ability to stay healthy and keep working as much as possible.  Without Medicaid, he would be forced to give up his music career and try to find a job that offers health insurance.

313.     Mr. Roode will be subject to work requirements under the Kentucky HEALTH waiver.  A significant concern is that he will be locked out of Medicaid coverage if his work hours fluctuate below 80 hours per month, which could happen anytime.  Mr. Roode is also at risk of being locked out of Medicaid coverage if he is unable to file required reports, including reports about changes in his income that would affect his eligibility.  His income changes every month, so reporting every change will be difficult.

314.     Under the Kentucky HEALTH waiver, Mr. Roode will be required to pay a monthly premium of up to 4% of his income for Medicaid coverage.  If he is unable to pay the premium, he will be locked out of Medicaid coverage for up to 6 months.

315.     Mr. Roode wears prescription eyeglasses, and he will not have any vision coverage under the waiver unless there are funds in his *My Rewards* account to cover vision care.

316.     Plaintiff Sheila Marlene Penney is a 54-year-old woman who lives alone in Louisville, Jefferson County, Kentucky.  She has an adult son who lives elsewhere.

317.     Ms. Penney was born in Fleming, Letcher County.  Her father and grandfather were coal miners.  The family moved to Louisville when Ms. Penney was an infant because coal jobs were drying up.

318.     Ms. Penney has worked her whole adult life as much as possible.  She has worked as a package handler, boat reservations manager, and as a kynector/assister for Medicaid enrollment.  She has also worked with victims of domestic violence and in the Jefferson County Drug Court.

319.     Ms. Penney currently does not have regular income.  Her mother pays half of her rent and her cell phone bill.  Her ex-boyfriend pays for her internet and incidentals.  Her monthly income from her mother and ex-boyfriend is $550 per month.  She receives SNAP benefits to help

with groceries. She estimates she spends an additional $500 per month from her savings to cover monthly household expenses of approximately $1,050.

320.    Ms. Penney's total income is $550 per month, and she has an annual household income of $6,600—54% of FPL for a single person ($12,140).

321.    Ms. Penney has been covered through Kentucky's Medicaid program for about two years. She was able to enroll in Kentucky's Medicaid program online and by phone.

322.    Ms. Penney has not worked since March 2016 due to depression and anxiety. She has had these conditions for 30 years. She also has sleep apnea and allergies.

323.    Prior to enrolling in Medicaid, Ms. Penney had trouble getting health care. She had to piece together treatment for her depression and anxiety through visits to a sliding fee scale family health clinic. Sometimes, she could get prescriptions filled through a free pharmaceutical plan. She was unable to pay out-of-pocket expenses for therapy and other needed treatment.

324.    Having Medicaid has allowed Ms. Penney to obtain consistent treatment to keep these conditions under control. She is now able to look for work but, so far, has not found a job. Without Medicaid, Ms. Penney does not believe she would be able to work at all.

325.    Ms. Penney will be subject to work requirements under the Kentucky HEALTH waiver. A significant concern is that she will lose her health coverage—and her mental health coverage in particular—if she is unable to work because of her health, if she is unable to find a job, or if she takes a job with inconsistent work hours.  In addition, Ms. Penney will be locked out of Medicaid if her income increases and she fails to report a change that would affect her eligibility within ten days.

326.    Under the Kentucky HEALTH waiver, Ms. Penney is required to pay a monthly premium of up to 4% of household income. Premium payments are a significant concern for her.

This is especially true now, because she is unemployed and has to rely on others to pay some of her expenses. She expects to be able to pay the premium, but admits it will mean other bills may go unpaid or she will have to rely on others to help her. If Ms. Penney does not pay the premium for 60 days, she will have to pay copayments for certain services that could be more expensive than the premium, her *My Rewards* account will be suspended, and money will be taken from the account.

327.    The *My Rewards* account is the only way Ms. Penney can afford to get vision and dental care. Ms. Penney wears glasses and has a broken tooth that needs to be removed.

