## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

———————————————————————

Ronnie Maurice STEWART, et al.,      )
        )
        *Plaintiffs*,     )
        )
     v.         )
        )   Civil Action No. 1:18-cv-152 (JEB)
Alex M. AZAR II, in his official capacity as   )
Secretary of the United States Department of Health  )
and Human Services, et al.,     )
        )
        *Defendants*.     )
        )

———————————————————————

## PROPOSED BRIEF OF AARP, AARP FOUNDATION, JUSTICE IN AGING, NATIONAL ACADEMY OF ELDER LAW ATTORNEYS, AND DISABILITY RIGHTS EDUCATION AND DEFENSE FUND AS *AMICUS CURIAE* IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Eric Carlson
JUSTICE IN AGING
3660 Wilshire Boulevard, Suite 718
Los Angeles, CA 90010
T: (213) 674-2813
ecarlson@justiceinaging.org

Kelly Bagby (D.C. Bar # 462390)
Iris Y. González (D.C. Bar # 987156)
AARP FOUNDATION
601 E Street, NW
Washington, DC 20049
T: (202) 434-2060
kbagby@aarp.org

René H. Reixach, Jr.
WOODS OVIATT GILMAN LLP
  on behalf of the NATIONAL ACADEMY
  OF ELDER LAW ATTORNEYS
700 Crossroads Building
2 State Street
Rochester, New York 14614
T: (585) 987-2858
rreixach@woodsoviatt.com

Lisa S. Blatt (D.C. Bar # 429544)
ARNOLD & PORTER
  KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC  20001-3743
T: (202) 942-5000
lisa.blatt@arnoldporter.com

Silvia Yee
Carly A. Myers
DISABILITY RIGHTS EDUCATION
  AND DEFENSE FUND
3075 Adeline Street, Suite 210
Berkeley, CA  94703
T: (510) 644-2555
syee@dredf.org
cmyers@dredf.org

*Counsel for Amici Curiae*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................... iii

INTERESTS OF AMICI CURIAE ..................................................... 1

INTRODUCTION .................................................................. 3

ARGUMENT ..................................................................... 4

I.     THE WAIVER WILL HARM VULNERABLE KENTUCKIANS WHO
       DEPEND ON MEDICAID FOR THEIR HEALTH CARE COVERAGE. ....................... 4

       A.     The Waiver Primarily Affects Adults from Ages 19 to 64, But It Is
              Misleading for Defendants and Intervenor to Broadly Describe this
              Population as "Able-Bodied." ...................................... 4

       B.     Defendants' Waiver Will Roll-Back Recent Coverage Improvements,
              Creating Particular Risks for Kentuckians with Chronic Conditions or
              Functional Limitations. ........................................... 6

II.    DEFENDANTS IMPEDE MEDICAID OBJECTIVES BY WAIVING THE
       PROTECTION THAT ALLOWS FOR COVERAGE PRIOR TO THE
       APPLICATION MONTH ................................................... 9

       A.     Coverage Prior to the Application Month Protects Low-Income Persons
              Who Have Suffered Injury or Another Health Setback. ............... 9

       B.     Due to Injury or Unfamiliarity with the Health Care System, Low-Income
              Persons Often Do Not Apply for Medicaid Coverage Within the First
              Month in Which Care Was Provided. ............................... 11

       C.     Because Medicaid Beneficiaries Have Few Financial Resources, Medicaid
              Policies Regarding Coverage Effective Dates Should Not Track the
              Practices of Private Insurers .................................... 13

III.   DEFENDANTS IMPEDE MEDICAID OBJECTIVES BY ELIMINATING
       NON-EMERGENCY MEDICAL TRANSPORTATION. ................................ 15

IV.    DEFENDANTS IMPEDE MEDICAID OBJECTIVES BY APPROVING SIX-
       MONTH ENROLLMENT LOCK-OUTS. ........................................ 16

       A.     Enrollment Lock-Outs Are Inappropriately Punitive and Not Supported By
              a Supposed Need to Align Medicaid Coverage with Private Health
              Insurance. ..................................................... 16

       B.     Beneficiaries May Be Disqualified for Improper Reasons, and Lock-Outs
              Would Magnify the Harm Caused By Such Improper Determinations. .... 20

CONCLUSION ................................................................. 21

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Cohen ex rel. Cohen v. Quern*,
   608 F. Supp. 1324 (N.D. Ill. 1984) ......................................................................10

*Hughes v. McCarthy*,
   734 F.3d 473 (6th Cir. 2013) ...............................................................................1

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
   567 U.S. 519 (2012).................................................................................................1

*Newton-Nations v. Betlach*,
   660 F.3d 370 (9th Cir. 2011) ................................................................................3

*Schott v. Olszewski*,
   401 F.3d 682 (6th Cir. 2005) ..............................................................................12

**Statutes**

42 U.S.C.
   § 1315(a) ................................................................................................................3
   § 1395c..................................................................................................................8
   § 1396-1 ................................................................................................................3
   § 1396a(a)(10)(A)(i)(VIII)....................................................................................4
   § 1396a(a)(34).........................................................................................10, 11, 13
   § 1396d(a) ............................................................................................................11
   § 1396d(a)(3) .........................................................................................................5
   § 1396o(c)(1) .......................................................................................................13
   § 1396o-1(b)(1)....................................................................................................13
   § 1396o-1(b)(2).....................................................................................................13

Patient Protection and Affordable Care Act,
   Pub. L. No. 111-148, Title II, § 2001 (2010).....................................................4

Fla. H.B. 5001 (Appropriations Act) ..........................................................................9

Fla. H.B. 5003 (Appropriations Implementation Bill) ...............................................9

H.R. 180, 115th Cong. § 1 (2017)..............................................................................11

H.R. 1628, 115th Cong. § 114(b) (2017)...................................................................11

H.R. 5626, 114th Cong. § 1 (2016).............................................................................11

