UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| RONNIE MAURICE STEWART, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> ALEX M. AZAR II, *et al.*, <br><br> Defendants. | Civil Action No. 18-152 (JEB) |

**MEMORANDUM OPINION**

Plaintiffs are sixteen Kentucky Medicaid enrollees who brought this action under the Administrative Procedure Act, 5 U.S.C. §§ 701-706, challenging the federal government's approval of a new Kentucky Medicaid program, Kentucky HEALTH. Defendants — the Department of Health and Human Services, the Centers for Medicare and Medicaid Services, and four officials — now move to transfer the case to the Eastern District of Kentucky pursuant to 28 U.S.C. § 1404(a). Because the Court finds that convenience and the interests of justice warrant keeping the matter in the District of Columbia, it will deny the Motion.

**I.   Background**

   A.   Medicaid Program

Since 1965 the federal government and the states have worked together to provide medical care to certain vulnerable populations under Title XIX of the Social Security Act, colloquially known as Medicaid. See 42 U.S.C. § 1396-1. The Centers for Medicare and Medicaid Services (CMS), a federal agency within the Department of Health and Human Services (HHS), has primary responsibility for overseeing Medicaid programs. Under the

1

cooperative federal-state arrangement, participating states submit their "plans for medical assistance" and receive federal funding to offset some of the costs if the plan is "approved by the Secretary [of HHS]." Id. Currently, all states have chosen to participate in the program.

The Medicaid Act sets out certain parameters for states to follow, but each state is free to administer its Medicaid program as it wishes within those strictures. See 42 U.S.C. § 1396a. One such provision requires state plans to "mak[e] medical assistance available" to certain low-income individuals, including pregnant women, children, and their families; former foster children under the age of 26; the elderly; and people with certain disabilities. Id. § 1396a(a)(10)(A); see ECF No. 1 (Complaint), ¶ 44. In 2010, Congress enacted the Patient Protection and Affordable Care Act, Pub. L. No. 111-148, 124 Stat. 119 (2010), "to increase the number of Americans covered by health insurance." Id., ¶ 45 (quoting Nat'l Fed'n of Indep. Bus. v. Sebelius, 567 U.S. 519, 538 (2012)). Under the ACA, states can choose to expand their Medicaid coverage to include low-income adults under 65 who would not otherwise qualify. See 42 U.S.C. § 1396a(a)(10)(A)(i)(VIII). While generally a state must cover all qualified individuals to receive any Medicaid funding, id. § 1396a(a)(10)(B), it may choose not to cover this "expansion population." Compl., ¶ 46; see NFIB, 567 U.S. at 587. If the state decides to cover the expansion group, however, those individuals become part of the state's mandatory population.

Both before and after the ACA, a state that wishes to deviate from the Medicaid Act's requirements must obtain a Section 1115 waiver from the Secretary of HHS. See 42 U.S.C. § 1315. These waivers allow the Secretary to approve "experimental, pilot, or demonstration project[s]" in state medical plans outside of the statutory parameters of the Medicaid Act, "which, in the judgment of the Secretary, [are] likely to assist in promoting the [Act's]

2

objectives." Id. § 1315(a). The ultimate decision whether to grant a waiver rests with the Secretary, but his discretion is not boundless. Before HHS can act on a waiver application, the state "must provide at least a 30-day public notice and comment period regarding" the proposed program and hold at least two hearings at least 20 days before submitting the application. See 42 C.F.R. §§ 431.408(a)(1), (3). Once a state completes those prerequisites, it then sends an application to CMS. Id. § 431.412 (listing application requirements). After the agency notifies the state that it has received the waiver application, a federal 30-day public-notice period commences, and the agency must wait at least 45 days before rendering a final decision. Id. §§ 431.416(b), (e)(1). Under very limited circumstances — e.g., "natural disaster" or "public health emergency" — CMS or the Secretary may waive the federal or state public-comment period. Id. § 431.416(g).

On January 11, 2018, Brian Neale, Director of CMS, issued a letter to state Medicaid Directors "announcing a new policy designed to assist states in their efforts to improve Medicaid enrollee health and well-being through incentivizing work and community engagement among" certain adult mandatory Medicaid groups. See Compl., Exh. D at 1. The nine-page letter noted that work-requirement-based eligibility for Medicaid "is a shift from prior agency policy," id. at 3, but that the agency was committed to "support state efforts to test incentives that make participation in work or other community engagement a requirement for continued Medicaid eligibility" and encouraged states to apply for Section 1115 waivers for this purpose. Id. at 1. It then "identified a number of issues for states to consider as they develop" work-requirement Medicaid programs. Id. at 4-9. To date, ten states have applied for such Medicaid waivers. See ECF No. 40 (Amicus Brief of AARP, et al.) at 2 n.1.

