# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____
                                        )
RONNIE MAURICE STEWART, *et al.*,       )
                                        )
     Plaintiffs,                        )
                                        )
     v.                                 )     Civil Action No. 1:18-cv-152(JEB)
                                        )
ALEX M. AZAR II, *et al.*,              )
                                        )
     Defendants.                        )
_____)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## BRIEF FOR DEANS, CHAIRS AND SCHOLARS AS *AMICI CURIAE*
## IN SUPPORT OF PLAINTIFFS

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Edward T. Waters (DC Bar No. 422461)
Phillip A. Escoriaza\*
FELDESMAN TUCKER LEIFER FIDELL, LLP
1129 20th Street NW, 4th Floor
Washington, DC 20036

ewaters@ftlf.com
pescoriaza@ftlf.com

Telephone: (202) 466-8960

Attorneys for *Amici Curiae*

\*Admitted *pro hac vice*

Date:     April 10, 2018
           Washington, D.C.

## CORPORATE DISCLOSURE STATEMENT

*Amici* are individuals and as such do not have a parent company and no publicly held company has a 10% or greater ownership interest in any *amici*.

# TABLE OF CONTENTS

**Page**

Interest of *Amici Curiae*.................................................................................................x

Statement........................................................................................................................1

Argument .......................................................................................................................4

    I.     The Purpose of § 1115 Medicaid Demonstrations is to Improve the
          Program, Not Cull the Rolls..................................................................................4

          A.  Congress Enacted § 1115 to Permit States to Test New Approaches
              to Expand Access, Provide Better Services and Strengthen Social
              Programs ....................................................................................................5

          B.  Early § 1115 Demonstrations Heeded Congressional Intent that
              Waivers Strengthen Medicaid and other Social Programs ...........................6

          C.  Since 1965 Congress Has Added Important Protections to Ensure
              Demonstrations Promote Medicaid's Purpose...............................................7

          D.  The Record Shows KY HEALTH Approval was Arbitrary,
              Capricious and Contrary to Federal Law: § 1115 Cannot be a
              Pretext to Restrict Medicaid Eligibility or Coverage....................................8

                1.  CMS' New § 1115 Policy Contradicts Consistent
                    Agency Views that Work Requirements Have No Place
                      in Medicaid and that Demonstrations Must Test
                    Program Improvement Innovations .............................................9

                2.  Extensive Commentary in the Administrative Record
                      Made Clear the Risks Created by Work Requirements
                      and Other Eligibility and Coverage Restrictions ........................10

                3.  CMS Misrepresented the Research on Which it Claims
                      to Rest Its Approval of KY HEALTH .........................................12

                  4.  KY HEALTH Lacks the Requisite Experimental
                      Soundness for a Valid § 1115 Demonstration .............................15

    II.    Kentucky's Remarkable Medicaid Achievements Make the Impact of
          this Demonstration Even More Catastrophic on Beneficiaries...........................17

A. Contrary to the Commonwealth's Estimates of Somewhat Gradual Coverage Declines Over Five Years that CMS Accepted, KY HEALTH is Likely to Remove at Least Twice as Many Beneficiaries in the First Year while Barring Initial Enrollment for Countless Others ..................................................................................17

B. KY HEALTH Places Most Nonelderly Adults and Even Working Beneficiaries and those Exempt from the New Requirements at Risk of Medicaid Loss .................................................................................19

C. There is No Realistic Expectation that Those Leaving Medicaid for Work will Find Alternative Sources of Health Insurance Following Loss of Medicaid Coverage ..........................................................................20

III. KY HEALTH will Produce A Major Spillover Impact, Affecting Access to Health Care Communitywide ............................................................22

Conclusion .........................................................................................................................24

Certificate of Compliance ................................................................................................26

Certificate of Service ........................................................................................................27

## TABLE OF AUTHORITIES[*]

**Cases**

\* *Beno v. Shalala*, 30 F.3d 1057 (9th Cir, 1994) ..................................................................8, 15

*Comacho v. Tex. Workforce Comm'n*, 408 F.3d 229 (5th Cir. 2005)....................................5

*Getty v. Federal Savs. & Loan Ins. Corp.*, 805 F.2d 1050 (D.C. Cir. 1986) .........................12

*INS v. Cardoza-Fonseca*, 480 U.S. 421 (1987) ....................................................................10

*National Federation of Independent Business v. Sebelius*, 567 U.S. 519 (2012)..................1

\* *Newton-Nations v. Betlach,* 660 F.3d 370 (9th Cir. 2011) ..................................................8, 15

*T.H. v. Jones*, 425 F.Supp. 873 (D. Utah 1975), *aff'd sub nom. Jones v. H.*, 425 U.S. 986 (1976).....................................................................................................................4-5

---

[*] Authorities upon which we chiefly rely are marked with an asterisk.

**Statutes**

42 U.S.C. § 254b ............................................................................................................22

42 U.S.C. § 601 ..............................................................................................................10

42 U.S.C. § 1315 ..............................................................................................................2

42 U.S.C. § 1315(a)(1) .....................................................................................................5

42 U.S.C. § 1315(d)(2) .....................................................................................................7

42 U.S.C. § 1396 ............................................................................................................21

42 U.S.C. § 1396-1 ...........................................................................................................4

42 U.S.C. § 1396a .............................................................................................................4

42 U.S.C. § 1396a(a)(8) ...................................................................................................8

42 U.S.C. § 1396a(a)(10)) ................................................................................................8

42 U.S.C. § 1396a(a)(10)(A)(i)(VIII) ..............................................................................1

42 U.S.C. § 1396a(a)(10)(A)(ii)(XV) ..............................................................................9

42 U.S.C. § 1396o .............................................................................................................7

*Patient Protection and Affordable Care Act*, Pub. L. 111-148, § 2601(b)(2),
§ 10201(i), 124 Stat. 119 (2010). ................................................................................1, 7

Public Welfare Amendments of 1962, Pub. L. No. 87-543, § 122,
76 Stat. 172, 192 ..............................................................................................................5

Pub. L. 89-97, Title I, Part 2, § 121(a), 79 Stat. 343 (1965) ...........................................5

*Tax Equity and Fiscal Responsibility Act*, Pub. L. 97-248, Title I, SubTitle B, §
131(b), 96 Stat. 367 (1982) ..............................................................................................7

**Legislative Materials**

S. Rep. No. 1589 (1962), *reprinted in* 1962 U.S.C.C.A.N. 1943, 1947, 1961 .....................5, 6

S. Rep. No. 744 (1967), *reprinted in* 1967 U.S.C.C.A.N. 2834, 2863 ..................................7

Vikki Wachino, Director, Center for Medicaid & CHIP Services, Hearing on
"Medicaid at 50," Responses to Additional Questions for the Record, U.S. House
of Rep. Energy and Commerce Health Subcommittee, 114th Cong. (Jul. 8, 2015),
https://energycommerce.house.gov/hearings/medicaid-50-strengthening-and-
sustaining-program/ .................................................................................................9

## Other Authorities

42 C.F.R. Part 431, subpart G, §§ 431.400-431.428 (2012).................................................2, 7

Mel Bartley and Ian Plewis, *Accumulated labour market disadvantage and
limiting long-term illness: data from the 1971-1991 Office for National Statistics'
Longitudinal Study*, INTERNATIONAL JOURNAL OF EPIDEMIOLOGY 31:336-341
(2002).......................................................................................................................13

Raj Chetty *et al.*, *The Association Between Income and Life Expectancy in the
United States*, JAMA. 315(16): 1750–1766. (Apr. 26, 2016); doi:
10.1001/jama.2016.4226............................................................................................12

CONG. RESEARCH SERV., RL44802 JUDICIAL REVIEW OF MEDICAID WORK
REQUIREMENTS UNDER SECTION 1115 DEMONSTRATIONS (2017)........................................5

Anuj Gangopadhyaya and Genevieve M. Kenney, *Updated: Who Could be
Affected by Kentucky's Medicaid Work requirements, and What Do We Know
About Them?*, URBAN INSTITUTE (Feb. 2018, updated Mar. 2018),
https://www.urban.org/sites/default/files/publication/96576/3.26-ky-
updates_finalized_1.pdf ............................................................................................19

Bowen Garrett and Robert Kaestner, *Recent Evidence on the ACA and
Employment: Has the ACA Been a Job Killer?* THE URBAN INSTITUTE AND THE
ROBERT WOOD JOHNSON FOUNDATION (Aug. 2015),
http://www.urban.org/research/publication/recent-evidence-aca-and-employment-
has-aca-been-job-killer/view/full_report ...............................................................14

Gibson, M. *et al*. *Welfare-to-work interventions and their effects on the mental
and physical health of long parents and their children*. COCHRANE DATABASE OF
SYSTEMATIC REVIEW.  Issue 8, Art. No. CD009820 (2007)...................................13

Angshuman Gooptu, *et al.*, *Medicaid Expansion Did Not Result in Significant
Employment Changes or Job Reductions in 2014*, HEALTH AFFAIRS 35, no. 1 (Jan.
2016), http://content.healthaffairs.org/content/35/1/111.short ...............................14

