## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

RONNIE MAURICE STEWART, *et al.*,

    **Plaintiffs,**

    v.

ALEX M. AZAR II, *et al.*,

    **Defendants.**

Civil Action No. 18-152 (JEB)

## MEMORANDUM OPINION

In 2010, Congress enacted the Patient Protection and Affordable Care Act — popularly known as Obamacare — which is "a comprehensive national plan to provide universal health insurance coverage" across the nation.  See Nat'l Fed'n of Indep. Bus. v. Sebelius, 567 U.S. 519, 583 (2012).  One central component of that statute was an expansion of Medicaid, allowing states to provide "health care to all citizens whose income falls below a certain threshold."  Id. at 531.  This "expansion," the Supreme Court has held, represented "a shift in kind, not merely degree."  Id. at 583.  While the "original program was designed to cover medical services for four particular categories of the needy: the disabled, the blind, the elderly, and needy families with dependent children," the Affordable Care Act "transformed" Medicaid "into a program to meet the health care needs of the entire nonelderly population with income below 133 percent of the poverty level."  Id.

Defendants in this case have sought to roll back those reforms.  Upon assuming office in March 2017, Defendant Seema Verma, the Administrator for the Centers for Medicare & Medicaid Services — along with then-Secretary of the Department of Health and Human Services Tom Price — immediately circulated a letter to the Governors of all states to share her

1

belief that the ACA's Medicaid expansion "was a clear departure from the core, historical mission of the program." Sec'y of Health & Human Servs., Dear Governor Letter (Mar. 14, 2017), https://www.hhs.gov/sites/default/files/sec-price-admin-verma-ltr.pdf. The letter encouraged states to apply for "waiver[s]" of some of the program's coverage requirements — especially for the expansion group — promising to "fast-track" approval of such petitions. Id.

Kentucky is one state to board that train. After the ACA went into effect, it elected to broaden Medicaid to include the expansion population, and by April 2016, more than 428,000 new residents had thereby received medical assistance. In July 2017, however, the state submitted an experimental plan to CMS called "KY HEALTH," which is made up of several components, most significantly Kentucky HEALTH. That latter program promised to "comprehensively transform" its Medicaid program. Under that plan, the state would impose "community-engagement" requirements for the expansion population, along with some of the traditional population as well. This new mandate would require that those recipients work (or participate in other qualifying activities) for at least 80 hours each month as a condition of receiving health coverage. The project also called for, among other things, increased premiums and more stringent reporting requirements. Consistent with CMS's earlier invitation, the Secretary approved Kentucky's application on January 12, 2018, waiving several core Medicaid requirements in the process.

Plaintiffs in this case are fifteen Kentucky residents, each of whom is currently enrolled in the state's Medicaid program. Together, they fear that Kentucky HEALTH will relegate them to second-class status within Medicaid, putting them and others "in danger of losing" their health insurance altogether. They have thus brought this action to challenge the Secretary's approval of Kentucky HEALTH.

Although the Secretary is afforded significant deference in his approval of pilot projects like Kentucky's, his discretion does not insulate him entirely from judicial review. Such review reveals that the Secretary never adequately considered whether Kentucky HEALTH would in fact help the state furnish medical assistance to its citizens, a central objective of Medicaid. This signal omission renders his determination arbitrary and capricious. The Court, consequently, will vacate the approval of Kentucky's project and remand the matter to HHS for further review.

## I. BACKGROUND

The Court begins with an overview of the statutes governing Medicaid and its experimental projects. It then turns more specifically to Kentucky's challenged plan, before concluding with a brief procedural history of the current suit.

### A. Statutory Background

#### 1. Medicaid Program

Since 1965, the federal government and the states have worked together to provide medical assistance to certain vulnerable populations under Title XIX of the Social Security Act, colloquially known as Medicaid. See 42 U.S.C. § 1396-1. The Centers for Medicare and Medicaid Services (CMS), a federal agency within the Department of Health and Human Services, has primary responsibility for overseeing Medicaid programs. Under the cooperative federal-state arrangement, participating states submit their "plans for medical assistance" to the Secretary of HHS. Id. To receive federal funding, those plans — along with any material changes to them — must be "approved by the Secretary." Id.; see also 42 C.F.R. § 430.12(c). Currently, all states have chosen to participate in the program.

Before the Secretary can approve a state plan, the Medicaid Act sets out certain minimum parameters that all states must follow. See 42 U.S.C. § 1396a (listing 83 separate requirements). One such provision requires state plans to "mak[e] medical assistance available" to certain low-

income individuals.  Id. § 1396a(a)(10)(A).  Until recently, that group included pregnant women,

children, and their families; some foster children; the elderly; and people with certain disabilities.

Id.  In 2010, however, Congress enacted the Affordable Care Act "to increase the number of

Americans covered by health insurance."  NFIB, 567 U.S. at 538.  Under that statute, states can

choose to expand their Medicaid coverage to include additional low-income adults under 65 who

would not otherwise qualify.  See 42 U.S.C. § 1396a(a)(10)(A)(i)(VIII).  It also allowed states to

cover certain former foster children under the age of 26.  Id. § 1396a(a)(10)(A)(i)(IX).

Generally, a state must cover all qualified individuals or forfeit its federal Medicaid

funding.  Id. § 1396a(a)(10)(B).  Although it may choose not to cover this ACA expansion

population, see NFIB, 567 U.S. at 587, if the state decides to provide coverage, those individuals

become part of its mandatory population.  In that instance, the state must afford the expansion

group "full benefits" — i.e., it must provide "medical assistance for all services covered under

the State plan" that are substantially equivalent "in amount, duration, or scope . . . to the medical

assistance available for [other] individual[s]" covered under the Act.  See 42 U.S.C.

§ 1396d(y)(2)(B); 42 C.F.R. § 433.204(a)(2); see also Jones v. T.H., 425 U.S. 986 (1976).

The Medicaid Act also ensures that enrolled individuals receive a minimum level of

coverage.  Under section 1396a, states must cover certain basic medical services, see 42 U.S.C.

§§ 1396a(a)(10)(A), 1396d(a), and the statute limits the amount and type of premiums,

deductions, or other cost-sharing charges that a state can impose on such care.  Id.

§ 1396a(a)(14); see also id. § 1396o.  Other provisions require states to provide up to three

months of retroactive coverage once a beneficiary enrolls, see id. § 1396a(a)(34), and to ensure

that recipients receive all "necessary transportation . . . to and from providers."  42 C.F.R.

§ 431.53.  Finally, states must "provide such safeguards as may be necessary to assure" that

eligibility and services "will be provided, in a manner consistent with simplicity of administration and the best interests of the recipients." 42 U.S.C. § 1396a(a)(19).

2. <u>Section 1115 of Social Security Act</u>

Both before and after the passage of the ACA, a state wishing to deviate from the Medicaid Act's requirements must obtain a waiver from the Secretary of HHS. <u>See</u> 42 U.S.C. § 1315. In enacting the Social Security Act (and, later, the Medicaid program within the same title), Congress recognized that statutory requirements "often stand in the way of experimental projects designed to test out new ideas and ways of dealing with the problems of public welfare recipients." S. Rep. No. 1589, 87th Cong., 2d Sess. 19, <u>reprinted in</u> 1962 U.S.C.C.A.N. 1943, 1961-62. To that end, Section 1115 of the Social Security Act allows the Secretary to approve "experimental, pilot, or demonstration project[s]" in state medical plans that would otherwise fall outside Medicaid's parameters. The Secretary can approve only those projects that "in [his] judgment . . . [are] likely to assist in promoting the [Act's] objectives." 42 U.S.C. § 1315(a). Once the Secretary has greenlighted such a project, he can then waive compliance with the requirements of Section 1396a "to the extent and for the period . . . necessary to enable [the] State . . . to carry out such project." <u>Id.</u> § 1315(a)(1).

While the ultimate decision whether to grant approval rests with the Secretary, his discretion is not boundless. Before HHS can act on a waiver application, the state "must provide at least a 30-day public notice[-]and[-]comment period" regarding the proposed program and hold at least two hearings at least 20 days before submitting the application. <u>See</u> 42 C.F.R. §§ 431.408(a)(1), (3). Once a state completes those prerequisites, it then sends an application to CMS. <u>Id.</u> § 431.412 (listing application requirements). After the agency notifies the state that it

has received the waiver application, a federal 30-day public-notice period commences, and the agency must wait at least 45 days before rendering a final decision. Id. §§ 431.416(b), (e)(1).

**B.     Factual Background**

1.    CMS's Actions

It is no secret that the current administration hopes to "prompt[ly] repeal[] the Patient Protection and Affordable Care Act." Exec. Order No. 13765, Minimizing the Economic Burden of the Patient Protection and Affordable Care Act Pending Repeal, 82 Fed. Reg. 8351 (Jan. 20, 2017). "In the meantime," it has promised to "take all actions consistent with law to minimize" the Act's impact, including on states. Id. To that end, the new CMS Administrator circulated a letter on March 14, 2017, alerting states of the agency's "intent to use existing Section 1115 demonstration authority" to help revamp Medicaid. See Dear Governor Letter at 2. In that letter, Defendant Verma and then-Secretary Price lamented "[t]he expansion of Medicaid through the Affordable Care Act" as "a clear departure from the core, historical mission of the program." Id. at 1. Together they promised to find "a solution that best uses taxpayer dollars to serve" those individuals they deemed "truly vulnerable." Id.

On January 11, 2018, Brian Neale, Director of CMS, issued a follow-up letter to all state Medicaid Directors, fleshing out that "new policy." See AR 90-99. The agency, he said, would "assist states in their efforts to improve Medicaid enrollee health and well-being through incentivizing work and community engagement among" certain adult mandatory Medicaid groups. Id. This was "a shift from prior agency policy." AR 92. While other welfare programs — such as Temporary Assistance for Needy Families (TANF) and Supplemental Nutritional Assistance Program (SNAP) — condition benefits on working, see 42 U.S.C. § 607; 7 U.S.C. § 2029(a)(1), there is no equivalent for the Medicaid program. Indeed, during the 50-plus years

of Medicaid, CMS has not previously approved a community-engagement or work requirement as a condition of Medicaid eligibility.  See AR 4.  Instead, the agency has consistently denied these requests, finding that work requirements "could undermine access to care" and were thus inconsistent with the purposes of Medicaid.  See, e.g., Letter from Andrew M. Slavitt, Acting Administrator, Ctrs. For Medicare & Medicaid Servs., HHS to Thomas Betlach, Director, Az. Health Care Cost Containment Sys. at 2-3 (Sept. 30, 2016), at https://www.azahcccs.gov/Resources/Downloads/1115Waiver/LetterToState09302016.pdf

In the 2018 State Medical Director (SMD) letter, however, the agency espoused a new commitment to "support[ing] state efforts to test incentives that make participation in work or other community engagement a requirement for continued Medicaid eligibility" and encouraged states to apply for Section 1115 waivers for this purpose.  See AR 90.  It then "identified a number of issues for states to consider as they develop[ed]" a community-engagement requirement for the Medicaid program.  Id. at 93-98.  To date, at least ten states have applied for such Medicaid waivers.  See ECF No. 40 (Amicus Brief of AARP, et al.) at 2 n.1.

## 2. KY HEALTH

One of those states is the Commonwealth of Kentucky.  On August 24, 2016, Governor Matt Bevin submitted an application to CMS requesting a Section 1115 waiver to implement an experimental project, Helping to Engage and Achieve Long Term Health, or KY HEALTH.  See AR 5432-33, 5447.  He followed up with an amended (though similar) KY HEALTH application on July 3, 2017.  That application had two key programs relevant here (as well as some others not challenged): (1) Kentucky HEALTH — not to be confused with the umbrella KY HEALTH — a "program" that applies only to "adult beneficiaries who do not qualify for Medicaid on the

basis of a disability"; and (2) Substance Use Disorder (SUD) Treatment, which would be

available for all Medicaid beneficiaries.  See AR 2-3.  The Court outlines each in turn.

*a.  Kentucky HEALTH*

Kentucky HEALTH is a program primarily (though not exclusively) targeting the

expansion group of adults covered under the ACA.  See AR 2-3, AR 5442.  The Commonwealth

believed that this project would "transform" the state's Medicaid program by, among other

things, predicating Medicaid eligibility for most of the expansion population on workforce

participation or community service.  See AR 2, 15-16.

On January 12, 2018 (just one day after issuing the SMD letter), the Secretary approved

Kentucky HEALTH, granting waivers to implement the following features:

1) Community-engagement requirement, which requires beneficiaries
   to spend at least 80 hours per month on qualifying activities
   (including employment, job-skills training, education, community
   service, and participation in SUD treatment) or lose their Medicaid
   coverage;

2) Limits on retroactive eligibility, which excuse the state from
   "provid[ing] three months of retroactive eligibility for beneficiaries
   receiving coverage through the Kentucky HEALTH program;
   except for pregnant women and former foster care youth";

3) Monthly premiums, including premiums varied based on income
   and/or length of time enrolled in Medicaid;

4) Limits on non-emergency medical transportation, which "relieve
   Kentucky of the requirement to assure non-emergency medical
   transportation to and from providers for the new adult group" —
   *i.e.*, adults without disabilities, except for those who are medically
   frail, former foster-care youth, or pregnant;

5) Reporting requirements, which mandate that individuals provide
   information for an annual redetermination and report changes in

> income or circumstances that affect Medicaid eligibility within 10
> days; and

> 6)  <u>Lockouts,</u> which allow the state to deny Medicaid coverage for up
> to six months for any beneficiary who (a) has an income above
> 100% of the FPL and (b) failed to meet her premium or reporting
> requirements.

