**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| RONNIE MAURICE STEWART, *et al.*, <br><br> **Plaintiffs,** <br><br> v. <br><br> ALEX M. AZAR II, *et al.*, <br><br> **Defendants.** | Civil Action No. 18-152 (JEB) |

<u>**MEMORANDUM OPINION**</u>

This Court again takes up a challenge to the federal approval of Kentucky HEALTH, an experimental project proposed by the Commonwealth of Kentucky intended to "comprehensively transform" its Medicaid program. The Secretary of Health and Human Services has authority to approve such experimental proposals — or "demonstration projects" — as long as they promote the objectives of the Medicaid Act. Kentucky HEALTH, which the Secretary initially approved on January 12, 2018, would condition Medicaid eligibility for a large portion of its beneficiaries on work or community-engagement requirements and impose several additional obligations intended to make Medicaid more like commercial insurance.

Plaintiffs, Kentucky residents currently enrolled in the Commonwealth's Medicaid program, believed HHS's approval unlawful. In a ruling last summer, this Court agreed. Finding that the "Secretary never adequately considered whether Kentucky HEALTH would in fact help the state furnish medical assistance to its citizens" and thus promote a central objective of the Medicaid Act, the Court concluded that this "signal omission render[ed] his determination arbitrary and capricious." <u>Stewart v. Azar</u>, 313 F. Supp. 3d 237, 243 (D.D.C. 2018). In

particular, it found that the Secretary had not grappled with Kentucky's estimate that a substantial number of people were likely to lose coverage under Kentucky HEALTH.  Id. at 260. The Court, consequently, vacated the approval and remanded to HHS for further review.

The bell now rings for round two.  Following the Court's remand and an additional notice-and-comment period, the Secretary reapproved the program last November, this time relying on somewhat different reasoning.  Plaintiffs now challenge the reapproval, contending principally that the Secretary has not remedied the defects that rendered his prior action unlawful.  Specifically, they maintain that he has still not adequately considered Kentucky HEALTH's likelihood to cause significant coverage loss.  The Secretary, by contrast, believes that this time around he has cured any critical omission.  Defendants now rely primarily on a new argument to that effect — namely that, although Kentucky HEALTH may cause nearly 100,000 people to lose coverage, that number will be dwarfed by the approximately 450,000 people who would suffer that fate if Kentucky ends its coverage entirely of those who have joined the Medicaid rolls via the Affordable Care Act, as it has threatened to do if this project is not approved.

The Supreme Court, in holding that Congress could not require states to adopt that Medicaid expansion by conditioning all their Medicaid funding on a decision to do so, explained that the states could not be compelled to engage in a program they had not bargained for with "a gun to the head."  Nat'l Fed. of Indep. Business v. Sebelius, 567 U.S. 519, 581 (2012). Kentucky, it seems, has now picked up that gun by threatening to de-expand Medicaid. Defendants urge the Court to adopt the proposition that the Secretary need not grapple with the coverage-loss implications of a state's proposed project as long as it is accompanied by a threat that the state will de-expand — or, indeed, discontinue all of Medicaid.  By definition, so this

argument goes, any number of people covered by an experimental Medicaid program would be greater than the number if there were no Medicaid at all; as a result, any demonstration project that leaves any individual on a state's Medicaid rolls promotes coverage. The Court cannot concur that the Medicaid Act leaves the Secretary so unconstrained, nor that the states are so armed to refashion the program Congress designed in any way they choose. As a consequence, once again finding the reapproval was both contrary to the Act and arbitrary and capricious, the Court will vacate it and remand to HHS for further review.

## I.   BACKGROUND

The details of the statutory scheme and the facts of the dispute will be familiar to readers of the Court's prior Opinion. See Stewart I, 313 F. Supp. 3d 237. The Court nevertheless offers a brief refresher on both before setting out the Secretary's actions on remand.

### A.  Statutory Scheme

Medicaid is a cooperative federal-state scheme that aims to provide medical assistance to certain vulnerable populations. See 42 U.S.C. § 1396-1. Specifically, Congress implemented the program "[f]or the purpose of enabling each state, as far as practicable . . . to furnish (1) medical assistance . . . [to] individuals[] whose income and resources are insufficient to meet the costs of necessary medical services, and (2) rehabilitation and other services to help such families and individuals attain or retain capability for independence and self-care." Id.  The Centers for Medicare and Medicaid Services (CMS), a federal agency within HHS, has primary responsibility for overseeing the Medicaid program. To receive federal funding, states must submit their "plans for medical assistance" for the HHS Secretary's approval. Id.  Currently, all states have chosen to participate in the program.

The Medicaid Act sets out certain minimum requirements to which all state plans must conform.  <u>See</u> 42 U.S.C. § 1396a.  Those provisions ensure that individuals receive a minimum level of coverage and stipulate that state plans "mak[e] medical assistance available" to certain sets of low-income individuals.  <u>See</u> 42 U.S.C. § 1396a(a)(10)(A).  Originally, that group included only pregnant women, children, and their families; some foster children; the elderly; and people with certain disabilities.  <u>Id.</u>  In 2010, the passage of the Affordable Care Act, colloquially known as Obamacare, gave states a choice to expand their Medicaid coverage to include additional low-income adults under the age of 65 who would not otherwise qualify — a group now commonly referred to as the "expansion population."  42 U.S.C. § 1396a(10)(A)(i)(VIII).

The Act also allows states wishing to deviate from either the original or the additional requirements of Medicaid to obtain a waiver from the Secretary of HHS.  <u>See</u> 42 U.S.C. § 1315.  Section 1115 of the Social Security Act, accordingly, permits the Secretary to approve "experimental, pilot, or demonstration project[s]" in state plans that would otherwise fall outside the Medicaid Act's parameters.  The Secretary, however, can approve only those projects that "in [her] judgment . . . [are] likely to assist in promoting the [Act's] objectives."  42 U.S.C. § 1315(a).  If a project, in the Secretary's judgment, passes muster, she can then waive compliance with the terms of  § 1396a "to the extent and for the period . . . necessary to enable [the] State . . . to carry out such project."  42 U.S.C. § 1315(a)(1).

**B.  Factual Background**

    1.  <u>Kentucky HEALTH</u>

In 2018, CMS released a State Medical Director (SMD) letter that indicated its new commitment to "support[ing] state efforts to test incentives that make participation in work or

other community engagement a requirement for continued Medicaid eligibility" and that encouraged states to apply for § 1115 waivers for this purpose. See AR 90. The Commonwealth of Kentucky submitted one such waiver application. As the Court has previously detailed, its application has multiple components. See Stewart I, 313 F. Supp. 3d at 246. Relevant here is its Kentucky HEALTH program, which "applies only to adult beneficiaries who do not qualify for Medicaid on the basis of a disability." Id. (internal quotation marks and citation omitted). That is, it targets primarily — though not exclusively — the ACA expansion population. Id. Kentucky "believed that this project would 'transform' the state's Medicaid program by, among other things, predicating Medicaid eligibility for most of the expansion population on workforce participation or community service." Id. (quoting AR 2, 15–16).

Just one day after releasing the SMD letter, the Secretary approved Kentucky HEALTH, granting the Commonwealth waivers to implement the following six features: first, a community-engagement requirement mandating that beneficiaries spend at least 80 hours per month on qualifying activities (including employment, job-skills training, education, community service, and participation in Substance Use Disorder (SUD) treatment) or lose Medicaid coverage; second, elimination — except for pregnant women and former foster-care youth — of the three-month period of retroactive eligibility for benefits; third, monthly premiums based on income and/or length of time enrolled in Medicaid; fourth, elimination — except for former foster-care youth, pregnant women, or the medically frail — of the Commonwealth's obligation to assure non-emergency medical transportation to and from providers; fifth, reporting requirements; and sixth, lockouts allowing the Commonwealth to deny coverage for up to six months to any beneficiary who failed to meet her premium or reporting requirements and has an income above 100% of the federal poverty line. Id. at 246–47. The Kentucky HEALTH

program also includes features similar to health-insurance plans on the commercial market, including "an incentive and savings account called *My Rewards*." Id. at 247 (citations omitted).

### 2. Stewart I

Two weeks after the Secretary's approval of Kentucky HEALTH, fifteen Kentuckians headed to Court, filing a nine-count suit seeking declaratory and injunctive relief on behalf of themselves and a "statewide proposed class . . . of all residents of Kentucky who are enrolled in the Kentucky Medicaid program on or after January 12, 2018." ECF No. 1 (Complaint), ¶ 33. The Court granted Kentucky's Motion to Intervene, see Minute Order of March 30, 2018, and the parties subsequently filed competing Motions for Summary Judgment. See ECF Nos. 33, 50, 51. Because Kentucky HEALTH was slated to take effect on July 1, 2018, the Court operated on an expedited schedule and issued its Opinion on June 29, 2018.

It found the Secretary's approval, considered as a whole, arbitrary and capricious because he "never adequately considered whether Kentucky HEALTH would in fact help the state furnish medical assistance to its citizens, a central objective of Medicaid." Stewart I, 313 F. Supp. 3d at 243. Specifically, he not only "failed to consider adequately the impact of Kentucky HEALTH on Medicaid coverage," but "he entirely failed to consider Kentucky's estimate that 95,000 persons would leave its Medicaid rolls during the 5-year [demonstration] project." Id. at 260 (internal quotation marks and citations omitted). The Court rejected the Secretary's contention that "he could properly focus on . . . three alternative criteria" — health and well-being, cost considerations, and beneficiary self-sufficiency — in approving the demonstration project. Id. at 265–66. In light of the Medicaid Act's "clear emphasis on promoting medical assistance," the Court found that "the Secretary could not reasonably focus on health and well-being instead." Id. at 268 (internal quotations omitted). It held similarly that while cost savings may be one

result of the demonstration project, they "cannot excuse the Secretary's failure" to consider

coverage. Id. at 271. The Court reasoned similarly regarding self-sufficiency after expressing

"doubts whether such an objective is proper." Id. at 271. It consequently "den[ied] Defendants'

Motions for Summary Judgment," "grant[ed] Plaintiffs' Motion for Summary Judgment . . .[,]

vacate[d] the Secretary's approval of Kentucky HEALTH, and remand[ed] to the agency." Id. at

274.