328.    Plaintiff Quenton Radford is a 20-year-old man who lives in Ashland, Boyd County, Kentucky, with his 16-year-old brother and his grandmother, who has multiple sclerosis. No other family members assist Mr. Radford in caring for his grandmother. Mr. Radford helps her in and out of bed, cooks, does laundry, and cleans the house. Mr. Radford spends about three hours each day caring for her. He also babysits his cousins for free, and volunteers at the church food pantry a few hours each month.

329.    Mr. Radford does not have a regular job but does odd jobs for family members and occasional paid jobs at his church. He was last employed at age sixteen on a temporary basis at a sandwich shop. He occasionally housesits for family members.

330.    Mr. Radford has been looking for work but without success. There are limited employment opportunities in the area where he lives. He does not have a car, so he walks or bikes where he needs to go.

331.    Mr. Radford has lived with his grandmother since he was 12 years old. Prior to that, he lived alternately with his mother, then his father. His father has five children and works

14 to 16 hours a day.  Mr. Radford's grandmother was granted permanent custody of both Mr. Radford and his 16-year-old brother.

332.    Mr. Radford's income (if any) varies from week to week, with a typical monthly income being $25.  His grandmother receives $1,153 from Social Security Disability once a month and that payment is the main source of income for the household.  His grandmother also receives $186 per month in K-TAP (transitional assistance) benefits for his brother.  The family also gets $88 per month in SNAP benefits.

333.    The monthly household income for the Radford family is $1,452 per month.  Their annual household income is only $17,424—84% of FPL for a family of three ($20,420).

334.    Mr. Radford and his family spend all of their income and benefits on various living expenses each month, including food, clothing, shelter, and other ongoing expenses.  Mr. Radford is not able to save money and often relies on other forms of help to make ends meet, like food from the local food bank.

335.    As an adult, Mr. Radford has been covered through Kentucky's Medicaid program since 2015.  He enrolled in Kentucky's Medicaid program at the local family support office.

336.    Having health insurance coverage through Medicaid is fundamental to Mr. Radford going to the doctor for check-ups and when he gets sick.

337.    Mr. Radford may be subject to work requirements under the Kentucky HEALTH waiver.  He might be able to satisfy this requirement because he takes care of his grandmother and does other volunteer work.  Even when he is able to find employment, Mr. Radford's working hours and income fluctuate substantially throughout the year.  Thus, he is at risk of losing coverage as his employment status and income ebb and flow.  Mr. Radford is also concerned that he will be

locked out of Medicaid if he is unable to file required reports, including reports about changes in his total household income that would affect eligibility.

338.    Under the Kentucky HEALTH waiver, Mr. Radford is required to pay a premium of up to 4% of his household income for Medicaid coverage.  Given his very sporadic income, and the family's limited income, his ability to pay the premium will vary, and Mr. Radford anticipates months when the premium will be difficult to pay.  If he is unable to pay the premiums for 60 days, he will be required to pay copayments for certain services, his *My Rewards* account will be suspended, and money will be taken from the account.

## COUNT ONE: VIOLATION OF ADMINISTRATIVE PROCEDURE ACT
## (DEAR STATE MEDICAID DIRECTOR LETTER)

339.    Plaintiffs repeat and incorporate herein by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

340.    The Administrative Procedure Act provides that a reviewing court may "hold unlawful and set aside" agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"; "contrary to constitutional right, power, privilege, or immunity"; "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right"; or "without observance of procedure required by law."  5 U.S.C. § 706(2)(A)-(D).

341.    In issuing the Dear State Medicaid Director Letter, the Defendants purported to act pursuant to Section 1115 of the Medicaid Act.

342.    Authorization of work and community engagement requirements is categorically outside the scope of the Secretary's Section 1115 waiver authority.

343.    The Dear State Medicaid Director Letter was required to be, but was not, issued through notice and comment rulemaking.

344.    In the Dear State Medicaid Director Letter, the Defendants relied on factors which Congress has not intended them to consider, entirely failed to consider several important aspects of the problem, and offered an explanation for their decision that runs counter to the evidence.