**Regulatory Provisions**

42 C.F.R.

    § 409.30(a) ...................................................................................12
    § 409.31(b) ...................................................................................12
    § 409.32.........................................................................................12
    § 409.61(b) ...................................................................................12
    § 431.53.........................................................................................15
    §§ 431.200–250 ............................................................................17
    § 435.915(a)(2) .............................................................................13
    § 435.916.......................................................................................17

83 Fed. Reg. 2,642 (2018) ....................................................................6, 17

**Other Authorities**

AARP Public Policy Institute, *Chronic Care: A Call to Action for Health Reform* (March 2009) .....................................................................................................8

Benjamin Sommers et al., *Three-Year Impacts of the Affordable Care Act: Improved Medical Care and Health Among Low-Income Adults*, 36 Health Affairs, No. 6 (2017) ............................................................................................................7, 18

Budget and Pol'y Priorities, *Kentucky Waiver Will Harm Medicaid Beneficiaries* (Jan. 16, 2018) .......................................................................................................2

GAO, *Medicaid: Efforts to Exclude Nonemergency Transportation Not Widespread, but Raise Issues for Expanded Coverage* (Jan. 2016) ....................................16

H. Stephen Kaye, Community Living Policy Ctr., *How Do Disability and Poor Health Impact Proposed Medicaid Work Requirements?* (Feb. 2018) ...................5

Health Care Cost Institute, *2016 Health Care Cost and Utilization Report* (Jan. 2018) ................9

Judith Solomon, Ctr. on Budget and Pol'y Priorities, *Kentucky Waiver Will Harm Medicaid Beneficiaries* (Jan. 16, 2018),

Kaiser Family Foundation, *Medicaid Retroactive Coverage Waivers: Implications for Beneficiaries, Providers, and States* (Nov. 2017) ...........................................9

Medicare Payment Advisory Commission (MedPAC), *A Data Book: Health Care Spending and the Medicare Program* (June 2016), *available at* ...........................12

Nat'l Institute on Aging and Nat'l Institutes of Health, *Growing Older in America: The Health & Retirement Study* (March 2007) .............................................................8

Rachel Garfield et al., Kaiser Family Foundation, *Understanding the Intersection of Medicaid and Work* (Jan. 2018) ...........................................................................5

S. Amdt. 270 to S. Amdt. 267, 115th Cong., Tit. I of Better Care Reconciliation Act of 2017, § 127(a) (2017), *in* 163 Cong. Rec. S4196, S4205 (July 25, 2017)..............................11

S. Rep. No. 92-1230 (1972), *in* Amendments to the Social Security Act 1969–1972, vol. 3, p. 221 of 1273 ....................................................................................................................10

Statement by Elliot L. Richardson, Sec'y of HEW, before the Sen. Fin. Comm. (July 14, 1970), *in* Amendments to the Social Security Act 1969–1972, vol. 8, p. 1262 of 1267 ........10

Steven Machlin et al.*,* Agency for Healthcare Research and Quality, *Statistical Brief #203: Health Care Expenses for Adults with Chronic Conditions, 2005* (May 2008) ..............8

T. Thompson et al., Associated Press-NORC Ctr. or Public Affairs Research, *Long-Term Care: Perceptions, Experiences, and Attitudes Among Americans 40 or Older* (2013) .........12

U.S. Dep't of Agric., Office of the Inspector Gen., *FNS Controls Over SNAP Benefits for Able-Bodied Adults Without Dependents* (Sept. 29, 2016) ......................................................20

Yeheskel Hasenfeld, et al., Social Service Review, *The Logic of Sanctioning Welfare Recipients: An Empirical Assessment* (June 2004) ................................................................20

## INTERESTS OF AMICI CURIAE

AARP is a nonprofit, nonpartisan organization dedicated to fulfilling the needs and representing the interests of people age fifty and older.  AARP fights to protect older people's financial security, health, and well-being.  AARP's charitable affiliate, AARP Foundation, creates and advances effective solutions that help low-income individuals fifty and older secure the essentials.  Among other things, AARP and AARP Foundation advocate for access to quality health care across the country, through members and affiliates, and frequently appear as friend of the court on issues affecting older Americans.  *See, e.g.*, *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519 (2012).

Justice in Aging is a national, nonprofit law organization that uses the power of law to fight senior poverty by securing access to affordable health care, economic security, and the courts for older adults with limited resources.  Justice in Aging conducts training and advocacy regarding Medicare and Medicaid, and provides technical assistance to attorneys and others from across the country on how to address problems that arise under these programs.  Justice in Aging frequently appears as friend of the court on cases involving health care access for older Americans.

The National Academy of Elder Law Attorneys, Inc. (NAELA) is a professional organization of attorneys concerned with the rights of the elderly and disabled, providing a professional center, including public interest advocacy, for attorneys whose work enhances the lives of people with special needs and of all people as they age.  Its member attorneys represent Kentuckians who are affected by the Kentucky HEALTH waiver granted by the Department of Health and Human Services (hereafter, "Waiver"), and appear frequently as friend of the court.  *See, e.g.*, *Hughes v. McCarthy*, 734 F.3d 473, 480–81 (6th Cir. 2013) (Sixth Circuit noting agreement with position advocated by NAELA as friend of court).

The Disability Rights Education and Defense Fund (DREDF) is a national law and policy center that protects and advances the civil and human rights of people with disabilities through legal advocacy, training, education, and development of legislation and public policy.  DREDF is committed to increasing accessible and equally effective healthcare for people with disabilities and eliminating persistent health disparities that affect the length and quality of their lives. DREDF has significant experience in Medicaid law and policy, given that disabled individuals disproportionately live in poverty and depend on Medicaid services and supports.

All Amici are national organizations that are affected by HHS's Waiver in this case.  At least nine states have requested similar waivers.[1]  The Court's ruling will have a nationwide impact on the extent to which low-income persons have access to health care and whether such health care will be subject to the types of restrictions established by the Waiver.