B. Kentucky HEALTH

Kentucky, like all other states and the District of Columbia, participates in Medicaid. After the ACA went into effect, the state broadened Medicaid to include the expansion population. See Compl., ¶ 79. On August 24, 2016, Governor Matt Bevin submitted an application to CMS requesting a Section 1115 waiver to implement an experimental project, Helping to Engage and Achieve Long Term Health, or Kentucky HEALTH. See Compl., Exh. B. The project as approved "transform[s]" the state's Medicaid program to include "commercial market health insurance features," id. at 7, including a deductible account, an incentive and savings account, and a requirement that enrollees pay premiums on a sliding scale. Id. at 9-10. It also predicates Medicaid eligibility for most of the expansion population on workforce participation or community service. Id. at 15-16.

Prior to submitting the application, Kentucky's Department for Medicaid Services held three public hearings and conducted two public-comment periods. See Compl., Exh. B. Throughout this process, the state and CMS were engaged in "continued negotiations" regarding the program's terms. Id., Exh. A at 5 & Exh. C. CMS also opened a federal public-comment period on Kentucky HEALTH. Id., Exh. C at 7. On January 12, 2018, CMS notified the Governor's office that the application had been approved. Id. at 1.

Two weeks later, Plaintiffs brought this nine-count suit seeking declaratory and injunctive relief on behalf of themselves and a "statewide proposed class . . . of all residents of Kentucky who are enrolled in the Kentucky Medicaid program on or after January 12, 2018." Compl., ¶ 33. The Complaint alleges that Defendants violated the Constitution and the Administrative Procedures Act by both sending the January 11 letter to state Medicaid directors and by approving Kentucky HEALTH. See Compl., ¶¶ 339-408. Soon thereafter, Defendants

4

filed this Motion to Transfer, asking the Court to send the case to Kentucky, specifically the Frankfort Docket of the Central Division of the Eastern District of that state. See Mot. to Transfer at 2 n.2. On March 30, 2018, the Court granted Kentucky's Motion for Intervention. See Minute Order.

## II.     Legal Standard

Even if a plaintiff has brought its case in a proper venue, a district court may, "for the convenience of parties and witnesses, in the interests of justice . . . transfer [it] . . . to any other district or division where [the case] might have been brought." 28 U.S.C. § 1404(a). The only textual limitation on the Court's power to transfer a case under § 1404(a), then, is the requirement that the case "might have been brought" in the forum to which the defendant is seeking transfer. Van Dusen v. Barrack, 376 U.S. 612, 623 (1964). In other words, the transfer statute requires that venue be proper in the new forum.

Once that threshold condition is met, district courts have "discretion … to adjudicate motions for transfer according to an 'individualized, case-by-case consideration of convenience and fairness.'" Stewart Org., Inc. v. Ricoh Corp., 487 U.S. 22, 29 (1988) (quoting Van Dusen, 376 U.S. at 622); see also Pres. Soc'y of Charleston v. U.S. Army Corps of Eng'rs, 893 F. Supp. 2d 49, 53 (D.D.C. 2012). This analysis "calls on the district court to weigh in the balance a number of case-specific factors," which typically relate to the private interests of the parties and the public interest of justice. See Stewart Org., 487 U.S. at 29-30.

In evaluating motions to transfer venue, courts in this circuit are instructed to guard against "the danger that a plaintiff might manufacture venue in the District of Columbia . . . [b]y naming high government officials as defendants . . . ." Cameron v. Thornburgh, 983 F.2d 253, 256 (D.C. Cir. 1993). Still, to prevail, the movant must show that "considerations of

5

convenience and the interest of justice weigh in favor of transfer." Sierra Club v. Flowers, 276 F. Supp. 2d 62, 65 (D.D.C. 2003); Trout Unlimited v. U.S. Dep't of Agric., 944 F. Supp. 13, 16 (D.D.C. 1996) (movant bears burden to show that transfer is proper).