Leada Gore, *13 Alabama Counties Saw 85 Percent Drop In Food Stamp
Participation After Work Requirements Restarted*, AL.COM (June 2017),
http://www.al.com/news/index.ssf/2017/06/13_alabama_counties_had_85_per.ht
ml .............................................................................................................................18

Jonathan Ingram & Nic Horton, *The Power Of Work: How Kansas' Welfare Reform Is Lifting Americans Out Of Poverty*, THE FOUNDATION FOR GOVERNMENT ACCOUNTABILITY (Feb. 2016), https://thefga.org/wp-content/uploads/2016/02/PowerOfWork-KansasWelfareReform.pdf ..................................18

INSTITUTE OF MEDICINE, *America's Uninsured Crisis: Consequences for Health and Health Care* (2004) ......................................................................................22

Robert Kaestner, *et al.*, *Effects of ACA Medicaid Expansions on Health Insurance Coverage and Labor Supply (Working Paper No. 21836)*, NATIONAL BUREAU OF ECONOMIC RESEARCH (Dec. 2015), http://www.nber.org/papers/w21836 ...........................14

KAISER FAMILY FOUNDATION, *Health Insurance Coverage of the Total* Population (2016), https://www.kff.org/other/state-indicator/total-population/?currentTimeframe=0&sortModel=%7B%22colId%22:%22Location%22,%22sort%22:%22asc%22%7D ...................................................................................21

KAISER FAMILY FOUNDATION, *Medicaid Waiver Tracker: Which States Have Approved and Pending Section 1115 Medicaid Waivers*? (MARCH 5, 2018), https://www.kff.org/medicaid/issue-brief/which-states-have-approved-and-pending-section-1115-medicaid-waivers/?utm_source=web&utm_medium=trending&utm_campaign=waivers ..................4

KAISER FAMILY FOUNDATION, *Sicker and Poorer: The Consequences of Being Uninsured* (Apr. 2002), https://www.kff.org/uninsured/report/sicker-and-poorer-the-consequences-of-being/ ......................................................................................16

President John F. Kennedy, *Special Message to the Congress on Public Welfare Programs* (Feb. 1, 1962), http://www.presidency.ucsb.edu/ws/?pid=8758 .........................5-6

Leighton Ku and Erin Brantley, *Medicaid Work Requirements: Who's at Risk?* HEALTH AFFAIRS BLOG (Apr. 2017), https://www.healthaffairs.org/do/10.1377/hblog20170412.059575/full/ .............................15

Letter from Matthew Bevin, Governor of Kentucky, to Sylvia Burwell, Secretary, U.S. Department of Health and Human Services (Aug. 24, 2016), https://www.medicaid.gov/Medicaid-CHIP-Program-Information/By-Topics/Waivers/1115/downloads/ky/ky-health-pa.pdf ........................................................16

Letter from Olivia Golden, Ass. Secretary for Children and Families and Nancy-Ann Min DeParle, Administrator, Health Care Financing Administration to State Medicaid Directors and TANF Administrators (June 5, 1998), https://www.medicaid.gov/Federal-Policy-Guidance/downloads/smd060598.pdf ..............10

Letter from Demetrios Kouzoukas, CMS Principal Deputy Administrator to Stephen P. Miller, Commissioner, Kentucky Cabinet for Health and Family Services (Jan. 12, 2018), *attaching* CENTERS FOR MEDICARE AND MEDICAID SERVICES, EXPENDITURE AUTHORITY, WAIVER LIST, AND SPECIAL TERMS AND CONDITIONS, 11-W-00306/4 and 21-W-00067/4, KY HEALTH SECTION 1115 DEMONSTRATION (2018), https://www.medicaid.gov/Medicaid-CHIP-Program-Information/By-Topics/Waivers/1115/downloads/ky/ky-health-ca.pdf ...............................2, 9, 10-11, 12, 16, 20

Letter from Demetrios Kouzoukas, CMS Principal Deputy Administrator to Allison Taylor, Medicaid Director, Indiana Family and Soc. Srvcs. Adm., (Feb. 1, 2018), *attaching* CENTERS FOR MEDICARE AND MEDICAID SERVICES, EXPENDITURE AUTHORITY, HEALTHY INDIANA PLAN (HIP), 11-W-00296/5, https://www.medicaid.gov/medicaid/section-1115-demo/demonstration-and-waiver-list/?entry=25478 ...................................................................................4

Letter from Adam Meier, Deputy Chief of Staff for Policy, Kentucky Governor's Office, to Brian Neale, Director, Center for Medicaid & CHIP Services (Jul. 3, 2017), https://www.medicaid.gov/Medicaid-CHIP-Program-Information/By-Topics/Waivers/1115/downloads/ky/ky-health-pa2.pdf .......................................................3, 10, 17

Letter from Andrew M. Slavitt, CMS Acting Administrator to Thomas Betlach, Director, Arizona Health Care Cost Containment System (Sept. 30, 2016), https://www.medicaid.gov/Medicaid-CHIP-Program-Information/By-Topics/Waivers/1115/downloads/az/Health-Care-Cost-Containment-System/az-hccc-demo-ext-09302016.pdf ...............................................................................10

Letter from Seema Verma, CMS Administrator to Cindy Gillespie, Director, Arkansas Dept. of Hum. Svcs. (Mar. 5, 2018), *attaching* CENTERS FOR MEDICARE AND MEDICAID SERVICES, EXPENDITURE AUTHORITY, 11-W-00287/6, ARKANSAS WORKS SECTION 1115 DEMONSTRATION (2018), https://www.medicaid.gov/medicaid/section-1115-demo/demonstration-and-waiver-list/?entry=15033...................................................................................4

Letter from Vicki Wachino, Director, Center for Medicaid & CHIP Services to Jeffrey A. Meyers, Commissioner, New Hampshire Dept. of HHS (Nov. 1, 2016), https://www.medicaid.gov/Medicaid-CHIP-Program-Information/By-Topics/Waivers/1115/downloads/nh/health-protection-program/nh-health-protection-program-premium-assistance-cms-response-110116.pdf ...................................9-10

MEDICAID AND CHIP PAYMENT AND ACCESS COMMISSION ("MACPAC"), *Work as a Condition of Medicaid Eligibility: Key Take-Aways from TANF*, (Oct. 2017), https://www.macpac.gov/wp-content/uploads/2017/10/Work-as-a-Condition-of-Medicaid-Eligibility-Key-Take-Aways-from-TANF.pdf.......................................................21

MaryBeth Musumeci, Julia Foutz & Rachel Garfield, *How Might Older Nonelderly Medicaid Adults with Disabilities be Affected by Work Requirements in Section 1115 Waivers,* KAISER FAMILY FOUNDATION (March 30, 2018), https://www.kff.org/medicaid/issue-brief/how-might-older-nonelderly-medicaid-adults-with-disabilities-be-affected-by-work-requirements-in-section-1115-waivers/ ..................................................................................................................19

MaryBeth Musumeci and Julia Zur, *Medicaid Enrollees and Work Requirements: Lessons from the TANF Experience* KAISER FAMILY FOUNDATION (Aug. 2017), https://www.kff.org/medicaid/issue-brief/medicaid-enrollees-and-work-requirements-lessons-from-the-tanf-experience/ ..................................................................21

OHIO DEPARTMENT OF MEDICAID, OHIO MEDICAID GROUP VIII ASSESSMENT (2016), http://www.medicaid.ohio.gov/Portals/0/Resources/Reports/Annual/Group-VIII-Assessment.pdf?ver=2016-12-30-085452-610 ......................................................................14

Recent Case: *Ninth Circuit Holds Statutory Waivers for Welfare Experiments Subject to Judicial Review,* 108 HARV. L. REV. 1208, 1212 (1995) ......................................15

Robert Rector, Rachel Sheffield & Kevin Dayaratna, *Maine Food Stamp Work Requirement Cuts Non-Parent Caseload by 80 %*, THE HERITAGE FOUNDATION (Feb. 8, 2016), https://www.heritage.org/welfare/report/maine-food-stamp-work-requirement-cuts-non-parent-caseload-80-% ....................................................................18

Sara Rosenbaum et al., *State 1115 Proposals to Reduce Medicaid Eligibility: Assessing their Scope and Projected Impact*, COMMONWEALTH FUND (Jan. 11, 2018), http://www.commonwealthfund.org/publications/blog/2018/jan/state-1115-proposals-to-reduce-medicaid-eligibility ...............................................................................17

SOCIAL SECURITY ADMINISTRATION, SOCIAL SECURITY HISTORY: KENNEDY'S STATEMENTS ON SOCIAL SECURITY, https://www.ssa.gov/history/jfkstmts.html ...................5

STATE HEALTH ACCESS DATA ASSISTANCE CENTER, U. MINN. *Final Report: Study of the Impact of the ACA Implementation in Kentucky*. (Feb. 2017), http://www.shadac.org/publications/final-report-study-impact-aca-implementation-kentucky .....................................................................................................1-2, 22

Renuka Tipirneni *et al., Medicaid Expansion Helped Enrollees Do Better at Work or in Job Searches,* UNIVERSITY OF MICHIGAN (Jun. 2017), http://ihpi.umich.edu/news/medicaid-expansion-helped-enrollees-do-better-work-orjob-searches ......................................................................................................................15