AR 2, 13-15.

Kentucky HEALTH also included "commercial market health insurance" features, <u>see</u> AR 6, such as a deductible account, an incentive and savings account called *My Rewards*. <u>Id.</u> at 6-7. The Secretary approved each of those mechanisms as part of Kentucky HEALTH and, in doing so, agreed to "fund[]" those programs "through the Section 1115(a)(2) expenditure authority." CMS Br. at 42. As part of that approval, the Secretary allowed Kentucky to penalize recipients who used the emergency room for "non-emergent" purposes, by deducting $75 from their new *My Rewards* health account (an account where Kentucky provides virtual funds for healthy behaviors). <u>See</u> AR 33-35, 5463.

With those programs in place, the Commonwealth expected to save roughly $331 million dollars, <u>see</u> AR 5513 (Estimated Fiscal Projections), primarily by reducing its Medicaid population by an estimated 95,000 persons. <u>Compare</u> AR 5421, <u>with</u> AR 5422.

### b. SUD Program

In the same KY HEALTH application, Kentucky also sought approval for an SUD Program. Traditionally, Medicaid bars states from receiving any "payments with respect to care or services for any individual who has not attained 65 years of age and who is a patient in an institution for mental diseases [IMD]." 42 U.S.C. § 1396d(a)(29); <u>see also</u> 42 U.S.C. § 1396d(a)(14) and (16)(A) (separately allowing payments for individuals under age 21). An IMD is a "hospital, nursing facility, or other institution . . . that is primarily engaged in providing

diagnosis, treatment, or care of persons with mental diseases." Id. § 1396d(i). In other words, the statute prohibits the federal government from reimbursing any treatment in mental-health facilities (at least for beneficiaries between 21 and 64).

Increasingly, this provision has posed problems for states. An estimated 21% of Medicaid-eligible adults suffer from a substance-use disorder, and Kentucky's citizens are no exception. See AR 5468. The state estimates that nearly "90,000 newly enrolled Kentuckians may have a SUD requiring treatment." Id. In 2014, the state expanded its coverage of mental health and SUD treatment options, "allowing Medicaid recipients to receive coverage for the full spectrum of inpatient and outpatient SUD services." Id. As the state put it, however, "coverage of benefits mean[s] little without access to providers." Id. Although there were 26 qualified mental-health facilities within Kentucky, none could provide care (or, at least, none could receive federal funding for such care) because of the "IMD exclusion." Id.

The Secretary recognized as much and circulated a State Medical Director letter in 2015, informing states of "a new opportunity for demonstration projects approved under section 1115 . . . to ensure that a continuum of care is available to individuals with SUD." Letter No. 15-003 at 1 (July 27, 2015), https://www.medicaid.gov/federal-policy-guidance/downloads/ smd15003.pdf. It encouraged states to propose "demonstration projects" under Section 1115 for treating SUDs. Id. If the Secretary approved any such project, Section 1115 would then require that the project costs (including patient-treatment costs) be "regarded as expenditures under the State [Medicaid] plan," meaning that they would be treated as reimbursable under Medicaid. See 42 U.S.C. § 1315(a)(2)(A). So long as states treated their SUD programs as part of a "demonstration" project, the federal government could thus help pick up the tab.

In 2017, the current administration confirmed its commitment to "work[ing] with states on section 1115(a) demonstrations . . . to combat the ongoing opioid crisis." Letter No. 17-003 at 1 (Nov. 1, 2017), https://www.medicaid.gov/federal-policy-guidance/downloads/ smd17003.pdf. In a new SMD Letter, the Secretary reaffirmed that through the "section 1115 initiative, states will have an opportunity to receive federal financial participation (FFP) for the continuum of services to treat addiction to opioids or other substances, including services provided to Medicaid enrollees residing in residential treatment facilities." Id. at 2. In total, twelve states (including Kentucky) have received approval on SUD demonstration projects. See MaryBeth Musumeci, Key Questions about Medicaid Payment for Services in "Institutions for Mental Disease", Henry J. Kaiser Family Foundation (June 18, 2018). Another thirteen have applications pending. Id.

As part of KY HEALTH, the Secretary approved an "[SUD] program available to all Kentucky Medicaid beneficiaries." AR 3. The "SUD program [allows] beneficiaries with SUD to access benefits that include SUD residential treatment, crisis stabilization and withdrawal management services provided in IMDs, which would otherwise be excluded from federal reimbursement." AR 85. Relatedly, the Secretary waived the requirement that Kentucky cover the non-emergency use of medical transportation (NEMT) "to and from methadone treatment, which requires daily dosing, for all Medicaid populations." AR 85. The plaintiffs have not challenged the SUD program (or any other component of KY HEALTH besides Kentucky HEALTH).

### C.   Procedural History

Before submitting its Section 1115 application to CMS, Kentucky's Department for Medicaid Services held three public hearings and conducted two public-comment periods. See

AR 5509, 5410.  Throughout this process, the state and CMS were engaged in "continued negotiations" regarding the program's terms.  See AR 5413, 5410.  CMS also opened a federal public-comment period on Kentucky HEALTH.  See AR 7-8.  On January 12, 2018, CMS notified the Governor's office that the application had been approved.  See AR 2-9.

Two weeks later, Plaintiffs brought this nine-count suit seeking declaratory and injunctive relief on behalf of themselves and a "statewide proposed class . . . of all residents of Kentucky who are enrolled in the Kentucky Medicaid program on or after January 12, 2018." Compl., ¶ 33.  Most named Plaintiffs have an income below 133% of the federal poverty line; many have serious medical conditions.  See ECF Nos. 33-2-17 (Declarations).  Almost all either already have part-time jobs or are actively seeking work, yet each fears that she may not be able to comply with the new "community-engagement" requirement.  Id.  Together, they worry that such a requirement — along with Kentucky HEALTH's other measures — places them in danger of losing Medicaid completely.  Id.  Their Complaint alleges principally that by approving Kentucky HEALTH, Defendants violated the Constitution and the Administrative Procedure Act. See Compl., ¶¶ 339-408.

On March 30, 2018, the Court granted Kentucky's Motion for Intervention.  See Minute Order.  Defendants then moved to transfer, asking the Court to send the case to the Bluegrass State, specifically the Frankfort Docket of the Central Division of the Eastern District of that state.  See ECF No. 6 at 2 n.2.  The Court denied that request on April 10, 2018, finding that this case was of "national, rather than local, significance" and would be properly adjudicated within the District of Columbia.  See Stewart v. Azar, 2018 WL 1730304, at * 6 (D.D.C. Apr. 10, 2018).  In the meantime, the parties have filed competing Motions for Summary Judgment.  The

Court heard oral argument on June 15, 2018, and because Kentucky HEALTH will take effect on July 1, 2018, has issued this Opinion on an expedited basis.

## II.    LEGAL STANDARD

The parties have cross-moved for summary judgment on the administrative record.  The summary-judgment standard set forth in Federal Rule of Civil Procedure 56(c), therefore, "does not apply because of the limited role of a court in reviewing the administrative record."  Sierra Club v. Mainella, 459 F. Supp. 2d 76, 89 (D.D.C. 2006); see also Bloch v. Powell, 227 F. Supp. 2d 25, 30 (D.D.C. 2002), aff'd, 348 F.3d 1060 (D.C. Cir. 2003).  "[T]he function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did."  Sierra Club, 459 F. Supp. 2d. at 90 (quotation marks and citation omitted).  "Summary judgment is the proper mechanism for deciding, as a matter of law, whether an agency action is supported by the administrative record and consistent with the [Administrative Procedure Act] standard of review."  Loma Linda Univ. Med. Ctr. v. Sebelius, 684 F. Supp. 2d 42, 52 (D.D.C. 2010) (citation omitted), aff'd, 408 Fed. App'x 383 (D.C. Cir. 2010).

The Administrative Procedure Act "sets forth the full extent of judicial authority to review executive agency action for procedural correctness."  FCC v. Fox Television Stations, Inc., 556 U.S. 502, 513 (2009).  It requires courts to "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2).  Agency action is arbitrary and capricious if, for example, the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency

expertise." Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983).

In other words, an agency is required to "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." Id. at 43 (quoting Burlington Truck Lines v. United States, 371 U.S. 156, 168 (1962)) (internal quotation marks omitted). Courts, accordingly, "do not defer to the agency's conclusory or unsupported suppositions," United Techs. Corp. v. Dep't of Def., 601 F.3d 557, 562 (D.C. Cir. 2010) (quoting McDonnell Douglas Corp. v. Dep't of the Air Force, 375 F.3d 1182, 1187 (D.C. Cir. 2004)), and "agency 'litigating positions' are not entitled to deference when they are merely [agency] counsel's 'post hoc rationalizations' for agency action, advanced for the first time in the reviewing court." Martin v. Occupational Safety & Health Review Comm'n, 499 U.S. 144, 156 (1991) (citation omitted). Although a reviewing court "may not supply a reasoned basis for the agency's action that the agency itself has not given," a decision that is not fully explained may, nevertheless, be upheld "if the agency's path may reasonably be discerned." Bowman Transp., Inc. v. Arkansas-Best Freight System, Inc., 419 U.S. 281, 285-86 (1974) (citation omitted).

## III. ANALYSIS

In this case, Plaintiffs accuse HHS of "tak[ing] by regulatory fiat what it could not accomplish in Congress." Pl. MSJ at 3. The Secretary and Kentucky, they say, sought to do little more than "knock people off Medicaid and undermine the Medicaid expansion enacted by Congress." Id. at 17. With that view in mind, their nine-count Complaint — which relies almost exclusively on the APA — challenges nearly every component of Kentucky HEALTH.

First, they attack the project as a whole, claiming the Secretary erred by finding that it was likely to promote the objectives of Medicaid.  <u>See</u> Compl, Count VIII.  Second, in Counts II-VII, they challenge each individual component of that program — *i.e.*, the community-engagement requirement, the premiums, the reporting requirements, the lockouts, the limits on NEMT and retroactive eligibility, and the penalties for non-emergency use of the emergency room.  For the latter counts, Plaintiffs principally maintain that each of those features is unlikely to promote the Act's objectives.  In Counts III and IV, Plaintiffs further allege that the Secretary could not permit certain premium or cost sharing (such as penalties on non-emergency use of the emergency room) through his Section 1115 authority.  Beyond that, Plaintiffs challenge the Secretary's issuance of the SMD Letter (Count I), as well as allege violations under the Take Care Clause (Count IX).

For reasons discussed in more detail below, the Court need adjudicate only one count of Plaintiffs' Complaint to grant them full relief: Count VIII, which challenges the Secretary's approval of Kentucky HEALTH as a whole.  Before the Court can reach that dispute, however, it must first address several threshold issues.

### A.      Threshold Issues

Whether his approval was lawful or not, the Secretary argues that this Court has no power to review it either because (1) Plaintiffs cannot establish standing for their challenge, or (2) the decision is "committed to agency discretion by law," 5 U.S.C. § 701(a)(2), thus barring any judicial oversight under the APA.

#### 1.   <u>Standing</u>

Article III of the Constitution limits the jurisdiction of federal courts to actual "Cases" and "Controversies."  U.S. Const., art. III, § 2.  But not just any dispute will do.  <u>See</u> <u>Lujan v. Defs. of Wildlife</u>, 504 U.S. 555, 559-61 (1992).  A plaintiff must demonstrate that she suffers: 1)

an injury-in-fact that is 2) caused by the conduct complained of and 3) "likely" to be "redressed by a favorable decision." Id. at 560-61 (quotations omitted). Because it considers only Count VIII, the Court limits its standing analysis to that claim.

### a. Injury/Causation

In a suit for injunctive relief, "past harm is not sufficient to establish an injury in fact." Nat'l Whistleblower Ctr. v. HHS, 839 F. Supp. 2d 40, 45-46 (D.D.C. 2012). The plaintiff, rather, must show "a real and immediate — as opposed to merely conjectural or hypothetical — threat of future injury." Nat. Res. Def. Council v. Pena, 147 F.3d 1012, 1022 (D.C. Cir. 1998) (citation omitted). "[I]n assessing plaintiffs' standing, [the Court] must assume they will prevail on the merits of their . . . claims." LaRoque v. Holder, 650 F.3d 777, 785 (D.C. Cir. 2011).

Here, Plaintiffs cite a litany of injuries stemming from the Secretary's approval of Kentucky HEALTH. Without that approval, Kentucky could not enact any feature of the program that required waivers of Section 1396a, such as (1) conditioning coverage on a community-engagement requirement; (2) increasing premiums, (3) limiting retroactivity eligibility, (4) limiting NEMT, (5) issuing reporting requirements; and (6) imposing lockouts. See AR 2-3. As part of his approval, the Secretary also authorized all waivers and expenditures needed from the "My Rewards Account incentives," including deductions for non-emergency use of emergency rooms. Id., AR 34 (allowing penalties "for each non-emergent visit to the emergency department").