### 3.   Action on Remand

Following the decision in Stewart I, the Secretary returned to the drawing board and re-

opened the public-comment period for Kentucky HEALTH. See AR 25,499. On November 20,

2018, he reapproved Kentucky HEALTH effective on April 1, 2019, for five years. See AR

6718–19. The program has essentially the same features as it did before — namely, a

community-engagement requirement; premium payments; a six-month lockout for failure to

complete the redetermination process or timely report changes to household circumstances;

elimination of retroactive eligibility for most enrollees; elimination of non-emergency medical

transport for most enrollees; heightened cost-sharing for non-emergency use of the emergency

room; and usage of the *My Rewards* account for various benefits. See AR 6756–60; 6762; 6764–

65; 6769; 6770–72; 6773–80. Indeed, the new approval letter acknowledges as much, naming

only four changes: first, waiving an additional statutory provision of the Act "in an abundance of

caution" to ensure the program limits retroactive eligibility as contemplated; second, "[r]evision

of the premium requirement for beneficiaries who are eligible for transitional medical

assistance"; third, "[u]pdated monitoring and evaluation [provisions]"; and fourth, a

"requirement for Kentucky to submit a demonstration implementation plan and . . . monitoring

protocol." AR 6723. Defendants have confirmed that those four changes, plus the "add[ition]

[of] certain exemptions for survivors of domestic violence," are the only "substantive changes to the project."  See ECF No. 130 (Supplemental Filing) at 1–2.

In addition to those modest changes in the plan, the Secretary also altered his rationale for approval.  In the November 20 approval letter, he acknowledged that he "may approve a demonstration project under section 1115 . . . if, in his judgment, the project is likely to assist in promoting the objectives of [the Act]."  AR 6719.  He explained that, while the Act "makes clear that an important objective of the Medicaid program is to furnish medical assistance and other services to vulnerable populations," "there is little intrinsic value in paying for services if those services are not advancing the health and wellness of the individual receiving them, or otherwise helping the individual attain independence."  Id.  The Secretary concluded that his "demonstration authority . . . allow[ed]" him to approve states' experimenting "with different ways of improving health outcomes and strengthening the financial independence of beneficiaries," while "at the same time, allow[ing] states to maintain the long-term fiscal sustainability of their Medicaid programs and to provide more medical services to more Medicaid beneficiaries."  AR 6720.  He elaborated on the ways in which Kentucky HEALTH would promote beneficiary health and financial independence and improve the sustainability of the safety net.  See AR 6723–28.  Regarding the "signal omission" the Court identified as the Secretary's failure to "adequately consider[] whether Kentucky HEALTH would in fact help the state furnish medical assistance to its citizens," Stewart I, 313 F. Supp. 3d at 243, he reasoned this time around that commenters did not understand the nature of the coverage loss, that the program has exemptions and guardrails in place to minimize coverage loss, that Kentucky is not required to cover the expansion population in any event, and that the 95,000 individuals who may lose coverage are "likely dwarfed by the 454,000 newly eligible adults who stand to lose

coverage" if the state makes good on its threat to terminate its participation in the ACA expansion in the absence of the demonstration project.  See AR 6730–32.

The question here, of course, is whether this second effort gets the Secretary over the line.  Plaintiffs, not surprisingly, think not.  They have returned to this Court seeking review of the Secretary's reapproval of Kentucky HEALTH.  See ECF No. 91 (Plaintiffs' MSJ) at 1. Contending that "the Secretary has failed to remedy the shortcomings identified" in Stewart I, Plaintiffs seek summary judgment on their APA claims and vacatur of the Kentucky HEALTH waiver (and, separately, the SMD Letter).  Id. at 1–2.  Defendants — federal and state — have cross-moved for summary judgment, maintaining that the reapproval was lawful.  See ECF Nos. 108 (HHS MSJ) at 1–5; 110 (Kentucky MSJ) at 1–2.  The Court heard oral argument on March 14, 2019, and because Kentucky HEALTH will take effect on April 1, has issued this Opinion on an accelerated basis.

## II.    LEGAL STANDARD

The parties have cross-moved for summary judgment on the administrative record.  The summary-judgment standard set forth in Federal Rule of Civil Procedure 56(c), therefore, "does not apply because of the limited role of a court in reviewing the administrative record."  Sierra Club v. Mainella, 459 F. Supp. 2d 76, 89 (D.D.C. 2006); see also Bloch v. Powell, 227 F. Supp. 2d 25, 30 (D.D.C. 2002), aff'd, 348 F.3d 1060 (D.C. Cir. 2003).  "[T]he function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did."  Sierra Club, 459 F. Supp. 2d at 90 (quotation marks and citation omitted).  "Summary judgment is the proper mechanism for deciding, as a matter of law, whether an agency action is supported by the administrative record and consistent

with the [Administrative Procedure Act] standard of review." <u>Loma Linda Univ. Med. Ctr. v.</u>

<u>Sebelius</u>, 684 F. Supp. 2d 42, 52 (D.D.C. 2010) (citation omitted).

The Administrative Procedure Act "sets forth the full extent of judicial authority to

review executive agency action for procedural correctness." <u>FCC v. Fox Television Stations,</u>

<u>Inc.</u>, 556 U.S. 502, 513 (2009).  It requires courts to "hold unlawful and set aside agency action,

findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not

in accordance with law."  5 U.S.C. § 706(2).  Agency action is arbitrary and capricious if, for

example, the agency "entirely failed to consider an important aspect of the problem, offered an

explanation for its decision that runs counter to the evidence before the agency, or is so

implausible that it could not be ascribed to a difference in view or the product of agency

expertise." <u>Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.</u>, 463 U.S.

29, 43 (1983).

In other words, an agency is required to "examine the relevant data and articulate a

satisfactory explanation for its action including a rational connection between the facts found and

the choice made." <u>Id.</u> at 43 (quoting <u>Burlington Truck Lines v. United States</u>, 371 U.S. 156, 168

(1962)) (internal quotation marks omitted).  Courts, accordingly, "do not defer to the agency's

conclusory or unsupported suppositions," <u>United Techs. Corp. v. Dep't of Def.</u>, 601 F.3d 557,

562 (D.C. Cir. 2010) (quoting <u>McDonnell Douglas Corp. v. Dep't of the Air Force</u>, 375 F.3d

1182, 1187 (D.C. Cir. 2004)), and "agency 'litigating positions' are not entitled to deference

when they are merely [agency] counsel's '*post hoc* rationalizations' for agency action, advanced

for the first time in the reviewing court." <u>Martin v. Occupational Safety & Health Review</u>

<u>Comm'n</u>, 499 U.S. 144, 156 (1991) (citation omitted).  Although a reviewing court "may not

supply a reasoned basis for the agency's action that the agency itself has not given," a decision

that is not fully explained may, nevertheless, be upheld "if the agency's path may reasonably be discerned." Bowman Transp., Inc. v. Arkansas–Best Freight System, Inc., 419 U.S. 281, 285–86 (1974) (citation omitted).

## III.   ANALYSIS

Plaintiffs' challenge, fortunately, does not require the Court to start from square one; indeed, this round of litigation resembles in many respects the one concluded in Stewart I. Plaintiffs again essentially contend that the Secretary has sought to "rewrite the Medicaid Act in a way that is contrary to the program's purpose." Pl. MSJ at 1.  They elaborate that he has violated the APA because he "failed to remedy the shortcomings identified" in Stewart I in again "ignor[ing]" record evidence that "Kentucky HEALTH's requirements and benefits cuts are antithetical to Medicaid's core purpose": "furnishing medical assistance to those who are unable to afford the costs of medically necessary care and services." Id.

Plaintiffs advance those arguments in challenging both the reapproval as a whole, see ECF No. 88 (Amended Complaint) at 83 (Count VIII under APA), and the individual components of the program. Id. at 77–83 (Counts II through VII).  Because, as the Court explained previously, the Secretary must determine under § 1115 "whether a project would promote the Act's objectives, not whether each component, viewed in isolation, would," it will again limit its analysis to Count VIII. See Stewart I, 313 F. Supp. 3d at 257 (internal quotation marks and citation omitted).  As they did last time, Plaintiffs also assert several additional causes of action, including that the Secretary acted in excess of statutory authority, that the SMD Letter ought to be vacated as an improperly promulgated substantive rule, and that Defendants violated the Take Care Clause. See Pl. MSJ at 34, 43; ECF No. 88 (Amended Complaint) at 83.  These claims will again remain in limbo, as the Court sidesteps resolving them.

Before moving to the substance of the dispute, the Court will address two jurisdictional objections — one concerning standing and one on justiciability.

## A.  Jurisdiction

Having addressed these issues in depth previously, see Stewart I, 313 F. Supp. 3d at 250–57, no more than a limited treatment is required here.

The Court takes standing first.  Article III restricts the jurisdiction of federal courts to actual "Cases" and "Controversies."  U.S. Const., art. III, § 2.  Not every dispute clears that hurdle.  Specifically, a plaintiff must demonstrate that she suffers: 1) an injury-in-fact that is 2) caused by the conduct complained of and is 3) "likely" to be "redressed by a favorable decision." Lujan v. Defs. of Wildlife, 504 U.S. 555, 560–61 (1992).  Defendants here offer no more than a brief objection.  They assert, in a handful of paragraphs, that Plaintiffs lack standing to level specific challenges at particular components of the Kentucky HEALTH program, including the waiver of retroactive eligibility, the lockouts, the waiver of non-emergency medical transportation, and deductions from the *MyRewards* account.  See HHS MSJ at 35, 37, 38, 39. Specifically, they argue that Plaintiffs' injuries-in-fact are too speculative to establish standing as to those particular components of Kentucky HEALTH.  Id.

Because the Court will examine whether the reapproval as a whole — rather than its individual components — violates the APA, it will again consider only whether Plaintiffs have standing to bring that global challenge.  See Davis v. Fed. Election Comm'n, 554 U.S. 724, 734 (2008) ("'[A] plaintiff must demonstrate standing for each claim he seeks to press' and 'for each form of relief' that is sought.") (quoting Daimler Chrysler Corp. v. Cuno, 547 U.S. 332, 352 (2006)).  Defendants do not dispute that they do.  Although they do cite a case for the proposition that standing "is not dispensed in gross," HHS MSJ at 35 (citing Davis, 554 U.S. at 734), it is

inapposite here.  That case held only that a plaintiff's standing to challenge one statutory provision does not necessarily establish her standing to challenge another.