345.    The Defendants' issuance of the Dear State Medicaid Director Letter exceeded the Secretary's Section 1115 waiver authority; otherwise violated the Medicaid Act; was arbitrary and capricious and an abuse of discretion; and ran counter to the evidence in the record.

## COUNT TWO: VIOLATION OF ADMINISTRATIVE PROCEDURE ACT (WORK REQUIREMENTS)

346.    Plaintiffs repeat and incorporate herein by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

347.    The Administrative Procedure Act provides that a reviewing court may "hold unlawful and set aside" agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"; "contrary to constitutional right, power, privilege, or immunity"; "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right"; or "without observance of procedure required by law."  5 U.S.C. § 706(2)(A)-(D).

348.    In approving the work and community engagement requirements of Kentucky HEALTH, the Secretary purported to waive 42 U.S.C. § 1396a(a)(8) and (a)(10) pursuant to Section 1115.

349.    Authorization of work and community engagement requirements is categorically outside the scope of the Secretary's Section 1115 waiver authority.

350.    In addition, Kentucky HEALTH's work and community engagement requirements are not an experimental, pilot, or demonstration project, nor are they likely to promote the objectives of the Medicaid Act.

351.   In approving the Kentucky HEALTH work and community engagement requirements, the Secretary relied on factors which Congress has not intended him to consider, entirely failed to consider several important aspects of the problem, and offered an explanation for his decision that runs counter to the evidence.

352.   The Secretary's decision to approve Kentucky HEALTH's work and community engagement requirements exceeded his Section 1115 waiver authority; otherwise violated the Medicaid Act; was arbitrary and capricious and an abuse of discretion; and ran counter to the evidence in the record.

### COUNT THREE: VIOLATION OF ADMINISTRATIVE PROCEDURE ACT (PREMIUM REQUIREMENTS)

353.   Plaintiffs repeat and incorporate herein by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

354.   The Administrative Procedure Act provides that a reviewing court may "hold unlawful and set aside" agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"; "contrary to constitutional right, power, privilege, or immunity"; "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right"; or "without observance of procedure required by law."  5 U.S.C. § 706(2)(A)-(D).

355.   In approving Kentucky HEALTH's premium requirements and its associated delays in coverage, penalties, and lock-out provisions, the Secretary purported to waive 42 U.S.C. § 1396a(a)(10)(B), (a)(17), and (a)(14) (insofar as it incorporates Sections 1396*o* and 1396*o*-1) pursuant to Section 1115.

356.   Authorization of premium requirements, or penalties for not satisfying such requirements, is categorically outside the scope of the Secretary's Section 1115 waiver authority.

357.   In addition, Kentucky HEALTH's premium requirements and associated penalties are not an experimental, pilot, or demonstration project, nor are they likely to promote the objectives of the Medicaid Act.

358.   In approving the Kentucky HEALTH premium requirements, the Secretary relied on factors which Congress has not intended him to consider, entirely failed to consider several important aspects of the problem, and offered an explanation for his decision that runs counter to the evidence.

359.   The Secretary's decision to approve Kentucky HEALTH's premium requirements and associated penalties exceeded his Section 1115 waiver authority; otherwise violated the Medicaid Act; was arbitrary and capricious and an abuse of discretion; and ran counter to the evidence in the record.

## COUNT FOUR: VIOLATION OF ADMINISTRATIVE PROCEDURE ACT (COST-SHARING FOR NON-EMERGENCY USE OF EMERGENCY ROOM)

360.   Plaintiffs repeat and incorporate herein by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

361.   The Administrative Procedure Act provides that a reviewing court may "hold unlawful and set aside" agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"; "contrary to constitutional right, power, privilege, or immunity"; "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right"; or "without observance of procedure required by law."  5 U.S.C. § 706(2)(A)-(D).

362.   Authorization of heightened cost sharing for non-emergency use of the emergency room is categorically outside the scope of the Secretary's Section 1115 waiver authority.

363.    Kentucky HEALTH's imposition of heightened cost sharing for non-emergency use of the emergency room is not an experimental, pilot, or demonstration project, nor is it likely to promote the objectives of the Medicaid Act.