HHS's Waiver applies to Medicaid coverage for Kentuckians from age 19 to 64 whose eligibility is not dependent upon meeting federal Medicaid law's definition of "disabled."  AR 5442.  As organizations that focus on the interests of older Americans and persons with disabilities, Amici have an interest in the Waiver and in this litigation for two reasons.  First, the Waiver is likely to harm Kentuckians with chronic conditions and functional limitations who are not classified as "disabled" under Medicaid law.  Second, Amici have an interest in older persons and persons with disabilities, chronic conditions, and/or functional limitations who receive services in Medicaid programs outside Kentucky; and this Court's orders will affect HHS's ability and willingness to grant similar waivers in other states.  This Court's ruling will have a

---

[1] These nine states are Arizona, Arkansas, Indiana, Kansas, Maine, New Hampshire, North Carolina, Utah, and Wisconsin.  Judith Solomon, Ctr. on Budget & Pol'y Priorities, *Kentucky Waiver Will Harm Medicaid Beneficiaries* 2 (Jan. 16, 2018), *available at* https://www.cbpp. org/research/health/kentucky-waiver-will-harm-medicaid-beneficiaries.

dramatic impact on Medicaid beneficiaries across the country, regardless of the beneficiary's age and level of disability.

## INTRODUCTION

Defendants are federal officials who have granted the State of Kentucky (Intervenor in this action) a broad waiver of certain long-standing Medicaid protections.  Contrary to the allegations of Defendants and Intervenor, the Waiver does not "assist in promoting the objectives" of the Kentucky Medicaid program.  *See* 42 U.S.C. § 1315(a).  Rather the Waiver would terminate or reduce Medicaid coverage for tens of thousands of low-income Kentuckians from ages 19 to 64.  The challenged terms of the Waiver are punitive, and they do nothing to improve health care for Kentucky's Medicaid beneficiaries.

To properly consider a waiver request, the federal government must assess (1) whether the project truly is an "experimental, pilot, or demonstration project;" (2) whether the project is likely to assist in promoting the Medicaid program's objectives, and (3) the length of time for which the project is necessary.  *Newton-Nations v. Betlach*, 660 F.3d 370, 380 (9th Cir. 2011).  Importantly, the purpose of the Medicaid program is to provide for "(1) medical assistance on behalf of [individuals] whose income and resources are insufficient to meet the costs of necessary medical services, and (2) rehabilitation and other services to help such [individuals] attain or retain capability for independence or self-care."  42 U.S.C. § 1396-1.

Amici agree with Plaintiffs' description of how Defendants have failed each of these requirements.  *See* Doc. 31-1 at 18-43.  First, Amici address the suggestion by Defendants and Intervenor that certain waiver provisions are justified by the fact that they will apply only to "able-bodied" persons.  *See* AR 0008, 1029, 1579, 1622, 1642, 1670, 1865, 1934, 2080, 2519, 2545, 2862, 2876, 5426, 5437, 5445, 5448, 5450–51, 5465, 5511–12, 5522–23.  In fact, the Waiver will harm many Kentuckians who have chronic conditions or functional limitations.

They will be more likely to lose Medicaid coverage and more susceptible to harm caused by that lack of coverage.

Amici then address three particular provisions of the Waiver: elimination of the Medicaid protection that allows for coverage for certain pre-application months, elimination of non-emergency medical transportation, and the six-month enrollment "lock-outs."  Finally, Amici explain why the Waiver's "medically frail" exemption is insufficient to protect those Kentuckians with chronic conditions and functional limitations who are likely to be harmed by the Waiver's requirements.

## ARGUMENT

I.     **THE WAIVER WILL HARM VULNERABLE KENTUCKIANS WHO DEPEND ON MEDICAID FOR THEIR HEALTH CARE COVERAGE.**

A.     **The Waiver Primarily Affects Adults from Ages 19 to 64, But It Is Misleading for Defendants and Intervenor to Broadly Describe this Population as "Able-Bodied."**

The Waiver by its terms affects five separate Medicaid eligibility groups: parents and other caretaker relatives, pregnant women, former foster care youth, transitional medical assistance, and the "new adult group."  AR 0025.  This "new" group is the population of adults who gained eligibility through the Affordable Care Act's expansion of Medicaid eligibility and by Intervenor's subsequent decision to offer coverage to this group.  AR 5442; *see* 42 U.S.C. § 1396a(a)(10)(A)(i)(VIII); Pub. L. No. 111-148, Title II, § 2001 (2010) (provision of Affordable Care Act).  The new group is comprised of persons between ages 19 and 64 who are not considered "disabled" under federal Medicaid law and who qualify based on having income of no more than 138% of the federal poverty level.  *Id.*  Because this "new" group comprises the largest percentage of persons subject to the Waiver and because the other groups (such as the pregnant women) are excused from some requirements, this brief will discuss the Waiver

primarily as affecting the "new" group of beneficiaries.  AR 5448-49, 5452.  This brief will refer to these beneficiaries as the "expansion" population, because they gained eligibility through the recent expansion of Medicaid through the Affordable Care Act.

In seeking the Waiver, Intervenor has characterized the affected population as "able-bodied."  *See supra* at 3.  As explained in this brief, the term "able-bodied" hides many harms that likely will result from the Waiver's implementation.  Although Medicaid eligibility rules may classify a person as "disabled" or "not disabled," in real life disability is a continuum.  A Medicaid beneficiary may not be formally "disabled" under Medicaid law, but nonetheless face significant health-related challenges.  Data from the National Center for Health Statistics shows that approximately 40% of working-age Medicaid beneficiaries "have broadly defined disabilities, most of whom are not readily identified as such through administrative records."[2] Similarly, data from the March 2017 Current Population Survey (reflecting 2016 health insurance coverage) show that, among Kentucky's non-elderly Medicaid population not receiving Supplemental Security Income due to disability, 51% cited being ill or disabled as the reason for not being employed.[3]

Likewise, Medicaid law classifies a beneficiary as either "aged"—age 65 or older—or not aged.  *See, e.g.*, 42 U.S.C. § 1396d(a)(3).  But in reality some beneficiaries in their 50s or early 60s face many of the same health-related challenges that confront beneficiaries who are formally classified as "aged."  Many health problems are hidden by Intervenor's use of the term

[2] H. Stephen Kaye, Community Living Policy Ctr., *How Do Disability and Poor Health Impact Proposed Medicaid Work Requirements?* 2 (Feb. 2018), *available at* https://clpc.ucsf.edu/sites/clpc.ucsf.edu/files/reports/Disability%20%26%20Medicaid%20Work%20Requirements.pdf.