### III. Analysis

#### A. Propriety of New Venue

Before assessing the "case-specific factors," Stewart Org., 487 U.S. at 29, Defendants must show that this case might have been brought in the Eastern District of Kentucky. They easily clear this hurdle, as venue in a suit against the federal government will lie in any district in which a plaintiff resides. See 28 U.S.C. § 1391(e)(1)(C); Gardner v. Mabus, 49 F. Supp. 3d 44, 47 (D.D.C. 2014). Here, several Plaintiffs reside in the area served by the Frankfort Docket of the Eastern District of Kentucky. See Compl., ¶¶ 12, 14, 16-18, 20-24, 26; see also Mot. to Transfer at 9 n.3. Section 1404(a)'s threshold requirement is thus satisfied.

#### B. Private- and Public-Interest Factors

Defendants must next establish that the "particular circumstances" of the case "render [this] forum inappropriate." Starnes v. McGuire, 512 F.2d 918, 925 (D.C. Cir. 1974). For this determination, the Court assesses a number of private- and public-interest factors. See Trout Unlimited, 944 F. Supp. at 16. The former factors include: (1) the plaintiff's choice of forum; (2) the defendant's choice of forum; (3) whether the claim arose elsewhere; (4) the convenience of the parties; (5) the convenience of the witnesses; and (6) the ease of access to sources of proof. Id. The public interests relevant to this inquiry are: (1) the transferee's familiarity with the governing laws; (2) the relative congestion of the calendars of the transferor and transferee courts; and (3) the local interest in having local controversies decided at home. Id.

### 1. *Private–Interest Factors*

In this APA case, the six private-interest factors collapse into three inquiries: (1) deference to each parties' forum choice; (2) the link between the relevant fora and the claims; and (3) overall convenience. The Court addresses each in turn.

#### a. Deference

The Court first considers the parties' choice of forum — namely, the amount of deference to afford each. "A plaintiff's choice of forum is generally afforded 'substantial deference,' but that deference is not unyielding." Gulf Restoration Net. v. Jewell, 87 F. Supp. 3d 303, 311 (D.D.C. 2015) (quoting Greater Yellowstone Coal. v. Bosworth, 180 F. Supp. 2d 124, 128 (D.D.C. 2001)). Defendants urge the Court to give "minimal deference" to Plaintiffs' choice because the District is not the home forum for any of the class (including the named Plaintiffs) for whom certification is sought. See Mot. to Transfer at 15.

While typically the named plaintiff's choice of forum in a class action "is afforded little weight," Eichenholtz v. Brennan, 677 F. Supp. 198, 202 (S.D.N.Y. 1988), the reasons for doing so are not applicable here. Courts that minimize such deference cite two rationales: (1) to guard against forum shopping, see In re Ferrero Litig., 768 F. Supp. 2d 1074, 1078 (S.D. Cal. 2011), and (2) when all class members do not hail from the same home forum, the one chosen by the named plaintiff may be inconvenient for others. See Blake Const. Co., Inc. v. Int'l Harvester Co., 521 F. Supp. 1268, 1272 (N.D. Ill. 1981); Jaramillo v. DineEquity, Inc., 664 F. Supp. 2d 908, 914 (N.D. Ill. 2009). Defendants do not allege that the Enrollees engaged in forum shopping in choosing this district, and, as discussed below, convenience to class members is largely irrelevant in this administrative case. The Court thus concludes that the potential of this case to become a class action does not affect the deference given to Plaintiffs' choice of forum.

Similarly, the Government's reliance on the principle that "less deference is given where, as here, Defendants seek transfer to the plaintiffs' resident forum," Preservation Soc'y, 893 F. Supp. 2d at 54 (internal quotation marks and citation omitted), has little bearing because, as discussed in detail below, the case has a strong nexus to the District. See Wilderness Soc'y v. Babbitt, 104 F. Supp. 2d 10, 13 (D.D.C. 2000) (relevant inquiry is "the nexus between plaintiffs' chosen forum — the District of Columbia — and the dispute"); see also Lou v. Belzberg, 834 F.2d 730, 739 (9th Cir. 1987). The Court thus finds that, because of the significant ties to the District, Plaintiffs' choice is accorded "some deference." See Gulf Restoration, 87 F. Supp. 3d at 313 (emphasis omitted); see also Wilderness Soc'y, 104 F. Supp. 2d at 14-15 (finding that plaintiff's choice of forum was "entitled to substantial deference" in part because of agency secretary's "involvement in the [agency's] review" of project and policymakers' residence in District); Lax v. Toyota Motor Corp., 65 F. Supp. 3d 772, 779 (N.D. Cal. 2014) (holding that "[e]ven though this is a class action, the plaintiffs' choice of forum weighs against transfer" because of "legitimate and significant connection to [the] forum").