U.S. DEPT. OF HEALTH, EDUC. & WELFARE, HANDBOOK OF PUBLIC ASSISTANCE ADMINISTRATION, H.T. No. 4, pt. IV, § 8421 (1963) ..........................................................6

U.S. DEPT. OF HEALTH, EDUC. & WELFARE, HANDBOOK OF PUBLIC ASSISTANCE
ADMINISTRATION, H.T. No. 109, pt. IV, § 8432 (Feb. 17, 1967) ..........................................6

U.S. DEPT. OF H.H.S., CENTERS FOR MEDICARE & MEDICAID SERVICES, STATE
MEDICAID DIRECTORS LETTER (OPPORTUNITIES TO PROMOTE WORK AND
COMMUNITY ENGAGEMENT AMONG MEDICAID BENEFICIARIES) (SMD 18-0002)
(Jan. 11, 2018), https://www.medicaid.gov/medicaid/section-1115-
demo/community-engagement/index.html ..........................................................................2, 9, 12,
                                                                                                                                                             13, 14

U.S. DEPT. OF H.H.S., Health Resources and Services Administration, Bureau of
Primary Health Care, 2016 Health Center Data: Kentucky Data (2017),
https://bphc.hrsa.gov/uds/datacenter.aspx?q=tall&year=2016&state=KY ...........................22-23

U.S. GOV'T ACCOUNTABILITY OFFICE, GAO-12-445, UNEMPLOYED OLDER
WORKERS: MANY EXPERIENCE CHALLENGES REGAINING EMPLOYMENT AND FACE
REDUCED RETIREMENT SECURITY (2012) ............................................................................19

U.S. GOV'T ACCOUNTABILITY OFFICE, GAO-18-220, MEDICAID
DEMONSTRATIONS: EVALUATIONS YIELDED LIMITED RESULTS, UNDERSCORING
NEED FOR CHANGES TO FEDERAL POLICIES AND PROCEDURES (2018).................................17

Van der Noordt *et al.*, *Health effects of employment: a systematic review of
prospective studies*, JOURNAL OF OCCUPATIONAL AND ENVIRONMENT MEDICINE
(10):730-6. (Oct. 7, 2014) doi: 10.1136/oemed-2013-101891 ............................................14

Sidney D. Watson, *Out of the Blackbox and into the Light: Using Section 1115
Medicaid Waivers to Implement the Affordable Care Act's Medicaid Expansion*,
15 YALE J. HEALTH POL'Y L. & ETHICS 213 (Winter 2015)...................................................8

Lucy A. Williams, *The Abuse of Section 1115 Waivers: Welfare Reform in Search
of a Standard*, 12 YALE L. & POL'Y REV. 1 (1994) ...............................................................6

## INTEREST OF *AMICI CURIAE*

Pursuant to Local Civil Rule 7(o), *amici* have sought leave for filing the instant brief. *Amici* are researchers and academics who are experts in the fields of health law, health policy, health services research, and national health reform.  They seek to inform the Court about the history of Section 1115 of the *Social Security Act*, the essential elements of Medicaid demonstration evaluation, the validity of the assumptions on which defendants' actions rest, and the likely effects of permitting defendants' actions to take effect in Kentucky.  Given the scope of defendants' actions and that defendants have begun to authorize similar activities in other states, *amici* believe this case provides an appropriate vehicle for the Court to find that defendants' actions are contrary to federal law.

No party or counsel for a party authored this brief in whole or in part.  No party, counsel for a party or any other person contributed money that was intended to fund preparing or submitting the brief.

The *amici curiae* are:

**DEANS & ASSOCIATE DEANS**

Ayman El-Mohandes, MBBCh, MD, MPH is Dean, Graduate School of Public Health & Health Policy, The City University of New York (CUNY)

Linda P. Fried, MD, MPH is Dean and DeLamar Professor of Public Health, Mailman School of Public Health, Columbia University

Sandro Galea, MD, MPH, DrPH is Dean and Robert A. Knox Professor, School of Public Health, Boston University

Sherry Glied, MA, PhD is Dean and Professor of Public Service, Robert F. Wagner Graduate School of Public Service, New York University

Lynn R. Goldman, MD, MS, MPH is Michael and Lori Milken Dean, Milken Institute School of Public Health, The George Washington University

Jody Heymann, MD, PhD is Dean, Fielding School of Public Health, University of California, Los Angeles (UCLA)

Paula Lantz, PhD is Professor and Associate Dean, Academic Affairs, Gerald R. Ford School of Public Policy, University of Michigan

Sten H. Vermund, MD, PhD is Dean, Yale School of Public Health, Yale University

**CHAIRS**

Thomas LaVeist, PhD is Professor and Chair, Department of Health Policy and Management, Milken Institute School of Public Health, The George Washington University

Jonathan Oberlander, PhD, MA is Professor and Chair, Department of Social Medicine; Professor, Department of Health Policy and Management, University of North Carolina-Chapel Hill

Michael Sparer, PhD, JD is Chair and Professor, Department of Health Policy and Management, Mailman School of Public Health, Columbia University

**SCHOLARS**

Julia Zoe Beckerman, JD, MPH is Adjunct Professor, Practicum Director, MPH@GW, Milken Institute School of Public Health, The George Washington University

Andrew Bindman, MD is Professor of Medicine, Philip R. Lee Institute for Health Policy Studies, University of California San Francisco

Claire Brindis, DrPH is Professor, Director, Institute for Health Policy Studies, UCSF School of Medicine, University of California, San Francisco

Maureen Byrnes, MPA is Lead Research Scientist, Lecturer, Health Policy and Management, Milken Institute School of Public Health, The George Washington University

Lara Cartwright-Smith, JD, MPH is Associate Research Professor and Program Director, MPH in Health Policy, Milken Institute School of Public Health, The George Washington University

Alan B. Cohen, Sc.D. is Research Professor, Markets, Public Policy and Law, Questrom School of Business, Boston University

Judith Feder, PhD, is Professor, McCourt School of Public Policy, Georgetown University.

David M. Frankford, JD is Professor of Law, Rutgers Institute for Health, Health Care Policy and Aging Research in New Brunswick; Faculty Director, Camden of the Rutgers Center for State Health Policy, Rutgers University

Abbe R. Gluck, JD is Professor of Law and Faculty Director of the Solomon Center for Health Law and Policy, Yale Law School, Yale University

Janet Heinrich, DrPH, RN, FAAN is Research Professor, Department of Health Policy and Management, Milken Institute School of Public Health, The George Washington University

Katherine Horton, RN, MPH, JD is Research Professor, Department of Health Policy and Management, Milken Institute School of Public Health, The George Washington University

Nicole Huberfeld, JD is Professor, Health Law, Policy & Management, School of Public Health, Boston University

Leighton Ku, PhD, MPH is Professor, Department of Health Policy and Management; Director, Center for Health Policy Research, Milken Institute School of Public Health, The George Washington University

Sylvia Law, JD is Elizabeth K. Dollard Professor of Law, Medicine and Psychiatry, School of Law, New York University

Jeffrey Levi, PhD is Professor, Department of Health Policy and Management, Milken Institute School of Public Health, The George Washington University

Anne Markus, PhD, MHS, JD is Associate Professor, Department of Health Policy and Management, Milken Institute School of Public Health, The George Washington University

Wendy K. Mariner, JD, LLM, MPH is Edward R. Utley Professor of Health Law; Professor, Center for Health Law, Ethics & Human Rights; Director, JD-MPH Dual Degree Program; School of Public Health, School of Law, School of Medicine, Boston University.

Melissa McCarthy, ScD, MS is Associate Professor of Health Policy and of Emergency Medicine, Department of Health Policy and Management, Milken Institute School of Public Health, The George Washington University

Wendy Parmet, JD is Matthews Distinguished University Professor of Law and Director of the Center for Health Policy and Law; Professor of Public Policy and Urban Affairs, Northeastern University School of Public Policy and Urban Affairs

James M. Perrin, MD, FAAP is Professor of Pediatrics, Harvard Medical School, Harvard University

Marsha Regenstein, PhD is Professor, Department of Health Policy and Management, Milken Institute School of Public Health, The George Washington University

Sara Rosenbaum, JD is Harold and Jane Hirsh Professor, Health Law and Policy, Milken Institute School of Public Health, The George Washington University

Rand E. Rosenblatt, JD is Professor of Law, Rutgers Law School, Rutgers University

Andy Schneider, JD is Research Professor of the Practice, McCourt School of Public Policy, Georgetown University

Naomi Seiler, JD is Associate Research Professor, Department of Health Policy and Management, Milken Institute School of Public Health, The George Washington University

Peter Shin, PhD, MPH is Associate Professor, Director of the Geiger Gibson in Community Health Policy, The George Washington University

Katherine Swartz, MS, PhD is Professor of Health Policy and Economics, Department of Health Policy and Management, Harvard T.H. Chan School of Public Health, Harvard University

Joel Teitelbaum, JD, LLM is Associate Professor and Director, Hirsh Health Law and Policy Program, Department of Health Policy and Management, The George Washington University

Sidney Watson, JD is Jane and Bruce Robert Professor of Law, School of Law, Saint Louis University

Timothy M. Westmoreland, JD is Professor of Law, Georgetown Law, Georgetown University

Paul H. Wise, MD, MPH is Richard E. Behrman Professor in Child Health, Department of Pediatrics – Neonatology, Stanford University

Susan F. Wood, PhD is Professor, Department of Health Policy and Management; Director, Jacobs Institute of Women's Health, Milken Institute School of Public Health, The George Washington University

## STATEMENT

In January of this year, the Centers for Medicare and Medicaid Services ("CMS") reversed its long-standing position that imposing work requirements on Medicaid beneficiaries does not promote the objectives of the Medicaid program.  This reversal will do great damage to the health of low income people in Kentucky and the Nation.