Considering all of its aspects, Plaintiffs say Kentucky HEALTH might strip them of Medicaid coverage altogether. Generally, "an eligible recipient . . . ha[s] a concrete interest in Medicaid benefits." Banks v. Sec'y of Indiana Family & Soc. Servs. Admin., 997 F.2d 231, 238 (7th Cir. 1993). The D.C. Circuit had "no doubt," for example, that agency actions that

"threaten[ed] an individual's ability to obtain Medicaid coverage . . . satisf[ied] the injury element of constitutional standing." NB ex rel. Peacock v. Dist. of Columbia, 682 F.3d 77, 83 (D.C. Cir. 2012). The Secretary, however, claims such protestations are premature. Although Kentucky estimates 95,000 people will lose coverage, he says none of the Plaintiffs here has shown such a likelihood. ECF No. 71 (Oral Argument Transcript) at 40:18-41:11.

The Court need not resolve this dispute because, even were Plaintiffs to keep their Medicaid coverage, Kentucky HEALTH will increase their monthly premium payments. Ordinarily, states can charge their Medicaid beneficiaries only "nominal" premiums. See 42 U.S.C. § 1396o. Effective July 1, 2018, however, Kentucky would require enrollees to pay monthly premiums of up to 5% of household income (with punishment for non-payment, including termination of coverage and a six-month lockout penalty). See AR 87. This sort of financial loss falls in the heartland of Article III standing. See Carpenters Indus. Cncl v. Zinke, 854 F.3d 1, 5-6 (D.C. Cir. 2017) ("Economic harm . . . clearly constitutes an injury-in-fact."). For such economic harm, "amount is irrelevant." Id. "A dollar of economic harm is still an injury-in-fact for standing purposes." Id.; see also Czyzewski v. Jevic Holding Corp., 137 S. Ct. 973, 983 (2017) ("For standing purposes, a loss of even a small amount of money is ordinarily an 'injury.'").

The Secretary does not dispute that any Plaintiffs subject to higher premiums would suffer a cognizable injury. Instead, he suggests that each named Plaintiff might be exempt from this requirement. Kentucky HEALTH, however, excepts only the following groups from premium payments: (1) former foster-care youth; (2) pregnant women; and (3) medically frail individuals. Although Kentucky has not yet defined medically frail, several Plaintiffs aver that they are "healthy and do not have any ongoing medical problems." See, e.g., ECF Nos. 33-13

(Affidavit of Katelyn Allen), ¶ 6; 33-15 (Affidavit of David Roode), ¶ 6; 33-17 (Affidavit of

Quenton Radford), ¶ 8. CMS concedes that David Roode is "substantially likely not to be found

exempt on the basis of medical frailty," CMS Br. at 30, and Kentucky has also submitted a

supplemental declaration noting that Plaintiff Glassie Kasey, among others, had not been

identified as "medically frail by an MCO." ECF No. 69 (Notice).

CMS suggests that these Plaintiffs might nevertheless meet one of the other two

exemptions, see CMS Br. at 30, but the Court cannot agree. Quite obviously, Roode, a 39-year-

old man, is not a pregnant woman. Medical advances notwithstanding, Kasey, a 56-year-old

woman, is also unlikely to meet that criterion. See ECF No. 33-3 (Affidavit of Glassie Kasey),

¶ 2. Plaintiffs also represent in their briefing that they will not "be exempted as former foster

care youth." Reply at 5. Although they could have made this point more clearly in their

affidavits, the Court sees no reason to think they might fall within that exemption (and the odds

would certainly suggest otherwise). The Court therefore finds it likely that at least those two

Plaintiffs would be required to pay increased premiums and thus would suffer a concrete injury

from Kentucky HEALTH. This is all that is needed to challenge the program. See Animal Legal

Def. Fund, Inc. v. Glickman, 154 F.3d 426, 429 (D.C. Cir. 1998) (holding that in a suit brought

by multiple plaintiffs, only a single plaintiff must possess standing for a case to proceed).

b. *Redressability*

Having established an injury, Plaintiffs must also show "a likelihood that the requested

relief will redress the alleged [harm]." Steel Co. v. Citizens for a Better Environment, 523 U.S.

83, 103 (1998) (emphasis added). Generally, courts will find "standing exists where the

challenged government action authorized conduct that would otherwise have been illegal."

Renal Physicians Ass'n v. HHS, 489 F.3d 1267, 1275 (D.C. Cir. 2007). "In such cases, if the authorization is removed, the conduct will become illegal and therefore very likely cease." Id.

Here, the challenged government conduct — *viz.*, the Secretary's approval — provided the necessary authorization for Kentucky HEALTH. Because that program would otherwise run afoul of Section 1396a's coverage requirements, the state needs the Secretary's approval and waiver authority before it can enact it. See 42 U.S.C. § 1315; see also 42 C.F.R. § 430.12(c). Should this Court decide that CMS unlawfully approved Kentucky HEALTH, the program (including each component challenged by Plaintiffs) therefore could not take effect. In that event, Plaintiffs' Medicaid coverage would, at least temporarily, remain undisturbed. That is all they need for redressability purposes. See Renal Physicians, 489 F.3d at 1275 (holding "[c]ausation and redressability . . . are satisfied in this category of cases, because the intervening choices of third parties" — *i.e.*, Kentucky — "are not truly independent of government policy") (internal quotation marks omitted).

Kentucky tries to muddy the waters, arguing that Plaintiffs cannot satisfy the redressability prong because "if [they] prevail in this action, the Commonwealth will not continue participating in expanded Medicaid." KY MSJ at 4. While the Governor has indeed issued an Executive Order directing the Commonwealth to "unexpand" Medicaid if any aspect of Kentucky HEALTH is invalidated, see ECF 25-1, that Order has no bearing on the standing analysis here. The Executive Order calls for the Commonwealth's Medicaid agency "to take the necessary actions to terminate Kentucky's Medicaid expansion program" only after a final court judgment. Id. at 3. The EO thus cannot take effect before this Court's decision. Even if Kentucky were able to "unexpand" Medicaid (far from a foregone conclusion), Plaintiffs would have, at minimum, momentary relief.

Generally, "those adversely affected by a discretionary agency decision . . . have standing to complain that the agency based its decision upon an improper legal ground." FEC v. Akins, 524 U.S. 11, 25 (1998). A court "can 'redress' [a plaintiff's] 'injury in fact'" in such cases "even though the agency" — or, in this case, a third party — "might later . . . reach the same result for a different reason." Id. In other words, it matters little whether Kentucky might later moot the Court's decision; the important point is that, as the record stands today, the Court can grant meaningful relief.

While not necessary to its decision, the Court also notes that relief here would likely be more than fleeting. Even if Kentucky decides to discontinue benefits pursuant to the EO, the state will not do so until "all appeals of the judgment have been exhausted or waived." ECF No. 25-1 at 3. That is not typically a lightning process. After the litigation resolves, furthermore, the state would still need to submit any amendments to CMS. See 42 C.F.R. § 430.12(c); see also Tr. at 52:18-19. The Secretary will then need to decide "whether the plan continues to meet the requirements for approval." Id. § 430.12(c)(2)(i). That approval, in turn, would once again be subject to judicial review. And in the interim, Plaintiffs would retain their full Medicaid benefits without paying higher premiums. That is more than enough for standing purposes.

### c. Standing for the Relief Sought

Finally, the Secretary argues that even if Plaintiffs' have standing to challenge the premiums, "they could not leverage that standing to challenge the project as a whole, or the other components of KY HEALTH that do not injure them (like the community-engagement initiative)." CMS Reply at 5 n.2. In other words, "[i]f a plaintiff is only injured by one component of that act," he posits, "that's the only component that the plaintiff has standing to challenge." Tr. at 33:10-12.

It is true that "a plaintiff must demonstrate standing separately for each form of relief sought," Friends of the Earth, Inc. v. Laidlaw Environ. Servs., Inc., 528 U.S. 167, 185 (2000), and "for each claim he seeks to press." DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 352 (2006). The Supreme Court has held, for instance, that a plaintiff must have standing to pursue both damages and injunctive relief. See City of Los Angeles v. Lyons, 461 U.S. 95, 109 (1983). The relevant "claim" pressed here, however, is Count VIII. The "relief sought" in that count is not invalidation of particular elements of Kentucky HEALTH; rather, Plaintiffs seek vacatur of the Secretary's approval of the entire program.

That relief is tethered to the claim. Unlike individual sections of a statute, see, e.g., Davis v. FEC, 554 U.S. 724, 734 (2008), or provisions in a regulation, see, e.g., Lewis v. Casey, 518 U.S. 343, 357–58 & n.6 (1996), the Court cannot parse the Secretary's approval of a program. See, e.g., Nat. Res. Def. Cncl., Inc. v. Dep't of Navy, 2002 WL 32095131, at *8 (C.D. Cal. Sept. 17, 2002); Vt. Pub. Interest Research Grp. v. U.S. Fish & Wildlife Serv., 247 F. Supp. 2d 495, 513-14 (D. Vt. 2002) (holding plaintiffs may challenge NEPA analysis and implementation of program as whole even though they only established injury as to one area). As CMS itself maintains, it considered Kentucky HEALTH as a whole before deciding whether to approve it, rather than analyzing separately each challenged component. See CMS Br. at 26. The Court, accordingly, examines the approval of the project as a whole as well. See State Farm, 463 U.S. at 50, ("[A]n agency's action must be upheld, if at all, on the basis articulated by the agency itself."). Were the Secretary arbitrary and capricious in approving Kentucky HEALTH, the Court would strike down that approval in toto.

It therefore need ask only whether Plaintiffs "have an interest in some portion" of the benefits affected by that program. See Nat. Res. Def. Cncl., Inc., 2002 WL 32095131, at *8.

The premiums are the most concrete interest here (though by no means the only one). For the reasons explained above, vacating Kentucky HEALTH would sufficiently redress that injury, and Plaintiffs therefore have standing for Count VIII.

2. Justiciability

The Secretary next maintains that even if Plaintiffs have standing, this Court has no power to review his authority under Section 1115. Rather, he says, his actions are "committed to agency discretion by law" and are thus barred from review under Section 701(a)(2) of the APA. See CMS Br. at 11.

The APA embodies a "basic presumption of judicial review." Lincoln v. Vigil, 508 U.S. 182, 190 (1993) (quoting Abbott Labs. v. Gardner, 387 U.S. 136, 140 (1967)), and the exception under Section 701(a)(2) is "a very narrow" one. See Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 410 (1971), abrogated on other grounds by Califano v. Sanders, 430 U.S. 99, 105 (1977). Absent an express statutory bar, courts may review agency action except "in those rare instances where statutes are drawn in such broad terms that in a given case there is no law to apply," Webster v. Doe, 486 U.S. 592, 599 (1988) (internal quotation marks omitted), and "a court would have no meaningful standard against which to judge the agency's exercise of discretion." Heckler v. Chaney, 470 U.S. 821, 830 (1985).

Here, Section 1115 provides, *inter alia*:

(a) In the case of any experimental, pilot, or demonstration project which, in the judgment of the Secretary, is likely to assist in promoting the objectives of [the Medicaid statute,]

(1) the Secretary may waive compliance with any of the requirements of section . . . 1396a of this title, as the case may be, to the extent and for the period he finds necessary to enable such State or States to carry out such project, and

> (2) (A) costs of such project . . . shall, to the extent and for the
> period prescribed by the Secretary be regarded as
> expenditures under the State plan or plans.

42 U.S.C. § 1315(a)(1)-(2)(A).  In other words, the Secretary must adopt a two-fold inquiry, asking (1) whether he can approve the project pursuant to Section 1115(a); and then (2) what waivers or expenditures are necessary for that project pursuant to Sections 1115(a)(1) and (a)(2). The Court will evaluate the justiciability of each step in turn.

### a. *Section 1115(a)*

In this case, Count VIII challenges the Secretary's approval of Kentucky HEALTH under Section 1115.  The statute required that the Secretary examine two criteria before doing so: First, whether the project is an "experimental, pilot or demonstration project"; and second, whether the project is "likely to assist in promoting the objectives" of the Act.  Id.; see also Newton–Nations v. Betlach, 660 F.3d 370, 379-80 (9th Cir. 2011) (noting that court could review whether "Secretary [made] some judgment that the project has a research or a demonstration value") (citation omitted).

The Court can readily apply both standards, which are a far cry from those traditionally deemed unreviewable.  In Webster, for instance, the Supreme Court considered a statute allowing the CIA Director to terminate "an Agency employee whenever [she] 'shall deem such termination necessary or advisable in the interest of the United States.'"  486 U.S. at 600 (citation and emphasis omitted).  Looking to both the statute's discretionary language and its overall structure, the Court found no real "law to apply."  Id.  The CIA Director's personnel decisions affected national security, and the Court reasoned that it was for the executive branch, rather than the courts, to determine what was "in the interest of the United States."  Id.