Of course, Defendants' lack of objections to standing does not end the inquiry, since the Court has an independent obligation to assure itself of its own jurisdiction.  See Floyd v. District of Columbia, 129 F.3d 152, 155 (D.C. Cir. 1997).  It has no trouble here concluding, as it did previously, that Plaintiffs have established standing to challenge the reapproval of Kentucky HEALTH as a whole.  See Stewart I, 313 F. Supp. 3d at 250–57.  Specifically, it found there that they had established an economic injury stemming from the rise in their premium payments the program would entail.  Id. at 251–52.  While granting the Government's contention that some of the named Plaintiffs may be exempt from the premium requirement, the Court found that at least some of them would indisputably be required to pay.  Id.  That is all that is necessary.  See Animal Legal Def. Fund, Inc. v. Glickman, 154 F.3d 426, 429 (D.C. Cir. 1998) (holding that in suit brought by multiple plaintiffs, only single plaintiff must possess standing for case to proceed).  Vacating the approval, moreover, would afford Plaintiffs complete relief.  See Stewart I, 313 F. Supp. 3d at 252–53.  The Court therefore finds no reason to depart now from its earlier conclusion that Plaintiffs have established the three elements necessary for standing.

That leaves justiciability.  The Court previously analyzed at length the justiciability of Plaintiffs' challenges to the program's approval in response to Defendants' arguments that the Secretary's § 1115 decisions are "committed to agency discretion by law."  Id. at 254–57. Following every other court to consider this issue, this Court concluded that it could review those decisions because "there is some 'law to apply.'"  Id. at 254–55.  The Secretary, nevertheless, appears to renew in a single sentence the Government's position that the language of § 1115 "commits these determinations to the Secretary's discretion as a matter of law."  HHS MSJ at 14.

There is no further analysis, however, much less a proffered reason that the Court should revisit its prior thorough treatment of this issue. As a result, it has little trouble concluding once again that the approval is judicially reviewable.

### B. Merits

Having cleared the ground, the Court can now move to Plaintiffs' main beef: the Secretary's reapproval of Kentucky HEALTH is, they contend, arbitrary and capricious primarily because he did not adequately consider whether his § 1115 waiver promotes the objectives of the Medicaid Act. The Court agrees.

The Secretary can only approve demonstration projects that are "likely to assist in promoting the objectives" of the Medicaid Act. See 42 U.S.C. § 1315(a). He must, consequently, first identify those objectives. Courts reviewing an agency's statutory interpretation employ the two-step Chevron framework. That is, they first ask whether "Congress has directly spoken to the precise question at issue," and, if not, whether "the agency's answer is based on a permissible construction of the statute." Chevron U.S.A., Inc. v. Nat'l Res. Def. Council, Inc., 467 U.S. 837, 842–43 (1984). The Court need not reach Plaintiffs' contention that this case is an exceptional one in which Chevron should not apply at all. See ECF No. 119 (Plaintiffs' Reply) at 2–4. That is because, even according the Secretary appropriate deference, his action cannot stand.

As the Court concluded in Stewart I, a central objective of the Act is "furnish[ing] medical assistance" to needy populations. See 313 F. Supp. 3d at 243. Rather than adequately addressing Kentucky HEALTH's potential to cause loss of medical coverage, the Secretary continues to press his contention that the program promotes his alternative proposed objectives of beneficiary health, financial independence, and the fiscal sustainability of Medicaid. The

Court finds that the first two of those three goals are not objectives of the Act in their own right,

and, regardless, the Secretary's failure once again to adequately consider the effects of Kentucky

HEALTH on coverage is alone — as it was in Stewart I — fatal to the approval.  To explain

why, the Court will begin with an account of the role of coverage as one of the Act's objectives

before setting out the Secretary's analysis and counterarguments.

### 1.   Coverage as Objective of the Medicaid Act

In Stewart I, the Court acknowledged that the "objectives" in Section 1115 may be

ambiguous.  See 313 F. Supp. 3d at 260.  To discern them, it followed other courts that have

considered this issue in beginning with 42 U.S.C. § 1396-1.  Id. (citing Pharm. Research & Mfrs.

of Am. v. Concannon, 249 F.3d 66, 75 (1st Cir. 2001); Jonathan R. Bolton, The Case of the

Disappearing Statute: A Legal & Policy Critique of the Use of Section 1115 Waivers to

Restructure the Medicaid Program, 37 Colum. J.L. & Soc. Probs. 91, 132 & n.235 (2003)).

Section 1396-1 provides that Congress appropriated Medicaid funds "[f]or the purpose of

enabling each State, as far as practicable under the conditions in such State, to furnish (1)

medical assistance . . . [to] individuals[] whose income and resources are insufficient to meet the

costs of necessary medical services, and (2) rehabilitation and other services to help such

families and individuals attain or retain capability for independence or self-care."  Medical

assistance, in turn, is defined in the statute as "'payment of part or all of the cost' of medical

'care and services' for a defined set of individuals."  Adena Reg'l Med. Ctr. v. Leavitt, 527 F.3d

176, 180 (D.C. Cir. 2008) (citing 42 U.S.C. § 1396d(a)); see also Harris v. McRae, 448 U.S. 297,

301 (1980) ("The Medicaid program was created . . . for the purpose of providing federal

financial assistance to States that choose to reimburse certain costs of medical treatment for

needy persons."); W. Va. Univ. Hosps. Inc. v. Casey, 885 F.2d 11, 20 (3d Cir. 1989) ("[T]he

primary purpose of [M]edicaid is to achieve the praiseworthy social objective of granting health care coverage to those who cannot afford it.").

Indeed, the Secretary agrees — as he did in the last round of litigation, see Stewart I, 313 F. Supp. 3d at 260 — that § 1396-1 is "include[d]" in the "purposes of Medicaid" and "makes clear that an important objective of the Medicaid program is to furnish medical assistance and other services to vulnerable populations."  AR 6719 (citing 42 U.S.C. § 1396-1).  At oral argument, the federal government again agreed that it is an objective of Medicaid, including for the expansion population.  See Oral Argument Transcript at 6; see also Tr. at 10 (acknowledging that "the central objective of Medicaid under the Court's analysis in Stewart I is the provision of medical assistance" and that therefore "what the Court has to figure out is whether the Secretary approved the project that is reasonably approximated toward enhancing the provision of medical assistance").

Particularly given the federal government's position, the Court finds unpersuasive Kentucky's assertion that "[i]t stands to reason that the 'objectives' of Medicaid" for the expansion population are different from those for the original Medicaid population.  See Kentucky MSJ at 5.  As it explained after thorough consideration of this issue in Stewart I, "[T]he Medicaid statute — taken as a whole — confirms that Congress intended to provide medical assistance to the expansion population."  313 F. Supp. 3d at 269.  Observing that when Congress passed the ACA, it placed the expansion population "on equal footing with other 'vulnerable' populations, requiring that states afford them 'full benefits,'" id., the Court held that the Secretary "must . . . evaluate the effect of Kentucky HEALTH on all Medicaid recipients, including low-income individuals, and he must do so without prioritizing certain groups over others."  Id. at 270.

The Court concludes, therefore, as it did previously, that § 1396-1 provides a central objective of the Medicaid Act: to furnish medical assistance to the populations covered by the Act.  Under § 1115, the Secretary must therefore "adequately analyze" any demonstration project's implications for such assistance or coverage.  Id. at 262 (citing Am. Wild Horse Pres. Campaign v. Perdue, 837 F.3d 914, 932 (D.C. Cir. 2017)).

2.   Secretary's Consideration of Medicaid's Objectives

Defendants contend that coverage is not the sole objective of Medicaid; indeed, in his approval letter, the Secretary discusses the program's promotion of what are, in his view, four objectives of the Act.  Specifically, he explains that one "important objective of the Medicaid program is to furnish medical assistance and other services to vulnerable populations," but because "there is little intrinsic value in paying for [those] services if [they] are not advancing the health and wellness of the individual receiving them, or otherwise helping the individual attain independence," another "objective of the Medicaid program . . . is to advance the health and wellness needs of its beneficiaries."  AR 6719 (emphasis added).  He also concludes that "reforms that go beyond just routine medical care and . . . evidence-based interventions . . . may increase beneficiaries' financial independence."  Id. (emphasis added).  Finally, he observes that "demonstration projects also provide an opportunity for states to test policies that ensure the fiscal sustainability of the Medicaid program."  Id. (emphasis added).  In citing these four purported objectives, the Secretary contends that he has adequately explained in the new approval letter how Kentucky HEALTH would promote the objectives of the Medicaid Act, "amply address[ing]" defects identified in Stewart I.  See AR 6718–37; HHS MSJ 14–21.

The Court will review his analysis of those four objectives — furnishing medical assistance, health, financial independence, and fiscal sustainability — in turn.  As before, it finds

his consideration of the program's effects on medical assistance inadequate.  His examination of

the other three aims, two of which the Court finds are not stand-alone objectives of the statute in

the first instance, cannot make up for that failure.  This is especially true where the Secretary

made no attempt to weigh any of those three aims against the coverage-loss consequences of the

program.  Although the Court takes up fiscal sustainability last, the reader should be aware that

this is the principal new position Defendants press in this round of litigation and the one

requiring the most analysis.

> a. *Furnishing Medical Assistance*

In Stewart I, the Court found that the Secretary had "ignored" the Act's objective to

furnish medical assistance.  See 313 F. Supp. 3d at 261.  As the Court explained then, "There are

two basic elements to that problem" — namely, "whether the project would cause recipients to

lose coverage" and "whether the project would help promote coverage."  Id. at 262.  Although he

has no longer entirely "ignored" this objective of the Act, his reapproval was nevertheless legally

inadequate because he "failed to 'adequately analyze' coverage."  Id. (quoting Am. Wild Horse,

873 F.3d at 932).  To explain why, the Court separately examines his more recent consideration

of coverage loss and of coverage promotion.

> i. Coverage Loss

In the original approval, the Secretary "never provided a bottom-line estimate of how

many people would lose Medicaid with Kentucky HEALTH in place," an "oversight" that was

especially "glaring" since, "[i]n its application, Kentucky estimated that the project would cause"

a substantial number of people to leave its Medicaid rolls — the equivalent of 95,000 people

losing coverage for a year.  Id.  As the Court noted before, "*Amici* maintain that such number is

conservative and peg the real figure as between 175,000 and 297,500" people losing coverage in

the first year of the program.  Id. (citing ECF No. 44 (Amicus Brief of Deans, Chairs, and

Scholars) at 18).  Whatever the precise calculation, the number is undoubtedly substantial.