364.    In approving the Kentucky HEALTH heightened cost sharing for non-emergency use of the emergency room, the Secretary relied on factors which Congress has not intended him to consider, entirely failed to consider several important aspects of the problem, and offered an explanation for his decision that runs counter to the evidence.

365.    The Secretary's decision to allow Kentucky HEALTH's imposition of heightened cost-sharing for non-emergency use of the emergency room violated the Medicaid Act; was arbitrary and capricious and an abuse of discretion; and ran counter to the evidence in the record.

## COUNT FIVE: VIOLATION OF ADMINISTRATIVE PROCEDURE ACT
## (LOCKOUT PENALTIES)

366.    Plaintiffs repeat and incorporate herein by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

367.    The Administrative Procedure Act provides that a reviewing court may "hold unlawful and set aside" agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"; "contrary to constitutional right, power, privilege, or immunity"; "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right"; or "without observance of procedure required by law."  5 U.S.C. § 706(2)(A)-(D).

368.    In approving Kentucky HEALTH's imposition of lockout penalties, the Secretary purported to waive the requirements of 42 U.S.C. § 1396a(a)(8), (a)(10), and (a)(52), pursuant to Section 1115.

369.    Kentucky HEALTH's imposition of lockout penalties is not an experimental, pilot, or demonstration project, nor is it likely to promote the objectives of the Medicaid Act.

370.    In approving the Kentucky HEALTH lockout penalties, the Secretary relied on factors which Congress has not intended him to consider, entirely failed to consider several important aspects of the problem, and offered an explanation for his decision that runs counter to the evidence.

371.    The Secretary's decision to approve Kentucky HEALTH's imposition of lockout penalties exceeded his Section 1115 waiver authority; otherwise violated the Medicaid Act; was arbitrary and capricious and an abuse of discretion; and ran counter to the evidence in the record.

## COUNT SIX: VIOLATION OF ADMINISTRATIVE PROCEDURE ACT
## (RETROACTIVE COVERAGE)

372.    Plaintiffs repeat and incorporate herein by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

373.    The Administrative Procedure Act provides that a reviewing court may "hold unlawful and set aside" agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"; "contrary to constitutional right, power, privilege, or immunity"; "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right"; or "without observance of procedure required by law."  5 U.S.C. § 706(2)(A)-(D).

374.    In approving Kentucky HEALTH's refusal to provide the retroactive coverage required by the Medicaid Act, the Secretary purported to waive 42 U.S.C. § 1396a(a)(34) pursuant to Section 1115.

375.    Authorization of refusal to provide the retroactive coverage required by the Medicaid Act is categorically outside the scope of the Secretary's Section 1115 waiver authority.

376.    In addition, Kentucky HEALTH's refusal to provide such retroactive coverage is not an experimental, pilot, or demonstration project, nor is it likely to promote the objectives of the Medicaid Act.

71

377.    In approving the Kentucky HEALTH refusal to provide the retroactive covered required by the Medicaid Act, the Secretary relied on factors which Congress has not intended him to consider, entirely failed to consider several important aspects of the problem, and offered an explanation for his decision that runs counter to the evidence.

378.    The Secretary's decision to approve Kentucky HEALTH's refusal to provide the retroactive coverage required by the Medicaid Act exceeded his Section 1115 waiver authority; otherwise violated the Medicaid Act; was arbitrary and capricious and an abuse of discretion; and ran counter to the evidence in the record.

### COUNT SEVEN: VIOLATION OF ADMINISTRATIVE PROCEDURE ACT (NON-EMERGENCY MEDICAL TRANSPORTATION)

379.    Plaintiffs repeat and incorporate herein by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

380.    The Administrative Procedure Act provides that a reviewing court may "hold unlawful and set aside" agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"; "contrary to constitutional right, power, privilege, or immunity"; "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right"; or "without observance of procedure required by law."  5 U.S.C. § 706(2)(A)-(D).