[3] Rachel Garfield et al., Kaiser Family Foundation, *Understanding the Intersection of Medicaid and Work* 10 (Appendix Table 2) (Jan. 2018), *available at* http://files.kff.org/attachment/Issue-Brief-Understanding-the-Intersection-of-Medicaid-and-Work.

"able-bodied" to describe the population of persons who are under age 65 and not classified as disabled.

**B.    Defendants' Waiver Will Roll-Back Recent Coverage Improvements, Creating Particular Risks for Kentuckians with Chronic Conditions or Functional Limitations.**

Intervenor anticipates that the Waiver will lead to a significant decline in Medicaid enrollment.  Intervenor estimates an enrollment decline of 238,000 member months for the first year, rising to 699,000 for the third year and 1.14 million for the fifth year.  AR 5427.  These lost *months* translate to approximately 19,833, 58,250, and 95,000 lost enrollees over each *year*.

Presumably, the vast majority of these lost enrollees are uninsured.  Intervenor's public notice acknowledges that "program non-compliance" is one reason for enrollment that will "fluctuate," but does not detail how its estimates were developed.  *Id.*  Given the lack of explanation, it is not unreasonable to assume that the vast majority of the lost enrollees are losing health insurance due to the Waiver's various administrative roadblocks, financial obligations, and enrollment lock-outs.  Intervenor suggests that persons might "transition to commercial coverage," but provides no reason to explain why that might be true.  *Id.*  Certain persons may increase their incomes beyond the Medicaid limit of $1,396.10 monthly, but such increases likely would occur regardless of the Waiver.[4]  Intervenor's evidence is insufficient to show that the decreased enrollment is the result of increased income, rather than the combined effect of the Waiver's administrative roadblocks, obligations, and lock-outs.

The extension of Medicaid to the "expansion" population has led to significant improvements for adult Kentuckians between the ages of 18 and 64.  A recent study surveyed Kentuckians from age 19 through 64, with incomes not exceeding 138% of the federal poverty

---

[4] The maximum income for expansion Medicaid eligibility is 138% of the federal poverty level, which for 2018 is $12,140 annually or $1,012 monthly.  *See* 83 Fed. Reg. 2,642, 2,643 (2018).

level.  In 2013, 40.2% of this low-income population was uninsured, but this percentage fell to 12.4%, 8.6%, and then 7.4% in 2014, 2015, and 2016, respectively.[5]

Furthermore, the increased level of insurance coverage led to health care improvements. Preventive care improved from 2013 to 2016, indicated by increases of 26%, 27%, and 19% in annual check-ups, annual cholesterol checks, and annual blood sugar checks.[6]  Similar improvements were seen in the quality of care for persons with preexisting health care conditions.  High-risk patients—those patients with histories of heart disease, stroke, diabetes, or hypertension—experienced an 11% increase in cholesterol checks.[7]  Likewise, patients with diabetes saw a 7% increase in blood sugar checks.[8]  Persons with chronic conditions were 13% more likely to receive regular care to address that condition.[9]

The Waiver, however, may well reverse many of these gains, with a significant burden falling on expansion population beneficiaries in their 50s and 60s or younger expansion population beneficiaries with chronic conditions or functional limitations.  These persons are not eligible for Medicare because they are not 65 years of age and (in most cases) do not meet

---

[5]  Benjamin Sommers et al., *Three-Year Impacts of the Affordable Care Act: Improved Medical Care and Health Among Low-Income Adults*, 36 Health Affairs, No. 6, at 1119 (2017), *available at* http://nrs.harvard.edu/urn-3:HUL.InstRepos:33330546.  The data cited in this brief are taken from Appendix Table 3, which is in the article found via the above-listed internet address for Digital Access to Scholarship at Harvard, but not in the article as published in Health Affairs.

[6] The percentage of persons receiving annual check-ups increases from 46.3% to 58.4%, a 26% increase.  Annual cholesterol checks and blood sugar checks increased from 45.8% to 58.1% (a 27% increase), and from 44.5% to 52.9% (a 19% increase), respectively.

[7] The percentage of high-risk patients receiving cholesterol checks increased from 66.2% to 73.5%, an 11% increase.

[8] The percentage of diabetic patients receiving blood sugar tests increased from 84.1% to 89.5%, a 7% increase.

[9] Sommers et al., *supra* note 5, Appendix Table 3.  The percentage of persons receiving care for chronic conditions increased from 69.4% to 78.3%, a 13% increase.

programmatic definitions of "disabled," but they are relatively more likely to be facing

significant health problems.  *See* 42 U.S.C. § 1395c (Medicare eligibility standards).

Prevalence of chronic conditions, including both physical and mental health conditions,

increases significantly with age.  Based on health care expense data, the Agency for Healthcare

Research and Quality found that 57% of persons from ages 55 through 64 have at least two

chronic conditions.  An additional 20.3% of these persons have one chronic condition, and only

22.7% have no chronic condition.[10]  AARP came to similar conclusions in an analysis of data for

the age 50–64 population, finding that 72.5% have at least one chronic condition, and almost

20% suffer from some sort of mental illness.[11]

The National Institute on Aging and National Institutes of Health reached similar results

based on surveys of tens of thousands of respondents.  Sixty percent of respondents from the age

of 55 to 64 reported at least one health problem, with 25% reporting at least two problems (for

the purposes of this study, a "problem" was defined as being related to one of six categories:

hypertension, diabetes, cancer, bronchitis/emphysema, heart condition, and stroke).[12]

Another marker of increased health need is an increase in health care expenses.  In an

examination of employer-sponsored health care, the Health Cost Institute documented how

health care expenses rose significantly with age.  For persons from age 55 to 64, average annual

---

[10] Steven Machlin et al.*,* Agency for Healthcare Research and Quality, *Statistical Brief #203: Health Care Expenses for Adults with Chronic Conditions*, *2005*, at 1–2, 5 (Figure 1) (May 2008), *available at* http://www.meps.ahrq.gov/mepsweb/data_files/publications/st203/ stat203.pdf.