Such deference outweighs Defendants' request to send this case to a particular court in Kentucky. Unlike the plaintiff, a defendant's forum preference "is not ordinarily entitled to deference," and to prevail, a defendant "must establish that the added convenience and justice of litigating in their chosen forum overcomes the . . . deference given to" the plaintiff's. Tower Labs., Ltd. v. Lush Cosmetics Limited, 2018 WL 534323, at *4 (D.D.C. Jan. 24, 2018). "[C]oncerns about forum shopping" can also count against a defendant's choice. Oceana v. Bureau of Ocean Energy Mgmt., 962 F. Supp. 2d 70, 78 (D.D.C. 2013).

As explained below, Defendants have not carried their burden to show how Kentucky is a more convenient place for this APA case, and the Enrollees further accuse the Government of

8

"blatant . . . forum shopping," Opp. at 1, by asking to transfer the case to a particular division. Kentucky has two federal districts, comprising ten different dockets, but the Government specifically asks this Court to transfer the case to Frankfort, which has only one judge. Defendants, understandably, balk at such a characterization and provide a legitimate reason for preferring the Frankfort Division: it is the state capitol and seat of government. See Reply at 9-10. Although the Court does find the Government's request unduly restrictive, given that Plaintiffs are geographically dispersed throughout the state, see Compl., ¶¶ 12-26, and the underlying situs of the case expands beyond Frankfort County, it declines to assign such nefarious motives to the Government's venue choice. This preference, however, does not overcome the requisite deference.

b. Connection of Claims to Fora

Deference thus established, the Court next moves to the crux of this Motion: where the claims arose and their connection to D.C. In APA cases, "courts generally focus on where the decisionmaking process occurred to determine where the claims arose." Nat'l Ass'n of Home Builders v. EPA, 675 F. Supp. 2d 173, 179 (D.D.C. 2009). "An administrative claim is said to arise in this district if it was drafted, signed, and published in this district, and if the controversy 'stems from the formulation of national policy on an issue of national significance.'" Oceana, Inc. v. Pritzker, 58 F. Supp. 3d 2, 6 (D.D.C. 2013) (quoting Greater Yellowstone Coalition v. Kempthorne, Nos. 07-2111, 07-2112, 2008 WL 1862298, at *5 (D.D.C. 2008)). Plaintiffs' suit clearly fits that bill. They challenge the Secretary's decision to (1) encourage Section 1115 waivers with work-eligibility requirements and (2) approve Kentucky HEALTH. The "decisionmaking process" for both actions "occurred primarily within the District of Columbia and the decisionnmakers [a]re located" here. Home Builders, 675 F. Supp. 2d at 179. The

9

Secretary's "national policy" allowing states to condition Medicaid benefits on workforce participation is also "an issue of national significance." Oceana, 58 F. Supp. 3d at 6; see AARP Amicus Brief at 2 n.1 (listing nine states that have requested similar waivers).

The Government's attempt to sidestep these facts, insisting that this is a "fundamentally local controversy," Mot. to Transfer at 9, construes Plaintiffs' claims too narrowly. The Enrollees challenge the approval of Kentucky HEALTH, which has an obvious connection to that state. But it mischaracterizes their case to assert that their "sole interest in this matter arises solely from their residency in the Commonwealth and their enrollment in Kentucky's State Medicaid program." Id. at 13 (emphasis added). In addition to mentioning Kentucky HEALTH, Plaintiffs argue that CMS's letter to all state Medicaid Directors supporting and encouraging Section 1115 waivers with a work-eligibility requirement violated the APA. This is not a case where the agency only rubber-stamped a proposal from its local office. On the contrary, D.C.-based agency officials drafted, signed, and disseminated the letter to state Medicaid directors, and those same agencies worked with Kentucky to develop, and ultimately approve, Kentucky HEALTH.