The *Patient Protection and Affordable Care Act* of 2010 ("ACA"), Pub. L. 111-148, "transformed [Medicaid] into a program to meet the health care needs of the entire [low-income] nonelderly population… ."  *National Federation of Independent Business v. Sebelius*, 567 U.S. 519, 583 (2012).  In January of 2014, Kentucky elected to participate in Medicaid expansion under the ACA for nonelderly adults with income up to 138% of the federal poverty level.  42 U.S.C. § 1396a(a)(10)(A)(i)(VIII).  This decision has led to extraordinary health gains for Kentucky's citizens.  The Commonwealth now seeks to reverse much of these gains to serve speculative and ill-founded experimental theories with no relationship to the objectives of Medicaid.

Since 2014, Kentucky has made important strides in securing better health care access and outcomes for its citizens.  In 2012, its uninsured rate was 13.6%, one of the highest in the country.  By 2015, the rate was cut by over half, to 6.1%, largely the result of its Medicaid expansion to Kentucky's poorest residents.  This dramatic reduction in the proportion of uninsured residents has produced enormous benefits in the form of improved health care access, improved health measures, and a strengthened health care system, especially in the poorest communities.  Moreover, employer-sponsored insurance ("ESI"), the largest source of coverage in Kentucky, has held steady at 50%, a "departure from the long-term trend of declining ESI coverage in Kentucky and nationally."  *See Final Report: Study of the Impact of the ACA*

1

*Implementation in Kentucky*. STATE HEALTH ACCESS DATA ASSISTANCE CENTER, U. MINN. (Feb. 2017) at 3, 5-6, 10 (hereinafter the "SHADAC Report").

    Kentucky's achievements face grave risks today.  On January 11, 2018, in a dramatic reversal of prior policy, and without the opportunity for notice and comment, CMS, relying on its authority under § 1115 of the *Social Security Act* ("SSA"), 42 U.S.C. § 1315, issued a letter inviting states to submit Medicaid work "demonstration" proposals.  *See* U.S. DEPT. OF H.H.S., CENTERS FOR MEDICARE & MEDICAID SERVICES, STATE MEDICAID DIRECTORS LETTER (*Opportunities to Promote Work and Community Engagement Among Medicaid Beneficiaries*) (SMD 18-0002) (Jan. 11, 2018) (hereinafter "SMDL").  In its letter, CMS stated for the first time that it would allow states to restrict Medicaid eligibility through work ("community engagement") requirements.  The letter also promoted other coverage conditions such as premiums and "lock-out" periods that bar coverage for months at a time.  One day later and despite regulations requiring not one but three rounds of notice and comment at the state and federal level, *see* 42 C.F.R. part 431, subpart G, on January 12, 2018, CMS approved a new, five-year Medicaid "demonstration" in Kentucky ("KY HEALTH") that features an 80-hours-a-month work requirement, extensive reporting requirements, lock-out periods, and the highest premiums yet approved under any federal demonstration (even higher than those permitted for less impoverished people who buy subsidized marketplace coverage).  *See* Letter from Demetrios Kouzoukas, CMS Principal Deputy Administrator, U.S. Department of Health and Human Services, to Stephen P. Miller, Commissioner, Kentucky Cabinet for Health and Family Services (Jan. 12, 2018) (hereinafter "KY HEALTH Approval").  According to the January 11th demonstration solicitation and the January 12th Kentucky approval, as discussed *infra*, in a

bizarre twist of logic, the purpose of depriving people of access to medical assistance is to improve their health.

CMS' approval of KY HEALTH fails to further Medicaid objectives, contrary to the Secretary's obligations under § 1115.  Instead of increasing access and expanding eligibility, the waiver will reduce coverage, and with it, access to ongoing care.  Even the Commonwealth's own numbers show that rather than improving Medicaid, its actions will cull the rolls of both people who qualify for Medicaid as part of the ACA expansion as well as those eligible under traditional program rules.[1]  Kentucky projects that this "demonstration" will lead to an almost 15% enrollment reduction (almost 100,000 beneficiaries) over a period of five years with the rate of coverage loss ramping up each year.  Although this projection is significant, the evidence in the administrative record shows that the downward Medicaid enrollment spiral will be larger and faster.  For instance, as discussed *infra*, following imposition of similar work requirements in the *Supplemental Nutrition Assistance Program* ("SNAP," often referred to as "Food Stamps"), a number of states saw participant decline rates of 50% to 85% within a year.  A similar, precipitous drop will likely occur in Kentucky Medicaid, not 100,000 over five years but somewhere between 175,000 to 300,000 by the time the waiver is fully implemented.

This is not what Congress envisioned when it created § 1115 demonstration authority.  Congress sought to give states the flexibility to test improvements in the major *Social Security Act* programs by granting the Secretary of Health and Human Services ("H.H.S.") narrow authority to waive certain requirements for demonstration projects that "promote[] the objectives of the program."  The new CMS policy and its KY HEALTH approval represent a stunning

---

[1] KY HEALTH disenrollment figures are based on the Commonwealth's projections in its July 2017 request to amend the August 24, 2016 demonstration application.  *See* Table in Letter from Adam Meier, Deputy Chief of Staff for Policy, Kentucky Governor's Office, to Brian Neale, Director, Center for Medicaid & CHIP Services (Jul. 3, 2017) at 17.

assault on Medicaid's core objective: to provide medical assistance to people whose income and

resources are insufficient to pay for the cost of necessary care. *See* 42 U.S.C. § 1396-1. If CMS

is allowed to proceed nationally, medical assistance for millions of low-income individuals

stands at risk under demonstrations whose true aim is to drive so-called "able-bodied" nonelderly

adults off Medicaid to cut spending. To accomplish this aim, CMS fabricates an entirely new

Medicaid purpose – to encourage work – in order to shoehorn a blatantly political agenda into

research authority.[2] In doing so, the agency mis-characterizes crucial research on which its

actions ostensibly are based and ignores its own record, including comments regarding the health

risks its actions create. CMS' approval of the KY HEALTH waiver is arbitrary and capricious

and contrary to law.

## ARGUMENT

The CMS work "demonstration" destroys, not improves, Kentucky's substantial health

care achievements and defeats, rather than promotes, Medicaid's purpose as a safety net insurer.

**I.     The Purpose of § 1115 Medicaid Demonstrations is to Improve the Program, Not Cull the Rolls**

Section 1902 of the *Social Security Act* sets forth Medicaid eligibility criteria and detailed

operational requirements. *See* 42 U.S.C. § 1396a. Longstanding decisions hold that while states

have options to expand eligibility and improve coverage and delivery, they cannot impose

eligibility or coverage restrictions not authorized by law. *See T.H. v. Jones*, 425 F.Supp. 873,

---

[2] CMS has recently approved work requirements and other restrictions in amendments to existing demonstrations in Arkansas and Indiana. *See* Letter from Seema Verma, CMS Administrator to Cindy Gillespie, Director, Arkansas Dept. of Hum. Svcs. (Mar. 5, 2018); Letter from Demetrios Kouzoukas, CMS Principal Deputy Administrator to Allison Taylor, Medicaid Director, Indiana Family and Soc. Srvcs. Adm., (Feb. 1, 2018). Seven states have work "demonstration" proposals pending before CMS, including Arizona, Kansas, Maine, Mississippi, New Hampshire, Utah and Wisconsin. *See* KAISER FAMILY FOUNDATION, *Medicaid Waiver Tracker: Which States Have Approved and Pending Section 1115 Medicaid Waivers*? (MARCH 5, 2018).

877 (D. Utah 1975), *aff'd sub nom. Jones v. H.*, 425 U.S. 986 (1976) (invalidating Utah's

parental consent requirements for Medicaid family planning services); *Comacho v.*

*Tex.Workforce Comm'n*, 408 F.3d 229, 235 (5th Cir. 2005) ("Texas cannot add additional

requirements for Medicaid eligibility."); Congressional Research Service, *Judicial Review of*

*Medicaid Work Requirements Under Section 1115 Demonstrations* (Report No. R44802) (March

28, 2017) at 3, n. 17.  Moreover, § 1115 authorizes the Secretary to add flexibility by waiving

State compliance with § 1902 requirements "[i]n the case of any experimental, pilot, or

demonstration project which, in the judgment of the Secretary, is likely to assist in promoting the

objectives of…[Medicaid]."  42 U.S.C. § 1315(a)(1).  This provision, by both its terms and

history, allows the Secretary to test program innovations, not to introduce restrictions that defeat

the purpose of Medicaid.