The Supreme Court later stressed that <u>Webster</u> dealt with "an area of executive action 'in which courts have long been hesitant to intrude.'" <u>Lincoln</u>, 508 U.S. at 192 (quoting <u>Franklin v. Massachusetts</u>, 505 U.S. 788, 819 (1992) (Stevens, J., concurring)). The D.C. Circuit, too, has interpreted that decision narrowly. <u>See</u> <u>Dickson v. Sec'y of Def.</u>, 68 F.3d 1396, 1403 (D.C. Cir. 1995). In <u>Dickson</u>, for example, the Circuit held reviewable the Army Board for Correction of Military Records' authority to waive certain statutory requirements "it found [to be] in the interest of justice" — a standard far closer to <u>Webster</u> than that at issue here. <u>Id.</u> at 1403. The Court of Appeals there found "no sufficient reason why the determination, on a case-by-case basis, of what is 'in the interest of justice'" should "lie[] within the exclusive expertise of the Board," rather than the courts. <u>Id.</u> Likewise, in <u>Marshall Cty. Health Auth. v. Shalala</u>, 988 F.2d 1221 (D.C. Cir. 1993), the D.C. Circuit held it could review the Secretary's decision to modify regulations under the Medicare Act, even though the statute allowed him to do so "as [he] deem[ed] appropriate." <u>Id.</u> at 1223 (quoting 42 U.S.C. § 1395ww(d)(5)(C)(iii)). Distinguishing <u>Webster</u>, it reasoned that "the Medicare statute" does not typically include the same degree of "congressional deference to the executive." <u>Id.</u> at 1224.

The same is naturally true of the Medicaid statute. That Act "contains numerous, detailed, specific requirements with which states must comply in order to receive federal funding." <u>Beno v. Shalala</u>, 30 F.3d 1057, 1068 (9th Cir. 1994). The Secretary is responsible for ensuring that state programs comply with these regulations and must "take certain specific steps, culminating with the loss of funding, when state plans fail to comply." <u>Id.</u>; <u>see also</u> 42 C.F.R. § 430.35. While Section 1115 allows the Secretary to relax those minimum requirements in some circumstances, the Court "doubt[s] that Congress would enact such comprehensive regulations, frame them in mandatory language, require the Secretary to enforce them, and then

24

enact a statute allowing states to evade these requirements with little or no federal agency review." Beno, 30 F.3d at 1068-69.

Were it otherwise, the Secretary could singlehandedly rewrite the Medicaid Act. Imagine, for instance, that he approved a demonstration project targeting the blind. He could then waive Section 1396a's requirement that a state (or all states) cover blind people. The Secretary promised at oral argument that he would not do so, see Tr. at 31:5-13, but what's to stop him? The statute's caveat that any such project must be "likely to assist in promoting" the statute's objectives. See 42 U.S.C. § 1315(a). Congress thereby limited the Secretary's authority and, in doing so, assured that the judicial branch would police the statute's boundaries. See Bowen v. Mich. Acad. of Family Phys., 476 U.S. 667, 681 (1986) ("We ordinarily presume that Congress intends the executive to obey its statutory commands and, accordingly, that it expects the courts to grant relief when an executive agency violates such a command.").

Indeed, "[e]very court which has considered the issue has concluded that" the Secretary's Section 1115 authority is "subject to APA review." Beno, 30 F.3d at 1067 & n.24 (collecting cases); see also C.K. v. N.J. Dep't of Health and Human Servs., 92 F.3d 171, 181-82 (3d Cir. 1996) (reviewing Secretary's approval pursuant to Section 1115); Aguayo v. Richardson, 473 F.2d 1090, 1105 (2d Cir. 1973) (same); Crane v. Mathews, 417 F. Supp. 532, 539 (N.D. Ga. 1976). Some of those courts have upheld the Secretary's judgment, see, e.g., C.K., 92 F.3d at 1181-89, Aguayo, 473 F.2d at 1106, while others have struck down his approval. See, e.g., Beno, 30 F.3d at 1076; Newton–Nations, 660 F.3d at 381-82. None of those courts, however, struggled to find some "law to apply."

The Secretary resists this consensus, stressing that the statute turns on "[his] judgment" as to whether a project is likely to further the Act's objectives. See 42 U.S.C. § 1315(a). To be

sure, he "has considerable discretion to decide which projects meet these criteria." Beno, 30 F.3d at 1069. And, as discussed below, the Court will afford him considerable deference on his "judgment" that these waivers fit the bill. "[T]he mere fact that a statute contains discretionary language," however, "does not make agency action unreviewable." Id. at 1066. Rather, as noted above, the D.C. Circuit has consistently found justiciable statutes with "broad delegation[s] of discretion." Marshall Cty., 988, F.2d at 1124; see also Dickson, 68 F.3d at 1402-03 (rejecting such a position as a mere "linguistic argument"). Ultimately, the Court may properly review an agency action as long as there is some "law to apply." There is more than enough here.

b. *Sections 1115(a)(1) and (2)(A)*

Once the Secretary has approved a demonstration protect, he must then consider "the extent and . . . period" of waivers "necessary" to carry it out. See 42 U.S.C. § 1315(a)(1). He may also treat any associated costs as "expenditures" (and thus reimbursable by the federal Government) to the extent and for the period he deems appropriate. Id. § 1315(a)(2)(A).

The Secretary suggests that these provisions lack "any meaningful judicial standard of review." CMS Br. at 11 (quoting Webster, 486 U.S. at 600). In this case, however, the Court has no occasion to substantively review the Secretary's individual waivers and or expenditures, so it need not linger of the justiciability of sections 1115(a)(1) or (2)(A). It suffices to note that it can at least review whether the Secretary made a finding that any given waiver was necessary "to carry out [a demonstration] project." 42 U.S.C. § 1315(a)(1). The Act requires him to at least check that box, even were the Court to hold that the underlying finding of necessity was unreviewable. It could also review whether, as Plaintiffs have alleged in Count III, the Secretary has purported to waive requirements beyond the 83 outlined in section 1396a. Id. (limiting the Secretary to "waiv[ing] compliance with any of the requirements of section . . . 1396a of this

title") (emphasis added). Regardless of whether those provisions are otherwise justiciable, they have no bearing on the Secretary's approval of Kentucky HEALTH in the first place and thus are not relevant to Count VIII. The Court proceeds to that count now.

**B. Merits**

Appetizers now dispatched, the Court may cut into the main course. Plaintiffs' central position here is plain: Kentucky HEALTH would "fundamentally" and impermissibly "transform Medicaid." Pl. MSJ at 3. They thus attack nearly every component of the program. At bottom, however, most of their challenges boil down to a simple argument: the program is "not likely to assist in promoting" Medicaid's objectives." See 42 U.S.C. § 1315(a).

The parties debate the appropriate standard of review: Defendants deny review is even possible, see Section III.A.2, *supra*, while Plaintiffs maintain that the Secretary acted outside his statutory authority and should thus receive no deference on that question. At minimum, however, both sides agree that the Secretary's approval (if reviewable) must not be "arbitrary, capricious . . . , or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The Court, like others before it, will thus view the Secretary's approval through that lens. See, e.g., Beno, 30 F.3d at 1067-68; see also C.K., 92 F.3d at 183-84; Aguayo, 473 F.2d at 1105-07. Before doing so, however, it pauses to outline the scope of the challenge before it.

1. Scope

The Secretary maintains that he must ask only whether a project, considered as a whole, is "likely to assist in promoting the objectives of" the Medicaid Act. See 42 U.S.C. § 1315(a). Plaintiffs, meanwhile, lob multiple challenges at individual components of that project (such as the community-engagement requirement or the increased premiums). To the extent Plaintiffs mean to argue that none of those features is independently likely to further the Act's objectives, such focus would be misplaced. As they now seem to concede, see Reply Br. at 24, Section

1115(a) asks whether a "<u>project</u>" would promote the Act's objectives, not whether each component, "viewed in isolation," would. <u>See</u> <u>Wood v. Betlach</u>, 922 F. Supp. 2d 836, 843 (D. Ariz. 2013) (emphasis). While it may be relevant to the Secretary's determination whether any given component is consistent with the Act's objectives, he must ultimately determine whether, on balance, the project as a whole passes muster.

The Court thus limits its analysis to Count VIII, which alleges that the Kentucky HEALTH program, "<u>as a whole</u>," was neither "an experimental, pilot or demonstration project[] nor . . . likely to promote the objectives of the Medicaid Act." Compl. at Count VIII & ¶ 388 (emphasis added and capitalization altered). Defendants concede that such a challenge (if reviewable) is proper, but mistakenly construe Count VIII as a challenge to <u>KY HEALTH</u> *writ large*. <u>See</u> CMS Br. at 17-18. During oral argument, however, Plaintiffs made clear that they target only the Secretary's approval of <u>Kentucky HEALTH</u>, leaving aside any challenge to other components of KY HEALTH, such as the SUD program. <u>See</u> Tr. at 57:18-21 ("I just want to be clear [that] [w]hat we have . . . challenged is something called Kentucky HEALTH, spelled out.").

This distinction does not affect the Court's arbitrary-and-capricious review, as it would hold the Secretary's approval of either KY HEALTH or Kentucky HEALTH fell short of that standard. <u>See</u> Section III.B.2, *infra*. The difference matters enormously, however, for the appropriate remedy. Were the Court to treat this as a challenge to KY HEALTH, a decision in Plaintiffs' favor would invalidate not only Kentucky HEALTH but also Kentucky's recently implemented SUD program. None of the parties has an appetite for such a result. <u>See</u> Tr. at 45:7-16 (CMS); <u>id.</u> at 54:8-16 (Kentucky); <u>id.</u> at 58:9-17 (Plaintiffs). Fortunately for all, the Court can properly limit its review to Kentucky HEALTH.

Although packaged inside the same application, Kentucky HEALTH was wholly distinct from other pieces of KY HEALTH, including, *inter alia*, the SUD program. As a refresher, the latter is available for all Medicaid beneficiaries, while the former applies only to adults without disabilities. See AR 2-3. The programs also have different start dates: SUD treatment became effective January 12, 2018, but Kentucky HEALTH does not take effect until July 1, 2018. See AR 2. And, of course, they have different purposes: one was meant to "ensure that a broad continuum of care" was available to those with substance-abuse disorders. See AR 83. The other proposes to add "commercial market health insurance" features to Medicaid. See AR 7.

It comes as no surprise, then, that the Secretary has solicited and regularly approved stand-alone SUD demonstrations in other states, without packaging in elements similar to Kentucky HEALTH. See, e.g., Letter from Seema Verma, Adm'r, CMS, to Jen Steele, Medicaid Dir., La. Dep't of Health & Hospitals (Feb 1, 2018), https://www.medicaid.gov/Medicaid-CHIP-Program-Information/By Topics/Waivers/1115/ downloads/la/la-healthy-oud-sud-demo-ca.pdf; Letter from Seema Verma to Cynthia Beane, Comm'r, W. Va. Bureau for Med. Servs. (Oct. 6, 2017), https://www.medicaid.gov/medicaid-chip-program-information/bytopics/waivers/ 1115/downloads/wv/wv-creating-continuum-care-medicaid-enrollees-substance-ca.pdf.

Here, too, the Secretary effectively treated the SUD program and Kentucky HEALTH as two separate demonstration projects. Although he nominally referred to the latter as a program within the KY HEALTH demonstration, that label did not control. Instead, he evaluated independently whether Kentucky HEALTH would promote various objectives of the Act, including by "improv[ing] health outcomes, promot[ing] increased upward mobility and improved quality of life, increas[ing] individual engagement in health care decisions, and prepar[ing] individuals who transition to commercial health insurance coverage to be successful

in this transition." AR 7. He then separately stated (1) which waivers were necessary "for the Kentucky HEALTH program" and (2) which were necessary for "the KY HEALTH demonstration as a whole." AR 3; see also AR 13-15. Similarly, he distinguished between the "expenditure authorities" needed to "implement the Kentucky HEALTH program" and those necessary "to implement the KY HEALTH section 1115 demonstration." AR 11.

This makes sense. When the Secretary concluded that the SUD program "was likely to promote the objectives" of the Act, he could not then piggyback other unrelated waivers onto that approval. Why not? Because he can issue only those waivers "necessary" to support the project. See 42 U.S.C. § 1315(a)(1). In this case, the Secretary determined that hardly any waivers were needed to make the SUD program run. Simply by approving the SUD project, he ensured that all SUD costs were treated as reimbursable under Medicaid. Id. § 1315(a)(2)(A). He then identified only one waiver needed to implement the program: he waived Section 1396a(a)(4) to "the extent necessary to relieve Kentucky of the requirements to assure non-emergency medical transportation to and from providers for all Medicaid beneficiaries" when such transportation was "for methadone treatment services." AR 85.

At the same time, the Secretary never considered whether (nor explained why) any of the Kentucky HEALTH components — including (1) retroactive eligibility, (2) premiums, (3) the community-engagement requirement, (4) lockouts, (5) reporting requirements, and (6) NEMT — were "necessary" to carry out the SUD program (or any other component of KY HEALTH as a whole). See AR 3 (distinguishing "additional waiver[s] and expenditure[s]" that were necessary for "the KY HEALTH demonstration as a whole"). He did not, for instance, conclude that those waivers provided necessary cost savings to make SUD practicable.