While the Secretary has now nominally acknowledged that estimate, none of his responses

evinces the kind of "reasoned decisionmaking" that arbitrary-and-capricious review requires.

See Michigan v. EPA, 135 S. Ct. 2699, 2706 (2015).

The most significant point that the Secretary now makes about coverage is one he

couches as a fiscal-sustainability consideration — namely, that because Kentucky is facing

budget woes and has as a result threatened to terminate the entire Medicaid expansion if this

demonstration project is not approved, any coverage loss from the project should be viewed

against the Commonwealth's unbridled prerogative to scrap the entire population.  See AR 6726,

6731; HHS MSJ at 3–4, 22.  The Court will, accordingly, address this point in its discussion of

fiscal sustainability.  See Section B.2.d, infra.  For now, it will note only that the argument is

inconsistent with and relies on an unreasonable reading of the Secretary's § 1115 authority.  It

cannot, as a result, satisfy his obligation to analyze coverage loss.

Defendants next make two arguments questioning the extent of his obligation to consider

coverage losses.  The Secretary first contends that § 1115 contemplates that demonstrations may

result in an impact on eligibility, meaning coverage loss does not necessarily render a project

unlawful.  See AR 6726, 6729–30.  That is certainly true: the Act expressly provides for a

"demonstration project . . . that would result in an impact on eligibility."  42 U.S.C. § 1315(d).

That acknowledgment does not, however, sanction a demonstration that would result in

significant coverage loss, nor does it relieve the Secretary of his obligation to consider the

magnitude of coverage loss here.  Indeed, the limitation remains that demonstration projects can

only be approved it they "promote the objectives" of the Act.  Here, the coverage loss is

sufficiently significant — even at the low end of the estimated range — that it cannot be waved off by the rejoinder that some amount of coverage loss is legally permissible.

Second, the Secretary protests that he has no obligation to provide an exact estimate of the number of people who will lose coverage, particularly because demonstration projects are experiments intended to gather data and "predictive calculations are a murky science in the best of circumstances." See AR 6730; HHS MSJ at 22–23 (citing Cablevision Sys. Corp. v. FCC, 597 F.3d 1306, 1314 (D.C. Cir. 2010)). As an initial matter, the experimental nature of the project cannot relieve the Secretary of the obligation to do the analysis that § 1115 itself demands — viz., whether a demonstration project promotes the objectives of the Act.

Of course, the exact number of people who will lose coverage under Kentucky HEALTH is admittedly subject to some uncertainty. As the D.C. Circuit acknowledged when a petitioner challenged the potential imprecision of an agency's numbers, even "in the best of circumstances," the agency "has no access to infallible data." Cablevision, 597 F.3d at 1314. Nevertheless, Kentucky itself provided an estimate equivalent to 95,000, while amici suggest "Medicaid losses will be much higher and faster than the Commonwealth predicted." Am. Br. of Deans, Chairs, and Scholars at 18; see Stewart I, 313 F. Supp. 3d at 262; see also, e.g., AR 13175, 14665. The central point is that no one questions that the loss will be substantial; as a result, it requires attention in any approval of the program. See Am. Wild Horse, 873 F.3d at 923 (explaining that agency must "examine all relevant factors and record evidence"); see also Humane Soc'y of United States v. Zinke, 865 F.3d 585, 606–07 (D.C. Cir. 2017) ("failure to address . . . salient factor" in statute renders agency's approval arbitrary and capricious).

Regardless of the precise loss number, the Secretary next maintains that his consideration was adequate because he has now "expressly stated that he considered Kentucky's estimated

coverage effects and Plaintiffs' interpretation of those figures, and he has explained why approval of the project is nonetheless warranted." HHS MSJ at 23–24 (citing AR 6730–31). He offers two broad sets of arguments. The first quibbles with the nature of the estimate. The second concerns safeguards in Kentucky HEALTH meant to assist beneficiaries in avoiding coverage loss.

The Secretary first explains that the 95,000 number is misleading. It represents the number of member months Kentucky projected will be reduced by Kentucky HEALTH, divided by twelve to reach a figure representing one year's worth of coverage for a given individual. He argues that, rather than commenting on the number of member months, "Plaintiffs incorrectly assume, with no foundation for doing so, that every member month of coverage lost under the demonstration is part of a full year of coverage for a person who never regains coverage." HHS MSJ at 24. In addition, the Secretary elaborates, the people who do leave Medicaid permanently may have lost their eligibility for a variety of reasons, including transitioning to commercial coverage. See AR 6730–31; see also Kentucky MSJ at 19–20.

This argument is unpersuasive and is, ultimately, legerdemain intended to undercut the significance of the number. 95,000 is one way to represent the annualized number of member months of lost coverage under Kentucky HEALTH, as commenters plainly understood. See, e.g., AR 16707–08. There are, as the Secretary acknowledges, multiple ways to slice the number of lost months: 95,000 people may lose coverage for a year; a larger number may lose coverage for shorter periods of time; or fewer people may be deprived of coverage for lengthier periods. Regardless of how the number of lost member months is distributed among Medicaid beneficiaries, it indisputably reflects that a substantial number of people will lose coverage. As such, the Secretary cannot avoid addressing that number. This is especially so where

commenters detailed the widespread predicted nature of coverage loss and its devastating effects, see AR 13175, 15482, 19489, including the destructive effects of coverage gaps.  See AR 12918, 12967, 15486, 19388–89, 19985–86; see also ECF No. 99 (Amicus Brief of American Academy of Pediatrics) at 10–15, 19–20.  In other words, understanding of the loss estimate was baked into their analysis of the magnitude of coverage loss, and the Secretary is not relieved of his obligation to consider the significance of the number — whether it represents primarily permanent losses of coverage or a high incidence of gaps.

He makes no effort, moreover, to cite evidence or otherwise provide a reasoned basis for the assertion that some number of people will transition to commercial coverage and, if so, how many he might expect.  Once again, "[w]hile the agency spoke generally of 'creating incentives for individuals to obtain and maintain coverage through private, employer-sponsored insurance,' it cited no research or evidence that this would happen, nor did it make concrete estimates of how many beneficiaries might make that transition."  Stewart I, 313 F. Supp. 3d at 264.  In addition, he made no effort to explain how — given that Kentucky HEALTH contains community-engagement rather than work requirements — beneficiaries could reasonably expect to get commercial insurance from "education, job skills training, job search activities, and community service."  AR 6730; see also AR 12823–24, 12858, 12973–75, 14044–45, 16716–18 (explaining beneficiaries unlikely to get coverage on labor market).

Second, the Secretary emphasizes that the coverage-loss "projections were made prior to the inclusion of changes made to the demonstration at approval, including additional beneficiary guardrails expected to help beneficiaries maintain enrollment."  AR 6731; see also HHS MSJ at 24.  He elaborates that there are a number of exemptions from program requirements — for the medically frail, pregnant women, former foster youth, and domestic-violence survivors — and

also several guardrails — including a good-cause exemption to certain penalties, an opportunity

for re-enrollment after coming back into compliance with program requirements, screening

beneficiaries for other eligibility possibilities before the lockout, full appeal rights prior to

eligibility loss, and maintaining a system for "reasonable modification[]" of the requirements for

persons with disabilities, "among other assurances."  AR 6729; see AR 6725–26; 6727–28;

6734–35; HHS MSJ at 25–27; Kentucky MSJ at 20–21.

      Yet, again, this "response . . . is no answer at all."  Stewart I, 313 F. Supp. 3d at 263.  The

Commonwealth's original application provided all of these exemptions, except that for domestic-

violence survivors, which is now an exemption rather than a good-cause exception.  It also

included opportunities for beneficiaries to come back into compliance before the end of a penalty

period.  "Even with those reforms baked in, Kentucky estimated that 95,000 people would lose

coverage," and the "commenters, too, expressed their concerns about coverage losses with those

features in mind."  Id. (citing AR 3694–95, 3937).  Before Stewart I, the Commonwealth also

added the good-cause exemption.  In fact, between then and now, there have been very few

substantive changes to Kentucky HEALTH.  See Notice of Supplemental Filing at 1–2.  Yet the

Secretary has "never revised Kentucky's estimate on coverage loss with" the exemptions,

guardrails, or any other set of reforms in mind.  See Stewart I, 313 F. Supp. 3d at 264.  "Rather,

he granted the waivers with no idea of how many people might lose Medicaid coverage and thus

'failed to consider an important aspect of the problem.'"  Id. (quoting State Farm, 463 U.S. at

43).

      At oral argument, counsel for Kentucky suggested that the state had added additional

guardrails — including extending an exemption to those exempt from work requirements

associated with other entitlement programs and a physician-attestation option to support the

medical-frailty exemption — that predated the Secretary's original approval but postdated its 95,000 estimate.  These additions, the Commonwealth contends, would have reduced its estimate.  See Tr. at 23–25.  Because the reapproval letter evinces consideration of neither of those things, the Court cannot consider them either, see SEC v. Chenery Corp., 318 U.S. 80, 87 (1943), nor can they be imagined to mitigate the coverage-loss estimate.

### ii.  Coverage Promotion

The Secretary devotes little space, conversely, to describing how Kentucky HEALTH would promote coverage.  He does elaborate that the "*My Rewards Account* incentives for healthy behaviors are intended to increase uptake of preventive services," and the "waiver of retroactive eligibility" is designed to "encourage preventive care."  AR 6724.  He also explains that the program will allow Kentucky to "evaluate whether the *My Rewards* and *Deductible* accounts, as well as redetermination and reporting requirements, will strengthen beneficiary engagement in their personal health and provide an incentive structure to support responsible consumer decision-making about maintaining health and accessing care and services," particularly given that a "prior evaluation of one demonstration project with beneficiary engagement components has shown some promise that these strategies can have a positive impact on beneficiary behavior."  Id.