381.    In approving Kentucky HEALTH's withdrawal of non-emergency medical transportation benefits from the expansion population (other than for "medically frail" individuals), the Secretary purported to waive 42 U.S.C. § 1396a(a)(4) insofar as it incorporates 42 C.F.R. § 431.53 pursuant to Section 1115.

382.    Kentucky HEALTH's withdrawal of non-emergency medical transportation benefits from the expansion population is not an experimental, pilot, or demonstration project, nor is it likely to promote the objectives of the Medicaid Act.

383.    In approving the Kentucky HEALTH withdrawal of non-emergency medical transportation benefits from the expansion population, the Secretary relied on factors which Congress has not intended him to consider, entirely failed to consider several important aspects of the problem, and offered an explanation for his decision that runs counter to the evidence.

384.    The Secretary's decision to approve Kentucky HEALTH's withdrawal of non-emergency medical transportation benefits from the expansion population exceeded his Section 1115 waiver authority; otherwise violated the Medicaid Act; was arbitrary and capricious and an abuse of discretion; and ran counter to the evidence in the record.

## COUNT EIGHT: VIOLATION OF ADMINISTRATIVE PROCEDURE ACT (KENTUCKY HEALTH PROGRAM AS A WHOLE)

385.    Plaintiffs repeat and incorporate herein by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

386.    The Administrative Procedure Act provides that a reviewing court may "hold unlawful and set aside" agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"; "contrary to constitutional right, power, privilege, or immunity"; "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right"; or "without observance of procedure required by law."  5 U.S.C. § 706(2)(A)-(D).

387.    In approving the Kentucky HEALTH program, the Secretary purported to waive various requirements of the Medicaid Act, pursuant to Section 1115.

388.    The Kentucky HEALTH program is not an experimental, pilot, or demonstration project, nor is it likely to promote the objectives of the Medicaid Act.

389.    In approving the Kentucky HEALTH program, the Secretary relied on factors which Congress has not intended him to consider, entirely failed to consider several important

aspects of the problem, and offered an explanation for his decision that runs counter to the evidence.

390.    The Secretary's decision to approve the Kentucky HEALTH program exceeded his Section 1115 waiver authority; otherwise violated the Medicaid Act; was arbitrary and capricious and an abuse of discretion; and ran counter to the evidence in the record.

### COUNT NINE: VIOLATION OF THE TAKE CARE CLAUSE, ARTICLE II, SECTION 3, CLAUSE 5

391.    Plaintiffs repeat and incorporate herein by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

392.    Plaintiffs have a non-statutory right of action to enjoin and declare unlawful official action that is ultra vires.

393.    The United States Constitution provides that "All legislative Powers herein granted shall be vested in a Congress of the United States." U.S. Const., art. I, § 1.  Congress is authorized to "make all laws which shall be necessary and proper for carrying into Execution" its general powers.  *Id.* §§ 1, 8.

394.    After a federal law is duly enacted, the President has a constitutional duty to "take Care that the Laws be faithfully executed."  *Id.* art. II, § 3.

395.    The Take Care Clause is judicially enforceable against presidential action that undermines statutes enacted by Congress and signed into law.  *See, e.g.*, *Angelus Milling Co. v. Comm'r*, 325 U.S. 293, 296 (1945) ("Insofar as Congress has made explicit statutory requirements, they must be observed and are beyond the dispensing power of [the Executive Branch]."); *Kendall v. United States ex rel. Stokes*, 37 U.S. (12 Pet.) 524, 612-13 (1838).

396.    The Take Care Clause limits the President's power and ensures that he will faithfully execute the laws that Congress has passed.

397.    Under the Constitution, the President lacks the authority to rewrite congressional statutes or to direct federal officers or agencies to effectively amend the statutes he is constitutionally required to execute.

398.    In implementing Kentucky HEALTH, the State has sought to "comprehensively transform Medicaid."

399.    The Director of CMS has expressed the need to "fundamentally transform Medicaid."

400.    The power to "transform" a congressional program is a legislative power vested in Congress.  An effort to "transform" a statute outside that legislative process is at odds with the President's duty to take care that the laws be faithfully executed.