[11] AARP Public Policy Institute, *Chronic Care: A Call to Action for Health Reform* 11–12, 16 (March 2009), *available at* https://www.aarp.org/health/medicare-insurance/info-03-2009/ beyond_50_hcr.html.

[12] Nat'l Institute on Aging and Nat'l Institutes of Health, *Growing Older in America: The Health & Retirement Study* 23 (March 2007), *available at* https://www.nia.nih.gov/sites/default/files/ 2017-06/health_and_retirement_study_0.pdf.

health care expenses were 44% higher than for persons age 45 to 54 and 116% higher than persons age 26 to 44.[13]

All these data demonstrate how low-income beneficiaries in their 50s and 60s—along with some younger low-income beneficiaries with chronic conditions or functional limitations — depend upon the Kentucky Medicaid program and are threatened by the restrictions imposed by the Waiver.  Lost months of Medicaid coverage have a human cost: less preventive care, greater decline, and avoidable deterioration in physical and mental health.

## II.   DEFENDANTS IMPEDE MEDICAID OBJECTIVES BY WAIVING THE PROTECTION THAT ALLOWS FOR COVERAGE PRIOR TO THE APPLICATION MONTH.

### A.   Coverage Prior to the Application Month Protects Low-Income Persons Who Have Suffered Injury or Another Health Setback.

Defendants have waived the important patient protection that allows Medicaid coverage to begin up to three months prior to a person's application month, as long as during those months the applicant met Medicaid eligibility standards.  AR 0025, 0027.  Defendants similarly have waived pre-application coverage in Arkansas, Indiana, Iowa, and New Hampshire, and Florida's current budget legislation calls for eliminating pre-application Medicaid coverage for all non-

---

[13] Health Care Cost Institute, *2016 Health Care Cost and Utilization Report Appendix*, at 1 (Table A1) (Jan. 2018), *available at* http://www.healthcostinstitute.org/wp-content/uploads/ 2018/01/2016-HCCUR-Appendix-1.23.18-c.pdf.  Annual health care expenses for the 55 to 64 population, the 45 to 54 population, and the 26 to 44 population were $10,137, $7,026, and $4,695, respectively.

pregnant adults.[14]  The Iowa waiver applies to virtually all Medicaid eligibility populations, including adults of any age and persons whose eligibility is based on disability.[15]

Waiver of this protection seriously impedes Medicaid objectives by denying Medicaid coverage for persons who cannot afford to pay for health care expenses or private health insurance.  In 1973, Congress enacted section 1396a(a)(34) of Title 42 of United States Code, which requires a state Medicaid program to provide coverage for up to three months prior to the application month, as long as the person met eligibility requirements during those months. Before then, states had the *option* of offering coverage up to three months prior to the month of application, and 31 states in fact chose to offer such coverage.  S. Rep. No. 92-1230, at 209 (1972), *in* Amendments to the Social Security Act 1969–1972, vol. 3, p. 221 of 1273.  In recommending that all states be required to provide this coverage, a Senate committee report noted that the amendment would "protect[] persons who are eligible for medicaid but do not apply for assistance until after they have received care, either because they did not know about the medicaid eligibility requirements or because the sudden nature of their illness prevented their applying."  *Id*; *see also Cohen ex rel. Cohen v. Quern*, 608 F. Supp. 1324, 1332 (N.D. Ill. 1984) (quoting from Senate report).

This accommodation to applicants made (and continues to make) good sense.  In states that did not offer coverage prior to the month of application, injured persons often were unable to receive needed health care.  The Secretary of Health, Education, and Welfare explained the problem in testimony supporting the legislative amendment:

---

[14] Kaiser Family Foundation, *Medicaid Retroactive Coverage Waivers: Implications for Beneficiaries, Providers, and States* 2 (Nov. 2017), *available at* https://www.kff.org/medicaid/ issue-brief/medicaid-retroactive-coverage-waivers-implications-for-beneficiaries-providers-and-states/; Fla. H.B. 5001, at 55 (Appropriations Act); Fla. H.B. 5003, at 25 (Appropriations Implementing Bill).

[15] Kaiser Family Foundation, *Medicaid Retroactive Coverage Waivers*, *supra* note 14.

> Providers have been reluctant in many instances to care for potential Medicaid eligibles because frequently the patient has not applied for Medicaid prior to his illness and, therefore, the providers would not be eligible to receive payment for their services.

Statement by Elliot L. Richardson, Sec'y of HEW, before the Sen. Fin. Comm., at 11 (July 14, 1970), *in* Amendments to the Social Security Act 1969–1972, vol. 8, p. 1262 of 1267. This problem is no less vexing today, as lack of health care coverage continues to limit persons' access to needed health care.

Today, the right to pre-application coverage is established through sections 1396a(a)(34) and 1396d(a), which defines Medicaid's "medical assistance" as including up to three pre-application months. Notably, Congress has rejected recent legislative efforts to amend sections 1396a and 1396d to eliminate this protection.[16] This failed legislation supports Plaintiffs' argument that Defendants, in approving the Waiver, have inappropriately taken over a legislative function in an effort to fundamentally transform Medicaid. *See* Doc. 31-1 at 12–18.