Defendants' selective citation only buttresses this point. The Government quotes Kafack v. Primerica Life Ins. Co., 934 F. Supp. 3 (D.D.C. 1996), arguing that "transfer is warranted because 'material events that constitute the factual predicate for the plaintiff's claims occurred' in the Eastern District of Kentucky." Mot. to Transfer at 10 (quoting Kafack, 934 F. Supp. at 6). But the court in that case found it significant that "all of the material events . . . occurred" in the proposed forum. Kafack, 934 F. Supp. at 6 (emphasis added). Here, the Government concedes that the Government's decision "was a product of yearlong discussions and negotiations with state officials[,] . . . and CMS worked with the Commonwealth to develop the terms and

conditions of the approval." Mot. to Transfer at 11. Medicaid is a cooperative program between federal and state governments. A challenge to HHS's decision to approve a state plan is thus almost always predicated on events that had their genesis in a state. To buy Defendants' argument would mean that Medicaid challenges only belong in courts of the relevant state. That simply is not so.

Not only did the claims arise here, but they also have a strong nexus to D.C. Courts in this district have often found that federal-agency action that occurs here can provide "meaningful ties" to support retention of the case. See, e.g., Gulf Restoration, 87 F. Supp. 3d at 312 (D.C. had interest in District-based federal agencies' decision to approve project in Alabama). "[T]he mere fact that a case concerns the application of a federal statute by a federal agency" is not, of course, enough to "provide a sufficient nexus to the District of Columbia to weigh against transfer." Preservation Soc'y, 893 F. Supp. 2d at 55. But " heavy," "personal involvement" by District-based government officials, such as occurred here, provides a "link between this controversy and the District of Columbia," even if the case "will have an impact on the residents" of another state. Wilderness Soc'y, 104 F. Supp. 2d at 13-14.

c. Convenience

The three private-interest factors that specifically address convenience — *viz.*, the convenience of the parties, the convenience of the witnesses, and ease of access to sources of proof — are neutral or tip only slightly in favor of sending the case to Kentucky. The Government cannot reasonably claim to be inconvenienced by litigating in this district; after all, this is its home forum. Defendants nevertheless argue that this factor should lean towards transfer because Kentucky would be a more convenient forum to decide whether to certify a class. While this could be a relevant point, the class that Plaintiffs seek to certify is "all residents

11

of Kentucky who are enrolled in the Kentucky Medicaid program on or after January 12, 2018."
Compl., ¶ 33. Defendants do not explain (and the Court does not see) how putative class members would need to be involved in the certifying of such a class in a way that might inconvenience them. In any event, at most this consideration tips only slightly towards transfer.

And, because this is an APA case, the convenience of witnesses and the ease of access to sources of proof are "not likely to be relevant here." Oceana, 58 F. Supp. 3d at 5 (citation omitted); see also Reply at 14 (stating that administrative record will be available in electronic form). The Government concedes that "judicial review of the merits will be limited to the administrative record and there will be no discovery or trial," but argues that "discovery into standing or class discovery" would take place in Kentucky. See Mot. to Transfer at 16-17. Again, the Court cannot foresee how the proposed class would require discovery, but, even if it did, this would only be a feather on the scale in favor of transfer. See Southern Utah Wilderness Alliance v. Norton (Southern Utah II), 315 F. Supp. 2d 82, 88 (D.D.C. 2004) (finding convenience of witnesses irrelevant where parties agreed case would be decided solely based on administrative record); Flowers, 276 F. Supp. 2d at 69 ("[T]he location of witnesses is not a significant factor" in judicial review of agency action.).

On balance, then, the private-interest factors tip in favor of keeping the case in D.C.

    2. *Public–Interest Factors*

        a. Judicial Economy

Defendants agree that the first two public-interest factors — the transferee court's familiarity with the governing law and the relative congestion of the courts' calendars — are neutral with respect to transfer. See Mot. to Transfer at 17. Resolving this case will require statutory interpretation, a task any federal court is competent to undertake. See Flowers, 276 F.

12

Supp. 2d at 70 n.6 (noting "the principle that the transferee federal court is competent to decide federal issues correctly") (citation omitted). If anything, this Court has more experience with APA cases, which would weigh against transfer. See Tuttle v. Jewell, 952 F. Supp. 2d 203, 208 (D.D.C. 2013) (finding relevant that D.C. "receives more APA claims than its western colleagues"). The caseload disparity between the two courts, moreover, is not great enough to have an effect on the transfer analysis. See Mot. to Transfer at 22 n.9 (noting pending cases per judge is 382 in Kentucky versus 263 in the District). Absent a showing that either court's docket is "substantially more congested" than the other, this factor weighs neither for nor against transfer. Nat'l Ass'n of Home Builders v. EPA, 675 F. Supp. 2d 173, 178 (D.D.C. 2009); see also Preservation Soc'y, 893 F. Supp. 2d at 57 (finding that when "relative congestion . . . appears comparable," judicial-economy factor not substantial enough to warrant transfer).