### A. Congress Enacted § 1115 to Permit States to Test New Approaches to Expand Access, Provide Better Services and Strengthen Social Programs

In 1962, the Kennedy Administration asked Congress to enact legislation authorizing

"[d]emonstration projects that states could undertake without having to meet all the conditions of

the federal [*Social Security*] act."  *Public Welfare Amendments of 1962*, P. L. No. 87-543, § 122,

76 Stat. 172, 192; *see also* S. Rep. No. 1589, at 1(1962), *reprinted in* 1962 U.S.C.C.A.N. 1947.

The President identified "needed improvements" in safety net programs including liberalization

of eligibility requirements and benefit rules.  *See* SSA, SOCIAL SECURITY HISTORY: KENNEDY'S

STATEMENTS ON SOCIAL SECURITY.  President Kennedy viewed this additional authority, which

extended to Medicaid as well following its later enactment (P. L. 89-97, Title I, Part 2, § 121(a),

79 Stat. 343 (1965)), as a way to help, not penalize, the poor: "[c]ommunities which have – for

whatever motives – attempted to save money through ruthless and arbitrary cutbacks in their

welfare rolls have found their efforts to little avail.  The root problems remained…." *President's Special Message to the Congress on Public Welfare Programs* (Feb. 1, 1962).

Explaining that demonstration authority would enable states "to improve the techniques of administering assistance and the related rehabilitative service under the assistance titles," the Senate envisioned demonstrations of limited scope and limited geographic impact, and disfavored duplication of demonstration projects.  S. Rep. No. 1589, *supra*, at 1943, 1961. Furthermore, "[a]t the committee hearing, no witness suggested – nor did the Finance Committee ever intimate- that section 1115 was to be used to reduce benefits by varying eligibility criteria…. In short…Congress and the Administration intended this section to be a narrow, technical, and beneficent research option." Lucy A. Williams, *The Abuse of Section 1115 Waivers: Welfare Reform in Search of a Standard*, 12 YALE L. & POL'Y REV. 1, 12, 13 (1994).

### B. Early § 1115 Demonstrations Heeded Congressional Intent that Waivers Strengthen Medicaid and other Social Programs

In implementing § 1115, the Secretary's waiver policy meant to "develop and improve the methods and techniques of administering assistance and related services designed to help needy persons achieve self-support or self-care or to maintain and strengthen family life." DEP'T OF HEALTH, EDUC. & WELFARE, HANDBOOK OF PUBLIC ASSISTANCE ADMINISTRATION, H.T. No. 4, pt. IV, § 8421 (1963).  Early § 1115 demonstrations focused on child care development programs and expanding benefits, Williams, *supra*, at 14.  Subsequent 1967 Department policy guidelines reaffirmed that demonstrations ought to strengthen programs by "provid[ing] assistance to needy individuals who would not otherwise be eligible; increas[ing] the level of payments; provid[ing] social services not presently available…; [and] experiment[ing] with new patterns and types of medical care…." DEP'T OF HEALTH, EDUC. & WELFARE, HANDBOOK OF PUBLIC ASSISTANCE ADMINISTRATION, H.T. No. 109, pt. IV, § 8432 (Feb. 17, 1967); *see also* S.

6

Rep. No. 744 (1967), *reprinted in* 1967 U.S.C.C.A.N. 2834, 2863 (appropriating additional funds

for § 1115 projects "to develop demonstrations in improved methods of providing service to

recipients or in improved methods of administration").

### C.  Since 1965 Congress Has Added Important Protections to Ensure Demonstrations Promote Medicaid's Purpose

Since Medicaid's enactment, Congress has taken additional steps to ensure § 1115

promotes Medicaid's purpose.  In 1982 Congress added § 1916 to the SSA to restrict § 1115

waivers that compel beneficiary participation in premium or cost-sharing demonstrations.  *Tax*

*Equity and Fiscal Responsibility Act*, Pub. L. 97-248, Title I, SubTitle B, § 131(b), 96 Stat. 367

(1982); 42 U.S.C. § 1396o.  In addition, Congress amended § 1115 in 2010 to require the

Secretary to permit public notice and comment at both the state and federal level prior to

approving demonstrations and to ensure that demonstrations comply with federal Medicaid law.

*Patient Protection and Affordable Care Act*, Pub. L. 111-148, § 2601(b)(2), § 10201(i), 124 Stat.

119, 922 (2010); 42 U.S.C. § 1315(d)(2).  Regulations issued in 2012 to require *inter alia* that

demonstrations serve a legitimate experimental purpose.  42 C.F.R. Part 431, subpart G, §§

431.400-431.428.  These regulations ask states to develop for CMS approval detailed evaluation

designs of their demonstrations' "key programmatic features," including testable hypotheses,

valid designs, reliable collection methods and approaches to minimize burdens on beneficiaries.

*Id*. at § 431.424.

Over decades, Medicaid demonstrations have tested new strategies for delivering health

care, or expand services and supports for program beneficiaries.  No Administration ever has

approved Medicaid demonstrations whose express purpose is to deprive people of eligibility or

coverage and CMS has rejected proposals seeking such ends.  The text and history of § 1115

clearly show that demonstration authority is not a blank check to circumvent Medicaid eligibility

and coverage protections.  The U.S. Court of Appeals for the Ninth Circuit has warned: "we

doubt that Congress would enact such comprehensive [*Social Security Act*] regulations, frame

them in mandatory language, require the Secretary to enforce them, and then enact a statute [§

1115] allowing states to evade these requirements with little or no federal agency review." *Beno*

*v. Shalala*, 30 F.3d 1057, 1068-69 (9th Cir, 1994); *see also Newton-Nations v. Betlach,* 660 F.3d

370 (9th Cir. 2011).

### D.   The Record Shows that KY HEALTH Approval was Arbitrary, Capricious and Contrary to Federal Law: § 1115 Cannot be a Pretext to Restrict Medicaid Eligibility or Coverage

The Secretary approved KY HEALTH notwithstanding overwhelming record evidence of

the harm it will cause and none that supports the claim that it will produce health gains.  Rather

than waiving conditions allowed under § 1115, the Secretary adds conditions of eligibility that

suspend the statute's core mandate to provide medical assistance to all eligible individuals in

sections 1902(a)(8) and 1902(a)(10) of the Act (42 U.S.C. § 1396a(a)(8), § 1396a(a)(10)).  States

are thus encouraged to pile on new eligibility conditions and coverage restrictions, erect barriers

to medical assistance, and push people out of the program, all in the name of making people

healthy.  This demonstration is not a valid exercise of the Secretary's waiver authority.  *See*

Sidney D. Watson, *Out of the Blackbox and into the Light: Using Section 1115 Medicaid*

*Waivers to Implement the Affordable Care Act's Medicaid Expansion*, 15 Yale J. Health Pol'y

L. & Ethics 213, 227 (Winter 2015) ("The Secretary has no Section 1115 authority to allow a

work requirement or work incentive.")

1. **CMS' New § 1115 Policy Contradicts Consistent Agency Views that Work Requirements Have No Place in Medicaid and that Demonstrations Must Test Program Improvement Innovations**

The January SMDL admits that requiring work or community engagement as an eligibility condition "is a shift from prior agency policy regarding work and other community engagement as a condition of Medicaid eligibility or coverage." SMDL at 3. Yet, the agency glossed over this drastic policy change stating that "it is anchored in historic CMS principles that emphasize work to promote health and well-being." *Id.* But no such "historic CMS principles" exist. By its own admission, "…CMS has not previously approved a community engagement requirement *as a condition of eligibility*." KY HEALTH Approval at 3 (*emphasis added*). Federal law permits states to help people with severe disabilities voluntarily re-enter the workforce by allowing them to keep Medicaid even if their income rises. *See* 42 U.S.C. § 1396a(a)(10)(A)(ii)(XV). However, this option bears absolutely no relationship to what CMS has authorized in KY HEALTH.

CMS has opposed work requirements consistently. As a recent CMS official charged with Medicaid administration told Congress, "the Secretary does not have the authority to permit a state to require Medicaid beneficiaries to work or receive job training because that is not an objective of Title XIX." Vikki Wachino, Director, Center for Medicaid & CHIP Services, Hearing on "Medicaid at 50," Responses to Additional Questions for the Record, U.S. House of Rep. Energy and Commerce Health Subcommittee, 114th Cong. (Jul. 8, 2015) at 37. Moreover, as recently as 2016, CMS denied Arizona and New Hampshire proposals because work requirements "undermine access, efficiency, and quality of care provided to Medicaid beneficiaries and do not support the objectives of the Medicaid program." Letter from Vicki

Wachino, Director, Center for Medicaid & CHIP Services to Jeffrey A. Meyers, Commissioner,

New Hampshire Dept. of HHS (Nov. 1, 2016); *see also* Letter from Andrew M. Slavitt, CMS

Acting Administrator to Thomas Betlach, Director, Arizona Health Care Cost Containment

System (Sept. 30, 2016).  Based on years of Congressional enactments, H.H.S. has consistently

viewed Medicaid eligibility as a matter entirely "decoupled" from programs whose express

purpose is to promote work, such as TANF (title IV of the *Social Security Act*, 42 U.S.C. § 601;

statutorily tying benefits to work activities).  *See* Letter from Olivia Golden, Ass. Secretary for

Children and Families and Nancy-Ann Min DeParle, Administrator, Health Care Financing

Administration to State Medicaid Directors and TANF Administrators (June 5, 1998).  CMS'

recent change of heart deserves little deference: "[a]n agency interpretation of a relevant

provision which conflicts with the agency's earlier interpretation is 'entitled to considerably less

deference' than a consistently held agency view.'"  *INS v. Cardoza-Fonseca*, 480 U.S. 421, 446

n. 30 (1987).