Instead, the Secretary identified each component as an "additional waiver[] [or] expenditure[]" that was necessary for the Kentucky HEALTH program. See AR 14-15; see also AR 2-3. That program, then, was the relevant "experimental, pilot, or demonstration project." 42 U.S.C. § 1315(a). And it is thus that project "which, in the judgment of the Secretary," needed to be "likely to assist in promoting the objectives of [the Medicaid statute]." Id. Otherwise, none of those waivers would be "necessary . . . to carry out such [a] project." Id. § 1315(a)(1). This Court will thus treat, as the Secretary did, Kentucky HEALTH as a standalone demonstration project.

### 2. Arbitrary & Capricious Review

The scope of the challenge defined, the Court finally arrives at the crux of the parties' argument: whether the Secretary acted arbitrarily or capriciously in concluding that Kentucky HEALTH was "likely to assist in promoting the objectives" of the Medicaid Act. See 42 U.S.C. § 1315(a).

Under that deferential standard, the Court "is not empowered to substitute its judgment for that of the agency." Overton Park, 401 U.S. at 416. Nor can it "presume even to comment upon the wisdom of [Kentucky's] effort at Medicaid reform." C.K., 92 F.3d at 181. Still, it is a fundamental principle of administrative law that "agencies are required to engage in reasoned decisionmaking." Michigan v. EPA, 135 S. Ct. 2699, 2706 (2015) (internal quotation marks omitted); see also Public Citizen, Inc. v. FAA, 988 F.2d 186, 197 (D.C. Cir. 1993) ("The requirement that agency action not be arbitrary or capricious includes a requirement that the agency adequately explain its result[.]").

This means that an agency must "examine all relevant factors and record evidence." Am. Wild Horse Pres. Campaign v. Perdue, 873 F.3d 914, 923 (D.C. Cir. 2017); see also Humane

Soc'y of United States v. Zinke, 865 F.3d 585, 606 (D.C. Cir. 2017) ("failure to address" a "salient factor" in a statute renders the agency's approval arbitrary and capricious). At minimum, the agency "cannot entirely fail[] to consider an important aspect of the problem." Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983). Rather, he must "adequately analyze . . . the consequences" of his actions. See Am. Wild Horse, 873 F.3d at 932. In doing so, "[s]tating that a factor was considered . . . is not a substitute for considering it." Getty v. Fed. Savs. & Loan Ins. Corp., 805 F.2d 1050, 1055 (D.C. Cir. 1986). The agency must instead provide more than "conclusory statements" to prove he "consider[ed] [the relevant] priorities." Id. at 1057.

With that framework in mind, Plaintiffs' position is simple: "[T]he purpose of the [Medicaid Act] is to provide coverage and care to the most vulnerable" and, more precisely, "to provide that care generally free of charge." Oral Arg. Tr. at 17:19-24. The Secretary, they believe, "failed to consider adequately" the impact of Kentucky HEALTH on Medicaid coverage. See Am. Wild Horse, 873 F.3d at 923. Indeed, he "entirely failed to consider" Kentucky's estimate that 95,000 persons would leave its Medicaid rolls during the 5-year project. See State Farm, 463 U.S. at 43. Those failures, they urge, make his decision arbitrary and capricious.

Plaintiffs are correct. To explain why, the Court begins with the basic "objectives" of Medicaid before turning to the Secretary's approval in this case. It then considers — and rejects — each of Defendants' counterarguments.

### a. The Objectives of Medicaid

Before the Secretary can approve an "experimental, pilot, or demonstration" project, he must first identify the objectives of the Medicaid program. After all, he could hardly hold that

Kentucky HEALTH was "likely to assist in promoting the objectives" of the Act without identifying any objectives in the first place. See 42 U.S.C. § 1315(a). The Court assumes, as the Secretary maintains, that he should receive deference in interpreting the Act's "objectives" under this section. Id. Ordinarily, courts review an agency's statutory interpretations using the familiar two-step Chevron framework. That inquiry calls for examining whether "Congress has directly spoken to the precise question at issue," and, if not, whether "the agency's answer is based on a permissible construction of the statute." Chevron U.S.A. Inc. v. Nat'l Res. Def. Council, Inc., 467 U.S. 837, 842-43 (1984).

While the "objectives" of Section 1115 may be ambiguous, courts have traditionally looked to 42 U.SC. § 1396-1, which provides standing appropriation authority for federal support of "State plans for medical assistance," to discern those objectives. See Pharm. Research & Mfrs. of Am. v. Concannon, 249 F.3d 66, 75 (1st Cir. 2001); Jonathan R. Bolton, The Case of the Disappearing Statute: A Legal & Policy Critique of the Use of Section 1115 Waivers to Restructure the Medicaid Program, 37 Colum. J.L. & Soc. Probs. 91, 132 & n.235 (2003). The parties, too, agree that Section 1396-1 provides at least the starting point to ascertain the "objectives" of Medicaid. See CMS Br. at 20; Ky. Br. at 15-18; Pl. Reply at 14-18. That provision explains that Congress appropriated Medicaid funds

> [f]or the purpose of enabling each State, as far as practicable under the conditions in such State, to furnish (1) medical assistance . . . [to] individuals[] whose income and resources are insufficient to meet the costs of necessary medical services, and (2) rehabilitation and other services to help such families and individuals attain or retain capability for independence or self-care.

By its terms, the statute thus identifies two related objectives: allowing states, "as far as practicable," to "furnish (1) medical assistance" and (2) "rehabilitation and other services" designed to "help individuals retain a capacity for independence." Id.

So what does "furnish[ing] . . . medical assistance" mean?  The Medicaid statute "defines 'medical assistance' as 'payment of part or all of the cost' of medical 'care and services' for a defined set of individuals."  <u>Adena Reg'l Med. Ctr. v. Leavitt</u>, 527 F.3d 176, 180 (D.C. Cir. 2008) (citing 42 U.S.C. § 1396d(a)).  Plugging that definition into the statute, Congress evinced a clear interest in "enabling each State, as far as practicable," to provide "payment of part or all of the cost of medical care and services."  In other words, "[t]he Medicaid program was created . . . for the purpose of providing federal financial assistance to States that choose to reimburse certain costs of medical treatment for needy persons."  <u>Harris v. McRae</u>, 448 U.S. 298, 301 (1980); <u>see also</u> <u>Alexander v. Choate</u>, 469 U.S. 287, 289 n.1 (1985) (noting Congress designed Medicaid to "subsidize[]" states in "funding . . . medical services for the needy"); <u>W. Va. Univ. Hosps. Inc. v. Casey</u>, 885 F.2d 11, 20 (3d Cir. 1989) ("[T]he primary purpose of [M]edicaid is to achieve the praiseworthy social objective of granting health care coverage to those who cannot afford it.").

In 2010, Congress expanded the Medicaid program to provide medical assistance for a new population: low-income adults under 65 who would not otherwise qualify.  <u>See</u> 42 U.S.C. § 1396a(a)(10)(A)(i)(VIII).  As the name implies, the Affordable Care Act was designed to provide "quality, affordable health care for all Americans," including by expanding the "role of public programs" — like Medicaid — in achieving that goal.  <u>See</u> Pub. L. No. 111-148, 124 Stat. 119, 130, 271 (2010) (capitalization altered); <u>see also</u> <u>Almendarez–Torres v. United States</u>, 523 U.S. 224, 234 (1998) ("[T]he title of a statute and the heading of a section are tools available for the resolution of a doubt about the meaning of a statute.") (internal quotation marks omitted).  Under the ACA, states can choose to expand their Medicaid coverage to include this new, low-income group.  <u>See</u> 42 U.S.C. § 1396a(a)(10)(A)(i)(VIII); <u>see also</u> <u>NFIB</u>, 567 U.S. at 587.  Should a state choose to do so, those individuals become part of its mandatory population.

Through the ACA, Congress made Medicaid an "element of a comprehensive national plan to provide universal health insurance coverage." NFIB, 567 U.S. at 583. As amended, one objective of Medicaid thus became "furnishing . . . medical assistance" for this new group of low-income individuals. Id. at 634.

*b. The Secretary's Consideration of Medicaid's Objectives*

The Secretary agrees that Section 1396-1 identifies at least "one purpose of Medicaid." CMS Reply at 2 (emphasis omitted). As the agency put it during oral argument, that provision "makes clear that a purpose of Medicaid is to provide medical assistance to certain specified populations as far as practicable under the conditions in those states." Tr. at 35:13-16. He also agrees that it is "obviously . . . a purpose to provide medical assistance to the expansion population" as well. Id. at 36:15-17 (emphasis added). That objective should therefore be a "salient factor" in his analysis. See Humane Soc'y, 865 F.3d at 606.

The fundamental failure here, however, is that he ignored that objective in evaluating Kentucky HEALTH. Instead, by his own description, the Secretary examined only the following factors in his consideration of KY HEALTH generally:

> (1) "whether the demonstration was likely to assist in improving health outcomes";
> (2) "whether it would address behavioral and social factors that influence health outcomes";
> (3) "whether it would incentivize beneficiaries to engage in their own health care and achieve better health outcomes"; and
> (4) "whether it would familiarize beneficiaries with a benefit design that is typical of what they may encounter in the commercial market and thereby facilitate smoother beneficiary transition to commercial coverage."

AR 4.

When it came to Kentucky HEALTH specifically, the Secretary maintained the same focus, deciding that the project "would improve health outcomes, promote increased upward

mobility and improved quality of life, increase individual engagements in health decisions, and prepare individuals who transition to commercial health insurance coverage to be successful in this transition."  AR 7; see also AR 6 (Kentucky HEALTH would "improve[] health outcomes" and "also meet several additional goals, including encouraging responsible utilization of services" and "improving program integrity").  Kentucky, too, cited the same goals in proposing the project.  See AR 5447 (stating "Kentucky HEALTH seeks to . . . accomplish the following goals:" (1) "Improve members' health"; (2) "Prepare[] [individuals] to use commercial health insurance"; (3) "Empower people to seek employment and transition to commercial health coverage"; (4) "Implement delivery system reforms"; (5) "Ensure long-term fiscal sustainability").

While those may all be worthy goals, there was a notable omission from the list: whether Kentucky HEALTH (or, indeed, KY HEALTH) would help provide health coverage for Medicaid beneficiaries.  That is, would Kentucky HEALTH help or hurt states in "funding . . . medical services for the needy"?  Alexander, 469 U.S. at 289 n.1.  By his own description, the Secretary "entirely failed to consider" that question.  See State Farm, 463 U.S. at 43.

At minimum, the Secretary failed to "adequately analyze" coverage.  See Am. Wild Horse, 873 F.3d at 932.  There are two basic elements to that problem: First, whether the project would cause recipients to lose coverage.  Second, whether the project would help promote coverage.  The Secretary, however, neglected both.

i.      Risk to coverage

The Secretary never provided a bottom-line estimate of how many people would lose Medicaid with Kentucky HEALTH in place.  This oversight is glaring, especially given that the risk of lost coverage was "factually substantiated in the record."  Humane Soc'y, 865 F.3d at

36

606.  In its application, Kentucky estimated that the project would cause more than 95,000 people to leave its Medicaid rolls by the fifth year.  Compare AR 5421 (listing eligible member months for Demonstration Year 5 without waiver) with AR 5422 (listing eligible member months for Demonstration Year 5 with waiver); see also Tr. 40:18-21.  *Amici* maintain that such number is conservative and peg the real figure as between 175,000 and 297,500.  See ECF No. 44 (Amicus Br. of Deans Chairs & Scholars) at 18.

Commenters, too, put the Secretary on notice that the Act might well reduce health coverage for low-income individuals.  As required, HHS provided a 30-day public notice-and-comment period regarding the proposed program.  The vast majority of those comments voiced concerns that Kentucky HEALTH would "significantly reduce low-income people's participation in health coverage programs."  AR 3835 (Comment of American Congress of Obstetricians and Gynecologists, *et al.*).  Citing extensive research, including from past Medicaid demonstrations, commenters explained how each provision of Kentucky HEALTH — namely, the (1) community-engagement requirement, see AR 3311, 3833-34, 3890, (2) increased premiums, see AR 3740, 3796-97, 3775, 3831, 3864, 3880, 3846-47, 3891, (3) cost sharing for non-emergency use of emergency rooms, see AR 3692, 3849, 3917, (4) suspension of retroactive eligibility, see Section III.B.2.b.ii, *infra*, (5) reporting requirements, see AR 3314, 3322-23, and (6) lockouts, see AR 3797, 3815, 3891— would likely reduce healthcare access and utilization. See Appendix A (reproducing comments).  To top it off, numerous comments also suggested that these new administrative requirements would increase "clerical and tracking errors and delays," which in turn would "cause inadvertent terminations."  See, e.g., AR 3486, 3643, 3652, 3661, 3791, 3931.