As the Court noted before, the invocation of the incentive created by the waiver of retroactive eligibility is a "'conclusory' reference" to coverage promotion that "cannot suffice, 'especially when viewed in light of' an obvious counterargument."  Stewart I, 313 F. Supp. 3d at 265 (quoting Getty v. Fed. Sav. and Loans Ins. Corp., 805 F.2d 1050, 1057 (D.C. Cir. 1986)).  In fact, "restricting retroactive eligibility will, by definition, reduce coverage."  Id.  Whether or not the program generally will lead to an uptick in preventive care, the Secretary makes no effort to

quantify that uptick or to weigh it against coverage losses for those whom Kentucky HEALTH may deprive of all access to care, preventive and otherwise.  Likewise, even if beneficiaries become more engaged with their care, the Secretary must balance that with the possibility that there will be widespread lack of <u>access</u> to care.  In light of the failure to weigh any coverage promotion in the face of the likelihood of substantial coverage loss, the Secretary did not "adequately analyze the . . . consequences" of the reapproval.  <u>See</u> <u>Am. Wild Horse</u>, 873 F.3d at 932.

### b.  Health

Moving off of coverage, the reapproval relies in part on the Secretary's conclusion that Kentucky HEALTH will promote the health and wellness of its beneficiaries.  Indeed, the Government contends that "Kentucky HEALTH is independently justified because the Secretary found that it is likely to improve the health of the Medicaid recipients receiving coverage under the demonstration."  HHS MSJ at 4.  To the extent Plaintiffs believe that it "cannot be a freestanding objective of Medicaid to improve the health of the people that program covers," the "Secretary emphatically disagrees."  <u>Id.</u>  In the approval letter, he explains this is so because "there is little intrinsic value in paying for services if those services are not advancing the health and wellness of the individual receiving them, or otherwise helping the individual attain independence." AR 6719.

The Court rejected this argument in <u>Stewart I</u>.  Treating health — rather than the furnishing of medical services — as the Act's ultimate goal is nothing "more than a sleight of hand."  <u>Stewart I</u>, 313 F. Supp. 3d at 266.  While the Court assumes that the Secretary is entitled to <u>Chevron</u> deference in isolating health as one of the "objectives" contemplated in § 1115, it cannot uphold his interpretation even under that standard.  It fails at step two because it falls

outside "the bounds of reasonableness." Abbott Labs v. Young, 920 F.2d 984, 988 (D.C. Cir. 1990). "'The reasonableness of an agency's construction depends,' in part, 'on the construction's fit with the statutory language, as well as its conformity to statutory purposes.'" Goldstein v. SEC, 451 F.3d 873, 881 (D.C. Cir. 2006) (quoting Abbott Labs, 920 F.2d at 988). On those scores, the Court cannot sustain the Secretary's generalization of health from the Act's objective of furnishing medical care.

The Secretary's primary contention is that health must be an independent objective because there is little value in paying for healthcare if it is not advancing that goal. As the Court explained in its prior Opinion, health was not necessarily the ultimate aim Congress pursued when it decided to "provide health insurance to needy populations." Stewart I, 313 F. Supp. 3d at 267. "It . . . had an interest in making healthcare more affordable for such people." Id. That focus is evident in the structure of the Act, which does not require states "to provide direct medical services to its citizens" but rather "provides federal funding so that the state can 'pay[] . . . [for] part or all of the cost of medical care and services for a defined set of individuals.'" Id. (quoting Adena Reg'l Med. Ctr. v. Leavitt, 527 F.3d 176, 180 (D.C. Cir. 2008)). Indeed, the history of the ACA's passage indicates that Congress was moved by the problem of medical bankruptcies and the concern that one of now two equally healthy people could have seen their life irrevocably altered by the cost of care. Id. Congress thus designed a scheme to address not health generally but the provision of care to needy populations. The Secretary is not free instead to extrapolate the objectives of the statute to a higher level of generality and pursue that aim in the way he prefers. See Waterkeeper Alliance v. EPA, 853 F.3d 527, 535 (D.C. Cir. 2017) ("[A]gencies are . . . bound not only by the ultimate purposes

Congress has selected, but by the means it has deemed appropriate, and prescribed, for the pursuit of those purposes.") (internal quotation marks omitted).

No more persuasive is Kentucky's argument that the ACA altered the objectives of the Act to include health as a stand-alone aim.  To begin, for the reasons discussed in Section B.1, *supra*, the Court is dubious that the ACA altered the objectives of Medicaid at all.  None of the Commonwealth's specific arguments here alters that conclusion.

It first contends that because the ACA amended the definition of "medical assistance" to include care itself as well as the payment for that care, the Act's objectives must now include health as well as furnishing medical assistance.  See Kentucky MSJ at 7.  It next maintains that because the Act requires that medical care be furnished with "reasonable promptness," the statute must be concerned with health because receiving care promptly "is undeniably linked to health and wellness."  Id. at 8.  Neither of those statutory features suggests that promoting health as a stand-alone objective has replaced furnishing medical assistance as the statute's primary aim.  Medical care is not health; health may be the result of medical care.  Faring no better is the state's citation-less assertion that "it makes sense to treat expanded Medicaid as a transition program, at least in part, given the inevitable fluctuations in the economy."  Id. at 18.  While the Commonwealth may believe it makes sense to treat the expansion population differently from the traditional Medicaid population, there is no evidence that Congress intended to so treat them.  Indeed, the expansion is part of a comprehensive coverage regime.  See NFIB, 567 U.S. at 581.

The Court will not explain again why holding health to be a freestanding objective of the Act would "have bizarre results."  Stewart I, 313 F. Supp. 3d at 267.  Were that the case, nothing would prevent the Secretary from conditioning coverage on a special diet or certain exercise regime.  Id. at 267–68.  While there would likely be a basis to conclude that "[e]ither of those

conditions could promote 'health' or 'well-being' . . .[,] both are far afield of the basic purpose

of Medicaid: 'reimburs[ing] certain costs of medical treatment for needy persons.'" Id. at 268

(quoting Harris, 448 U.S. at 301).

Because the Court finds that health is not a freestanding objective of the statute, it need

go no further, since, if that is so, the Secretary's consideration of it cannot support his § 1115

analysis.  Even if health were such an objective, approving Kentucky HEALTH on this basis

would still be arbitrary and capricious.  The Secretary, most significantly, did not weigh health

gains against coverage losses in justifying the approval.  Because the provision of Medicaid

coverage is indisputably a central objective of the Act, the Secretary's consideration of the

separate objective of health does not excuse him from addressing an "important aspect of the

problem."  State Farm, 463 U.S. at 43.  This is especially true where the Secretary himself

acknowledged that there is a conflict between his reasoning for why the program promotes health

and the possibility that it will cause widespread coverage deprivation: "To create an effective

incentive for beneficiaries to take measures that promote health and independence, it may be

necessary for states to attach penalties to failure to take those measures," which "may mean that

beneficiaries who fail to comply will lose Medicaid coverage, at least temporarily."  AR 1631.

Even solely in the realm of health, moreover, the agency fell short.  That is because it did

not consider the health benefits of the project relative to its harms to the health of those who

might lose their coverage.  Commenters made clear that those health effects were significant.

See AR 12918, 12967, 13175, 15482, 15486, 19388–89, 19985–86.  Even if health were an

appropriate consideration under § 1115, therefore, these oversights demonstrate why it would be

necessary to weigh purported health benefits against the coverage losses and resulting health

consequences.  This the Secretary did not do, rendering his decision arbitrary and capricious.

### c. Financial Independence

The Secretary also posits that the project will "test[] measures designed to help adults transition from Medicaid to greater financial independence and other forms of health coverage," including by preparing them for the commercial health market. See HHS MSJ at 2; AR 6724–25. As the Court found before, financial self-sufficiency is not an independent objective of the Act and, as such, cannot undergird the Secretary's finding under § 1115 that the project promotes the Act's goals. This is so even where the Court accords Chevron deference to his interpretation of financial independence as an "objective" contemplated in § 1115. For the reasons that follow, it is an unreasonable reading of the relevant provision because it is incompatible with the surrounding statutory language and aims. See Goldstein, 451 F.3d at 881.

The Secretary does not specify the statutory basis from which he derives financial independence as a purpose. Rather, he explains that "there is little intrinsic value in paying for services if those services are not" improving beneficiaries' health "or otherwise helping . . . individual[s] attain independence." AR 6719. As before, the Secretary is not free to generalize or otherwise extrapolate the ultimate value of the program Congress designed. Rather, he must employ the means Congress prescribed to tackle the problem it identified. See Waterkeeper Alliance, 853 F.3d at 535.

In his previous approval, the Secretary did specify a statutory basis to believe self-sufficiency is an objective of the Act — namely, § 1396-1's appropriation to states to "furnish . . . rehabilitation and other services to help such families and individuals attain or retain capability for independence or self-care." From that, he relied on the mention of "independence or self-care" to conclude that "greater independence" and "reduc[ing] reliance on public assistance" are stand-alone objectives of the Act. See Stewart I, 313 F.3d at 271 (citing AR 4,

5).  The Court found that contention unpersuasive because "[t]he text . . . quite clearly limits its objectives to helping States furnish <u>rehabilitation and other services</u> that might promote self-care and independence," so that it "does not follow that <u>limiting</u> access to medical assistance would further that same end."  <u>Id.</u>  The Secretary, in any case, does not seem to renew that argument here.

The Commonwealth does offer additional reasons as to why the Court should find that financial independence is a stand-alone objective of the Act.  Again, because the Secretary did not rely on them in his approval, the Court need not consider them.  <u>See</u> <u>Chenery</u>, 318 U.S. at 87. To add a set of suspenders to its belt, it nevertheless does so briefly here.  In Kentucky's view, it is an "extreme position to believe that Medicaid is unconcerned with whether able-bodied persons stay on government assistance."  Kentucky MSJ at 15.  The Commonwealth acknowledges that the Court previously found that financial independence was not a stand-alone objective of the Act, but reasons that it may make sense as an objective for the <u>expansion</u> population, if not the traditional one.  This is so, it believes, because "Section 1396-1 makes clear that it does not list the universe of 'purposes' for appropriations for expanded Medicaid." <u>Id.</u>

For the reasons already explained, the Court does not find that the objectives for the expansion are different.  Renewing its argument in this specific context, the Commonwealth urges that "'[i]ndependence' for [the traditional] four populations and what they need to attain it is quite different from 'independence' for the expanded Medicaid population and what they need to attain it."  <u>Id.</u> at 16.  Kentucky concludes that "independence and self-care" should take on a different meaning for the expansion population because they are able-bodied adults who do not require "rehabilitation and other services" to attain self-sufficiency.  <u>See</u> Kentucky MSJ at 16–

17. The Court finds this position unconvincing because even able-bodied adults may require rehabilitation or other services to "<u>retain</u>" that capacity, even if they need not "<u>attain</u>" it.  <u>See</u> 42 U.S.C. § 1396-1.  (And, of course, it is worth noting here that 20% of the beneficiaries to which Kentucky HEALTH would apply are members of the traditional Medicaid population.  <u>See</u> <u>Stewart I</u>, 313 F. Supp. 3d at 268.)