401.    The Medicaid population targeted by the waiver here is the so-called Medicaid "expansion population."  That population was added by Congress in the Affordable Care Act.  The Executive Branch has repeatedly expressed its hostility to the Affordable Care Act and its desire to undermine its operation.  An effort to undermine the Affordable Care Act by undoing the extension of Medicaid to the expansion population is at odds with the President's duty to take care that the laws be faithfully executed.

402.    The President's Executive Order set out herein direct agencies to take action contrary to the ACA, Medicaid, and other laws passed by Congress.

403.    The Defendants' actions, as described herein, followed that Executive Order.

404.    The Defendants' actions, as described herein, seek to redefine the purposes and objectives of the Medicaid Act, including through the granting of the Kentucky HEALTH waiver, and represent a fundamental alteration of Medicaid.

405.     The Defendants' actions, as described herein, seek to undermine the ACA, including its optional expansion of Medicaid, and represents a fundamental alteration to those statutes.

406.     Accordingly, the Defendants' actions are in violation of the Take Care Clause and are ultra vires.

407.     Plaintiffs will suffer irreparable injury if the Secretary's actions following the President's Executive Orders are not declared unlawful and unconstitutional because those actions have injured or will continue to harm Plaintiffs.

408.     Plaintiffs are in danger of suffering irreparable harm and have no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully ask that this Court:

1.     Certify this case as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(2);

2.     Declare that Defendants' issuance of the Dear State Medicaid Director Letter violates the Administrative Procedure Act, the Social Security Act, and the United States Constitution in the respects set forth above;

3.     Declare that Defendants' approval of the Kentucky HEALTH waiver application violates the Administrative Procedure Act, the Social Security Act, and the United States Constitution in the respects set forth above;

4.     Preliminarily and permanently enjoin Defendants from implementing the practices purportedly authorized by Dear State Medicaid Director Letter and the approval of the Kentucky HEALTH waiver application;

5.      Award Plaintiffs their reasonable attorneys' fees and costs pursuant to 28 U.S.C.

§ 2412; and

6.      Grant such other and further relief as may be just and proper.

January 24, 2018

Thomas J. Perrelli
    (D.C. Bar No. 438929)
Ian Heath Gershengorn
    (D.C. Bar No. 448475)
Devi M. Rao*
    (D.C. Bar No. 1004146)
Samuel F. Jacobson*
    (D.C. Bar No. 1033373)
Natacha Y. Lam*
    (D.C. Bar No. 1030168)
Lauren J. Hartz*
    (D.C. Bar No. 1029864)
Jenner & Block LLP
1099 New York Avenue, N.W.
Suite 900, Washington, DC 20001
Phone: 202 639 6004
TPerrelli@jenner.com
IGershengorn@jenner.com
DRao@jenner.com
SJacobson@jenner.com
NLam@jenner.com
LHartz@jenner.com

*Counsel to National Health Law Program*

*\*Application for Admission to the District*
*Court for District of Columbia Pending*

Respectfully submitted,

By: /s/  Jane Perkins
Jane Perkins
Catherine McKee
Sarah Somers
National Health Law Program
200 N. Greensboro Street, Suite D-13
Carrboro, NC 27510
Phone: 919-968-6308 (x101)
perkins@healthlaw.org
mckee@healhtlaw.org

/s/ Anne Marie Regan
Anne Marie Regan
Cara Stewart
Kentucky Equal Justice Center
222 South First Street, Suite 305
Louisville, KY 40202
502-468-9403
859-582-2285
amregan@kyequaljustice.org
carastewart@kyequaljustice.org

/s/ Samuel Brooke
Samuel Brooke
Emily C.R. Early
Neil K. Sawhney
Southern Poverty Law Center
400 Washington Avenue
Montgomery, Alabama 36104
Phone: 334-956-8200
samuel.brooke@splcenter.org
emily.early@splcenter.org
neil.sawhney@splcenter.org

*Counsel for Plaintiffs*