**B.    Due to Injury or Unfamiliarity with the Health Care System, Low-Income Persons Often Do Not Apply for Medicaid Coverage Within the First Month in Which Care Was Provided.**

Amici routinely witness the importance of this Medicaid protection. Needless to say, many hospitalizations are unplanned. Our members and clients suffer strokes, auto accidents, and falls, among other setbacks, and unexpectedly find themselves in hospitals and nursing homes, often struggling with terrifying new medical realities. It is little surprise that many do not file a Medicaid application within the initial month, particularly when the "month" of admission may just be a day or two before one month turns into another. Under the Waiver, a

---

[16] H.R. 1628, 115th Cong. § 114(b) (2017); H.R. 180, 115th Cong. § 1 (2017); H.R. 5626, 114th Cong. § 1 (2016); S. Amdt. 270 to S. Amdt. 267, 115th Cong., Tit. I of Better Care Reconciliation Act of 2017, § 127(a) (2017), *in* 163 Cong. Rec. S4196, S4205 (July 25, 2017).

woman could be hit by an uninsured driver on the evening of April 29 and be liable for thousands of dollars of hospital expenses due to the "failure" to file a Medicaid application within 36 hours, when April becomes May.  A comparable fact pattern underlay a Sixth Circuit decision involving Section 1396a(a)(34): an emergency hospitalization had led to pre-Medicaid-application health care bills totaling approximately $50,000.  *Schott v. Olszewski*, 401 F.3d 682, 685 (6th Cir. 2005) (more than $40,000 in unpaid bills and more than $8,000 in reimbursement due to patient for bills she had paid herself).

Amici also observe in practice how the complexity of the system causes delays in filing a Medicaid application.  One complexity is particularly common for persons of age 65 or older (who are not included in the Kentucky Waiver, but who have lost pre-eligibility coverage in a waiver granted by Defendants to the State of Iowa).  When first admitted to a nursing home, many older persons initially assume that their nursing home care expenses will be covered by Medicare.[17]  That assumption, however, is wholly off-target—Medicare coverage is much more restrictive than generally believed.  Medicare coverage requires a hospital stay of at least three nights and is available only when in the nursing home the person on a daily basis receives skilled therapy services or extraordinary nursing services as a specific follow-up to the hospital services. 42 C.F.R. §§ 409.30(a), 409.31(b), 409.32.  Also, Medicare can pay the entirety of nursing home charges only for the initial 20 days; days 21 through 100 have a daily co-payment (for 2018) of $167.50.  42 C.F.R. § 409.61(b).  Finally, most persons do not receive anything close to 100 days

---

[17] *See, e.g.*, T. Thompson et al., Associated Press-NORC Ctr. or Public Affairs Research, *Long-Term Care: Perceptions, Experiences, and Attitudes Among Americans 40 or Older* 7 (2013) (survey shows Americans "overestimate the long-term care services that Medicare will cover"), *available at* http://www.apnorc.org/PDFs/Long%20Term%20Care/AP_NORC_Long%20Term% 20Care%20Perception_FINAL%20REPORT.pdf.

of coverage, due primarily to Medicare contractor determinations that the person no longer needs the required level of therapy or skilled nursing services.[18]

### C. Because Medicaid Beneficiaries Have Few Financial Resources, Medicaid Policies Regarding Coverage Effective Dates Should Not Track the Practices of Private Insurers.

Intervenor justifies waiver of pre-application coverage by making comparisons to private insurance, which generally does not become effective until the applicant pays the relevant premium. Intervenor claims that "[e]liminating Medicaid retroactivity encourages individuals to obtain and maintain health insurance coverage, even when the individual is healthy" and further asserts that this elimination is "consistent with the commercial market and federal Marketplace policies." AR 5453.

The flaws in Intervenor's claim are in its premises—that Medicaid beneficiaries can afford private insurance and that Medicaid should track private insurance policies. But persons are eligible for Medicaid precisely because they cannot afford private health insurance. Limiting Medicaid coverage does not incentivize purchase of private health insurance, but instead leads only to more uninsured persons, deficient health care, and unpaid health care bills.

Likewise, Medicaid should not be administered like private insurance and federal Marketplace policies. Medicaid coverage is based on financial need, not on payment of premiums—indeed, the federal Medicaid statute either prohibits premiums or, for persons with incomes above 150% of the federal poverty level, caps total cost sharing at 5% of income. 42 U.S.C. §§ 1396o(c)(1), 1396o-1(b)(1)–(2); *see* Doc. 31-1 at 26. Accordingly, the State has no legitimate policy reason to deny Medicaid coverage for health care received within three months

---

[18] In 2016, the average length of stay under Medicare was only 27.6 days. Medicare Payment Advisory Commission (MedPAC), *A Data Book: Health Care Spending and the Medicare Program* 112, Chart 8-4 (June 2016), *available at* http://www.medpac.gov/docs/default-source/data-book/june-2016-data-book-health-care-spending-and-the-medicare-program.pdf.

prior to the application month, since such coverage only is available for months in which the person meets financial eligibility requirements.  42 U.S.C. § 1396a(a)(34); 42 C.F.R. § 435.915(a)(2).

If, for example, a patient applies for Medicaid coverage in May, and his low-income financial situation met Medicaid financial eligibility standards for the preceding February and all subsequent months, a safety-net health care program should authorize coverage starting in February.  Put another way, eliminating pre-application coverage for February, March, and April would frustrate Medicaid's objectives.  The patient might not be able to obtain needed services in February, March, or April or, if he received the health care, would face unaffordable health care bills.  The health care provider also would be injured, with no way to obtain reimbursement for any services provided to the patient.

It is no defense for Defendants or Intervenor to claim that their consistency-with-private-market arguments are justified by the premiums authorized by the Waiver.  As explained in Plaintiffs' brief supporting their Motion for Summary Judgment, imposition of premiums impedes the objectives of Kentucky's Medicaid program and should not be allowed.  Doc. 31-1 at 25–34.

Even assuming that premiums could be lawfully assessed, they cannot justify eliminating pre-application coverage.  Premiums undoubtedly increase the financial pressure on low-income persons who already cannot afford private health insurance.  It would be a perverse turn of reasoning if imposition of premiums was used to prop up the claim that Medicaid policies should be aligned with private insurance.  Whether or not premiums are assessed, Medicaid beneficiaries cannot afford private insurance and often need coverage within the three months prior to the application month.

Intervenor claims that it wants to encourage Medicaid enrollment when persons are healthy but, by eliminating pre-application coverage, it instead is ensuring that many low-income persons will be denied care or saddled with unaffordable bills and that health care providers will not be reimbursed for care provided to low-income Kentuckians.  Furthermore, Intervenor's purported interest in encouraging early Medicaid enrollment is belied by its imposition of premiums.