        b.   Local Interest

This brings the Court to the final and arguably "most important" of the public-interest factors: the local interest in having local controversies decided at home. Southern Utah Wilderness Alliance v. Norton, 845 F. Supp. 2d 231, 237 (D.D.C. 2002); Pres Soc'y, 893 F. Supp. 2d at 57. Because the Court finds that this a case of national, rather than local, significance, this factor tips sharply against transfer.

Defendants first mention that their preferred forum is "experienced with the laws in the Commonwealth that may be relevant to the review of Plaintiffs' claims," Mot. to Transfer at 22, but a federal court need not wade into any particulars of state law to decide whether the Secretary can, under federal laws and regulations, permit certain state Medicaid proposals. See Wilderness Soc'y, 104 F. Supp. 2d at 16 ("no reason to transfer" case challenging agency decision to start oil and gas leasing because it would not involve state law).

13

The Government's stronger argument is that "Kentucky has a substantial interest in the resolution of the claims of this lawsuit" because it is "the citizens of Kentucky who will directly feel the effects of" Kentucky HEALTH. See Mot. to Transfer at 17. The central question, however, is not "whether the people of [Kentucky] have an interest — even a strong one — in the outcome of this case. Instead, the Court must determine whether this is a 'question[] of national policy or national significance.'" Oceana, 58 F. Supp. 3d at 9 (quoting Oceana v. Bureau of Ocean Energy Mgmt., 962 F. Supp. 2d 70, 77 (D.D.C. Aug. 23, 2013)) (emphasis added). While this suit has an undeniable connection to Kentucky and may affect the lives of many people there, it also carries national consequences, particularly in light of CMS's invitation to other states to use Section 1115 waivers in a similar way. Indeed, Plaintiffs ask the Court to enjoin not only Kentucky HEALTH but also all "practices purportedly authorized by" the letter to state Medicaid Directors. See Compl. at 76. In other words, the Enrollees' challenge to the Secretary's use of Section 1115 waivers has "potential impacts" that will likely be felt "locally" in Kentucky, but also broadly across the nation. See Mot. to Transfer at 20; see also Preservation Soc'y, 893 F. Supp. 2d at 55 (noting that "a facial attack on the statutes and regulations at issue . . . might have the kind of national impact that would weigh against transfer" but declining to reach issue because plaintiffs only challenged decision made by local agency office) (emphasis omitted). Those effects are already spilling out past Kentucky, as several other states have similar waiver applications pending, and the Secretary recently approved Indiana's work-eligibility Medicaid requirements. See Opp. at 13.

Defendants' reliance on cases where a local federal-agency office made a decision involving local resources that are located entirely in a proposed transferee district does not change the outcome. See Mot. to Transfer at 20-21 (citing cases); Preservation Soc'y, 893 F.

14

Supp. 2d at 57 (finding challenge was local controversy because "a clear majority of the events took place within the District of South Carolina," and "challenged action was taken by Charleston District of the [U.S. Army] Corps") (internal quotation marks and citation omitted); Airport Working Grp. of Orange Cty., Inc. v. Dep't of Defense, 226 F. Supp. 2d 228, 232 (D.D.C. 2002) (granting motion to transfer case challenging "administrative decision that involves land situated only in Orange County and affects only the local citizenry there" when decision was prepared by agency staff "located in Orange Country [*sic*]"); Sierra Club, 276 F. Supp. 2d at 67, 71 (challenge to Everglades permitting was "controversy local to Florida" when federal officials in Washington did not play "active or significant role" in decision); Trout Unlimited, 944 F. Supp. at 19 (transferring case challenging "decision made by a Forest Service official located in Colorado, which directly affects" water in that state). Here, the federal decisionmaking happened in the District by D.C.-based officials, and the waiver program affects all states. This factor thus tips in Plaintiffs' favor.

## IV. Conclusion

In the end, both the private- and public-interest factors weigh against transfer. The Court will thus deny the Government's Motion to Transfer the case to Kentucky. An Order consistent with this Opinion will issue this day.

/s/ James E. Boasberg
JAMES E. BOASBERG
United States District Judge

Date: April 10, 2018