       **2.**   **Extensive Commentary in the Administrative Record Made Clear the Risks Created by Work Requirements and Other Eligibility and Coverage Restrictions**

CMS simply ignored or provided unresponsive answers to extensive public comments

presenting well-supported research that debunks its KY HEALTH and SMDL assumptions.

Repeated comments in the record underscore the severe health effects of losing coverage, even

temporarily.   CMS summarily dismissed the comments, using experimentation as the sole

justification for an action that by the Commonwealth's estimates, accepted by CMS, will remove

100,000 people from the Medicaid rolls over 5 years.  *See* Letter from Adam Meier, supra note 1.

In approving Kentucky HEALTH, moreover, CMS acknowledged that "[m]any

commenters who opposed the community engagement [and work] requirement emphasized that

CMS has rejected similar proposals in the past…[and] some commenters questioned the efficacy of work requirements in other public programs." KY HEALTH Approval at 7. While it claimed to have "considered" these numerous comments (all of which were submitted *before* CMS changed its mind to promote work requirements), CMS repeatedly fell back on experimentation as its justification -- hardly the outcome Congress anticipated in creating § 1115.

For instance, the record contains extensive opposition to CMS' new policy of requiring work ("community engagement") as an eligibility condition, based on the large body of evidence showing the catastrophic impact of work requirements in other social programs such as cash welfare and "SNAP". *See, e.g.*, AR at 3834 *and research cited therein*. The only experimental question CMS conceivably could be trying to answer – so harmful as to take one's breath away – is whether attaching a similar requirement to medical assistance would produce similar catastrophic results. To the many concerns raised in the record, CMS provided a cursory response best summarized as it "has considered those comments," and embracing uncritically the premise that a work requirement somehow makes people healthy, without specific evidence to sustain it. KY HEALTH Approval at 3, 7-8.

CMS was also warned repeatedly with respect to extensive research showing the adverse impact of unaffordable premiums on low-income persons with little to no disposable income, which in turn forces significant reductions in Medicaid enrollment. See AR at 3708, 3835 *and research cited therein*. CMS' unresponsive answer was that "[s]upporters noted that beneficiary engagement provisions, such as the cost-sharing and premium requirements, aligned with aspects of the private insurance market." KY HEALTH Approval at 7. CMS never explained what knowledge of the private insurance market has to do with either the purpose of Medicaid or provision of publicly-financed health insurance to a low-income population.

11

The foregoing record sample represents CMS' cavalier approach to approving KY HEALTH -- CMS turned a blind eye to actual research findings, undertook actions contrary to compelling evidence against it, implemented a major policy change after the three mandatory comment periods had concluded and failed to weigh the health risks this demonstration will trigger.  In sum, CMS did not meaningfully consider the relevant factors, failed to document a reasoned decision to approve KY HEALTH, and offered implausible explanations of the health gains to be had by depriving people of medical assistance.  The record contains nothing to show that the agency actually considered critical public comments.  "Stating that a factor was considered…is not a substitute for considering it."  *Getty v. Federal Savs. & Loan Ins. Corp.*, 805 F.2d 1050, 1055 (D.C. Cir. 1986) (rejecting as "conclusory" an agency statement that all relevant factors had been considered).  This record is insufficient to justify KY HEALTH approval.

### 3. <u>CMS Misrepresented the Research on Which it Claims to Rest Its Approval of KY HEALTH</u>

The cornerstone of CMS' new § 1115 policy is that employment leads to improved health outcomes and that research support this assertion.  *See* KY HEALTH Approval at 3; SMDL at 2.  There is no such research.  First, CMS incorrectly relies on a 2016 JAMA study by Chetty and others for the proposition that employment is associated with better health outcomes and "higher earnings are positively correlated with longer lifespan."  *Id*. at 2, n. 4 *and accompanying text*.  In fact, the study authors concluded that "[u]nemployment rates, changes in population, and changes in the size of the labor force …*were not significantly associated with life expectancy among individuals in the bottom income quartile*."  Raj Chetty *et al.*, *The Association Between Income and Life Expectancy in the United States*, JAMA 315 (2016), at 1759 (emphasis added).  Thus, CMS has relied on a study that appears to directly contradict the agency's premise that

employment will lead to better health outcomes among the poor.  Indeed, a recent, systematic

review of 94 high quality rigorous research studies, conducted by the Cochrane Collaboration

concluded that experiments in which receipt of cash assistance hinges on work are unlikely to

have tangible health effects.  This study, which most closely examines the potential effects of

work requirements on health, found no significant health improvements from welfare-to-work

policies, either in the short- (12-18 months) or long-term (48-72 months).  Moreover, the review

found that such programs had no substantial long-term effects on employment or income.  *See*

Gibson, M. *et al*.  *Welfare-to-work interventions and their effects on the mental and physical*

*health of long parents and their children*.  COCHRANE DATABASE OF SYSTEMATIC REVIEW. Issue

8, Art. No. CD009820 (2007).

Second, CMS cites a 2002 Bartley and Plewis study, featured in the *International Journal*

*of Epidemiology,* for the claim that "education…can lead to improved health by increasing health

knowledge and healthy behaviors."  SMDL at 2, n. 3 *and accompanying text*.  However, that

study examined long-term effects of social class status and unemployment on limiting long-term

illness among males in England and Wales, both of which guarantee universal access to health

care.  This study did not explore health knowledge or healthy behavior as outcomes; indeed, it

concluded that "[s]hort term improvements in health inequality may not prove easy to obtain in

areas of large scale de-industrialization, where many citizens have experienced two decades or

more of economic hardship and its social consequences."  Mel Bartley and Ian Plewis,

*Accumulated labour market disadvantage and limiting long-term illness: data from the 1971-*

*1991 Office for National Statistics' Longitudinal Study*, INTERNATIONAL JOURNAL OF

EPIDEMIOLOGY 31:336-341 (2002) at 340.  This study provides no support to CMS' view that

work requirements lead to improved health outcomes.

Third, CMS relies on a study by Van der Noordt and others, published in 2014, for the proposition that there is "a protective effect of employment on depression and general mental health."  SMDL at 2, n. 6 *and accompanying text*.  However, the study's authors state on page 735 that "…the relationship between employment and health can be bi-directional. …the positive health effects of employment can be affected by the fact that healthier people are more likely to get and stay in employment."  Van der Noordt *et al*. *Health effects of employment: a systematic review of prospective studies*, JOURNAL OF OCCUPATIONAL AND ENVIRONMENT MEDICINE (10):730-6. (Oct. 7, 2014) doi: 10.1136/oemed-2013-101891.  This study then took a commonsense view exactly opposite of the position espoused by CMS, *i.e.*, healthy people are more likely to work, not that working makes people healthier.

This outcome is what has been happening in Kentucky since 2014.  Studies show that Medicaid expansion has had no depressing effects on employment by promoting people with employer coverage to quit work and instead rely on medical assistance.  Furthermore, studies including ones focusing on Kentucky, point to the positive economic impact of the Medicaid expansion, both for people able to return to work because of improved access to medical care and as a jobs-creating economic engine.  *See* Angshuman Gooptu, *et al.*, *Medicaid Expansion Did Not Result in Significant Employment Changes or Job Reductions in 2014*, HEALTH AFFAIRS 35, no. 1 (Jan. 2016): 111-118, 1-12; Bowen Garrett and Robert Kaestner, *Recent Evidence on the ACA and Employment: Has the ACA Been a Job Killer?* THE URBAN INSTITUTE AND THE ROBERT WOOD JOHNSON FOUNDATION (Aug. 2015); *and* Robert Kaestner, *et al.*, *Effects of ACA Medicaid Expansions on Health Insurance Coverage and Labor Supply (Working Paper No. 21836)*, NATIONAL BUREAU OF ECONOMIC RESEARCH (Dec. 2015).  Similar results have been achieved in Ohio, *see* OHIO DEPARTMENT OF MEDICAID, OHIO MEDICAID GROUP VIII

ASSESSMENT (2016) at 4; and Michigan, Renuka Tipirneni *et al., Medicaid Expansion Helped Enrollees Do Better at Work or in Job Searches,* UNIVERSITY OF MICHIGAN (Jun. 2017), which found that Medicaid enabled greater work engagement from people previously unable to do so because of poor health.[3]  Medicaid's positive impact on work underscores a fundamental truth about the poor: research shows that two-thirds are either working or looking for work, while the rest overwhelmingly cannot work because of their own poor health or that of a family member or are caring for young children.  In other words, CMS' authorized "experiment" to measure the impact of depriving potentially hundreds of thousands of people of Medicaid coverage is a dangerous solution in search of a problem.  *See* Leighton Ku and Erin Brantley, *Medicaid Work Requirements: Who's at Risk?* HEALTH AFFAIRS BLOG (Apr. 2017).