While the Secretary was not required to address each comment in writing, see CMS Br. at 7, he concedes that he needed to at least "consider[]" those objections. See Tr. at 43:22-44:2. Yet in the face of those warnings, "the record contains a rather stunning lack" of discussion about the effect of Kentucky HEALTH on health coverage. See Beno, 30 F.3d at 1074. For starters, the Secretary never once mentions the estimated 95,000 people who would lose coverage, which gives the Court little reason to think that he seriously grappled with the bottom-line impact on healthcare. Nor did he "request . . . additional information related to the project's impact on recipients" or offer "any information refuting plaintiffs' substantial documentary evidence" that the action would reduce healthcare coverage. Id. at 1074.

Instead, the Secretary noted commenters' concerns that the work requirement "would create significant barriers to access for vulnerable individuals who are not able to work or otherwise meet the requirements." AR 8. To address their objections, the Secretary cited Kentucky HEALTH's "important protections for vulnerable individuals," such as exempting those who cannot work "due to a disability" or are "medically frail" from the community-engagement requirement. Id. He also notes that the state had added flexible "on-ramps," allowing those who lose coverage to regain it after meeting certain conditions. See CMS Br. at 35-36. During the litigation, too, he stresses that these "guardrails" show that the Secretary considered coverage concerns "in substance." Tr. 44:3-15.

That response, however, is no answer at all. In its original application, Kentucky already exempted "vulnerable individuals," such as those deemed medically frail, pregnant women, and children, from many of its project's requirements. See, e.g., AR 5467 (explaining that pregnant women and children would be exempt from co-payments and premiums, while premiums would be "optional" for the medically frail). Likewise, the state included the same "on ramps" in its

initial waiver application.  See AR 5466-67 (allowing early re-entry for persons who (1) pay past debt; (2) pay a premium for reinstatement month; and (3) participate in financial or health literacy); see also AR 5488-89 (comparing initial and amended application).  Even with those reforms baked in, Kentucky estimated that 95,000 people would lose coverage.  The commenters, too, expressed their concerns about coverage losses with those features in mind.  See, e.g., AR 3694-95, 3937 (noting problems with on ramp).

Although Kentucky's initial project may have thus included adequate protections for "vulnerable" individuals, this was not enough for the Secretary to rubber-stamp it.  Rather, as the Secretary admits, it is "obviously . . . a purpose to provide medical assistance to the expansion population" as well, see Tr. at 36:15-17, a group broader than the vulnerable classes identified in Kentucky HEALTH.  As explained in more detail below, the Secretary therefore cannot limit his review to only "vulnerable individuals," such as persons with disabilities and the medically frail.  He must consider coverage to all groups enrolled in the project.  Here, that included grappling with the fact that 95,000 people would lose Medicaid coverage, even with those "guardrails" in place.

Beyond those features, the Secretary cites only one other "guardrail" against coverage loss: a "good cause" exemption.  In an early exchange between him and Kentucky, the state agreed to "provide good cause exceptions to the lockout for failure to pay premiums that would allow beneficiaries to re-enroll under certain conditions without completion of early re-entry requirements or waiting."  AR 1540.  The Secretary's final Special Terms and Conditions exempted from lockouts persons who were hospitalized, incapacitated, or disabled or whose immediate family members had died or become disabled.  See AR 7, 28-29. There were also exceptions for people who were evicted or became homeless, were victims of natural disasters,

had gained and lost private insurance, or were victims of domestic violence.  Id.  Those narrow

changes, however, do not establish that the Secretary "adequately analyzed" coverage loss.  See

Am. Wild Horse, 873 F.3d at 932.  He never revised Kentucky's estimate on coverage loss with

these reforms in mind.  Rather, he granted the waivers with no idea of how many people might

lose Medicaid coverage and thus "failed to consider an important aspect of the problem."  State

Farm, 463 U.S. at 43.

Left with little else, the Secretary now argues that perhaps the 95,000 individuals would

not lose coverage after all; instead, maybe they will simply transition to "employer-sponsored

and commercial coverage."  CMS Br. at 11 (quoting AR 4, 7).  It made no such finding below,

however.  While the agency spoke generally of "creating incentives for individuals to obtain and

maintain coverage through private, employer-sponsored insurance," AR 5, it cited no research or

evidence that this would happen, nor did it make concrete estimates of how many beneficiaries

might make that transition.  And, of course, it is not obvious that the community-engagement

requirement alone would help a person shift to private insurance.  As the Secretary stresses, this

is not a work requirement; individuals can meet it, for example, by volunteering in the

community.  While those unpaid activities may have long-term benefits, he never discussed how

they will promote a "transition from Medicaid to commercial coverage."  AR 6.

The Court thus cannot credit the Secretary's speculations now.  "[T]he mere fact that

there is some rational basis within the knowledge and experience" of the agency, "under which

[it] might have" justified its conclusion, "will not suffice to validate agency decisionmaking."

Bowen v. American Hosp. Ass'n, 476 U.S. 610, 627 (1986) (internal quotation marks and

citations omitted).  Although it may "uphold a decision of less than ideal clarity if the agency's

path may reasonably be discerned," State Farm, 463 U.S. at 43 (quoting Bowman Transp., Inc. v.

Arkansas-Best Freight System, 419 U.S. 281, 296 (1974)), it cannot infer an agency's reasoning from mere silence or where the agency failed to address significant objections and alternative proposals. Id. at 43-44. Rather, "an agency's action must be upheld, if at all, on the basis articulated by the agency itself." Id. at 50. There was no discussion of coverage loss here.

ii.     Promote coverage

At the same time, the Secretary identified only one element of Kentucky HEALTH that might promote health coverage. In a single sentence, he noted that "[t]he approval of the waiver of retroactive eligibility encourages beneficiaries to obtain and maintain health coverage, even when healthy." AR 6. This sort of "conclusory" reference cannot suffice, "especially when viewed in light of" an obvious counterargument. See Getty, 805 F.2d at 1057. As is documented in the comments, restricting retroactive eligibility will, by definition, reduce coverage for those not currently on Medicaid rolls. See, e.g., AR 3811 (Comment of National Women's Law Center) ("Kentucky's request to waive retroactive eligibility for newly eligible low-income adults does not provide any demonstrative value other than to delay coverage – putting newly eligible beneficiaries at risk of medical debt and providers at risk for bad debt."); AR 3702 (Comment of Human Arc) ("The gap in coverage that will be created by the elimination of retroactive coverage could be devastating to those newly enrolled Kentucky HEALTH recipients who received services prior to their start date.").

When asked at oral argument how Kentucky HEALTH would otherwise furnish medical assistance, the Secretary cited one last feature: the SUD program. See Tr. 38:1-10. True, that program would cover all Medicaid beneficiaries' access to "residential treatment, crisis stabilization and withdrawal management services." AR 85. As explained above, however, it could operate regardless of Kentucky HEALTH, so the Secretary cannot cite it as a justification

for approving the latter project.  In any event, even <u>had</u> the Secretary considered KY HEALTH as a whole, he would have still needed to ask whether that project "promote[d] the objectives of Medicaid assistance" "on balance."  CMS Br. at 21 (quoting <u>CWRO</u>, 348 F. Supp. at 497).  Yet the Secretary made no such finding here.  He did not, for instance, suggest that providing SUD treatment might justify (much less require) the loss of Medicaid coverage for up to 95,000 individuals; those people, of course, will not be able to take advantage of SUD treatment.  Nor did he grapple with the fact that, by the state's estimate, roughly 80% of the expansion population did <u>not</u> suffer from a substance-use disorder.  For those persons, the SUD program does nothing to "furnish . . . medical assistance."   Against that backdrop, the Court cannot hold he made a reasoned decision "that on balance the objectives considered together were likely to be advanced."  <u>Id.</u>

* * *

At bottom, the record shows that 95,000 people would lose Medicaid coverage, and yet the Secretary paid no attention to that deprivation.  Nor did he address how Kentucky HEALTH would otherwise help "furnish . . . medical assistance."  In other words, he glossed over "the impact of the state's project" on the individuals whom Medicaid "was enacted to protect."  <u>Beno</u>, 30 F.3d at 1070.  By doing so, he "failed to consider adequately" a salient purpose of Medicaid and, thus, an important aspect of the problem.  <u>See</u> <u>Am. Wild Horse</u>, 873 F.3d at 923; <u>cf.</u> <u>Public Citizen v. Federal Motor Carrier Safety Admin.</u>, 374 F.3d 1209 , 1216 (D.C. Cir. 2004) ("A statutorily mandated factor, by definition, is an important aspect of any issue before an administrative agency, as it is for Congress in the first instance to define the appropriate scope of an agency's mission.").  The Court, consequently, cannot validate his approval of Kentucky HEALTH.

*c. Defendants' Counterarguments*

If the Secretary did not consider the impact of Kentucky HEALTH on health coverage, what did he consider instead?  Principally, three things: (1) "health and well-being"; (2) cost considerations, including "focus[ing]" the state's resources on "traditional" populations; and (3) "self-sufficiency" and "lessen[ing] dependence on government assistance."  CMS Br. at 21-22, 24 (citing AR 7).  The Secretary argues that he could properly focus on those three alternative criteria in approving the Act.  Id.  None of those factors, however, can justify ignoring whether the project would "furnish. . . medical assistance."  To explain why, the Court discusses each in turn.

i.  Health and Public Well-Being

In defending his approval, the Secretary first tries to move the target: "the objective of the Medicaid Act in the end," he says, is really "to promote the <u>health</u> of Medicaid beneficiaries." Tr. at 40:3-5.  In such a case, the agency would not need to consider whether Kentucky HEALTH helped furnish medical assistance, so long as it made beneficiaries healthier on the whole.

To that end, the Secretary spent much time claiming that Kentucky HEALTH would "improve health and wellness" for low-income individuals.  <u>See</u> AR 3; <u>see also</u> AR 7 ("Overall, CMS believes that Kentucky HEALTH has been designed to empower individuals to improve their health and well-being.").  He noted, for example, that the community-engagement requirement will "promote Medicaid's objective of improving beneficiary health."  AR 5; <u>see also</u> AR 4 (finding meaningful work was "essential to the economic self-sufficiency, self-esteem, well-being, and improved health of people with disabilities").  Likewise, he justified the

premium requirements, deductibles, and limited enrollment windows as necessary "to ensure continuity of care, which is important for improving health outcomes." AR 6.

The Secretary's SMD letter evinced the same belief that "work [would] promote health and well-being." AR 92. It encouraged states "to test the hypothesis that requiring work or community engagement as a condition of eligibility . . . will result in more beneficiaries being employed or engaging in other productive community engagement, thus producing improved health and well-being." AR 92. In its application, Kentucky, too, cited the "cornerstone" of its project as "employment initiative[s] aimed at increasing workforce participation rates in Kentucky," which it promised was "critical to improving the health status of Kentuckians." AR 5445 & n.24 (citing K. Hergenrather, *et al.*, Employment as a Social Determinant of Health: A Systematic Review of Longitudinal Studies Exploring the Relationship Between Employment Status and Physical Health, Rehabilitation Research, Policy, and Education (2015)).

While Plaintiffs and their *amici* assert that these proclaimed health benefits are unsupported by substantial evidence, see Pl. MSJ at 38; Deans Br. at 8-17; see also AR 3917, 3701, 3684, 3464, 3643, the Court need not enter that thicket. The Secretary's analysis, instead, fails for a more basic reason: it is little more than a sleight of hand. At each step, the Secretary impermissibly conflated "improv[ing] health and wellness," AR 3, with the Medicaid Act's more specific stated purpose of "furnish[ing] . . . medical assistance" and "rehabilitative and other services." 42 U.S.C. § 1396-1. Put another way, this focus on health is no substitute for considering Medicaid's central concern: covering health costs. While improving public health and health outcomes might be one consequence of "furnishing . . . medical assistance," the Secretary cannot choose his own means to that end. See Waterkeeper Alliance v. EPA, 853 F.3d 527, 535 (D.C. Cir. 2017) ("Agencies are . . . bound not only by the ultimate purposes Congress

has selected, but by the means it has deemed appropriate, and prescribed, for the pursuit of those purposes.") (internal quotation marks omitted). To the extent Congress sought to "promote health" and "well-being" here, it chose a specific method: covering the <u>costs</u> of medical services.

More fundamentally, promoting health is not the only reason Congress wanted to provide health insurance to needy populations. It also had an interest in making healthcare more <u>affordable</u> for such people. <u>See</u> Pl. Reply at 18. Had Congress maintained a singular focus on promoting health, it easily could have said as much, but the text and structure of Medicaid shows its desire to provide health <u>coverage</u> to those groups. After all, the Act does not convert states into hospitals, forcing them to provide direct medical services to its citizens. Rather, Medicaid provides federal funding so that the state can "<u>pay</u>[] . . . [for] part or all of the cost' of medical 'care and services' for a defined set of individuals." <u>Adena</u>, 527 F.3d at 180 (quoting 42 U.S.C. § 1396d(a)) (emphasis added).

To be more concrete, imagine two Kentuckians, Joe and Dan. Both are diagnosed with Hodgkin's Lymphoma. Joe has health insurance and is able to receive treatment for a co-pay of $100. Dan has no health insurance. He, too, is able to receive treatment, but he must pay out of pocket for the treatment costing tens of thousands of dollars. To do this, he and his wife must sell the family ranch, which had been in Dan's family for over four generations. After 18 months, both Joe and Dan are cancer free; in other words, they are equally <u>healthy</u>. But Dan, unlike Joe, is in financial ruin.