Kentucky contends finally that its "interpretation of 'independence' is bolstered by 42 U.S.C. § 1396u-1(b)(3)(A), which permits termination of Medicaid benefits to those individuals who have had Temporary Assistance for Needy Families benefits terminated 'because of refusing to work,'" and the Second Circuit's decision in <u>Aguayo v. Richardson</u>, 473 F.2d 1090 (2d Cir. 1973), in which it believes that the court approved a similar waiver application for a different entitlement program on the basis that it would promote beneficiaries' self-sufficiency.  <u>See</u> Kentucky MSJ at 18–19.  Neither the statutory provision nor the Second Circuit's decision, however, sheds light on the objectives of Medicaid.  Section 1396u-1(b) is a specific statutory provision allowing states to coordinate eligibility for people who are covered by <u>both</u> Medicaid and TANF.  TANF has job preparation as one of its objectives and includes work requirements.  <u>See</u> 42 U.S.C. § 601; 42 U.S.C. § 607.  That Congress allows for states to coordinate their administration of these two different programs does not transform the purposes of Medicaid.

<u>Aguayo</u> is no more instructive.  In that case, the Second Circuit upheld a waiver allowing for work requirements in the Aid to Families with Dependent Children statute.  The Commonwealth asserts that the purpose language in the AFDC statute is "remarkably similar" to that in the Medicaid statute.  <u>See</u> Kentucky MSJ at 19.  Although the phrase "maximum self-support and personal independence" does appear in the AFDC statute, <u>see</u> <u>Aguayo</u>, 473 F.2d at 1103–04, the AFDC and Medicaid statutes are very different.  The Court cannot credit the

Commonwealth's "argument for uniform usage" and "ignore[] the cardinal rule that statutory language must be read in context since a phrase gathers meaning from the words around it." Gen. Dynamics Land Sys., Inc. v. Cline, 540 U.S. 581, 596 (2004). That is so because the AFDC statute also contained purposes such as keeping children in their own homes, in addition to achieving "maximum self-support." See Aguayo, 473 F.3d at 1104. The Medicaid Act lacks those additional objectives. The AFDC statute, moreover, already included some work requirements when the court upheld it in Aguayo, including some from the inception of the program "quite similar to those" at issue in the waiver. Id.; see also H.R. Rep. No. 74-615 at 3 (1935); Public Welfare Amendments of 1962, Pub. L. No. 87-543, § 105, 76 Stat. 172, 186. The Medicaid Act does not. The Court is not suggesting a waiver application approving work requirements in some form could never be lawful because the Medicaid Act does not contain work requirements. Rather, the point is only that the existence of work requirements in the AFDC statute is probative of their compatibility with that Act's objectives and the possibility that additional similar requirements would promote those aims.

Even if financial independence were an objective of the Act and thus a proper consideration for § 1115 approval, the Secretary's invocation of it cannot support the approval here for a separate reason. That is because, absent any attempt to estimate the number of people who will gain employment and move onto commercial coverage or otherwise attain financial independence — or any analysis of the mechanism by which they are likely to do so — his assertion that some significant number of people would migrate is insufficient. As the Court pointed out before, "[I]t is not obvious that the community-engagement requirement alone would help a person shift to private insurance," particularly given that "individuals can meet it, for example, by volunteering in the community" — an activity that "may have long term benefits"

but would not come with health coverage.  See Stewart I, 313 F. Supp. 3d at 264; see also AR

12823–24, 12858, 12973–75, 14044–45, 16716–18 (explaining beneficiaries unlikely to get

coverage on labor market).  Even if some number of beneficiaries were to gain independence, the

Secretary does not weigh the benefits of their self-sufficiency against the consequences of

coverage loss, which would harm and undermine the financial self-sufficiency of others.  See AR

12916–17, 13547, 16723–24, 17464–65, 19985–87, 26311.  These deficiencies render his

determination arbitrary and capricious.

### d.  Fiscal Sustainability

Long diverted into myriad other byways, the Court now arrives at the broad avenue that

constitutes Defendants' key position.  Fiscal sustainability is, in fact, the primary rationale on

which the Secretary relied in approving this demonstration.  In his view, "Demonstration projects

that seek to improve beneficiary health and financial independence" improve well-being and "at

the same time, allow states to maintain the long-term fiscal sustainability of their Medicaid

programs."  AR 6720.  The Secretary explained that "Kentucky expects that the reforms included

in the demonstration will enable the Commonwealth to continue to offer Medicaid to the ACA

expansion population," since Kentucky "has repeatedly stated that if it is unable to move forward

with its Kentucky HEALTH demonstration project, it will discontinue coverage for the ACA

expansion population."  AR 6726.  "[E]ven assuming" that the program would result in the

estimated eligibility losses, he posits that the number of people who lose coverage under

Kentucky HEALTH "is likely dwarfed by the 454,000 newly eligible adults who stand to lose

coverage if Kentucky elects to terminate the non-mandatory ACA expansion."  AR 6732.  And

because "the demonstration provides coverage to individuals that the state is not required to

cover[,] [a]ny potential loss of coverage that may result from a demonstration is properly

considered in the context of a state's substantial discretion to eliminate non-mandatory benefits or to eliminate coverage" altogether for the expansion population.  See AR 6731.

In this explanation, the Secretary does not make entirely clear whether he interprets fiscal sustainability to be an independent objective of the Act, or whether making the program more fiscally sustainable is essentially a point about coverage promotion — that is, whether saving money by covering fewer people is ultimately coverage promoting because any number of people Kentucky still covers under the demonstration would be greater than the number of people covered if it terminated the ACA expansion.  Based on federal Defendants' representations during oral argument, it seems that the Government primarily presses the latter iteration.  See Tr. at 8, 53.  The Court, nevertheless, will address each in turn, finding that either way the argument is sliced, it cannot support the Secretary's reapproval here.

i.   Fiscal Sustainability as Independent Objective

The first issue is whether the Secretary could reasonably conclude that the approval of Kentucky HEALTH was justified because it advanced, as an independent objective of the Act, the fiscal sustainability of the safety net.  The Court preliminarily considers under the Chevron framework whether the Secretary permissibly interpreted the Act to contain fiscal sustainability as a stand-alone objective; finding in the affirmative, it next addresses whether the agency's conclusion that the program would advance that objective is arbitrary and capricious.

The Commonwealth is the party that most clearly contends that fiscal sustainability is an independent objective of the Medicaid Act.  It maintains first that, as a textual matter, specific language in § 1396-1 supports this position.  See Kentucky MSJ at 10.  Although the Secretary did not clearly rely on this rationale in the reapproval letter — and does not do so in his briefing here — the letter does at least understand "Section 1115 demonstration projects . . . [to] provide

an opportunity for states to test policies that ensure the fiscal sustainability of the Medicaid program, better 'enabling each [s]tate, as far as practicable under the conditions in such [s]tate,' to furnish medical assistance."  AR 6719 (citing 42 U.S.C. § 1396-1).  Federal Defendants, at oral argument, offered that portion of the letter in support of this contention.  See Tr. at 50–51.

As discussed previously, the Court finds at <u>Chevron</u> step one that the word "objectives" as it appears in § 1115 is ambiguous.  It therefore proceeds to <u>Chevron</u>'s second step and asks whether the Secretary's interpretation is reasonable.  The statutory text on which Defendants rely provides that the Act aims to "enabl[e] each State, as far as practicable under the conditions in such state, to furnish" first, medical assistance and second, rehabilitation and other services.  <u>See</u> 42 U.S.C. § 1396-1.  In context, practicability is at least a qualifier of the extent to which states must furnish medical assistance.  Given that the Act stipulates mandatory floors for benefits and coverage populations, <u>see</u> 42 U.S.C. §§ 1396a, 1396a(a)(10)(A), the Court believes the qualifier is as easily understood as establishing a ceiling as it is lowering the floor.  That said, it cannot find his interpretation unreasonable under <u>Chevron</u>.  Defendants may, as a result, take into account fiscal sustainability in determining under § 1115 whether a demonstration project promotes the objectives of the Act.

Identifying an objective of the Act is just the first step, however.  The Secretary must also give an adequate explanation for why Kentucky HEALTH advances that objective and why, if it is adverse to other Medicaid objectives, he could reasonably conclude that, on balance, it promotes the objectives of the Act as required by § 1115.  On these fronts, he fell short.  First, he made no finding, supported by substantial evidence, that Kentucky HEALTH would improve the sustainability of Kentucky's Medicaid program — either by accruing savings to the state or by any other mechanism.  Second, he unreasonably prioritized program savings without weighing

those against the consequences of lost coverage, rendering his determination arbitrary and capricious.

Beginning with the first, the Secretary made no finding that Kentucky HEALTH would save the Commonwealth any amount of money or otherwise make the program more sustainable in some way.  In the last round of litigation, the Court isolated some confusion about savings attributable to the program: Defendants "repeatedly highlight[ed] that the program could save $2.2 billion," but the "Commonwealth's own records show that . . . the state's actual savings would be $331 million." Stewart I, 313 F. Supp. 3d at 271.  While not a trivial number, the back-and-forth highlights the importance of analyzing the evidence to come to some reasonable conclusion.  The Court is not suggesting here that the Secretary must quantify some exact amount of savings, but he must make some finding that supports his conclusion that the project would actually advance Kentucky Medicaid's fiscal sustainability.  This is especially so where — although the Court does not pass on the persuasiveness of the evidence — the record contains some reason to believe that full administration of the expansion will save the Commonwealth money, while reducing coverage of the expansion population would cost the state.  See AR 4970, 4974–75 (study determining Kentucky will experience significant "positive fiscal impact" from expansion through 2021).