## III.     DEFENDANTS IMPEDE MEDICAID OBJECTIVES BY ELIMINATING NON-EMERGENCY MEDICAL TRANSPORTATION.

Defendants also have waived the requirement that the Medicaid program ensure necessary transportation to and from health care services.  Under federal law, "necessary" transportation can include both emergency and non-emergency transportation (42 C.F.R. § 431.53), but the Waiver has eliminated non-emergency medical transportation ("NEMT") for persons in the Medicaid expansion population.  The Waiver also eliminates NEMT for methadone treatment services for nearly all Medicaid beneficiaries, including those deemed "medically frail."  Except for the methadone-related restriction, the elimination of NEMT does not apply to "medically frail" beneficiaries or any persons eligible for Medicaid prior to the enactment of the Affordable Care Act.  AR 0032.

Many low-income people simply cannot afford to buy a car or hire a transportation service, and some lack access to affordable and reliable public transit.  These issues—when compounded with still widespread physical accessibility barriers—make the NEMT benefit particularly critical for persons with chronic conditions or functional limitations.  Indeed, the Government Accountability Office ("GAO") found that "excluding the NEMT benefit would

impede . . . enrollees' ability to access health care services, particularly individuals living in rural or underserved areas, as well as those with chronic health conditions."[19]

Furthermore, lack of non-emergency medical transportation has consequences.  When transportation is unavailable, the person does not receive needed health care and the risk of hospitalization, nursing-home admission, or institutionalization increases.

For these reasons, the Waiver's elimination of NEMT conflicts with the objectives of the Medicaid program.  Intervenors rely in part on data showing that, from June 2014 through June 2015, the Kentucky "expansion" population of more than 400,000 beneficiaries utilized less than 140,000 non-emergency trips.  AR 5478.  But the fact that many beneficiaries did not use NEMT is not determinative; the crucial fact is the 140,000 instances in which a Medicaid beneficiary relied upon Medicaid-funded NEMT.  And these 140,000 instances are more likely situations in which Medicaid beneficiaries had a chronic condition or functional limitation that necessitated Medicaid-covered transportation.

## IV.    DEFENDANTS IMPEDE MEDICAID OBJECTIVES BY APPROVING SIX-MONTH ENROLLMENT LOCK-OUTS.

### A.    Enrollment Lock-Outs Are Inappropriately Punitive and Not Supported By a Supposed Need to Align Medicaid Coverage with Private Health Insurance.

The Waiver also authorizes six-month enrollment lock-outs to penalize persons who otherwise meet Medicaid eligibility standards.  AR 0015, 0019, 0027, 0030.  The punitive nature of this provision is striking—for such transgressions as not timely submitting documentation, otherwise eligible persons are barred for Medicaid eligibility for up to six months.

---

[19] GAO, *Medicaid: Efforts to Exclude Nonemergency Transportation Not Widespread, but Raise Issues for Expanded Coverage* 15 (Jan. 2016), *available at* https://www.gao.gov/assets/680/674674.pdf.

Amici recognize that Intervenor legally may facilitate private health care coverage or, under the proper circumstances, terminate eligibility for failure to submit required information, provided that the beneficiary receives all due process protections.  *See, e.g.*, 42 C.F.R. §§ 431.200–250 (right to notice and administrative hearing), 435.916 (redeterminations of eligibility).  Medicaid law, however, does *not* allow for denying eligibility to otherwise eligible persons and thus imposition of enrollment lock-outs is inconsistent with Medicaid objectives.

Under the Waiver, lock-outs can be imposed in three situations: when a beneficiary did not timely report changed circumstances, did not timely submit documentation for renewing eligibility, or did not pay a premium within 60 days of the due date.  AR 0015, 0019, 0027, 0030. The premium-related lock-out applies only to those beneficiaries with incomes exceeding $1,012 monthly.[20]  Also, the Waiver provides exceptions from enrollment lock-out for certain situations. Lock-outs are not imposed on pregnant women, former foster care youth, and "medically frail" beneficiaries:  these persons are not required to pay premiums and are excused from lock-out related to changed circumstances or renewals.  AR 0028, 0030, 0035.  Also, certain circumstances can exempt a beneficiary from a lock-out.  These circumstances include hospitalization, death of a family member, eviction, natural disasters, and domestic violence.  AR 0028–0031, 0037.  With these exemptions, however, comes the administrative burden of proving that one is eligible for the exemption.  Finally, a beneficiary subject to a lock-out can reenroll prior to the expiration of the lock-out period by paying required premiums and completing a re-enrollment education course on health or financial literacy.  AR 0041.

---

[20]  AR 0039.  The lock-out for failure to pay premiums only applies to those beneficiaries with income above the federal poverty level, which is $1,012 monthly in 2018.  83 Fed. Reg. 2,642, 2,643 (2018).

As was true in the waiver of pre-application coverage, the State based its request for lock-

outs on inapt comparisons with private insurance.  A stated goal of the Waiver is to "encourage

individuals to become active consumers of healthcare who are prepared to use commercial health

insurance."  AR 5452.  In accord, the Waiver purportedly "will implement key commercial

market and Marketplace policies in order to introduce these critical concepts to Kentucky

HEALTH members."  *Id*.  One such concept supposedly is the "client-specific open enrollment

period."

> Specifically, if an individual is disenrolled from the program in accordance with
> current practice for failing to comply with annual eligibility redetermination
> requirements, the individual will be required to wait six months for a new open
> enrollment period.  This policy will educate members of the importance of
> meeting commercial market open enrollment deadlines, while also allowing
> members to rejoin the program at any time prior to the six-month date by
> completing a financial or health literary course.

AR 5444–45.

This reasoning, however, conflicts with the purpose of the Medicaid program and fails to

recognize Medicaid beneficiaries' low-income reality.  Again, Medicaid exists precisely to

provide health care coverage for persons who otherwise cannot afford such coverage.  Intervenor

has noted the rapid growth in the Kentucky Medicaid "expansion" population—persons from age

19 to 64 whose coverage was authorized by the Affordable Care Act—and data show that

introduction of coverage in Kentucky for the "expansion" population reduced the uninsured rate

from 40.2% to 7.4% among the eligible population.  AR 5437–38; Sommers et al., *supra* note 5,

Appendix Table 3.  Medicaid beneficiaries do not use Medicaid coverage because they are

unfamiliar with private coverage—they use it because they cannot *afford* private coverage.