### 4.   KY HEALTH Lacks the Requisite Experimental Soundness for a Valid § 1115 Demonstration

Consistent with applicable decisions, *see, e.g.*, *Newton-Nations v. Betlach*, 660 F.3d 370 (9th Cir. 2011) (Medicaid) and *Beno v. Shalala*, 30 F.3d, 1057 (9th Cir. 1994) (AFDC), the record must show the basic methodological soundness of the experiment.  The demonstration must produce valuable information that could lead to program improvements, facilitate "true research data and serve interests beyond state fiscal concerns."  Recent Case: *Ninth Circuit Holds Statutory Waivers for Welfare Experiments Subject to Judicial Review,* 108 HARV. L. REV. 1208, 1212 (1995).  "[T]he Secretary must make at least some inquiry into the merits of the experiment-she must determine that the project is likely to yield useful information or

---

[3] By contrast, reversing Kentucky's gains likely will carry major economic and employment consequences; one expert estimates that by 2021, when the work requirements are fully in effect, Kentucky could forgo nearly $700 million annually in federal funding, which in turn would have major implications for the health care industry.  Dr. Sherry Glied, Dean, Wagner Graduate School of Public Service, New York University, *Estimate* (April 5, 2018).  A funding loss of this magnitude inevitably will trigger a major adverse employment impact, as demonstrated, *infra*, in the case of the Commonwealth's community health centers.

demonstrate a novel approach to program administration." *Beno*, 30 F.3d at 1069.  Moreover, "[t]he Secretary's second obligation under *Beno* is to 'consider the impact of the state's project on the' persons the Medicaid Act 'was enacted to protect.'" *Newton-Nations*, 660 F.3d at 381. In the absence of a true experimental design, the risks are confusion, contamination of research findings, and additional hardship to people who depend on the program.  Like all sound experimentation, the demonstration must yield new knowledge, be methodologically sound, and benefits should outweigh risks.

KY HEALTH is not designed to produce a rigorous or novel evaluation of work requirements or its multiple program barriers.  For instance, premiums have been tested widely and their negative impact has been documented.  *See, e.g.*, AR 3835 *and research on premiums and cost-sharing cited therein*.  Indeed, the approval documents contain no sound evaluation hypotheses related to the effects of work requirements, only tropes about the value of working. For instance, the Commonwealth's § 1115 application proposes to test *inter alia* the hypothesis that work requirements in Medicaid "will encourage members to seek employment."  *See* Attachment to Letter from Matthew Bevin, Governor of Kentucky, to Sylvia Burwell, Secretary, U.S. Dept. of H.H.S. (Aug. 24, 2016), at 62.  Yet, the effects of denying low income people access to health insurance are already well established in the research literature.  *See, e.g., Sicker and Poorer: The Consequences of Being Uninsured,* KAISER FAMILY FOUNDATION (Apr. 2002).

In addition, despite the potential impact of its policy shift on hundreds of thousands of people, CMS did not require submission of a sound evaluation design prior to approving KY HEALTH.  The approval letter requires Kentucky to submit a plan for an evaluation that would be conducted by an independent party, but the design to evaluate the research hypotheses, already baseless to begin with, is not yet known.  KY HEALTH Approval at 48-51.  KY

HEALTH falls well short of quality experimental standards.  *Generally, see* U.S. GOV'T

ACCOUNTABILITY OFFICE, GAO-18-220, MEDICAID DEMONSTRATIONS:  EVALUATIONS YIELDED

LIMITED RESULTS, UNDERSCORING NEED FOR CHANGES TO FEDERAL POLICIES AND PROCEDURES

(2018) (citing CMS' poor record of § 1115 research oversight and failure to produce evaluation

results).

## II.     Kentucky's Remarkable Medicaid Achievements Make the Impact of this Demonstration Even More Catastrophic on Beneficiaries

### A.     Contrary to the Commonwealth's Estimates of Somewhat Gradual Coverage Declines Over Five Years that CMS Accepted, KY HEALTH is Likely to Remove at Least Twice as Many Beneficiaries in the First Year while Barring Initial Enrollment for Countless Others

In the enrollment projections accompanying its proposal, Kentucky estimates a 14.8%

enrollment decline over the 5-year life of the demonstration.  *See* Table in Letter from Adam

Meier, *supra* note 1, at 17.  KY HEALTH proposes the largest reduction of any state work

proposal submitted as of January 2018.  *See* Sara Rosenbaum *et al.*, *State 1115 Proposals to*

*Reduce Medicaid Eligibility: Assessing their Scope and Projected Impact*, COMMONWEALTH

FUND (Jan. 11, 2018).  By the end of the first year of the demonstration, according to the

Commonwealth's projections, some 20,155 beneficiaries (5.8% of the target population, that is,

those not exempt from the work requirement) will be disenrolled, reaching to 96,687 by the fifth

year (27.6%).

As bad as these estimates are, they grossly understate the likely impact.  Recent data from

similar SNAP work requirements, which CMS cites as a model for Medicaid work requirements,

show that reductions could range from 50% to 85% of the target population in the first year

alone.  In SNAP, able bodied adults without dependents (ABAWDs) between the ages of 18 to

49 must work at least 20 hours a week or lose benefits after 3 months in any 36-month period.

Comparable reports about SNAP work requirement impacts in Alabama, Georgia, Kansas and Maine reveal losses ranging 50% to 85% within a few months, as a result of people not finding sufficient work as well as paperwork and administrative compliance barriers.  *See* Leada Gore, *13 Alabama Counties Saw 85% Drop In Food Stamp Participation After Work Requirements Restarted*, AL.COM (June 2017); Jonathan Ingram & Nic Horton, *The Power Of Work: How Kansas' Welfare Reform Is Lifting Americans Out Of Poverty*, THE FOUNDATION FOR GOVERNMENT ACCOUNTABILITY (Feb. 2016);  Robert Rector, Rachel Sheffield & Kevin Dayaratna, *Maine Food Stamp Work Requirement Cuts Non-Parent Caseload by 80%*, THE HERITAGE FOUNDATION (Feb. 8, 2016).  There is no reason to expect the outcome in Kentucky Medicaid will be different than that in SNAP, since both the work requirements and target populations are similar.  Viewed from that lens, of the 350,000 people subject to the work requirements in Kentucky, Medicaid losses will be much higher and faster than the Commonwealth predicted, between 175,000 and 297,500 losing coverage in the first year, a devastating result.

In fact, SNAP work policies may understate the impact of Kentucky's Medicaid work requirements. SNAP work requirements apply only to working-age adults ages 18-49 without dependents.  By contrast, the CMS approval permits Kentucky to apply its work requirements statewide, to parents and all adult beneficiaries up to age 65. The approval also enables the Commonwealth to couple work requirements with other drivers of downward enrollment, such as escalating premiums and additional reporting requirements.  Parents will face additional barriers because the terms of the demonstration do not permit the Commonwealth to use federal Medicaid funding for child care costs  (as it could not, since child care and other work supports are not recognized as legitimate medical assistance expenditures, thus underscoring the extent to

18

which the demonstration is at legal odds with Medicaid's purposes).  People ages 50 and over

will face greater challenges finding work because they are older, often have out-of-date job

skills, are less able to perform physical labor, and may have medical needs that do not qualify

them for a "medically frail" exemption (as yet undefined) but impair their employment

prospects.  *See* US GOVERNMENT ACCOUNTABILITY OFFICE, GAO-12-445, UNEMPLOYED OLDER

WORKERS:  MANY EXPERIENCE CHALLENGES REGAINING EMPLOYMENT AND FACE REDUCED

RETIREMENT SECURITY (2012); *see also* MaryBeth Musumeci, Julia Foutz & Rachel Garfield,

*How Might Older Nonelderly Medicaid Adults with Disabilities be Affected by Work*

*Requirements in Section 1115 Waivers,* KAISER FAMILY FOUNDATION (March 30, 2018).

### B. KY HEALTH Places Most Nonelderly Adults and Even Working Beneficiaries and those Exempt from the New Requirements at Risk of Medicaid Loss

KY HEALTH places these two distinct beneficiary groups at risk: nonelderly adults 18-

64 who work but cannot find enough work to satisfy the 20 hour-per-week / 50 week-per-year

requirement; and  adults who qualify for a "medically frail" exemption or another work

exemption (*e.g.*, pregnancy), all of which presumably must be continually updated and proved.

An analysis conducted by the Urban Institute ("UI") documents the characteristics of

beneficiaries who risk Medicaid loss under KY HEALTH.  *See* Anuj Gangopadhyaya and

Genevieve M. Kenney, *Updated: Who Could be Affected by Kentucky's Medicaid Work*

*requirements, and What Do We Know About Them?*, URBAN INSTITUTE (Feb. 2018, updated Mar.

2018).  UI reports that, of 653,000 nonelderly Medicaid enrolled adults in 2016, only 23.9%

(156,000) will be shielded (unless their status should change) because their basis of Medicaid

eligibility disability is severe enough to qualify for *Supplemental Security Income* ("SSI").

Every other working-age adult – nearly half a million – risks loss of coverage.

UI further estimates that about 168,000 people will meet the caregiver or student exemption.  Within this group, however, 17% lacks internet access, 9% lacks access to a vehicle, and 15% lacks a high school degree, thereby making it more difficult to apply for and maintain an exemption over time.