Dan's story, as it happens, is not so hypothetical. Instead, in its hearings leading up to the passage of the ACA, the Senate heard similar testimony about Dan DeLong, a rancher from Montana who lost his farm to pay medical bills. <u>See</u> U.S. Senate Committee on Health, Education, Labor & Pensions, Full Committee Hearing (June 11, 2009) (Statement of Dennis

Rivera).  During the same committee hearing, Senator and Committee Chairman Chris Dodd

spoke about one of his constituents, "a cancer survivor," who paid "as much for her healthcare as

she does for the mortgage on her home."  Id. (Statement of Sen. Dodd).  More generally,

witnesses testified that "[o]ver 60 percent of bankruptcies filed in 2007 were largely attributable

to medical expenses," id. (Rivera Statement), and that over 7% of cancer patients needed to take

a second mortgage to finance their care.  Id. (attaching David, U., Himmelstein *et al.*, Medical

Bankruptcy in the United States, 2007: Results of a National Study); see also H.R. REP. 111-

443, 987, 2010 U.S.C.C.A.N. 474, 509 (citing story of entrepreneur who was quoted $12,800 per

month to cover herself, her husband, her business partner, and business partner's family, forcing

her out of business).

Although the Court "need not rely on legislative history given the text's clarity," that

"history only supports" what the Act's text and structure already made clear: the Senate was

concerned with more than making America healthier when it expanded Medicaid; it also sought

to reduce the costs of healthcare for American families.  See Mohamad v. Palestinian Auth., 566

U.S. 449, 459 (2012); see also Warger v. Shauers, 135 S. Ct. 521, 527 (2014) ("For those who

consider legislative history relevant, here it confirms that this choice of language was no

accident.").

To hold otherwise would have bizarre results.  To borrow from the Supreme Court's

"broccoli horrible" example, see NFIB, 567 U.S. at 615 (Ginsburg, J., dissenting), imagine that

the Secretary could exercise his waiver authority solely to promote health, rather than cover

healthcare costs.  Nothing could stop him from conditioning Medicaid coverage on consuming

more broccoli (at least on an experimental basis).  Or, as Plaintiffs suggest, he might force all

recipients to enroll in pilates classes or take certain nutritional supplements.  See Tr. 19:16-22.

The penalty for non-compliance?  No more Medicaid.  Either of those conditions could promote "health" or "well-being" (perhaps in a more straightforward way than "community engagement" would), but both are far afield of the basic purpose of Medicaid: "reimburs[ing] certain costs of medical treatment for needy persons."  Harris v. McRae, 448 U.S. 297, 301 (1980).

Finally, the Secretary fell back during oral argument on Chevron deference.  See Tr. 40-13-17.  To the extent he means to offer his own alternative interpretation of "medical assistance," as defined in Section 1396-1, Chevron deference cannot save him.  That doctrine "'come[s] into play' only when [a court] must resolve statutory ambiguity."  U.S. Ass'n of Reptile Keepers v. Zinke, 852 F.3d 1131, 1138 (D.C. Cir. 2017) (quoting S. Cal. Edison Co. v. FERC, 195 F.3d 17, 23, 27 (D.C. Cir. 1999)).  The Secretary's interpretation here runs counter to the statute's plain text, its structure, and its legislative history, and would thus fail at Chevron step 1.

To the extent the Secretary means that he should receive deference in interpreting the "objectives" of Medicaid under Section 1115 more generally, the Court assumes he is correct.  While that term may be ambiguous, the Secretary's interpretation of it cannot "fall[] outside the bounds of reasonableness" at Chevron's second step.  See Goldstein v. SEC, 451 F.3d 873, 881 (D.C. Cir. 2006).  Remember, the Secretary agrees that Section 1396-1 outlines at least some of the Act's objectives.  In light of that provision's clear emphasis on promoting "medical . . . assistance," the Secretary could not reasonably focus on "health" and "well-being" instead.  The agency needed to at least consider the project's effect on healthcare coverage.

ii.      Cost considerations

At times, the Secretary did make conclusory assurances that Kentucky HEALTH "endeavor[s] to maintain coverage," AR 4, or "ensures that resources are preserved for individuals who meet eligibility requirements."  AR 7.   Of course, such fleeting references mean

little in the face of Kentucky's estimates that 95,000 people would <u>lose</u> coverage.  How did the

Secretary nevertheless "endeavor[] to maintain coverage"?  <u>See</u> AR 4.  His limited analysis is

difficult to parse, but the Court assumes he might have meant either that (1) Kentucky could

prioritize "its finite resources on the <u>traditional</u> populations," as opposed to the low-income

group added by the ACA, <u>see</u> Reply at 13 (emphasis added); or (2) Kentucky HEALTH was

needed "to maintain access for [all] currently enrolled populations."  AR 5.  Neither appeal to

cost considerations, however, can excuse his failure to consider coverage losses here.

(a) *Traditional Populations*

The Secretary at times suggests that he prioritized coverage for "traditional" Medicaid

populations.  Even accepting that argument on its own terms, however, it would hardly justify his

actions here.  While Kentucky HEALTH largely affects the expansion group, it would impact

some "traditional" recipients as well.  <u>See</u> AR 5422; <u>see also</u> Tr. at 56:8-11 (noting that 20% of

enrollees in Kentucky HEALTH would be part of the non-expansion group).  All told, Kentucky

estimated that nearly 19,765 adults from the "non-expansion" group would also leave its

Medicaid rolls.  <u>Compare</u> AR 5421 (without waiver population) <u>with</u> AR 5422 (with waiver

population).

In any event, the Secretary's focus on "traditional" Medicaid populations was misplaced.

Whatever the "traditional" purpose of Medicaid, the program was amended by the Affordable

Care Act.  As the Supreme Court held, the "Medicaid expansion" under that Act was "a shift in

kind, not merely degree."  <u>NFIB</u>, 567 U.S. at 583.  While "the original program was designed to

cover medical services for four particular categories of the needy: the disabled, the blind, the

elderly, and needy families with dependent children," the ACA "transformed" Medicaid "into a

program to meet the health care needs of the entire nonelderly population with income below

133 percent of the poverty level." Id.  It did so as part "of a comprehensive national plan to provide health insurance coverage." Id.

The Secretary cannot ignore that overarching purpose or turn a blind eye to Congress's efforts to "furnish[] . . . medical assistance" to this group.  In suggesting otherwise, he highlights that Section 1396-1 speaks specifically to furnishing "medical assistance on behalf of families with dependent children and of aged, blind, or disabled individuals."  That, he believes, allows him to limit his focus to (or at least give preference to) those "traditional" groups.  See Reply at 14-15; see also Ky. Br. at 15.  The upshot of this interpretation is that Congress has no interest at all in furnishing medical assistance "to the expansion population." Ky. Br. at 16.

At oral argument, the Secretary wisely backtracked from that position, conceding that it is "obviously . . . a purpose [of Medicaid] to provide medical assistance to the expansion population." Tr. 36:15-16.  For good reason.  While at first blush, Section 1396-1 might indeed seem to limit the Act's purposes to the listed categories, the "meaning — or ambiguity — of certain words or phrases may only become evident when placed in context." Brown & Williamson, 529 U.S. at 132.  A court, accordingly, must always read statutory language "in [its] context and with a view to [its] place in the overall statutory scheme." Id. at 133 (internal quotation marks omitted).  Its duty, after all, is "to construe statutes, not isolated provisions." Graham County Soil and Water Conservation Dist. v. United States ex rel. Wilson, 559 U.S. 280, 290 (2010) (internal quotation marks omitted).

Here, the Medicaid statute — taken as a whole — confirms that Congress intended to provide medical assistance to the expansion population.  The ACA amended Section 1396a(a)(10)'s mandatory population to include all individuals whose income fell below prescribed levels.  In so doing, it placed this group on equal footing with other "vulnerable"

49

populations, requiring that states afford them "full benefits." See 42 U.S.C. § 1396d. Under this regime, states must provide "medical assistance for all services covered under the State plan under this subchapter that is not less in amount, duration, or scope, or is determined by the Secretary to be substantially equivalent, to the medical assistance available for [other individuals]" covered under the Act. Id. Regardless of whether the Secretary can ultimately waive that requirement, he must start with the presumption that the expansion group is on par with other protected populations.

To be sure, Congress might have made its objectives all the more express by amending Section 1396-1 directly. See Def. MSJ at 23. The Supreme Court has not hesitated to highlight, however, that "[t]he Affordable Care Act contains more than a few examples of inartful drafting." King v. Burwell, 135 S. Ct. 2480, 2492 (2015). This Court must nevertheless "do [its] best, bearing in mind the fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." Id. (quoting Utility Air Regulatory Grp. v. EPA, 134 S. Ct. 2427, 2441 (2014)) (internal quotation marks omitted).

And this omission, while perhaps ill-guided, is not particularly glaring. Over time, Congress has amended Section 1396a(a)(10)(A)(i) to expand medical assistance to low-income pregnant women, emancipated children, and former foster youth. See Medicare Catastrophic Coverage Act of 1988, Pub. L. No. 100-360, § 302, 102 Stat. 683, 750-51; Omnibus Budget Reconciliation Act of 1989, Pub. L. No. 101-239, § 6401, 103 Stat. 2106, 2258; Omnibus Budget Reconciliation Act of 1990, Pub. L. No. 101-508, § 4601, 104 Stat. 1388, 1388-166; Patient Protection and Affordable Care Act, Pub. L. No. 111-148, § 10201, 124 Stat. at 917-18. None of those groups is mentioned in Section 1396-1, yet it is inconceivable that Congress intended to

establish separate Medicaid programs, with differing purposes, for each. Indeed, in his approval letter, the Secretary specifically sought to preserve health coverage for "vulnerable individuals like people with disabilities and pregnant women," even though pregnant women are not among those groups mentioned expressly by Section 1396-1. See AR 7.

As explained above, the Court will afford the Secretary deference in interpreting the "objectives" of Medicaid. See 42 U.S.C. § 1315. His interpretation, however, cannot fall "outside the bounds of reasonableness." Goldstein, 451 F.3d at 881. To the extent he concluded that the Act's objectives do not include "furnish[ing] . . . medical assistance" to the expansion group, his interpretation would be "utterly unreasonable" in light of Medicaid's text, structure, and legislative history. Id. He must thus evaluate the effect of Kentucky HEALTH on all Medicaid recipients, including low-income individuals, and he must do so without prioritizing certain groups over others. Here, that means the Secretary had an obligation to at least consider the 95,000 people who would lose Medicaid coverage, even if those people were largely members of the expansion group.

(b) *Financial Collapse*

Alternatively, the Secretary's reference to "preserving" resources might mean that the Commonwealth "would be unable to maintain access for currently enrolled populations." AR 5. In such a case, Kentucky HEALTH's cost-saving reforms would be necessary to keep Kentucky's entire Medicaid program afloat and thus preserve coverage for all recipients. It is an open question whether the Secretary could approve an "experimental, demonstration, or pilot project" on that basis. See Beno, 30 F.3d at 1069. The Ninth Circuit, for instance, has held that "[a] simple benefits cut, which might save money, but has no research or experimental goal, would not satisfy" Section 1115's requirements. Id. (emphasis added) (noting any project must

51

be "likely to yield useful information or demonstrate a novel approach to program administration").

Indeed, the Secretary disclaimed any such intent during oral argument, instead framing the cost savings as a "happy side effect" of the project. See Tr. at 42:25-43:2. He could hardly argue otherwise, as the record lacks substantial evidence that Kentucky's Medicaid program was in danger of collapse. First, the record shows that CMS, or at least Kentucky, may have misunderstood the projected cost savings. Both Defendants repeatedly highlight that the program could save $2.2 billion. During argument, Kentucky's counsel represented that the <u>state</u> would save that amount even after federal reimbursement. See Tr. at 47:22-24. He is mistaken. The Commonwealth's own records show that while the total savings (state plus federal) would reach that figure, the state's actual savings would be $331 million — not a trivial number, to be sure, but still significantly below that cited by the parties. See AR 5513.

Second, Defendants made no effort to contextualize those savings. The Court is sympathetic to "the unique challenges the Commonwealth is facing," AR 4, including that "[a]lmost twenty percent of [its] residents live in poverty"; "nearly one-third of Kentuckians are on Medicaid"; its "workforce participation is . . . less than 60 percent"; and it "ranks third in the nation for drug related fatalities." AR 5432. But basic questions remain to assess whether the state's Medicaid program is actually at risk: What are Kentucky's current state revenues? What is its budget generally? Is the state running a deficit?

Nor did Defendants explain why cuts to the <u>expansion</u> population would be the best remedy for any budget woes. "While Congress pays 50 to 83 percent of the costs of covering individuals [traditionally] enrolled in Medicaid, § 1396d(b)," the federal Government currently pays 94% of costs for the expansion group. See <u>NFIB</u>, 567 U.S. at 584; <u>see also</u> 42 U.S.C.