The point is not to evaluate how Kentucky ought to spend its money.  See Tr. at 29 (maintaining that Kentucky's "budgetary priorities" are "[its] prerogative").  The Commonwealth, moreover, may well be free to pull out of the expansion entirely (or, indeed, all of Medicaid) if it chooses not to spend its money that way.  The central point is that — without a finding about the savings that Kentucky HEALTH could be expected to yield — the Secretary could not make a reasoned decision that it would promote fiscal sustainability.  If he is to rely on

that rationale, he must so find.  Otherwise, as here, he has not marshaled substantial evidence for

that position and, indeed, has ignored contrary evidence in the record.  See Fred Meyer Stores,

Inc. v. NLRB, 865 F.3d 630, 638 (D.C. Cir. 2017) (finding agency acted arbitrarily and

capriciously when it "evidence[d] a complete failure to reasonably reflect upon the information

contained in the record and grapple with contrary evidence"); Am. Wild Horse, 873 F.3d at 923

(agency must "examine all relevant factors and record evidence").

Second, the Secretary's reliance on fiscal sustainability was arbitrary and capricious

because he did not compare the benefit of savings to the consequences for coverage.  The Ninth

Circuit has twice invalidated similar approvals, holding that the agency acted in an arbitrary and

capricious manner in approving a § 1115 waiver that — as here — derived cost savings from

shrinking a state's Medicaid rolls without adequately considering the program's coverage

consequences.  See Newton-Nations v. Betlach, 660 F.3d 370, 381 (9th Cir. 2011) (holding

Secretary's approval of § 1115 waiver arbitrary and capricious where its purpose was "to save

money"); Beno v. Shalala, 30 F.3d 1057, 1069 (9th Cir. 1994) (rejecting benefits cut conceived

as work incentive and finding that the "statute was not enacted to enable states to save money or

to evade federal requirements").

The Government attempts to distinguish these cases by arguing that they held that § 1115

authority did not extend to the approval of simple benefits cuts enacted to save money.

Kentucky HEALTH, Defendants argue, is not a simple "benefit cut."  Tr. at 7, 10–11.  That

distinction, however, is not convincing.  As a technical matter, Kentucky HEALTH does not, on

its face, simply cut benefits.  But the Secretary's analysis of the program was defective precisely

because he did not adequately consider the significant number of people for whom the program

would entail a loss of all benefits.  Their loss of coverage appears, from the record in this case, to

be how the Commonwealth would save money.  That is precisely what the Ninth Circuit said

states cannot do with a § 1115 waiver.

Defendants rejoin with several cases that they claim stand for the proposition that the

manner in which they considered fiscal sustainability here was reasonable.  See HHS MSJ at 15–

18 (citing Pharm. Research & Mfrs. of Am. v. Walsh, 538 U.S. 644, 663, 666–67 (2003)

(plurality); N.Y. State Dept. of Soc. Servs. v. Dublino, 413 U.S. 405 (1973); Pharm. Research &

Mfrs. of Am. v. Thompson, 362 F.3d 817, 824–25 (D.C. Cir. 2004); Aguayo, 473 F.2d at 1103–

04); Kentucky MSJ at 11 (citing similar plus Crane v. Matthews, 417 F. Supp. 532, 540 (N.D.

Ga. 1976), and Cal. Welfare Rights Org. v. Richardson, 348 F. Supp. 491, 496 (N.D. Cal. 1972)).

These cases are of mixed relevance.  For example, as the Court discussed previously, Aguayo's

conclusion that the imposition of work requirements promotes the objectives of the AFDC

statute — which differ from Medicaid's — does not bear squarely on the Medicaid context,

especially where the reasoning hinged in no small part on the long history of work requirements

in the AFDC program.  See 473 F.2d at 1103–04.  Dublino holds that federal work requirements

do not preempt the state's imposition of work requirements on AFDC recipients but does not

analyze the propriety of the state program or its approval.  See 413 U.S. 405.  Crane and

Richardson affirm that the Secretary's authority under § 1115 is broad, both in the context of

affirming copayment requirements.  See Crane, 417 F. Supp. at 540; Richardson, 348 F. Supp. at

496.  The Court does not gainsay that he has "considerable discretion" under § 1115.  See

Stewart I, 313 F. Supp. 3d at 256.  The question here, however, is whether he has lawfully

exercised it.

The Government relies particularly on Thompson, in which, in their view, the D.C.

Circuit held it permissible to "impose a burden on Medicaid recipients to keep other people off

of Medicaid."  Tr. at 11–12.  This case, they believe, is parallel because it seeks to lift people out

of Medicaid to make the program smaller and therefore more fiscally viable.  Id. at 12.

Thompson, in turn, relies significantly on Walsh.  See 362 F.3d at 821.  Neither, however, aids

Defendants here.  In fact, their analysis demonstrates why this approval was legally defective.

Walsh is a fractured opinion upholding the vacatur of a preliminary injunction preventing

the implementation of a Medicaid-covered outpatient drug program that the state of Maine

sought to implement.  See 538 U.S. 644.  In the part of the opinion on which the Government

relies, three Justices affirmed that the program served "two Medicaid-related interests" in

benefiting the "medically needy" and in "enabling some borderline aged and infirm persons

better access to prescription drugs earlier," thereby "reduc[ing]" Medicaid expenses.  Id. at 663

(plurality opinion).  "A third rather obvious Medicaid purpose [would]" also "be fostered"

because "[a]voiding unnecessary costs in the administration of a State's Medicaid program

obviously serves the interests of both the Federal Government and the States that pay the cost of

providing prescription drugs to Medicaid patients."  Id. at 663–64 (plurality opinion).

"The analyses in Walsh enlighten[ed]" that of the D.C. Circuit in Thompson, which

concerned a similar program.  See 362 F.3d at 821.  There, the court considered a challenge to

the Secretary's approval of "a low-cost state prescription drug coverage program . . . for

beneficiaries of Medicaid and two non-Medicaid state health programs."  Id. at 819.  The D.C.

Circuit held that the approval did not violate "the general statutory mandate that Medicaid

services be provided in a manner consistent with the best interests of recipients."  Id. (citing 42

U.S.C. § 1396a(a)(19)).  The court upheld the Secretary's determination that "the best interests

requirement . . . allow[s] a state to establish a Medicaid prior authorization program in order to

secure rebates on drugs for non-Medicaid populations" if a state demonstrates that the program

will further "the goals and objectives of the Medicaid program."  Id. at 824–25.  In that case, the

prior authorization program furthered Medicaid's objectives because it allowed the state to make

prescription drugs accessible to borderline Medicaid populations who were, in turn, less likely to

become Medicaid eligible.  The rebate program thereby preserved Medicaid resources.  Id. at

825.  In Defendants' view, Thompson demonstrates that it is permissible to "impose a burden on

Medicaid recipients to keep other people off of Medicaid."  Tr. at 11–12.

Those cases do not establish that the Secretary acted reasonably here.  If anything, they

illuminate how the project in this case — and the reasoning given to support it — departs from

previous ones.  Most importantly, the programs in those cases involved only incidental burdens

on Medicaid recipients.  Specifically, the drug-rebate programs at issue in Walsh and Thompson

made certain drugs, but not others, more difficult to obtain and in so doing provided reduced-cost

medication to all individuals in the state.  Neither program entirely stripped coverage or a

mandatory benefit from Medicaid recipients.  Language in those opinions addressed this very

concern.  As Walsh noted, "[P]roviding benefits to needy persons and . . . curtailing the State's

Medicaid costs . . . would not provide a sufficient basis for upholding the program if it severely

curtailed Medicaid recipients' access to prescription drugs."  538 U.S. at 664–65 (emphasis

added).  Thompson reasoned similarly, pointing out "the absence of any demonstrable significant

impediment to Medicaid services from [the challenged] prior authorization requirement."  362

F.3d at 826 (citing Walsh, 538 U.S. at 664, 688).

Those disclaimers make eminently clear that a project that enhances financial

sustainability may not advance the objectives of Medicaid if it significantly impedes or curtails

Medicaid services or coverage.  Important to both the D.C. Circuit and the Supreme Court was

the fact that neither program threatened the entirety of beneficiaries' Medicaid coverage — or

even an aspect of their coverage, like that for prescription drugs — in the name of cost savings.

Rather, both of those cases explicitly sanctioned an <u>incidental</u> burden on Medicaid recipients.

They do not suggest that Medicaid recipients can be significantly burdened — that is, for

example, their eligibility significantly restricted or benefits significantly cut — in the name of

saving money.  That there are limits on the extent to which fiscal sustainability can justify cuts

like those outlined in these cases makes sense.  Most cuts to Medicaid services would reduce the

cost of Medicaid and thus advance the sustainability of the program to some extent.  But it would

be nonsensical to conclude that any cut therefore always promotes the Act's objectives.

Perhaps the most important takeaway from these cases is what the Court has been saying

all along: the Secretary must engage in considered analysis of the fiscal-sustainability concern,

both alone and relative to the issue of coverage loss.  <u>See</u> <u>Thompson</u>, 362 F.3d at 826.  The D.C.

Circuit considered in some detail the Secretary's explanation for the mechanism by which the

project under review would save money — including the nature of the incidental burden it

imposed — and the amount of money that would be saved, ultimately finding that it passed

muster.  <u>Id.</u>  The agency had the same responsibility here.  In failing to analyze the nature of

expected savings, <u>id.</u> at 825–26, whether the burden on Medicaid recipients was minimal, <u>id.</u> at

826, and how the savings should be balanced against the burdens, the Secretary acted arbitrarily

and capriciously.

### ii.  Fiscal Sustainability as Coverage Promoting

Defendants' alternative fiscal-sustainability position is that Kentucky HEALTH is

coverage promoting because, absent its approval, the Commonwealth will — given fiscal strain

— simply de-expand Medicaid.  This coverage-promotion argument, in fact, does not depend on

fiscal sustainability at all.  Rather, all that matters is that a state, like Kentucky, has threatened to

de-expand Medicaid if its proposed demonstration is not approved.  The underlying reason for

the threat — whether budgetary priorities, fiscal crisis, or other policy goals — is of no moment.

This route is legally permissible, Defendants assert at multiple points, because the expansion

population is optional and therefore need not receive <u>any</u> coverage.  As the Secretary indicated in

the reapproval letter, Kentucky HEALTH should be viewed "in the context of a state's

substantial discretion" to eliminate coverage for the expansion population.  <u>See</u> AR 6731; <u>see</u>

<u>also</u> Tr. at 18, 52.  A demonstration that shrinks coverage may thus be coverage promoting for

the purposes of § 1115 as long as the state threatens that if the demonstration is not approved, it

will discontinue coverage entirely.  <u>See</u> HHS MSJ at 18–20; AR 6729.