To defend imposition of penalty periods, Intervenor confuses findings from an interim

report on the Indiana Medicaid program, claiming that "less than 6% of the individuals (2,677)

[in the Indiana Medicaid program] were disenrolled for non-payment, and the majority (56%) were able to obtain health insurance during this six month period." AR 5483.  One major flaw of Intervenor's rationale is the failure to distinguish between differing components of the Indiana Medicaid program.  In Indiana, the failure to pay premiums had different consequences depending on whether the person's income was between 100% and 138% of the federal poverty limit ("FPL") or whether it was no more than 100% FPL.  Non-payment resulted in disenrollment with a six month lock-out for the population with incomes from 100% to 138% FPL, but not for the persons whose incomes were no greater than 100% of FPL—who were downgraded to a more limited benefit package.  AR 4859.

The interim report on the Indiana program found disenrollment of 2,677 persons (5.9% of enrollment) from the 100% to 138% FPL group and downgrading of coverage for 21,445 persons (8.2% of enrollment) within the no-more-than-100%-of-FPL group.  Intervenor relies on a finding that, of 75 surveyed persons who lost health care coverage from the 100% to 138% FPL group, 42 persons (56%) had acquired other coverage.  AR 4895–97.  Notably, the sample size is relatively small, so Intervenor overstates the findings to the extent that it suggests that the study gathered data regarding each of the persons subject to an enrollment lock-out.  AR 5483.

More importantly, the data from Indiana do not support imposing lock-outs.  The data indicate that 44% of Indiana Medicaid beneficiaries in the 100%-to-138% group were locked out of Medicaid *without* having alternative health care coverage.  Furthermore, it is likely that the remaining 56% of persons in that group made a conscious choice to not pay Medicaid premiums because they had arranged for other health care coverage.

**B.    Beneficiaries May Be Disqualified for Improper Reasons, and Lock-Outs Would Magnify the Harm Caused By Such Improper Determinations.**

As discussed immediately above, the Waiver authorizes six-month enrollment lock-outs in response to three relatively mild transgressions. *See supra* at 16–19.  The unfairness and inappropriateness of lock-outs is exacerbated by the likelihood that the underlying "violation" may never have happened or may have happened through no real fault of the beneficiary.

Research on the Temporary Assistance for Needy Families ("TANF") program (which provides cash benefits) found that beneficiaries with disabilities and poor health are more likely to lose benefits due to an inability to navigate the system.[21]  In accord, review of the research notes that the existence of exemptions does not necessarily ameliorate problems, since a beneficiary may likely have difficulty understanding and obtaining the exemption.  AR 4726.

In a similar vein, a recent nationwide report from the U.S. Department of Agriculture found that implementing work requirements for the Supplemental Nutrition Assistance Program ("SNAP") was an "administrative nightmare" that was "error prone" in multiple states.[22]  In several instances, the Department found that the state was terminating beneficiaries' SNAP benefits even though the beneficiary qualified for an exemption.[23]

Likewise, the Kentucky Medicaid program is likely to take improper actions, and there will be less ability to contest those improper actions among beneficiaries with chronic conditions

---

[21] Yeheskel Hasenfeld, et al., Social Service Review, *The Logic of Sanctioning Welfare Recipients: An Empirical Assessment* 304, 306–07 (June 2004), *available at* https:// repository.upenn.edu/cgi/viewcontent.cgi?referer=&httpsredir=1&article=1028&context= spp_papers.

[22] U.S. Dep't of Agric., Office of the Inspector Gen., *FNS Controls Over SNAP Benefits for Able-Bodied Adults Without Dependents* 5 (Sept. 29, 2016), *available at* https://www.usda.gov/ oig/webdocs/27601-0002-31.pdf.

[23] *Id.*

or functional limitation.  Furthermore, in many cases, the result of those improper determinations will be truly draconian—loss of Medicaid eligibility for six months.

## CONCLUSION

If implemented, the Kentucky Waiver will harm low-income persons with functional limitations and chronic conditions of all ages, but especially those ages 50 to 64.  The results will be more low-income people without health care and without the ability to gain independence and provide self-care.  Because these effects contravene the stated purposes of the Medicaid Act, the Court should grant Plaintiffs' motion for summary judgment.

Dated: April 6, 2018

Respectfully submitted,

*/s/ Lisa S. Blatt*

Eric Carlson
JUSTICE IN AGING
3660 Wilshire Boulevard, Suite 718
Los Angeles, CA 90010
T: (213) 674-2813
ecarlson@justiceinaging.org

Kelly Bagby (D.C. Bar # 462390)
Iris Y. González (D.C. Bar # 987156)
AARP FOUNDATION
601 E Street, NW
Washington, DC 20049
T: (202) 434-2060
kbagby@aarp.org

René H. Reixach, Jr.
WOODS OVIATT GILMAN LLP
   on behalf of the NATIONAL ACADEMY
   OF ELDER LAW ATTORNEYS
700 Crossroads Building
2 State Street
Rochester, New York 14614
T: (585) 987-2858
rreixach@woodsoviatt.com

Lisa S. Blatt (D.C. Bar # 429544)
ARNOLD & PORTER
   KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC  20001-3743
T: (202) 942-5000
lisa.blatt@arnoldporter.com

Silvia Yee
Carly A. Myers
DISABILITY RIGHTS EDUCATION
   AND DEFENSE FUND
3075 Adeline Street, Suite 210
Berkeley, CA  94703
T: (510) 644-2555
syee@dredf.org
cmyers@dredf.org

*Counsel for Amici Curiae*

**CERTIFICATE OF SERVICE**

I hereby certify that on April 6, 2018, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system.


*/s/ Lisa S. Blatt*
Lisa S. Blatt