Even working beneficiaries are at risk. UI estimates that another 165,000 (25% of working-age adult beneficiaries) likely will meet the requirement, but only sporadically. Although these workers average about 36 hours of work per week, only 64% are estimated to satisfy the requirement of 20 hours per week year-round. Thirty-six percent of them experience heavy work fluctuation and periodic layoffs, a reality of the low-wage job market. Even those who can maintain 20 hours weekly year-round may be too burdened by continual reporting obligations to maintain enrollment.

A third group – those who do not qualify for a student or caretaker exemption and are not working are at highest risk for loss of benefits in KY HEALTH. UI researchers estimate that within this group -- close to 165,000 persons (25% of nonelderly adult beneficiaries)  –  44% are age 50 and older, and 59% report at least one serious health limitation or living with someone with such a limitation.  Among this group an astonishing 74% faces one or more of the following barriers to getting and keeping an exemption, even if eligible: no vehicle, no internet access, no high school diploma, or a serious health limitation (either their own or that of a family member with whom they live).  *Id.* at 2-3.

C. **There is No Realistic Expectation that Those Leaving Medicaid for Work will Find Alternative Sources of Health Insurance Following Loss of Medicaid Coverage**

In approving KY HEALTH, CMS offers as a justification that it will create "incentives for individuals to obtain and maintain coverage through private employer-sponsored insurance."

KY HEALTH Approval at 4.  Its assertion rests on two assumptions: (1) part time work at low

wages offers employer benefits; (2) threatening people with the loss of Medicaid will lead them

to find the jobs with generous benefits.  CMS cites no evidence to support its assertion; indeed,

the evidence points in the opposite direction: part-time, low wage jobs come without health

benefits.

Extensive evidence from TANF work programs shows that jobs gained, if any, are low-

wage jobs without employer health benefits.  In an examination of eight pending state Medicaid

work demonstration proposals, the Medicaid and CHIP Payment and Access Commission

("MACPAC"), created to advise Congress on Medicaid access and services, *see* 42 U.S.C. §

1396, reported that: (1) only one third of people losing TANF benefits found jobs that included

employer-sponsored coverage; (2)  almost half of the jobs held by Medicaid beneficiaries were at

small firms not required under the ACA to provide health insurance; and (3) 40% worked in the

agriculture and service industries, known for their  low employer-sponsored insurance offer

rates."  *Work as a Condition of Medicaid Eligibility: Key Take-Aways from TANF*, MEDICAID

AND CHIP PAYMENT AND ACCESS COMMISSION (Oct. 2017); *see also* MaryBeth Musumeci and

Julia Zur, *Medicaid Enrollees and Work Requirements: Lessons from the TANF Experience*,

Kaiser Family Foundation (Aug. 2017).

Employee health benefits for low wage workers are especially uncommon in Kentucky.

Prior to implementation of the Medicaid expansion, only 16% of poor Kentucky adults were

covered by employer insurance; this figure briefly rose to 18% in the year following full

Medicaid expansion implementation before falling back to 12% in 2016.  *Health Insurance*

*Coverage of the Total Population*, KAISER FAMILY FOUNDATION (2016).  The U.S. average is

only slightly better; in 2013, 17% of poor adults had access to employer insurance, declining

slightly to 16% by 2016.  There is zero evidence to suggest that depriving people of Medicaid

will lead to greater levels of employer insurance.   For the people who lose Medicaid because

they fail to satisfy work, premium, or reporting requirements, a return to persistently uninsured

status will be the norm.

### III.      KY HEALTH will Produce A Major Spillover Impact, Affecting Access to Health Care Communitywide

KY HEALTH will trigger a large-scale insurance rollback that can be expected to

produce crucial spillover consequences for the Commonwealth.  One major consequence of this

demonstration will be the impact on the entire health care system of creating a large group of

uninsured people.  A major study examining the consequences of being uninsured conducted by

the Institute of Medicine (renamed the National Academy of Medicine) found that communities

with high levels of uninsured persons lack critical services even for insured people, because

essential market conditions for health care to exist simply are not present.  *See America's*

*Uninsured Crisis: Consequences for Health and Health Care*, INSTITUTE OF MEDICINE (2004) at

4.  Kentucky's Medicaid expansion produced major health system gains, for example, in the

form of reduced levels of uncompensated hospital care (SHADAC Report, *supra*, at 4); reversing

these gains will produce real adverse consequences for the entire population.

Kentucky's community health centers offer insight into this spillover phenomenon.  In

2016, 23 health centers furnished primary and preventive care to more than 423,000 Kentucky

residents – 10% of state residents – in 232 sites.  Health centers operate pursuant to the *Public*

*Health Service Act*, 42 U.S.C. § 254b; their purpose is to make health care accessible and

affordable to medically underserved urban and rural populations regardless of ability to pay.

Kentucky's health centers are a major health care source for uninsured and publicly insured

patients; 60% have below-poverty income, and 84% have incomes below twice poverty, $41,560

for a family of 3 in 2018.  *See* U.S. DEPT. OF H.H.S., Health Resources and Services

Administration, Bureau of Primary Health Care, 2016 Health Center Data: Kentucky Data (2017)

(All community health centers must report annually data on their patients, staffing, services, and

revenue to the Uniform Data System.).  Medicaid is the single largest source of health insurance

coverage for health center patients.  Federal data show that in 2016, 48.5% of Kentucky health

center patients were insured through Medicaid, up from 32% in 2013.

Because health centers serve poor patients, the Medicaid expansion had an enormous

impact.  Between 2013 (one year prior to implementation of the ACA in Kentucky) and 2016

(two years after expansion went into effect), health centers experienced a 46% decline in the

number of uninsured patients.  Moreover, the revenue increases produced by expansion led to

major health center growth.  Federal government data analyzed by researchers at the Milken

Institute School of Public Health, The George Washington University, show that between 2013

and 2016 the number of patients grew by 34%, from 315,593 to 423,515; the number of clinical

care sites grew by 73% from 134 to 232; medical visits grew by 33%; dental visits grew by 41%;

mental health visits grew by 152%; medical and dental staffing grew by over 40%; mental health

staff grew by 152%; and substance abuse staff, by over 400%.  *Analysis conducted by* Peter Shin,

PhD, MPH; Jessica Sharac, MSc, MPH; *and* Sara Rosenbaum, JD. The Geiger Gibson/RCHN

Community Health Foundation Research Collaborative (March 2018).

Applying the data on enrollment loss cited previously, researchers project that 14% to

24% of health center Medicaid patients – between 28,900 and 49,200 beneficiaries – will lose

coverage in the first year alone.  *Id.*  This decline translates into approximately $22 million to

$37 million in lost revenue, leading to an estimated decline of between 400 and 700 lost staff.

This loss results in a reduction in capacity of 60,000 to 102,000 patients served, nearly 25% of current capacity.

These declines will affect health care access for entire communities and understate the impact of KY HEALTH since they do not account for declines linked to premium increases and reporting requirements.  Nor do they take into account that tens of thousands of Medicaid beneficiaries will need to obtain "medically frail" assessments to maintain eligibility or coverage and that this new burden will fall on health centers given they are the main source of medical services in many communities.

## CONCLUSION

Overall, the KY HEALTH demonstration will produce bad outcomes for families across Kentucky for an unreasonably long time.  This waiver will unduly strain safety-net medical providers and the entire Commonwealth health care system.  Yet there is no evidence in the record that the Secretary considered the harm this § 1115 demonstration will have on Medicaid participants.  The record does not show how this demonstration will further Medicaid objectives or yield any experimental value.  KY HEALTH and the new CMS demonstration policy will not help people be healthier or deliver the benefits its backers claim; they fall short of the applicable standard of review and short-change Medicaid participants in Kentucky and across the Nation.

Respectfully submitted,

Dated:     April 10, 2018
           Washington, D.C.

                             /s/   Edward T. Waters
                             Edward T. Waters (DC Bar No. 422461)
                             Phillip A. Escoriaza*
                             FELDESMAN TUCKER LEIFER FIDELL, LLP
                             1129 20th Street NW, 4th Floor
                             Washington, DC 20036

ewaters@ftlf.com
pescoriaza@ftlf.com

Telephone: (202) 466-8960
Attorneys for *Amici Curiae*

*Admitted *pro hac vice*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Local Civil Rule 7(o). This brief consists of 24 pages of text, exclusive of the Table of Contents, Table of Authorities, Attorney identification and Certificate of Compliance, and contains three (3) footnotes containing nineteen (19) aggregate lines of text.

Dated:    April 10, 2018
          Washington, D.C.

/s/   Edward T. Waters
Edward T. Waters (DC Bar No. 422461)
FELDESMAN TUCKER LEIFER FIDELL, LLP
1129 20th Street NW, 4th Floor
Washington, DC 20036

ewaters@ftlf.com

Telephone: (202) 466-8960

Attorney for *Amici Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that on April 10, 2018, I caused the foregoing document to be served on

the parties' counsel of record electronically by means of the Court's CM/ECF system.

/s/   Edward T. Waters
Edward T. Waters (DC Bar No. 422461)
FELDESMAN TUCKER LEIFER FIDELL, LLP
1129 20th Street NW, 4th Floor
Washington, DC 20036

ewaters@ftlf.com

Telephone: (202) 466-8960

Attorney for *Amici Curiae*