§ 1396d(y)(1)(C).  Even "once the expansion is fully implemented [in 2020,] Congress will pay 90 percent of the costs for newly eligible persons."  Id. (citing 42 U.S.C. § 1396d(y)(1)(E)).  Such numbers raise the question: why target only the group receiving the most federal aid if the goal is simply to cut the budget?  Without data on those points, the Secretary could not make a reasoned decision that Kentucky would truly be "unable to maintain access for currently enrolled populations."  AR 5.  Although the cost savings may have been a "happy side effect," they thus cannot excuse the Secretary's failure to consider "furnish[ing] . . . medical assistance."  42 U.S.C. § 1396-1.

iii.    Self-sufficiency

Finally, the Secretary flagged an interest in promoting "greater independence" and "reduc[ing] reliance on public assistance."  AR 4, 5.  The Court has doubts whether such an objective is proper.  The Secretary primarily cites Section 1396-1 in defense of that purpose, which appropriates money so that states can "furnish . . . rehabilitation and other services to help such families and individuals attain or retain capability for independence or self-care."  From there, he excises the language about "independence or self-care," treating those as stand-alone objectives of the Act.  The text, however, quite clearly limits its objectives to helping States furnish rehabilitation and other services that might promote self-care and independence.  It does not follow that limiting access to medical assistance would further the same end.

In any event, even accepting that argument, the Secretary never maintained that "self-sufficiency" is a substitute for considering healthcare (or even health).  Instead, he suggests that even if the latter objective "would suffer by reason of the project's operation," he could properly approve Kentucky HEALTH so long as he concluded "that on balance the objectives considered together were likely to be advanced."  CMS Br. at 21 (quoting Cal. Welfare Rights Org. v.

Richardson, 348 F. Supp. 491, 497 (N.D. Cal. 1972)).  Whether the Secretary can make such tradeoffs, he must, at least, "balance" that objective with the statute's others.  See MSJ at 21; see also Reply at 2 (acknowledging the appropriations statute "identifies one purpose of Medicaid").  Yet, as discussed above, the Secretary simply neglected the project's effect on medical coverage.  Given that oversight, the Court cannot hold he made a reasoned decision that the Act's objectives "considered together were likely to be advanced."  CWRO, 348 F. Supp. at 497.

* * *

At the end of the day, even if the Secretary could properly consider other factors — such as health, cost, or self-sufficiency — his "failure to address" a "salient factor" in the Act — i.e., furnishing medical assistance — renders his approval arbitrary and capricious.  See Humane Soc'y, 865 F.3d at 607.  That is not to say, of course, that the Secretary can never approve demonstration projects that might adversely affect Medicaid enrollment or reduce healthcare coverage.  After all, the point of the waivers is to give states flexibility in running their Medicaid programs, and experimental projects may (at least inadvertently) adversely affect healthcare access.  While there may be limits to how much loss is too much, see Tr. at 23:3-12, the Court need not answer that question now.  Rather, it holds today only that the Secretary must adequately consider the effect of any demonstration project on the State's ability to help provide medical coverage.  He never did so here.

3.  Remedy

Such failure infected his entire approval.  As previously explained, he evaluated whether Kentucky HEALTH, as a whole, was likely to promote the objectives of the Act, but he did so while neglecting the primary objective of the Medicaid program.  When an agency exercises discretion using the wrong legal standard, its action cannot survive.  See SEC v. Chenery Corp.,

318 U.S. 80, 94 (1943) ("[A]n [agency] order may not stand if the agency has misconceived the law."); see also Fox, 556 U.S. at 562 ("The agency's failure to discuss . . . two 'important aspect[s] of the problem' means that the resulting decision is 'arbitrary, capricious, an abuse of discretion' requiring us to remand the matter to the agency") (citation omitted). The Court must therefore hold the approval of Kentucky HEALTH invalid *in toto*.

In doing so, it grants Plaintiffs full relief. See Tr. 16:21-17:1. The Secretary's approval of Kentucky HEALTH was necessary for the state to implement each of their challenged components: the community-engagement requirement, the premiums, the reporting requirements, the lockouts, the limits on NEMT and retroactive eligibility, and the penalties for non-emergency use of the emergency room. Because the Court invalidates that approval, it need not tackle Plaintiffs' alternative bases for vacating some or all of the components — *e.g.*, that the Secretary lacked statutory authority to issue certain waivers; that his findings were not supported by substantial evidence; that the SMD letter was invalid; and that his approval violated the Take Care Clause. Nor does it need to consider Plaintiffs' request for class certification. While those questions may resurface on remand, they will not trouble the Court now.

That leaves the question of remedy. When a court concludes that agency action is unlawful, "the practice of the court is ordinarily to vacate the rule." Ill. Pub. Telecomms. Ass'n v. FCC, 123 F.3d 693, 693 (D.C. Cir. 1997); Reed v. Salazar, 744 F. Supp. 2d 98, 119 (D.D.C. 2010) ("[T]he default remedy is to set aside Defendants' action."); Sierra Club v. Van Antwerp, 719 F. Supp. 2d 77, 78 (D.D.C. 2010) ("[B]oth the Supreme Court and the D.C. Circuit Court have held that remand, along with vacatur, is the presumptively appropriate remedy for a violation of the APA."). "[A]lthough vacatur is the normal remedy, [courts] sometimes decline to vacate an agency's action." Allina Health Servs. v. Sebelius, 746 F.3d 1102, 1110 (D.C. Cir.

2014). That decision depends on the "seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly) and the disruptive consequences of an interim change." Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n, 988 F.2d 146, 150-51 (D.C. Cir. 1993) (citation omitted); see also Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers, 2017 WL 4564714, at *8 (D.D.C. Oct. 11, 2017) (declining to vacate when agency "largely complied" with statute and could likely substantiate prior conclusions on remand).

Neither factor favors the Government. The D.C. Circuit recently affirmed that the "fail[ure] to address" an important aspect of the problem is a "major shortcoming[]." Humane Soc'y, 865 F.3d at 614. It has thus repeatedly vacated agency actions with that flaw. See, e.g., id. at 615; SecurityPoint Holdings, Inc. v. TSA, 867 F.3d 180, 185 (D.C. Cir. 2017) ("[T]he court must vacate a decision that 'entirely failed to consider an important aspect of the problem.'") (quoting State Farm, 463 U.S. at 43); Wedgewood Village Pharmacy v. DEA, 509 F.3d 541, 552-53 (D.C. Cir. 2007) (vacating after failure to consider an important aspect of the problem). Here, that failure went "to the heart" of the Secretary's decision to approve Kentucky HEALTH. See Humane Soc'y, 865 F.3d at 614. Given that he neglected to consider one of Medicaid's central objectives, the Court harbors "substantial 'doubt whether [he] chose correctly'" in his approval. Id. (quoting Sugar Cane Growers Co-op of Fla. v. Veneman, 289 F.3d 89, 98 (D.C. Cir. 2002)). That makes vacatur appropriate. Id. at 615; Fox Television Stations, Inc. v. FCC, 280 F.3d 1027, 1052-1053 (D.C. Cir. 2002).

Nor would vacatur be particularly disruptive. This is not a case in which "[t]he egg has been scrambled and there is no apparent way to restore the status quo ante." Sugar Cane Growers, 289 F.3d at 97. Rather, Kentucky HEALTH has yet to take effect. Allowing it to do so during remand, on the other hand, could be exceptionally disruptive for Plaintiffs. Many of

them suffer from various chronic conditions, such as diabetes, hypertension, and mental-health conditions; they thus fear even a temporary implementation of Kentucky HEALTH could cause serious harm.  See, e.g., Pl. MSJ, Exh. 1 (Declaration of Ronnie Stewart), ¶¶ 6, 8; Kasey Decl., ¶¶ 8, 10; Exh. 3 (Declaration of Lakin Branham), ¶¶ 7, 12; Exh. 4 (Declaration of Shanna Ballinger), ¶¶ 9, 11.  *Amici* report that those problems are common among the expansion population as a whole.  See AARP Br. at 6-9.  The Court therefore believes that preserving the status quo — including Plaintiffs' continuity of coverage — is appropriate.

Defendants' "best" argument against vacatur is that the Court should preserve "the substance abuse component of the waiver."  Tr. at 45:7-16.  That program, they say, "is critically important to ensuring treatment to the people of Kentucky who are suffering from substance abuse."  Id.; see also id. at 54:8-16 (noting that the SUD treatment program was "critical" and its vacatur would be "disastrous").  Defendants' fears are unfounded.  The Secretary's decision to approve Kentucky HEALTH is severable from his approval of KY HEALTH as a whole.  As explained above, the Secretary separately considered the former program and issued waivers that were "necessary" only in its service.  At the same, CMS has repeatedly affirmed its commitment to approving stand-alone SUD programs and has regularly done so for other states.  The Court therefore has no "substantial doubt" that the Secretary would have approved the SUD project without Kentucky HEALTH.  See North Carolina v. FERC, 730 F.3d 790, 795-96 (D.C. Cir. 1984).  It will therefore leave that program — along with the rest of KY HEALTH — intact.

# IV.  CONCLUSION

For the foregoing reasons, the Court will deny Defendants' Motions for Summary

Judgment.  It will also grant Plaintiffs' Motion for Summary Judgment via Count VIII, vacate

the Secretary's approval of Kentucky HEALTH, and remand to the agency.  A contemporaneous

Order to that effect will issue this day.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date: June 29, 2018

**Appendix A**

| Kentucky HEALTH Component | Comments |
| --- | --- |
| *Community-Engagement Requirement* | AR 3311 (Center for Law and Social Policy) ("Expecting current enrollees who transition to Kentucky HEALTH to meet the work requirements in the first month of Kentucky HEALTH does not support work, but only serves to immediately disenroll people from Medicaid."); AR 3833-34 (American Congress of Obstetricians and Gynecologists, *et al.*) ("[T]he experience of the Temporary Assistance for Needy Families (TANF) program demonstrates that imposing a work requirement on Medicaid would lead to the loss of health coverage for substantial numbers of people who are unable to work or face major barriers to finding and retaining employment."); AR 3890 (Nat'l Alliance on Mental Illness) ("Work requirements . . . create a barrier to coverage that is likely to delay or disrupt prevention."). |
| *Premiums* | AR 3740 (Families USA) ("In Indiana, November 2015 through January 2016, the state dis-enrolled 1,680 individuals from its Medicaid expansion HIP 2.0 program for failure to pay premiums."); AR 3775 (Save Ky. Healthcare) ("There is evidence that premiums are a barrier to coverage and enrollment for low-income individuals."); AR 3796 (Community Catalyst) ("A rich collection of evidence verifies that premiums in Medicaid discourage enrollment and result in people losing coverage. For instance, when Oregon increased premiums for enrollees below poverty in 2003 from $6 to $20, nearly half of the state's Medicaid beneficiaries lost coverage, mostly due to affordability issues."); AR 3831 (United Automobile, Aerospace, and Agricultural Implement Workers of America) ("Studies have shown that premiums are a hardship on the poor and lead to reduced enrollment and dropped coverage."); AR 3864 (National Health Law Program) ("[P]remiums for low-income enrollees, has been repeatedly tested and consistently shown to depress enrollment."); AR 3846-47 (American Diabetes Ass'n) (citing study that "a premium increase of $10 per month is associated with a decrease in public coverage"); AR 3880 (Kentucky Center for Economic Policy) ("All five states that have instituted premiums for their expansion populations have seen either an increase in collectable debt among enrollees, a decrease in enrollment or at the very least an increase in churn in and out of the Medicaid program."); AR 3891 (NAMI) ("Research has consistently demonstrated that premiums deter enrollment."); AR 3835 (ACOG) ("Extensive research (including research from Medicaid demonstration projects conducted prior to health reform) shows that premiums significantly reduce low-income people's participation in health coverage programs."). |
| *Non-emergency use of emergency rooms* | AR 3692 (American Cancer Society Cancer Action Network) ("Studies have shown that imposing cost-sharing on low-income individuals is likely to deter enrollment in the Medicaid program."); |

| | |
|---|---|
| | AR 3962 (American Diabetes Association) ("[T]he cost-sharing requirements in Kentucky HEALTH are likely to deter individuals from obtaining Medicaid coverage."); AR 3849 (Advocacy Action Network) ("More than forty years of research, beginning with the Rand Corporation studies in the 1970's, plus experience from many other states, have demonstrated that cost-sharing requirements will reduce the number of individuals who will have and maintain coverage.). |
| *Retroactive Eligibility* | <u>See</u> Section III.B.2.b.ii, *supra*. |
| *Reporting Requirements* | <u>See, e.g.</u>, AR 3322-23 (Families USA) (explaining how a beneficiary might easily fail to report small fluctuations in jobs, thereby resulting in lockouts of six months from coverage); AR 3314 (CLASP) (same). |
| *Lockouts* | <u>See, e.g.</u>, AR 3797 (Community Catalyst) (noting that in Indiana's similar program, "six percent of individuals with incomes above the poverty line were locked out of coverage for falling behind on their premiums"); AR 3815 (National Women's Law Center) ("Evaluations of the Children's Health Insurance Program (CHIP) show that lockout periods reduce retention in the program and are associated with increases in disenrollment as well as decreases in reenrollment after the lockout period."); AR 3891 (NAMI) ("A six-month lock-out period would result in gaps in coverage, treatment and care, especially for people with mental illness."). |