This contention is both inconsistent with the Medicaid Act and arbitrary and capricious.

<u>See Agape Church, Inc. v. FCC</u>, 738 F.3d 397, 410 (D.C. Cir. 2013) ("The analysis of disputed

agency action under <u>Chevron</u> Step Two and arbitrary and capricious review is often 'the same,

because under Chevron Step Two, [the court asks] whether an agency interpretation is arbitrary

or capricious in substance.'").  As an initial matter, Defendants are incorrect that a state has

additional discretion to diminish or condition eligibility for the expansion — as opposed to the

traditional — population.  Relying in part on <u>NFIB</u>, they repeatedly assert that Kentucky has the

prerogative to de-expand.  <u>See</u> HHS MSJ at 4, 6, 18, 19–20; Kentucky MSJ at 13; <u>see also</u> Tr. at

13, 18, 54.  That may well be correct.  But the privilege Kentucky seeks to exercise here is not to

de-expand, but rather to implement the ACA expansion as an *à la carte* exercise, picking and

choosing which of Congress's mandates it wishes to implement.  <u>NFIB</u> did not sanction that.

Rather, the Court was very clear: "Nothing in [<u>NFIB</u>] precludes Congress from offering funds

under the Affordable Care Act to expand the availability of health care, and requiring that States

accepting such funds comply with the conditions on their use."  567 U.S. at 585.  The case held

only that Congress was "not free . . . to penalize States that choose not to participate in [the expansion] by taking away their existing Medicaid funding." Id. That is, the Court held that, as with traditional Medicaid, Congress may impose requirements on the states for the use of expansion funds. Nothing in that analysis allows for "additional discretion" in how the states comply with Medicaid requirements for the expansion population as compared to the traditional one.

While Defendants thus err in positing that their treatment of the expansion population is undergirded with any greater discretion than their administration of any other part of the Medicaid program, their arguments about flexibility *vis-à-vis* the expansion population are ultimately a red herring. That is so because the entire Medicaid program is optional for states. The Court does not see why — if Defendants are correct that threats to terminate the expansion program can supply the baseline for the Secretary's § 1115 review — that argument would not be equally good as applied to traditional Medicaid. Their argument must thus posit that any § 1115 program that maintains any coverage for any set of individuals promotes the objectives of the Medicaid Act as long as the state threatens to terminate all of Medicaid in the absence of waiver approval.

Taken to its logical conclusion, the Secretary's position thus makes little sense. Under his reasoning, states may threaten that they wish to de-expand, or indeed do away with all of Medicaid — for fiscal reasons or no reason at all — if the Secretary does not approve whatever waiver of whatever Medicaid requirements they wish to obtain. The Secretary could then always approve those waivers, no matter how few people remain on Medicaid thereafter because any waiver would be coverage promoting compared to a world in which the state offers no coverage at all. Remarkably, when asked for a limiting principle to this proposition during oral argument,

Defendants did not give one.  See Tr. at 9–11, 13–14.  Could a state decide it did not wish to cover pregnant women?  The blind?  All but 100 people currently on its Medicaid rolls?  The Secretary offers no reason that his position would not allow for any of those results.

Not only does Defendants' position entail radical results, but it is also inconsistent with the text of § 1115.  The statute requires the Secretary to evaluate whether the project will promote the objectives of the Act.  See 42 U.S.C. § 1315; see also Tr. at 35, 38–39.  Against what baseline is he supposed to evaluate the project?  The structure of the waiver provision assumes the implementation of the Act.  It confirms that the relevant baseline is whether the waiver will still promote the objectives of the Act as compared to compliance with the statute's requirements, not as compared with a hypothetical future universe where there is no Act.  This is so because the overarching provision authorizing these waivers stipulates that, if the Secretary makes a judgment that a demonstration promotes the objectives of the Act, he may then waive compliance with certain of its provisions "to the extent and for the period necessary" to carry out the project.  See 42 U.S.C. § 1315(a), (a)(1).  That is, the provision contemplates a limited waiver.  It would make little sense to have such waiver authority and limitations where the relevant consideration was not full compliance with the Act's requirements but instead no engagement whatsoever in the program.

The Court, furthermore, need not exclude the possibility that fiscal considerations are ever permissible in any context to reject the staggering breadth of the argument that Defendants present here.  To summarize, their central contention is that, where a state threatens to discontinue Medicaid coverage entirely, any waiver approval would promote coverage.  The argument does not depend on dealing with the expansion population; it is equally applicable to traditional Medicaid.  It does not depend on a state's being in a fiscally precarious position

because it does not take into account the reason the state wants to discontinue participating in the

Medicaid program.  It is not subject to any kind of limiting principle.  The Secretary's

interpretation constitutes "an impermissible construction of the statute . . . because [it] is utterly

unreasonable in" its "breadth" — "nothing in this record . . . indicate[s] that Congress

empowered the agency to effect" such a sweeping authority.  See Aid Ass'n for Lutherans v.

U.S. Postal Serv., 321 F.3d 1166, 1178 (D.C. Cir. 2003).  Its interpretation is therefore "arbitrary

[and] capricious in substance."  See Agape Church, 738 F.3d at 410.  That provision of the Act

does not turn the comprehensive Medicaid program that Congress designed into a buffet for

states.  Defendants' remarkable interpretation of Section 1115 thus cannot stand.

In finding the Secretary's position unreasonable, the Court does not suggest that the

agency may never consider the fiscal sustainability of the Medicaid program.  He very well

might properly assess whether a more efficient way of administering a state's Medicaid program

would save resources or whether, as in Thompson, a state might save money by continuing to

deliver mandatory care to mandatory populations while restricting precisely which kinds of tests

or medications are available, for example.  Those considerations are not incompatible with the

prime objective of the Act being the furnishing of medical assistance.  But that is not the exercise

the Secretary engaged in here.

3.  Relief

Where a court concludes that an agency's action is unlawful, "the practice . . . is

ordinarily to vacate the rule."  Ill. Pub. Telecomms. Ass'n v. FCC, 123 F.3d 693, 693 (D.C. Cir.

1997).  Defendants, however, protest that any relief should be limited to Plaintiffs here, rather

than all Kentuckians who would lose coverage.  See HHS MSJ at 41–42.  In support, they

contend that "[t]here is no equitable reason to disrupt the statewide implementation of Kentucky

HEALTH and thus jeopardize the expansion coverage for hundreds of thousands of individuals who are not before this Court." Id.  The cases Defendants cite, however, merely concern equitable discretion in fashioning remedies or the need, for standing purposes, for a plaintiff's remedy to be tailored to her injury.  While the Court does retain discretion in granting relief under the APA, Defendants offer no reason that, in this case, it should depart from the ordinary practice of vacating the agency action found unlawful under the APA.

Even weighing the harms, as Defendants suggest, the balance does not net out in their favor.  Indeed, while vacatur is warranted based on procedural deficiencies in the approval, as opposed to the Court's analysis of the merits of Kentucky HEALTH, it is worth noting here that many of Plaintiffs' objections to the program hinge on their concern that the demonstration project would cause a great deal of harm.  In other words, the Court's holding turns on the Secretary's inadequate analysis of the likelihood of coverage loss and its consequences.  In light of that, it is likely that vacatur would inflict less harm than allowing the project to take effect. As the Court explains in its Opinion today in Gresham v. Azar, No. 18-1900, Slip Opinion at 27– 28, 32 (Mar. 27, 2019), the loss of Medicaid coverage is a substantial burden on Plaintiffs and others like them.

There is another exception to the ordinary course of vacatur under the APA, which Defendants do not press but the Court nevertheless considers.  "[A]lthough vacatur is the normal remedy, [courts] sometimes decline to vacate," Allina Health Servs. v. Sebelius, 746 F.3d 1102, 1110 (D.C. Cir. 2014), depending on the "seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly) and the disruptive consequences of an interim change."  Allied-Signal, Inc. v. U.S. Nuclear Reg. Comm'n, 988 F.2d 146, 150–51 (D.C.

Cir. 1993) (citation omitted).  As before, "[n]either factor favors the Government."  Stewart I,
313 F. Supp. 3d at 273.

Failure to consider an important aspect of the problem is a "major shortcoming[]"
generally warranting vacatur.  Human Soc'y, 865 F.3d at 614–15; see also SecurityPoint
Holdings, Inc. v. TSA, 867 F.3d 180, 185 (D.C. Cir. 2017); Wedgewood Village Pharmacy v.
DEA, 509 F.3d 541, 552–53 (D.C. Cir. 2007).  Stewart I offered clear guidance that Section
1115 mandated that coverage considerations be a central part of the analysis.  Rather than follow
that direction, the Secretary doubled down on his consideration of other aims of the Medicaid
Act.  Given a second failure to adequately consider one of Medicaid's central objectives, the
Court has some question about HHS's ability to cure the defects in the approval.  Vacatur would
not, moreover, be especially disruptive.  Unlike in Arkansas, Kentucky HEALTH has yet to take
effect.  Far from there being "no apparent way to restore the status quo ante," Sugar Cane
Growers Co-op of Fla. v. Veneman, 289 F.3d 89, 97 (D.C. Cir. 2002), there has yet been no
departure.  The Court therefore still "believes that preserving the status quo . . . is appropriate."
Stewart I, 313 F. Supp. 3d at 273.

### C.  Other Issues

Plaintiffs raise a number of other issues, including that the Secretary acted in excess of
statutory authority; that the SMD letter is an improperly promulgated substantive rule that should
have been subject to notice and comment; and that they have a claim for relief under the Take
Care Clause.  As before, where Plaintiffs alleged a nearly identical set of additional claims, the
Court "need not tackle Plaintiffs' alternative bases for vacating some or all of the components"
of Kentucky HEALTH or the SMD letter "[b]ecause [it] invalidates [the entire] approval" of
Kentucky HEALTH.  Id. at 272.  Vacating the reapproval will give Plaintiffs all the relief they

seek.  "While those [other] questions may resurface on remand, they will not trouble the Court now."  Id.

## IV.   CONCLUSION

For these reasons, the Court will grant Plaintiffs' Motion for Summary Judgment on Count VIII.  It will also deny Defendants' Cross-Motions, vacate the Secretary's approval of Kentucky HEALTH, and remand to the agency.  A separate Order so stating will issue this day.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date:  March 27, 2019